STATE OF NORTH CAROLINA      IN THE COURT OF GENERAL JUSTICE
CABARRUS COUNTY            SUPERIOR COURT DIVISION

STATE OF NORTH CAROLINA      )
                                   )
                                   )      **CASE NOS:**
                                   )
                                   )      76 CR 5708 & 76 CR 5709
        v.                           )
                                   )
RONNIE WALLACE LONG,           )
                                   )
        **Defendant.**              )

EXHIBIT

D

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### MOTION FOR APPROPRIATE RELIEF
### N.C. Gen. Stat. § 15A-1415 (b) (3), (8) & (c)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

NOW COMES the defendant, Ronnie Wallace Long, and moves the Court for appropriate relief pursuant to:

1.      **N.C. Gen. Stat. § 15A-1415 (b) (3) on the grounds that Ronnie Wallace Long's conviction was obtained in violation of the Constitution of the United States and the Constitution of North Carolina in that the State failed to disclose exculpatory material to the defense in violation of defendant's right to a fair trial under the due process clause of the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 19 of the North Carolina Constitution; and**

2.      **N.C. Gen. Stat. § 15A-1415 (c) on the ground that new evidence is available which was unknown or unavailable to the defendant at the time of trial, which could not with due diligence have been discovered at that time and which has a direct and material bearing upon defendant's guilt or innocence; and**

3.      **N.C. Gen. Stat. § 15A-1415 (b) (8), on the ground that Mr. Long's Judgments and Commitments should be corrected and amended to specifically state that Mr. Long shall "be imprisoned for a term of 80 years in the State's prison" in accordance with N.C. Gen. Stat. § 14-2 which was in effect at the time that he was sentenced in October of 1976; and**

1

4.    N.C. Gen. Stat. §15A-1415 (b) (7) & (b) (8), on the ground that the sentence imposed upon Mr. Long is invalid as a matter of law due to significant changes in North Carolina's sentencing law.

## PROCEDURAL HISTORY

On October 1, 1976, Ronnie Wallace Long ("Mr. Long") was convicted in Cabarrus County Superior Court, the Honorable William Z. Wood presiding, of one count of first-degree rape and one count of first-degree burglary. He was sentenced to two concurrent life sentences. Mr. Long's appeal (State v. Long, 293 N.C. 286; 237 S.E.2d 728 (1977)) and his 1987 state petition for post-conviction relief on the grounds of ineffective assistance of counsel and racial discrimination in the selection of the jury was denied.

On May 25, 2005, the Honorable Erwin Spainhour granted Mr. Long's Motion to Locate and Preserve Evidence (the "Preservation Order", Ex. A). As part of that order, the Cabarrus County District Attorney's Office (the "District Attorney's Office"), the Concord City Police Department (the "Concord Police Department") and the N.C. State Bureau of Investigation (the "SBI") were ordered, *inter alia*, to:

1.    Submit for inspection "the records of their evidence custodians relating to any and all evidence collected in [State v. Long];" and

2.    "Provide defense counsel with copies of all test results or reports prepared in connection with this matter."

On June 16, 2005, the parties reconvened before the Court for law enforcement to report to the Court on their efforts to locate evidence and to be heard on Mr. Long's Motion for DNA testing (the "DNA Motion"). In the DNA motion, Mr. Long requested, among other things, that the

2

toboggan which was introduced against him at his trial, and which contains hair that can be seen by the naked eye and is reddish in color, be submitted for DNA testing.

At the June 16th hearing, pursuant to the Preservation Order, the SBI reported that "the only evidence found by the SBI that pertains to these matters is a latent shoe print that was used to link the defendant to these crimes." (Ex. B ¶ 5.) Order of the Hon. Erwin Spainhour dated June 17, 2005, the "DNA Order"). Further, the Concord Police Department reported that the only item found in their possession relating to this case was the master case file, consisting entirely of paper work and a spiral notebook listing various items of evidence that were "not specific to this case." (Ex. B ¶ 6.) The District Attorney told the Court that she had reviewed the police department file and there was nothing in it of evidentiary value. Even though the Court denied the DNA Motion, finding that any testing done on the hair could not conclusively exonerate Mr. Long and that the evidence was "not sufficient, as a matter of law, to compel DNA testing to prevent manifest injustice", the DNA Order included a direction that defense counsel be permitted to examine the master case file and the spiral notebook in the possession of the Concord Police Department.

On its own initiative, this Court, by order dated June 7, 2005, directed NorthEast Medical Center to locate and preserve all biological evidence in the hospital's possession and to provide the Court with a descriptive inventory of such evidence. Northeast Medical Center, by letter dated June 5, 2007, indicated they turned everything over to the Concord Police Department on April 26, 1976. A copy of this Court's order and the Northeast Medical Center letter are annexed collectively hereto as Exhibit C. By letter of this Court to the undersigned dated July 12, 2005 (Ex. D), counsel was provided with certain medical records of the victim which were provided to the Court by NorthEast Medical Center. This Court reviewed *in camera* 26 pages of medical records, redacted certain

3

portions and then provided 11 remaining pages to counsel.[1]  The medical records indicate that Dr. Lance Monroe, the physician who examined the victim at the hospital on the night of the crime:

> (a) combed the victim's pubic hair and put it into a plastic bag;
>
> (b) took fluid from the victim's vaginal vault and placed it on a slide by wet preparation;
>
> (c) took additional secretions from the vaginal vault and placed them on two slides for dried preparations; and
>
> (d) took a portion of the fluid found in the vagina and placed it on two swabs which were then placed into a test tube and stoppered.

Counsel found in the medical records a document entitled "Authorization for Release of Rape Information, Specimens & Photographs", dated April 26, 1976, which indicated the "combed pubic hair [of the victim] in plastic bag" and "1 test tube with vaginal swabs and secretions" were released to Marshall J. Lee of the Concord Police Department.  (Ex. E).[2]

As discussed more fully below, when counsel examined the Concord Police Department master case file, we discovered that certain physical evidence was personally delivered by Concord Police Detective Van Isenhour on May 11, 1976 to the SBI lab for testing. With the assistance of the North Carolina Center on Actual Innocence and based on the efforts of SBI Agent Bill Weiss, in January of 2006 the SBI test results – exculpatory in nature – were delivered to counsel.

Based on that finding and other information that came to light, on March 15, 2007, counsel filed another Motion to Locate and Preserve Evidence, requesting an order be issued to UNC Hospitals to search for any test reports relating to any biological evidence in this case, including but

---

[1] To protect the victim's privacy, her medical records are not annexed to this motion. However, since the Court has possession of them, it is respectfully requested they be considered part of the record.

[2] This Court also ordered the search of a storage unit which the Court learned might contain some of Dr. Monroe's records and other medical items. (Ex. F). Following the search, this Court issued an order, dated July 22, 2005, indicating that nothing was found in the premises relating to this matter. (Ex. G.)

4

not limited to serological testing, and to search for any tests that may have been conducted on the victim's clothing (the "UNC Motion", Ex. H). Based upon our investigation and research, undersigned counsel discovered that in the 1970s serological testing was frequently utilized to convict defendants of murder and/or rape.[3] While such testing was routinely conducted by the SBI, it was also conducted by what was then called North Carolina Memorial Hospital, located in Chapel Hill, North Carolina (now called UNC Hospitals). The District Attorney consented to the UNC Motion, and the Consent Order (Ex. I) was duly served upon UNC Hospitals on April 12, 2007. By Affidavit of Medical Record Custodian, dated April 26, 2007 (Ex. J), counsel was informed that after a diligent search, UNC Hospitals has no medical records in the name of the victim or Mr. Long.[4] Counsel has continued to try to determine if any serological testing was done by the SBI but our efforts have been to no avail to date.

Counsel also continued to search for the victim's clothing with the assistance of Concord Police Sgt. Robert Ledwell. Sgt. Ledwell informed us that he looked in the "old" evidence room on several occasions, including a search of that room just before the Concord Police Department moved into its new headquarters. The clothing has not been found and counsel does not know whether, at some point in time, it was misplaced, lost or destroyed. In addition, counsel has continued to search for the SBI evidence log-in book, which should show all of the evidence that was sent in this case to the SBI for testing but, once again, our efforts have been to no avail. Based upon the exculpatory evidence that has been found, counsel seeks a new trial for Mr. Long.

---

[3] See, e.g., State v. Gray, 292 N.C. 270, 233 S.E.2d 905 (1977); State v. King, 287 N.C. 645, 215 S.E.2d 540 (1975); State v. Woods, 286 N.C. 612, 213 S.E.d 214 (1975).

[4] The victim's medical records indicated that a blood sample was taken from the victim on the night of the crime and sent to the Department of Pathology at UNC Hospitals to be tested for ethanol and "other volatiles". Those tests were negative.

## STATEMENT OF FACTS

### Introduction

On May 10, 1976, Mr. Long, a nineteen year old cement mason from Concord, North Carolina, with no prior felony record appeared in Cabarrus County District Court, accompanied by his father, on a misdemeanor trespass charge. The trespass case was dismissed and he returned home where he lived with his parents and where he grew up with his seven brothers and sisters.

That evening, Sgt. David Taylor and Officer Marshall Lee of the Concord Police Department went to Mr. Long's home and asked him to come to the station to "straighten out [a] trespassing warrant." (Trial Tr. 215.) Mr. Long voluntarily drove to the police station, believing he was going to attend to some unfinished paperwork related to his morning court appearance on the dismissed trespass charge. Unbeknownst to him, he was a suspect in a rape case and he would never go home again. He was taken into the State's custody that evening and there he has remained for the past thirty two years.

On October 1, 1976, within six months of his arrest, Mr. Long was tried and convicted of burglary and of the rape of a prominent white woman in her historic downtown Concord home.[5] From the outset of this case, Mr. Long has consistently maintained his innocence. Indeed, his continued profession of innocence has helped to keep him incarcerated: the North Carolina Parole Board has denied him parole because he refuses to admit his "guilt" and participate in a sex offender treatment program (Ex. K).

---

[5] At trial, Mr. Long was represented by the law firm of Chambers, Ferguson, Stein and Wallace (the "Chambers Firm"). His lead trial attorneys were James Fuller ("Mr. Fuller") and Karl Adkins ("Mr. Adkins). Their lead investigator in this case was Les Burns ("Mr. Burns"). See the accompanying affidavits of Mr. Fuller, Mr. Adkins and Mr. Burns.

6

## The State's Case

The State's case at trial relied almost entirely on the testimony of the victim. She testified that on April 25, 1976, she was attacked and raped in her home by an individual she described to the police just after the crime occurred as:

> "A black male, height, five foot five to five foot nine, slender build, slim hips. Subject was plain spoken, used correct English and at times spoke very softly. No speech defect, accent, or noticeable brogue evident. Subject was wearing a dark waist length leather jacket, blue jeans with a dark toboggan pulled over his head. Could possibly have been wearing gloves." (Trial Tr. 179, 243-44, Ex. L.)

That description did not include any mention of the perpetrator having any kind of facial hair. (Trial Tr. 243.) A police photograph taken of Mr. Long on April 30, 1976 reveals that he wore a moustache and a "scruffy beard" at that time. (Trial Tr. 247; State's Ex. 10; State's Ex. 11.) [6]

During the attack, the victim's assailant threatened her with a knife, and beat and raped her. (Trial Tr. 8-18) She testified she struggled and fought for her life (Trial Tr. 15, 16, 71, 113, 119); that her assailant continually yelled, "don't look at my face" (Trial Tr. 9); and that her assailant "kept pushing [her] face to the side, holding [her] face with his hand" (Trial Tr. 78). The victim also testified that she was very frightened, so frightened that "[she] had no idea [she]'d ever get out alive. There was no way. [She] couldn't see any way of ever getting out." (Trial Tr. 6, 9, 12, 13, 42, 44, 116.) As soon as her assailant fled the scene, the victim ran to a neighbor's house and reported the rape. (Trial Tr. 19.) She was admitted to the hospital almost immediately after the attack. (Trial Tr. 143-145.)

---

[6] On April 30, 1976, Mr. Long was arrested for allegedly trespassing in Caldwell Park, which was located right behind and adjacent to his parents' home where he lived at the time. Upon his arrest, his "mug shot" was taken. That photograph shows Mr. Long with sideburns, a moustache and a scruffy beard. The trespass charge was dismissed on May 10, 1976 – the day Mr. Long appeared in court and was identified by the victim.

7

Dr. Lance Monroe testified that he examined the victim on the night of the attack and that, in his opinion, the injuries he observed on the victim had been caused by "some sort of traumatic intercourse." (Trial Tr. 172). Dr. Monroe also described a slide he had made containing semen and sperm he had collected during a pelvic examination of the victim. (Trial Tr. 170-71.) There was no testimony by Dr. Monroe that numerous items of biological evidence, including pubic combings and no less than five samples of the bodily fluid of the perpetrator, were collected from the victim. (Trial Tr. 166-173.) There was also no testimony by Dr. Monroe or anyone else at the trial that the biological evidence was picked up from the hospital by Officer Lee of the Concord Police Department (see Trial Transcript).

While the victim was being treated in the hospital, the Concord Police Department conducted a full-scale investigation of the crime scene. Pursuant to that investigation, Detective Van Isenhour, who was the evidence custodian at the time, testified that he lifted a partial latent shoe print from one of the porch columns on the victim's home. He testified he had no way of knowing when the shoe print was made and that it could have been made as long as one month prior to the night of the rape. (Trial Tr. 291.) Detective Isenhour told the jury that he asked SBI Agent Dennis Mooney to conduct an examination and comparison of the impression taken from the crime scene to a set of shoe tracks taken on paper from shoes collected from Mr. Long on the day of his arrest. (Trial Tr. 288). Agent Mooney testified that he conducted the examination and comparison and that, in his opinion, the shoes taken from Mr. Long "could have made" the shoe track impression found at the scene. (Trial Tr. 297-98.) However, Agent Mooney also admitted that he could not say that the print "was made" by either of Mr. Long's shoes. (Trial Tr. 298-99.)

8

Both the defense and the jury were led to believe that the latent shoe print was the **only** piece of physical evidence recovered from the scene. At closing, the District Attorney's office made the following arguments:

- "Every word [the victim] uttered is fully and entirely corroborated by the evidence as was seen by the officers in her home . . . and the latent evidence found by the officers." (Trial Tr. 103-04.)

- "The man that made that footprint is the man that broke into her home." (Trial Tr. 109.)

- "Mrs. Bost's testimony is not only accurate, but totally consistent with **every piece of physical evidence existent.** Everything she says happened that is capable of being corroborated by physical evidence, corroboration, is so corroborated . . . **Every piece of physical evidence points unerringly to the fact that [the victim] told you exactly what happened that night unerringly."** (Trial Tr. 113, *emphasis added*.)

At trial, the only direct evidence introduced linking Mr. Long to the crime was the victim's eyewitness identification. The only scientific evidence introduced by the State was the latent shoe print that the State's own witness could not conclusively link to Mr. Long. The State also introduced as evidence against Mr. Long a black leather jacket he was wearing the day he was arrested, a pair of black leather gloves and a green toboggan that were recovered from the car he drove to the police station the day he was arrested. Mr. Long has consistently and persistently denied, from the beginning of this case, that the toboggan belonged to him and testified he had never seen it before. (Trial Tr. 218.) At the trial, defense counsel elicited from Sgt. Taylor that the hairs that can be seen in the toboggan are light in color. (Trial Tr. 310.) Mr. Long is an African American whose hair was and is black.

## The Identification Evidence and Procedure

On May 5, 1976, ten days after the crime occurred, Sgt. Taylor and Lt. George Vogler went to the victim's home and told her, "it would be necessary for her to go to district court on May 10, 1976

9

at 9:30 a.m. to observe all persons in the courtroom", stating that "we don't know, we have reason to believe that maybe this day, or in a couple of days if you would come. . .that there might be a man in the courtroom that [she] could identify. . .as the man who raped [her]"; and to "watch carefully for, and see if she could recognize, the person who broke in on her April 25, 1976 and raped her." (Trial Tr. 20-21, 181.) She was told, "they had reason to believe there might be somebody there that [she] could recognize . . . as the man who raped me." (Trial Tr. 21, 45-46.)

Sgt. Taylor and Lt. Vogler picked the victim up the morning of May 10th – fifteen days after the crime occurred - and escorted her to the courtroom. (Trial Tr. 25, 183.) Mr. Long was scheduled to appear in court that morning for the alleged trespass violation. (Trial Tr. 214.) She stated she was instructed by the officers "to sit there and to look around and see if I saw anybody that I knew, or the man that raped me, and I did that. Before I came down to be seated, I looked around to see if I could see any black person and I saw a few". (Trial Tr. 27.)

The victim testified there were 35- 50 people in the courtroom that day (Trial Tr. 27) and "there were some blacks in there, like maybe, a dozen". (Trial Tr. 27-28.) She also testified that the judge asked people who did not have a lawyer to line up front and pick up some papers (Trial Tr. 28), and that "maybe two of them were black" (Trial Tr. 28-29). She testified on cross examination that one of the black men in the courtroom was "very light, and tall, and all stooped over . . . and I noticed several in the audience that had afros" (Trial Tr. 45-46). When asked if she saw "anybody that even closely resembled [the suspect] in the court room?" she answered, "no." (Trial Tr. 46.)

She testified she sat in the courtroom "constantly looking around" (Trial Tr. 29) for about an hour or an hour and a half before Mr. Long's case was called. (Trial Tr. 48-49, 127). She testified she did not see Mr. Long during the entire time she was looking around. (Trial Tr. 28). She also

10

stated that in her mind *she knew why she was asked to go to court that day.* (Trial Tr. 129, *emphasis added*). The victim testified that the judge "asked for Ronnie Wallace Long to come before ... come up" (Trial Tr. 29), and that she recognized Mr. Long as he was walking toward the judge with his father (Trial Tr. 30, 51-52). She testified she indicated to her friend "that's the one", but also indicated that she saw Lt. Vogler and Sgt. Taylor sitting in the jury box (Trial Tr. 30), even though she claimed "she didn't really look at them until after I realized that I had recognized him" (Trial Tr. 30-31). The trial testimony indicates that Sgt. Taylor observed where Mr. Long was sitting in the courtroom, and noticed that his father was sitting beside him. (Trial Tr. 184-185.) Sgt. Taylor was also observing the victim. (Trial Tr. 185-186.) Before leaving the courtroom, the officers asked the victim if she was "sure" and she said "yes", that there was "no doubt in my mind. Absolutely no doubt". (Trial Tr. 33).

About 15 or 20 twenty minutes after the courtroom identification (Trial Tr. 49), the officers took the victim to the police station and showed her 6 or 8 pictures. The victim testified "I picked him out". (Trial Tr. 33, 50.) However, she also testified that one of the people in the photo array "looked like it might have been a woman". (Trial Tr. 34.) Additionally, she was asked at trial if "there was anything distinctive about the dress of any individuals depicted in those photographs that drew your attention to them", and she replied "It was the jacket...it was the identical, one identical to it. It was a leather jacket". (Trial Tr. 35.) She testified that Mr. Long was the only one in any of the pictures that had on a black leather jacket. (Trial Tr. 53.)

The victim testified that she was not sure if the police told her Mr. Long's name before she saw him in the courtroom or at the follow-up photo array (Trial Tr. 52). She wavered in her testimony as to whether or not she knew the name of Mr. Long before the judge called his case in the

11

courtroom that day, and also wavered about whether or not the police told her Mr. Long's name before she viewed the photo array. (Trial Tr. 51-53.) She testified that "they could have [asked her to pick out Ronnie Long] but I don't know, I don't remember finding out, even finding out that when, what his name was really". (Trial Tr. 53.)

During the trial, the victim pointed to Mr. Long from the witness stand and identified him as her assailant. (Trial Tr. 20.) She said there was no doubt in her mind whatsoever that it was him. (Trial Tr. 40, 187.) The State also had her examine Mr. Long's photograph a second time from the witness stand. (Trial Tr. 40.) Despite her alleged certainty, the victim admitted she never visited in black people's homes (Trial Tr. 130-131); did not have black people ever visit in her home (Trial Tr., 131); and said she did not know very many black people and did not have much experience with them (Trial Tr. 131-133). The victim also testified that she was very frightened, so frightened that "[she] had no idea [she]'d ever get out alive. There was no way. [She] couldn't see any way of ever getting out." (Trial Tr. 42.) She said her assailant threatened her with a knife while repeatedly yelling "don't look at me" and shoving her head to the side so that she could not get a good look at his face. (Trial Tr. 9,78.)

### The Defense Case

Mr. Long's trial counsel put forth an alibi defense, calling several witnesses who testified that he had spent the afternoon planning a high school reunion party (Trial Tr. 311-12, 316-17, 322-23, 329, 377); spent time at home in the evening (at the time of the attack of the victim) talking to his girlfriend and young son on the phone (Trial Tr. 338-43, 347-53); listened to music in his room (Trial Tr. 352); and then, around 10:00 p.m., drove with a friend to a party in Charlotte (Trial Tr. 362, 377). The victim testified that the attack occurred around 9:30-9:45 p.m. when witnesses

12

testified Mr. Long was at home. (Trial Tr. 5, 40-41, 338-43, 347-53.) Other witnesses testified that they did not observe any scratches or injuries on Mr. Long or any scratches on his jacket that night at the party. (Trial Tr. 325, 330.)

The trial transcript reflects that on both cross examination and in their summations, the defense attempted to challenge the accuracy of the victim's identification by demonstrating that she had little to no interaction with African-Americans. They pointed out that: her initial description of the perpetrator did not resemble Mr. Long or include a description of the perpetrator having facial hair; she was terribly frightened; she had a knife to her throat; it took her a long time to identify Mr. Long even though she sat in the courtroom for an hour or more looking for him; she initially told the police her attacker was black but then changed her testimony to "light skinned" or "yellow looking"; she recognized Mr. Long because he was wearing a leather jacket; the toboggan hid the perpetrator's face; she was, understandably, extremely emotionally upset. The defense also pointed to the lack of physical evidence connecting Mr. Long to the crime: SBI Agent Dennis Mooney admitted that he could not say that the latent shoe print was made by Mr. Long's shoes; there was no paint on the leather jacket or leather gloves; there were no scratches on Mr. Long or his jacket even though the victim admitted she fought her assailant; the hair that could be seen in the toboggan was light in color as opposed to the black hair of Mr. Long; and no blood was found on Mr. Long's clothing. Trial counsel did not have the medical records of the victim and, of course, were unaware of the existence of exculpatory evidence.

### New Evidence

As a result of this Court's order directing that counsel be allowed to examine the master case file and the work of Sgt. Robert Ledwell of the Concord Police Department, it is now known that on

13

the night of and the day after the crime occurred, the police collected certain physical evidence, including a "suspect hair" found at the bottom of the stairs where the rape took place, the clothing the victim was wearing when she was attacked, paint samples from the porch banister believed to have been scaled by the perpetrator, and carpet fibers from the victim's home. The summaries of the physical evidence collected, which were found by current counsel in the master case file, are attached hereto collectively as Exhibit M.

In addition, the master case file revealed that almost all of the physical evidence was sent to the SBI for forensic examination. A copy of the evidence sent to the SBI and the requests for various tests to be conducted is annexed hereto as Exhibit N. These documents show that, in addition to the shoe print evidence that was introduced at trial, Mr. Long's jacket, gloves and the toboggan attributed as belonging to him by the police were personally delivered by Detective Isenhour to the SBI on May 11, 1976 to be analyzed for the presence of paint, carpet fibers or the victim's hair. While photographs of the victim's clothing, which was torn from her body by her assailant, were introduced at trial (State's Ex. 3), the actual items of clothing (which included her housecoat, pants, underwear, pantyhose and bedroom slippers) were not. However, the victim's clothing was delivered to the SBI for analysis to look for the presence of Mr. Long's head and pubic hair. Matchbooks taken from Mr. Long's vehicle on the day of his arrest were asked to be compared with burned matches found in the victim's residence on the night of the crime. Finally, Mr. Long's head and pubic hair were delivered for comparison with the hair found in the hallway at the base of the stairs where the victim was raped. The SBI reports indicate that after the evidence was tested, it was to be retrieved personally from the SBI by Detective Isenhour. (Ex.O). Counsel has been unable to discover what happened to the evidence after it was released by the SBI to Detective Isenhour..

14

The master case file did not contain any SBI test reports. Despite the SBI's initial letter to this Court on June 16, 2005, indicating they had no records of any testing done in this case aside from the latent shoe print introduced at trial (Ex. P), the master case file indicated the SBI tested physical evidence. With the assistance of the North Carolina Center on Actual Innocence, the SBI was urged to look for the test reports which were found and provided to defense counsel in January of 2006. A copy of the SBI test reports are annexed as follows: a report by Examiner Glen Glense, dated May 19, 1976 (Ex. O); a report by Examiner R.D. Cone, dated May 14, 1976 (Ex. Q); and a report by Examiner Dennis Mooney, dated May 19, 1976 (Ex. R). *The test results are astounding for none of them show any match to Mr. Long. Rather all of the SBI results pointed in the opposite direction- the physical evidence in this case strongly pointed to Mr. Long's innocence. Just as astounding is the fact that none of this evidence was introduced at trial because Mr. Long's trial attorneys were completely unaware that it had been collected, sent to the SBI and tested.*[7]

The SBI reports indicate that on May 11, 1976, Detective Isenhour personally submitted the following items to the SBI for testing:

     a.     one plastic bag containing a green toboggan;

     b.     one plastic bag containing a pair of black gloves;

     c.     one plastic bag containing a black leather jacket;

     d.     one plastic bag containing known head hair from Mr. Long;

     e.     one plastic bag containing known pubic hair from Mr. Long;

     f.     one glass test tube containing carpet fibers taken from the victim's home;

     g.     one glass test tube containing paint from the scene;

     h.     one plastic bag containing suspect hair from the scene;

     i.     one plastic bag containing known head and pubic hair from the victim;

---

[7] See the annexed affidavits of Mr. Fuller and Mr. Adkins.

15

j.     one plastic bag containing matchbooks;

k.     one plastic bag containing three partially burned matches; and

l.     one plastic bag containing the victim's clothing

(Ex. Q.)

Detective Isenhour requested that the SBI conduct a comparison of the suspect hair found at the scene with the hair samples taken from the Mr. Long. Examiner Glense's report indicates the following analysis: **"Microscopic examination and comparison of the hair found at the scene .. . showed it to be different from the suspect's hair . . ."** (Ex. O.) The examiner's notes further indicate that the hair found at the scene was "more reddish" with a "heavier pigmentation" while Mr. Long's hair was "more brownish gray" with "more scattered pigment." The medulla of the hair found at the crime scene was "wide" while the medulla of Mr. Long's hair was "narrow". The hair found at the scene was "more oval" while Mr. Long's hair was "flatter-ribbony". In his report, the examiner speculates that the hair found at the scene "may be negroid or ~~indian~~ (Mongolian)". The examiner specifically concluded that the hair found at the scene was "different from suspect's hair". (Ex. O).[8]

Detective Isenhour also requested an examination of the victim's clothing for hair and a comparison of any hair found with the hair taken from Mr. Long. Examiner Glense indicates the following result: **"No hair or hair fragments similar to the suspect's were found in the victim's clothing."** (Ex. O.)

Detective Isenhour further requested that the toboggan, the gloves and the leather jacket collected on the day of Mr. Long's arrest be examined for the presence of paint and carpet fibers to

---

[8] Interestingly, the hair found at the scene was "reddish" which is also the color of the hair in the toboggan that can be seen with the naked eye.

16

Case 1:16-cv-00539-CCE-LPA   Document 1-3   Filed 05/26/16   Page 16 of 47

see if there was a match to the paint and carpet fibers collected from the victim's home. Examiner Cone's report states the examination of Mr. Long's clothing **"failed to reveal the presence of any fibers or paint similar to those [submitted]."** (Ex. Q.)

Detective Isenhour requested a comparison of the matches found at the crime scene with the matchbooks allegedly found in Mr. Long's car. An examination of the matches **"failed to reveal sufficient identifying characteristics to allow the examiner to give an opinion with regard to their origin relative to the matchbooks..."** (Ex. Q. )

According to a separate report (Ex. R.), on that same date (May 11, 1976), Detective Isenhour also submitted to the SBI (a) one shoe track impression, and (b) two known shoe tracks on paper. He requested an examination and comparison of the impression taken from the crime scene to the shoe tracks taken on paper from shoes collected from Mr. Long on the day of his arrest. The written SBI shoe print report prepared by Examiner Mooney was never provided to trial counsel.[9] Only the latent shoe print from the scene (State's Ex. 13) and the shoe impressions from Mr. Long's shoes (State's Ex. 15A & 15B) were introduced as evidence at the trial. However, consistent with the testimony at trial, the May 19, 1976 report of Examiner Mooney notes that "there were an insufficient number of distinct characteristics noted by which to effect any identification." (Ex. R; see also Trial Tr. 297-99.) Detective Isenhour testified the prints found at the scene "could have been" made "a month ago" (meaning a month before the crime occurred). (Trial Tr. 270.)

There is not one scintilla of physical evidence connecting Mr. Long to this crime. *None of the SBI laboratory reports was ever disclosed to trial counsel.*[10] Mr. Long's trial attorneys were led to believe they had received "open file discovery." Indeed, that belief continued: on December 16th, 1987 at a hearing on Mr. Long's motion for post-conviction relief, then District Attorney James

---

[9] See the accompanying affidavit of Mr. Burns, Mr. Fuller and Mr. Adkins.
[10] See the accompanying affidavits of Mr. Burns, Mr. Fuller and Mr. Adkins.

"Bob" Roberts stated that his office provided "virtually an open file for [the] preparation of [the] defense." (See pp. 49-50 from a transcript of a 1988 hearing on Mr. Long's Motion for Appropriate Relief, annexed hereto as (Ex. S.) However, Mr. Burns, the lead investigator for trial counsel, kept his field file for 31 years and provided it to UNC Law Professor, Richard Rosen, in March of 2007.[11] That field file contains a copy of the complete discovery received by trial counsel (attached hereto as (Ex. T) which definitively shows that trial counsel was never informed of the testing of the evidence, much less the attendant results, by the SBI. Indeed, when comparing a copy of the discovery produced and contained in the Cabarrus County Clerk's Office file to the discovery kept in Mr. Burns' file, those discovery documents match page for page, word for word.

In addition, the testimony received at trial was *designed to affirmatively conceal* the fact that most of the physical evidence was taken for testing. When asked under oath at trial to name the items he took with him to the SBI on May 11, 1976, Detective Isenhour testified that he delivered Mr. Long's shoes, the inked impressions made from those shoes the day before and the latent lift he had found on the banister column of the victim's house, (Trial Tr. 265.) He further testified that the shoe print evidence never left his custody or control (Trial Tr. 265). However, it is clear from the report of Examiner Mooney that this evidence *was* left with the SBI for examination.

More importantly, Detective Isenhour utterly failed to disclose any of the other items that he took to the SBI *the same day he took the shoe print evidence.* Again, Detective Isenhour led the defense and the jury to believe that the toboggan, the leather jacket and the gloves had remained in his sole custody and control from the time it was collected until the day of the trial. (Trial Tr. 265, 282, 284-286, 288-289.) As one example, at trial Detective Isenhour was asked about the black leather jacket taken from Mr. Long at the police station on the day of his arrest. On direct

---

[11] See the accompanying affidavit of Mr. Burns.

18

Case 1:16-cv-00539-CCE-LPA   Document 1-3   Filed 05/26/16   Page 18 of 47

examination, ADA Ron Bowers asked Detective Isenhour, "Where has it [the black leather jacket] been since you received it?" He responded, "It has been in my custody and control." (Trial Tr. 289.) According to the SBI reports, the evidence (including the jacket) was delivered to the SBI on May 11, 1976 and left there until at least May 19th. The May 19th report of Examiner Glense indicates "Please notify Det. Isenhour when results is complete and he will pick up evidence". (Ex.O.) The May 19th report also indicates that the evidence was received by Examiner Cone from Detective Isenhour on May 11, 1976; that the evidence went to Examiner Glense for testing on May 14, 1976; and that the evidence was returned by Examiner Glense to Examiner Cone on May 17, 1976. (Ex.Q.)

Sgt. Taylor's testimony at trial also reveals an effort to avoid disclosure of the results of the SBI testing. On re-cross examination, after listing the items that were allegedly recovered from the car that Mr. Long drove to the police station, Sgt.Taylor was asked why the match box covers were taken into evidence. The following exchange takes place:

Q.     Why were the match box covers received?
A.     It was physical evidence we obtained from the scene to match with the matches we got out of the car.
Q.     Could you explain that, I didn't...
A.     We obtained some matches from the scene of the crime. Some matches that had been struck and lit, and we took matches of similar nature from his vehicle.
Q.     What kind of matches did you find?
A.     They were just paper matches.
Q.     Did they match?
A.     **I didn't match them, no, sir.**
Q.     Then they were not matched?
A.     **To my knowledge, they were not matched.**
Q.     In other words, the matches you got out of the car do not match with those found at the scene of the crime?

|              |                                                      |
|--------------|------------------------------------------------------|
| MR. BOWERS:  | Objection.                                           |
| COURT:       | Overruled.                                           |
| THE WITNESS: | I can't testify to that.                             |
| COURT:       | Do you have any information that they didn't match?  |

19

| THE WITNESS: | No, sir, they didn't match. |
|---|---|
| COURT: | They didn't match. |

(Trial Tr. 208-209.) Not one word was said at trial that *the SBI* had conducted match tests and found the evidence to be insufficient to draw any conclusions. (See, Ex. Q.)

In addition to the hair and shoe samples taken from Mr. Long, the officers claimed that upon a search of the car (which Mr. Long had driven to the police station when asked to "come to the station to straighten out this [dismissed] trespassing warrant."), they found a green toboggan underneath the driver's seat. (Trial Tr. 237.) Mr. Long has consistently and persistently denied, from the beginning of this case, that the toboggan belonged to him and testified he had never seen it before. (Trial Tr. 218.) At the trial, defense counsel elicited from Sgt. Taylor that the hairs that can be seen in the toboggan are light in color. (Trial Tr. 310.) This statement is validated by the SBI report indicating that the hair found at the scene was "more reddish" than the hair of Mr. Long. (Ex. O.)

The victim's hospital records were not provided to trial counsel.[12] According to the medical records, numerous items of physical evidence, including pubic combings and *no less than five samples* of the bodily fluid of the perpetrator, were collected from the victim. The medical records show that on April 26, 1976, the biological evidence was picked up from the hospital by Officer Lee. There the trail ends. None of the medical evidence the hospital collected was introduced at trial nor was trial counsel aware it even been collected and made available to the investigating officers. Aside from the fact that five samples of bodily fluid were collected from the victim, the records also show that the victim's "wrists are markedly sore and swollen... occurred when she was trying to beat her assailant over the head with her hands and wrists"; and that her "fingernails are all sore and some of them have been bent backward which the patient thinks occurred when she was trying to scratch her assailant and fighting back". This is consistent with the victim's testimony that she fought and

---

[12] See the accompanying affidavits of Mr. Burns, Mr. Fuller and Mr. Adkins.

20

scuffled with, and scratched at her attacker. This evidence supports the alibi defense: no one saw scratches on Mr. Long or his jacket at the party he attended in Charlotte the night of the crime.

Although the evidence connecting Mr. Long to the crime was quantitatively small, the victim's identification at the trial had a dramatic impact on the jury. The victim pointed to Mr. Long and identified him as her assailant from the witness stand during the trial. (Trial Tr. 20.) She said there was no doubt in her mind whatsoever that it was him. (Trial Tr. 40, 187.) However, it is now well-established that identification evidence is suspect. This is especially true in this case.[13] Had trial counsel had the benefit of the exculpatory evidence, it is likely that evidence would have affected the outcome of the trial. The failure to provide Mr. Long's trial counsel with critical exculpatory evidence violates Mr. Long's federal and state constitutional rights.

## REASONS WHY THE MOTION FOR APPROPRIATE RELIEF SHOULD BE GRANTED

1.  **Mr. Long's conviction was obtained in violation of the Constitution of the United States and the Constitution of North Carolina in that the State of North Carolina failed to disclose exculpatory material to the defense in violation of Mr. Long's right to a fair trial under the due process clause of the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 19 of the North Carolina Constitution.**

A defendant may seek appropriate relief when his conviction was obtained in violation of the federal or state constitutions. N.C. Gen. Stat. § 15A-1415 (b) (3) (2007). At the time of his 1987 state petition for post-conviction relief, Mr. Long was not in a position to raise the constitutional claims presented by this motion due to the State's failure to disclose the exculpatory evidence in its possession in violation of the 5th and 14th Amendments to the United States Constitution and Article I, Section 19 of the North Carolina Constitution. The prosecution's failure to disclose exculpatory

---

[13] See discussion below at pp. 28-36.

evidence and the resulting prejudice to Mr. Long also constitute "good cause" under N.C. Gen. Stat. § 15A-1419 (b) (1).

A criminal defendant is entitled to exculpatory evidence in the hands of the State, and failure to disclose evidence favorable to the accused violates a defendant's right to due process when the evidence is material either to guilt or to punishment. U.S. Const. Amends. V, XIV; Const. of N.C. Art. I, §§ 18, 19, 23; Brady v. Maryland, 373 U.S. 83 (1963); State v. Canady, 355 N.C. 242, 559 S.E.2d 762 (2002); State v. Barber, 147 N.C. App. 69, 554 S.E.2d 413 (2001); State v. Bates, 348 N.C. 29, 497 S.E.2d 276 (1998).

Under *Brady*, favorable evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985); see also Mueller v. Angelone, 181 F.3d 557 (4th Cir. 1999), cert. denied, 527 U.S. 1065 (1999); State v. Canady, 355 N.C. 242, 559 S.E.2d 762 (2002). A "reasonable probability" of a different result is established when the government's suppression of evidence "undermines confidence in the outcome of the trial." Kyles v. Whitley, 514 U.S. 419, 434 (1995) (citing United States v. Bagley, 473 U.S. 667 (1985)); see also State v. Johnson, 165 N.C. App. 854; 559 S.E.2d 599 (2004). In order to establish materiality, it is not necessary to demonstrate that disclosure of the suppressed evidence would have resulted in acquittal nor is the test for materiality a "sufficiency of the evidence" test. Kyles, 514 U.S. at 434; Canady, 355 N.C. at 252, 559 S.E.2d at 767. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Strickler v. Greene, 527 U.S. 263, 280 (1999) (citing Kyles v. Whitley, 514 U.S. 419 (1995)). In determining whether undisclosed evidence is material, the court must consider the cumulative effect of all suppressed evidence, rather than considering each item of evidence individually. Kyles, 514 U.S. at 436. The duty to disclose

22

encompasses impeachment evidence as well as exculpatory evidence. United States v. Bagley, 473 U.S. 667 (1985); Giglio v. United States, 405 U.S. 150 (1972).

The State's affirmative duty to disclose *Brady* material extends beyond the prosecutor's office to include State investigative agencies, including the police. Kyles, 514 U.S. at 437-438. See, also, N.C. Consti. Art. IV, §18; State v. Smith, 337 N.C. 658, 447 S.E.2d 376 (1994)(the fact that a prosecutor does not know of the existence of exculpatory evidence is irrelevant since the presence of such evidence is imputed to the prosecution). In State v. Bates, 348 N.C. 29, 38, 497 S.E.2d 276, 281 (1998), the North Carolina Supreme Court held the "State's liability [under Brady] is 'not limited to information in the actual possession of the prosecutor and certainly extends to any in the possession of state agencies subject to judicial control." These rules, by extension, apply to records in the possession of the SBI and are especially critical if local law enforcement had knowledge of the substance of the information possessed by the SBI.

The Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 19 of the North Carolina Constitution prohibit the State from knowingly presenting false testimony. Giglio v. United States, 405 U.S. 150 (1972); Napue v. Illinois, 360 U.S. 264 (1959); State v. Boykin, 298 N.C. 687, 259 S.E.2d 883 (1979). In *Napue*, the United States Supreme Court held that a conviction obtained through the knowing use of false testimony by the prosecution violates due process. Napue, 360 U.S. at 269. This is true whether the prosecution solicited false testimony or simply allowed such testimony to pass uncorrected. Giglio, 405 U.S. at 153; Napue, 360 U.S. at 269. The Supreme Court has consistently held that the use of false testimony is material and violates due process when there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury". Kyles v. Whitley, 514 U.S. 419, 433 n.7 (1995) (quoting United States v. Agurs, 427 U.S. 97 (1976)). The defendant does not need to show the prosecuting attorney knew the testimony was false. Knowingly false or misleading testimony by law enforcement is

23

imputed to the prosecution. Longworth v. Ozmint, 377 F.3d 437 (4th Cir. 2004); Boyd v. French, 147 F.3d 319 (4th Cir. 1998).

## A. The Failure to Disclose Brady material:

Mr. Long was convicted after a trial in which the only direct evidence introduced to link him to the crime was the identification testimony of the victim. It is now clear that the reason for the paucity of evidence introduced at trial is that the remaining evidence gathered during the pre-trial investigation of this case *excludes* Mr. Long as a suspect. See McDowell v. Dixon, 858 F.2d 945 (4th Cir. 1988) (holding that the defendant was denied due process by the nondisclosure of evidence where the only direct evidence presented by the State at trial was an eyewitness identification; there was no evidence of matching fingerprints, bloodstains, body secretions, hair or fibers, and the withheld evidence was contradictory to the prosecution's case); cf., State v. Campbell, 133 N.C. App. 531, 515 S.E.2d 732 (1999), disc. review denied 351 N.C. 111, 540 S.E.2d 370 (1999) (where court denied *Brady* claim with respect to hair samples that were *never* tested and defendant confessed). It is equally clear that, absent disclosure of the exculpatory evidence, Mr. Long did not receive a fair trial and any confidence that might have existed in the verdict has clearly been undermined.

Current counsel discovered that the District Attorney's Office failed to disclose exculpatory evidence in the form of SBI laboratory reports that were available to the State *within days* of Mr. Long's arrest. Over the 32 years since the conviction was obtained, the State has not only failed to avail itself of numerous opportunities to disclose these reports, the District Attorney's Office has affirmatively led Mr. Long and his attorneys to believe that all existing records were disclosed and that the trial attorneys had received "open file" discovery pursuant to the policies of former Cabarrus County District Attorney James Roberts.[14] In Banks v. Dretke, 540 U.S. 668, 692 (2004), the United

---

[14] See the accompanying affidavits of Mr. Burns, Mr. Fuller and Mr. Adkins.

24

Case 1:16-cv-00539-CCE-LPA   Document 1-3   Filed 05/26/16   Page 24 of 47

States Supreme Court held that a defendant is entitled to rely upon the State's representation that the State follows an "open file" discovery policy in fulfillment of the defendant's statutory and constitutional rights to pretrial discovery, including *Brady* material. The Banks decision held defense counsel reasonably relied on the prosecutor's assertion that "the prosecutor's files were open" and "there was no need for a formal motion.". Banks at p. 692. See also, Stricker v. Greene, 527 U.S. 263, 283-284 (1999). Because of the stated "open file" policies of the District Attorney's office, Mr. Long's trial attorneys did not file a pre-trial discovery motion. They relied upon the prosecutor's assurances that all evidence collected had been disclosed to them and that all evidentiary documents had been provided to them. In addition, the prosecution's ongoing failure to disclose the exculpatory test results prevented Mr. Long from raising this issue as part of his 1987 Motion for Appropriate Relief.

In addition, the results of the SBI laboratory analysis were divided into distinct and separate reports, none of which was disclosed to trial counsel. While the latent shoe print testing was testified to at trial by Examiner Mooney, there was no disclosure before or during the trial about any of the other evidence that was delivered to the SBI *the very same day*, leading Mr. Long's trial attorneys and the jurors to believe the shoe print items were the only evidence submitted for testing. In fact, when asked under oath at trial to name the items he took with him to the SBI on May 11, 1976, Detective Isenhour testified that he delivered Mr. Long's shoes, the inked impressions made from those shoes the day before and the latent lift he had found on the banister column of the victim's house. (Trial Tr. 264-265.) Detective Isenhour did not mention any of the other items he took to the SBI *that same day*. Based on that testimony, the jury and defense counsel were clearly lead to believe that all of the other known evidence (the toboggan, gloves and the jacket) was always in the possession and control of Detective Isenhour. (Trial Tr. 255-293.)

What Sgt. Taylor *did not* tell the jury was that the matches were also sent to the SBI, leading them to believe the matches were not tested. His testimony indicates *he* didn't match them. He

never told the jury the SBI could not match them. Even though he stated they didn't match, his omission of how he knew there was no match kept trial counsel from finding out that other items were sent to the SBI. Both the testimony and the supposed "open file discovery" received by Mr. Long's attorneys caused them to believe there was only one test conducted. This, of course, was not true.

Had Mr. Long's trial attorneys been aware of the evidence collected and known of the favorable test results, they would have presented it, along with Mr. Long's alibi defense, at trial.[15] Not only would this evidence have helped support the alibi defense, it would have greatly aided the defense's position that the victim was mistaken in her identification of Mr. Long as the perpetrator. It could also have been used to guide the pre-trial investigation conducted by the trial team.

Taken together, the undisclosed SBI reports are powerful evidence supportive of Mr. Long's claim of innocence. While each of the test results contains material favorable to Mr. Long, the hair comparison is particularly poignant in light of the victim's testimony at trial regarding the attacker's skin color and in light of the orange/reddish hair that can be seen in the toboggan. The victim described the attacker as "light-skinned," "yellow," "not a real black man." (Trial Tr. 11, 122, 310). The SBI report indicates that the non-caucasian hair found at the very spot in the home where she was attacked "did not belong to Ronnie Long"; the hair was "possibly negroid or indian (Mongolian)"; and "more reddish" than the hair of Mr. Long. (Ex. O.) In addition to supporting Mr. Long's alibi and calling into question the accuracy of the victim's identification, the hair analysis report contained crucial information that could have led the defense investigation to other possible suspects who fit the description of a "yellow-looking" black man with "reddish hair" – a description that clearly does not fit Mr. Long. This evidence also supports Mr. Long's assertion that the toboggan was not his.

---

[15] See the accompanying affidavits of Mr. Fuller and Mr. Adkins.

26

The victim's testimony at trial established that she struggled and fought her attacker in a violent and physical scene. (Trial Tr. 71-72.) She also testified that she did not have occasion to "visit in the homes of black people" or to have "blacks visiting in [her] home." (Trial Tr. 132-33.)

In light of her testimony that she did not invite black people into her home, it is reasonable to assume that the hair found at the base of the stairs belonged to her attacker. It is also a reasonable assumption that the attacker would have left hair behind on the victim or her clothing. *The undisclosed report establishes that the hair found at the scene did not belong to Mr. Long.* (Ex. O.) The report further establishes that *none* of Mr. Long's hair was found on the victim's clothing.

The State alleged at trial that the perpetrator, wearing black gloves and a black leather jacket, entered the victim's home by scaling the painted covered porch banister (where the shoe print was lifted) and crawling through an open second story window. (Trial Tr. 277-79.) The paint was described as "broken." (Trial Tr. 264.) *None* of the items taken from Mr. Long contained any traces of the paint or carpet fibers taken from the victim's home. When viewed together with the lab reports, Mr. Long's black gloves and black jacket look less like the "perpetrator's clothes" and more like the African-American teenager "style of the times" that they were. (Trial Tr. 314-315, 318, 324, 331-332.)

Examiner Mooney was unable to conclude that Mr. Long's shoes were the same ones that made the shoe track impression at the crime scene. Detective Isenhour's incomplete testimony regarding what evidence he took to the SBI clearly left the jury with the impression that the shoe print was the *only* piece of evidence found at the scene. That, coupled with Officer Mooney's testimony that "State's Exhibit Number Thirteen [latent lift] could have been made by State's Exhibits Fifteen-A or Fifteen-B [Mr. Long's shoes]" (Trial Tr. 297-98), makes the shoe track impression a much more powerful piece of evidence than it would have been if it had been coupled with all of the negative test results that were withheld by the State. In addition to the misleading

27

testimony elicited at trial, the prosecution's closing arguments were designed to leave jurors with the misleading impression that the **only** physical evidence found at the scene was that latent shoe print they claimed provided a physical link between Mr. Long and the crime.

As the only party aware of the evidence that was undisclosed, the prosecutor was responsible for evaluating the cumulative effect of the suppressed evidence and had a duty to learn of any favorable evidence known to others acting on the government's behalf. The District Attorney's office knew or should have known about the existence of the SBI reports. They had a duty to learn of them and to disclose them to the defense. The District Attorney failed to turn over the reports, and even worse, affirmatively led the jury to believe at closing argument that they did not exist. The testimony offered by the prosecution, when at least one of the investigating officers knew of contrary evidence of which the defense was unaware, was false and misleading. Since Detective Isenhour, the chief evidence collector and evidence custodian, knew that he had taken other physical evidence to the SBI for testing, the State is deemed under Brady to have had knowledge of that information as well. The prosecution was obligated to disclose this evidence.

The prosecution's failure to provide exculpatory evidence, which trial counsel unequivocally states would have been brought to the jury's attention had counsel known then what we know now, is a direct and abhorrent violation of Mr. Long's constitutional rights that has resulted in actual prejudice to Mr. Long. It has deprived him of his constitutional right to due process and ultimately it has deprived him of his freedom. It is submitted that the result of his trial would have been different if this exculpatory evidence had been made available to the defense and presented to the jury.

28

## B. The Identification Evidence:

Scientific research now proves that identification testimony is one of the most unreliable types of evidence.[16] The only direct evidence introduced at trial was the victim's identification of Mr. Long as her attacker. Given that the attacker was a stranger to the victim, the undisclosed lab reports could have directly challenged the accuracy of the identification by the victim who said "he's the one".

Many psychological research studies of erroneous convictions have shown that mistaken eyewitness identification is the single largest cause of erroneous convictions.[17] Professor Elizabeth Loftus, a renowned identification researcher, discovered in her 2004 study of eligible jurors that they failed to understand the unreliability of factors that influence eyewitness identification.[18] In 1996, the United States Department of Justice Office and the National Institute of Justice released a report detailing 28 cases in which individuals convicted of various crimes were later exonerated by DNA testing. The report stated "In the majority of the cases, given the absence of DNA evidence at the trial, eyewitness testimony was the most compelling evidence. Clearly, however, those eyewitness identifications were wrong".[19] By 2000, attorney Barry Sheck and his colleagues, with the use of DNA, identified 62 erroneously convicted citizens, including eight who had been sentenced to death.[20] A total of 77 eyewitnesses had made confident but mistaken identification of 52 of the 62 unfortunate individuals. Unfortunately, in this case, DNA evidence cannot be located.

---

[16]  This body of knowledge was not available at the time of Mr. Long's trial nor was most of it available at the time of his 1987 MAR hearing.
[17]  See the reference list of studies included at the end of this motion which sets forth the full reference cites referred to in this section.
[18]  See, Loftus, O'Toole & Easterly
[19]  The report is titled "Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence After Trial", published by the United States Department of Justice Office of Justice Programs and the National Institute of Justice.
[20]  See, Sheck, Neufeld & Dwyer.

29

Based upon information undersigned counsel has gathered from two nationally prominent identification experts, Dr. Gary Wells of Iowa State University and Dr. Brian Cutler, formerly the Chairman of the Department of Psychology at UNC-Charlotte (who has recently moved to Canada), there are a number of critical factors present in this case which make the identification highly suspect. The specific factors are as follows:

(A) The Courtroom Identification Procedure: Controlled studies indicate that when an investigator knows the identity of the suspect, there is the possibility the investigator will advertently or inadvertently convey the suspect's identity to the eyewitness. Cues from the investigator serve as a form of confirmation for the eyewitness and create witness certainty.[21] The North Carolina Actual Innocence Commission has adopted guidelines for line-ups and photo arrays which require that the individual conducting the identification procedure not know which member of the array is the suspect. One of the recommendations released by the Innocence Commission contains the following provisions:

> b. Use an independent administrator. The individual conducting the photo or live lineup should be someone who does not know which member of the lineup is the suspect. When it is not possible to conduct a lineup with an independent investigator, the primary investigator must exercise extreme caution to avoid inadvertent signaling to the witness of the "correct" response. Technological tools, such as computer programs that can run photo lineups and record witness identifications without the presence of an investigator, may assist agencies with resource constraints. Additionally, agency personnel can be trained to assist with identification procedures... d. There should not be anyone present during the lineup procedure who knows the suspect's identity, except counsel, as required by law.

Studies also show that once an eyewitness has identified someone, any further identification is likely to be reinforced by the first identification.[22] It has also been shown that memory decays with

---

[21] See, e.g., Bradfield & Wells; Cutler & Fisher; Cutler & Penrod; Malpass & Devine; and Steblay, Dysart, Fulero & Lindsay.

[22] See, e.g., Bradfield & Wells, Steblay, Dysart, Fulero & Lindsay; and Wagenaar & Loftus.

30

time and the longer between the time of the crime and the identification, the less reliable the identification becomes.[23]

In this case, the initial identification procedure in no way resembled today's best practices, such as those embodied in the recent legislation from the 2007 North Carolina legislative session (*Eyewitness Identification Reform Act*) or those published by the Department of Justice. The police did not use either a carefully crafted line-up or photo array procedure. In essence, the courtroom identification procedure was a "show-up". The police did not give clear instructions to the victim indicating that the perpetrator might not be present in the courtroom. They also failed to use "fillers" – other persons known to be innocent but who resemble the perpetrator in physical appearance and who fit the initial description given by the victim. Instead, the police utilized a highly unusual and suggestive procedure in an uncontrolled environment with great potential for error.

The victim did not identify Mr. Long until 15 days after the crime occurred.[24] She was asked to go to court by the investigating officers, who told her they had reason to believe there might be somebody in the courthouse she could recognize. She testified that in her mind she knew why she was asked to go to court that day. The victim was escorted to the courthouse on a day selected by the same investigating officers. She looked around for a long time – an hour to an hour and a half- but did not identify Mr. Long during that entire time. She testified there was no one in the courtroom who resembled Mr. Long. In fact, among the 35-50 people in the courtroom that day, only about 12 were black and of those blacks, the victim noticed several with "afros" and one who was tall and stooped over. Sgt. Taylor and Lt. Vogler were sitting in the jury box as the victim looked around the courtroom. Sgt. Taylor observed where Mr. Long was sitting in the courtroom,

---

[23] See, e.g., Shapiro & Penrod; and Krafka & Penrod.
[24] The Court is respectfully referred to the Statement of Facts at pp. 9 to 12 with regard to factual statements contained in this section of the motion.

31

and noticed that his father was sitting beside him. Sgt. Taylor was also observing the victim. The investigators, sitting within the victim's purview, knew that Mr. Long was *their* prime suspect. It was only *when Mr. Long's name was called* and he approached the bench as a criminal defendant that she pointed him out.

Immediately thereafter at the police station, the victim was shown 6-8 photographs, including one of Mr. Long. That the victim identified Mr. Long from the photo array is not surprising. She had just identified him in court. Further, the photo array she was shown is suspect. She testified that one of the people in the photo array appeared to be a woman. More importantly, Mr. Long was the only person in the photo array who was wearing a leather jacket, the clothing she described as being worn by her assailant. She testified that she recognized Mr. Long because of the "identical" leather jacket. She also wavered in her testimony about whether or not she had been told the name of Mr. Long before she saw him in the courtroom or picked out his photo. The identification procedures used in this case not only fly in the face of proper procedures which are necessary to protect one against being wrongly accused of a crime, they make it highly likely that the victim's identification is erroneous.

   **(B)   Cross Racial Identification:**   Experiments have confirmed that cross-racial identification is one of the most unreliable. Researchers have concluded, across all studies, that witnesses are more likely to correctly identify someone from their own race, while witnesses are more likely to falsely identify someone from a different race. [25]

   The victim's initial description to the police does not match Mr. Long. There was no description of facial features, facial hair or skin color other than "black". However, at trial the victim testified the perpetrator's complexion was "yellow looking" as opposed to "a real blue black man". (Trial Tr. 11, 122) She also testified that when she identified Mr. Long in the courtroom he had

---

[25] See, e.g., Meissner & Brigham; Platz & Hosch; Cutler & Penrod; Handberg;and Loftus & O'Toole.

32

facial hair and was wearing a leather jacket. Then, 15 minutes later, at the police station she was presented a photo array containing a picture of Mr. Long with facial hair and wearing a leather jacket. Clearly, the victim matched what she observed about Mr. Long during the courtroom identification with the picture of him in the photo array, and for the first time, at trial, she said the perpetrator had facial hair.

The victim admitted she never visited in black people's homes (Trial Tr. 130-131); did not ever have black people ever visit in her home (Trial Tr. 131); and said she did not know very many black people and did not have much experience with them (Trial Tr. 131-133). In view of the scientific studies proving the unreliability of cross-racial identifications, it is likely this victim made an erroneous identification.

(C). **Confidence & Accuracy:** Research demonstrates that witness confidence, though believed by laypeople to be strongly predictive of the accuracy of eyewitness identifications, is not a strong predictor of identification accuracy.[26] The studies show that suggestive identification procedures actually increase the witness' confidence level and cause it to become inflated, regardless of accuracy. After making an identification, the physical look of the person identified tends to "become" the witness's memory of the person.

In this case, the victim testified confidently many times that she was positive about her identification. It was 15 days after the crime that she made her identification of Mr. Long in the courtroom, followed 15 minutes later by a photo array containing Mr. Long's picture. Additional bolstering occurred when she pointed him out in the courtroom at the trial. Given the events surrounding her identifications, it is not surprising the victim became confident that she had picked the "right" man, and that Mr. Long was, indeed, the perpetrator. Even though her description of the

---

[26] See, e.g., Sporer & Penrod; Wells; Cutler, Penrod & Martens; Cutler & Penrod; O'Rourke & Penrod; and Loftus & O'Toole.

33

Case 1:16-cv-00539-CCE-LPA   Document 1-3   Filed 05/26/16   Page 33 of 47

perpetrator did not include him having facial hair, once she identified Mr. Long, who had facial hair, her description changed and his physical appearance "became" her memory. The studies show that a victim's "certainty" has little, if any, probative value.

(D) **Stress Experienced by Witness:** Eyewitnesses claim that extreme stress, experienced as the result of an excessively violent crime, heightens and facilitates their "accurate" memory. In stark contrast, research shows that extreme stress has a debilitative effect and negative impact on identification accuracy.[27] Here, the victim was under a tremendous amount of stress during the attack. She testified "I was so frightened I couldn't stand it" (Trial Tr. 6, 9, 12, 13, 42, 44, 116) and that she "had no idea I'd ever get out alive" (Trial Tr. 13, 16, 42, 116). Given that the victim was under a tremendous amount of stress during the crime, that stress was likely to have a significant and detrimental effect on the accuracy of her identification.

(E) **Weapon Focus:** There are many studies indicating that when a weapon is present during the crime, the weapon draws the victim's attention away from the perpetrator's characteristics, and creates a greater potential for mistakes in identification.[28] The victim testified the perpetrator "put a knife at my throat before he threw me down [on the floor of the den]" (Trial Tr. 9, 40, 73, 113) and told her if she did not stop screaming, "he'd cut my throat" (Trial Tr. 9, 40, 69, 73). She described the knife as being 5-6 inches long, and that the shiny blade was all she saw (Trial Tr. 75-76). She testified she felt it in her throat and was terrified (Trial Tr. 76). All of this suggests the victim was focused on the knife and not on the perpetrator's face.

(F) **Hairline Cues:** Studies show that eyewitnesses are more likely to make false identifications when attempting to identify perpetrators who wore hats.[29] The victim described the perpetrator as wearing a dark toboggan that was "pulled down over his ears" but claimed the hat did

---

[27] See, e.g., Deffenbacher & Bornstein; Morgan & Hazlett; Cutler & Penrod; and Loftus & O'Toole.
[28] See, e.g., Steblay; O'Rourke & Penrod; Cutler & Penrod; and Loftus & O'Toole.
[29] See, e.g., Cutler & Penrod; and Cutler, Penrod & Martens.

34

not obscure the face. (Trial Tr. 10). However, she also testified that she could only see the "whites of his eyes underneath" the hat. (Trial Tr. 12). Clearly, the toboggan obscured the perpetrator's face and made an accurate identification difficult, if not impossible.

In 1984, Jennifer Thompson was raped at knifepoint. In an article she wrote for the New York Times entitled I Was Certain, But I Was Wrong, *N.Y. Times*, June 18, 2000, Ms. Thompson wrote of her experience:

> I studied every single detail on the rapist's face. I looked at his hairline; I looked for scars, for tattoos, for anything that would help me identify him. When and if I survived the attack, I was going to make sure that he was put in prison and he was going to rot.

In a photo spread and, later, a lineup, Ms. Thompson identified Ronald Cotton as her attacker. She wrote, "I knew this was the man. I was completely confident. I was sure." Id. Later, when another man, Bobby Poole, was alleged to have claimed that he raped Ms. Thompson, Mr. Poole was brought to Ms. Thompson, who told police, "I have never seen him in my life. I have no idea who he is." Id. Eleven years after her rape, however, DNA testing proved that Bobby Poole, and not Ronald Cotton, had raped Jennifer Thompson.

In summary, because "there is nothing more convincing than a live human being who takes the stand, points a finger at the defendant, and says, 'That's the one!,'" Watkins v. Sowders, 449 U.S. 341, 352 (Brennan, J., dissenting), there can be little doubt that this evidence carried enormous weight with the jury.[30] The identification procedures used in this case were highly irregular and would not pass muster under today's standards. The victim's eyewitness identification testimony is of questionable reliability in light of significant scientific research and is directly contradicted by the evidence withheld from the defense. There can be no confidence in the verdict rendered in this case.

---

[30] See, e.g., Handberg, stating that "[t]o jurors, once an eyewitness has picked out the defendant, that evidence dictates a guilty verdict"; Scheck, Neufeld & Dwyer; and Loftus (estimating that half of all wrongful convictions are caused by inaccurate eyewitness identification).

The suppression of favorable evidence critical to the defense deprived Mr. Long of the fair trial he is guaranteed under the constitutions of both the United States and North Carolina. His conviction should be vacated.

2. **New evidence is available which was unknown or unavailable to the defendant at the time of trial, which could not with due diligence have been discovered at that time and which has a direct and material bearing upon Mr. Long's guilt or innocence.**

As described above, at the time of his 1987 state petition for post-conviction relief, Mr. Long was not in a position to raise the claims presented by this motion due to the State's failure to disclose the exculpatory evidence in its possession in violation of the 5th and 14th Amendments to the United States Constitution and Article 1, Section 19 of the North Carolina Constitution. N.C. Gen. Stat. § 15A-1415(c) permits a defendant, at any time after verdict, to move for appropriate relief on the ground "that evidence is available which was unknown or unavailable to the defendant at the time of trial, which could not with due diligence have been discovered or made available at that time . . . and which has a direct and material bearing upon . . . the defendant's guilt or innocence". N.C. Gen. Stat. § 15A-1415(c) (2007).

In order to prevail upon a motion for appropriate relief on the ground of newly discovered evidence, a defendant must establish: (1) that the witness or witnesses will give newly discovered evidence; (2) that such newly discovered evidence is probably true; (3) that it is competent, material and relevant; (4) that due diligence was used and proper means were employed to procure the testimony at trial; (5) that the newly discovered evidence is not merely cumulative; (6) that it does not tend only to contradict a former witness or to impeach or discredit him; and (7) that it is of such a nature as to show that on another trial a different result will probably be reached and that the right will prevail. N.C. Gen. Stat. §15A-1415(c) (2007); State v. Britt, 320 NC 705, 712-13, 360 S.E.2d 660 (1987); State v. Stukes, 153 N.C. App. 770, 571 S.E.2d 241 (2002). The decision whether to grant a new trial in a criminal case on the ground of newly discovered evidence is within the trial court's discretion and is not subject to review absent a showing of an abuse of discretion. State v.

36

Wiggins, 334 N.C. 18, 431 S.E.2d 755 (1993); State v. Stukes, 153 N.C. App. 770, 571 S.E.2d 241 (2002).

In State v. Jones, 296 N.C. 75, 248 S.E.2d 858 (1978), the Supreme Court granted the defendant a new trial based on the State's failure to provide an SBI report with potentially exculpatory material. The State's evidence at trial consisted of the testimony of the victim and the testimony of the arresting officer who said he noted the odor of kerosene when speaking with the defendant. The defendant's clothing was analyzed by the SBI for the presence of kerosene or other flammables which were found to be absent. The Jones Court considered the following factors in holding that the SBI report had a direct and material bearing on the defendant's guilt or innocence:

1. both the defendant's version of the events and the State's version were believable on their face;

2. the credibility of the victim's testimony was bolstered by the arresting officer's testimony;

3. the SBI report could tend to show the arresting officer was mistaken;

4. the SBI report could undercut the credibility of the only evidence upon which the defendant was convicted.

Applying the statutory factors present here, the SBI reports were not available to Mr. Long at the time of his trial and were only discovered thirty-one years later. The due diligence element is satisfied in that Mr. Long and his attorneys reasonably relied on the State's representation that they provided "open file" discovery. In Banks v. Dretke, 540 U.S. 668, 695 (2004), the United States Supreme Court stated:

> In light of the State's open file policy . . . 'it is especially unlikely
> that counsel would have suspected that additional impeaching evidence
> was being withheld.' Our decisions lend no support to the notion that
> defendants must scavenge for hints of undisclosed *Brady* material
> when the prosecution represents that all such material has been disclosed.
> As we observed in Strickler, defense counsel has no procedural obligation
> to assert constitutional error on the basis of mere suspicion that some

37

prosecutorial misstep may have occurred . . . The State here nevertheless urges, in effect, that the prosecution can lie and conceal and the prisoner still has the burden to ... discover the evidence, so long as the potential existence of a prosecutorial misconduct claim might have been detected. A rule thus declaring prosecutor may hide, defendant must seek, is not tenable in a system constitutionally bound to accord defendants due process.") Banks at 695.

The newly discovered evidence – testing conducted by the SBI – is "probably true". See, State v. Acklin, 317 N.C. 677, 346 S.E.2d 481 (1986) (stating that SBI lab reports contained adequate assurances of trustworthiness 'given the impartiality of the SBI chemists' and right to examine and cross examine witnesses for purposes of admissibility under Rule 803(c)).

The SBI reports are competent, material and relevant to this case. The credibility of the victim's testimony was supported by little physical evidence. The SBI reports undercut the credibility of that evidence. Not only do the SBI reports tend to contradict the victim but that evidence is of high probative value as it is exculpatory in nature.

The newly discovered SBI reports are not merely cumulative. They analyze critical evidence collected at the crime scene that *excludes* Mr. Long as a suspect. While trial counsel presented testimony supporting Mr. Long's alibi defense, the SBI reports demonstrate that Mr. Long was not present at the scene of the crime. The undisclosed SBI reports tend to show that the victim was mistaken in her identification. The SBI reports are material and relevant in that they contain exculpatory evidence that, had it been available at the time of trial, would have been used in support of Mr. Long's alibi defense and as evidence that the victim was mistaken in her identification of Mr. Long as her attacker. Finally, the reports are of such a nature as to show that at another trial a different result will probably be reached and that the right verdict will prevail.

3.    Mr. Long's Judgments and Commitments should be corrected and amended to specifically state that Mr. Long shall "be imprisoned for a term of 80 years in the State's prison" in accordance with N.C. Gen. Stat. § 14-2 which was in effect on both the date of the offense (April 25, 1976) and at the time that he was sentenced (October 1, 1976).

38

Should the Court deny Mr. Long's request for relief under parts 1 & 2 of this motion, his Judgments and Commitments (collectively, Ex. U) should be corrected and amended to specifically state that his term of imprisonment is 80 years, the statutory definition of a "life sentence" under N.C. Gen. Stat. §14-2 at the time he was sentenced in October of 1976. At present, his Judgments and Commitments state that his sentence is "life imprisonment" and the Department of Correction (DOC) has not distinguished between his life sentence (of 80 years) and a life sentence under today's Structured Sentencing Law (natural life) for purposes of calculating a projected release date.

> A. **The clear and unambiguous language of N.C. Gen. Stat. § 14-2 requires that Mr. Longs' concurrent sentences be amended to a term of imprisonment of eighty (80) years.**

Mr. Long's Judgments and Commitments should be amended to reflect a sentence of imprisonment of eighty years in accordance with the clear language of N.C. Gen. Stat. § 14-2 which was in effect on April 25, 1976, the date of the offense and at the time that he was sentenced on October 1, 1976. According to the Editor's Note in the 1977 Cumulative Supplement, prior to April 8, 1974, N.C. Gen. Stat. § 14-2 read as follows:

> Every person who shall be convicted of any felony for which no specific punishment is prescribed by statute shall be punishable by fine, by imprisonment for a term not exceeding 10 years, or both, in the discretion of the court.

See Exhibit V(*Editor's Note*, N.C. Gen. Stat. § 14-2 (1977 Cum. Supp.)). In 1973, the Legislature amended N.C. Gen. Stat. § 14-2 by changing the word "punishable" to "punished" and by adding this second relevant sentence:

> *A sentence of life imprisonment shall be considered as a sentence of imprisonment for a term of 80 years in the State's prison.* (emphasis added)

39

See Ex. W (Session Laws 1973, ch. 1201, § 6); see also Exhibit V; N.C. Gen. Stat. § 14-2 (1977 Cum. Supp.). The amendment to § 14-2 became effective on April 8, 1974 and was applicable to all offenses committed thereafter. See Exhibit W (Session Laws 1973, ch. 1201, § 8).

The eighty year statutory term for a life sentence remained in effect until July 1, 1978 when the above provision was deleted by the legislature.[31] Although Session Laws 1977, ch. 711 § 39 indicates that it applies "without regard to when a defendant's guilt was established or when judgment was entered against him," to retroactively apply the removal of the eighty-year life term would be a clear violation of the constitutional prohibitions against enactment of *ex post facto laws*. See, State v. Robinson, 335 NC 146, 147 (1993), *quoting* U.S. Cons. Art. I, § 10; N.C. Const. art. I § 16; and Calder v. Bull, 3 U.S. 386, 1 L. Ed. 648 (1798). The goal of the statue was to set the length of a life sentence in a specific term of years, to wit, 80 years. Mr. Long is entitled to avail himself of this statue which was in effect when the was sentenced in 1976.

It is well established that the intent of the legislature controls the interpretation of a criminal statute. State v. Hearst, 356 N.C. 132, 567 S.E.2d 124 (2002); State v. Hart, 287 N.C. 76, 213 S.E.2d 291 (1975). "The legislative intent of a statute may first be ascertained through examining the language of the statute, and then by examining the statute's legislative history, the spirit of the statute, and the goal that the statute seeks to accomplish." State v. Jones, 358 N.C. 473, 479, 598 S.E.2d 125, 129 (2004).

When the language of a statute is clear and unambiguous, there is no room for judicial construction. The courts must give the statute its plain and definite meaning, and are without power to interpolate or superimpose provisions and limitations not contained therein. State v. Camp, 286 N.C. 148, 209 S.E.2d 754 (1974). It is an elementary rule that a criminal statute must be strictly construed, and *any doubt on this point will be resolved in favor of the defendant*. State v. Hill, 272 N.C. 439, 158

---

[31] See Ex. X, Session Laws 1977, ch. 711, §§ 15 & 39.

S.E.2d 329 (1968) (emphasis added). "It is the General Assembly which is to define crimes and ordain their punishment." Id. at 443, 158 S.E.2d at 332 (citation omitted).

The language of N.C. Gen. Stat. § 14-2 is crystal clear and unambiguous. There is no room for judicial construction and this Court is required to give the statute its plain and definite meaning, *i.e.*, this Court should find that Mr. Long is entitled to an amendment of his Judgments and Commitments to reflect a specific term of imprisonment of eighty years.

The language of N.C. Gen. Stat. § 14-2 is not only clear and unambiguous, it is also mandatory. It states that "[a] sentence of life imprisonment **shall** be considered as a sentence of imprisonment for a term of 80 years in the State's prison." Ordinarily, the words "must" and "shall", as used in a statute, are deemed to indicate a legislative intent to make the provision of the statute mandatory, and a failure to observe it is fatal to the validity of the purported action. State v. Boston, 165 N.C. App. 214, 598 S.E.2d 163 (2004). In State v. House, 295 N.C. 189, 244 S.E.2d 654 (1978), the North Carolina Supreme Court stated:

> In determining the mandatory or directory nature of a statute, the importance of the provision involved may be taken into consideration. Generally speaking, those provisions which are a mere matter of form, or which are not material, do not affect any substantial right, and do not relate to the essence of the thing to be done so that compliance is a matter of convenience rather than substance, are considered to be directory." To the same effect, *see:* 32 C.J.S., Statutes, §§ 376, 380; 12 Strong, N.C. Index 3d, Statutes, § 5.3.

Id. at 203, 244 S.E.2d at 661-62 (quoting 73 Am. Jur. 2d, Statutes, § 19).

In addition to the clear and unambiguous language of the applicable statute, the North Carolina Supreme Court has used the statutory eighty-year term to calculate an inmate's total sentence for purposes of applying jail credit. In State v. Richardson, 295 NC 309, 318 (1978) the Supreme Court used the eighty-year life term to calculate the defendant's total sentence for purposes of determining jail credit. The defendant in Richardson received three consecutive sentences: a life sentence for rape, ten

41

years for felony breaking and entering, and ten years for crime against nature. The Supreme Court applied N.C. Gen. Stat. §14-2 and concluded that "defendant received one sentence of 100 years for purposes of determining credit for pre-conviction incarceration." Id. Likewise, in State v. Williams, 295 NC 655 (1978), the Supreme Court used the eighty-year life term in N.C. Gen. Stat. §14-2 to calculate a defendant's total sentence for purposes of evaluating his claim that the sentence imposed upon him constituted cruel and unusual punishment.

In the case at bar, the use of the word "shall" indicates the Legislature's intent to make N.C.G.S. §14-2 mandatory. To interpret the statute in question here other than to require the imposition of a specific sentence of imprisonment for a term of eighty years would be to ignore the express language and obvious intent of the statute. Furthermore, it affects a substantial right of Mr. Long's, i.e., the right to have his sentence considered as a term of eighty years, thereby requiring the Department of Corrections to calculate a projected release date for him. The directive of this statute is not a matter of convenience rather than substance. Any doubt on this point must be resolved in Mr. Long's favor. His Judgments are required to be amended to reflect a specific term of imprisonment of eighty years. Only then will Mr. Long's Judgments and Commitments be in compliance with the plain and definite meaning of N.C. Gen. Stat. § 14-2 and the attendant case law of this state.

**B.     The provision of N.C. Gen. Stat. § 14-2 which requires a life sentence to be considered as an eighty-year term of imprisonment does not relate to parole eligibility.**

The amendment of N.C. Gen. Stat. § 14-2 in 1974, adding the sentence that a life sentence "shall be considered as a sentence of imprisonment for a term of 80 years", should not be seen as relating to parole provisions. This amendment was not required in order to give any parole statute effect. N.C. Gen. Stat. § 148-58 sufficiently and specifically covered the terms of parole eligibility and no further provision was necessary, especially in the unrelated "General Provisions" subchapter of Chapter 14.

42

Case 1:16-cv-00539-CCE-LPA   Document 1-3   Filed 05/26/16   Page 42 of 47

According to the decision in Carver v. Carver, 310 N.C. 669, 674, 314 S.E.2d 739, 742 (1984), only statutes which are applicable to the *same matter* are to be "construed together in order to ascertain legislative intent." The parole statutes are found in Article 4, "Paroles" in Chapter 148 entitled "State Prison System." N.C. Gen. Stat. § 14-2 is found in Article 1, "Felonies and Misdemeanors," contained within Subchapter 1, "General Provisions," in Chapter 14, "Criminal Law." Thus, N.C. Gen. Stat. § 14-2 should not be considered by this Court as a duplication of the parole statute in determining the legislative intent. Such duplication is completely unnecessary. The parole statutes are not "*in pari materia*", *i.e.*, they certainly do not relate to the same matter or subject at issue in this case. See Carver, 310 N.C. at 674, 314 S.E.2d at 742. The purpose of the enactment of the parole statute, N.C. Gen. Stat. § 148-58, was to specifically set out the period of imprisonment which a defendant sentenced to life imprisonment was to serve before being considered for the privilege of parole. On the other hand, the purpose of enacting N.C. Gen. Stat. § 14-2 was to set out the precise punishments of felonies. In fact, the title sentence of N.C. Gen. Stat. § 14-2 is "Punishment of felonies: what constitutes life sentence," while the title sentence of the parole statute, N.C. Gen. Stat. § 148-58, is "Time of eligibility of prisoners to have cases considered." See Exhibits V & Y. These are two entirely different matters and are in no way related. Therefore, they should not be considered together in determining the legislative intent in this case.

The clear, unambiguous, and mandatory language of N.C. Gen. Stat. § 14-2 states "what constitutes life sentence" and that is "a term of 80 years in the State's prison." Mr. Long is entitled, as a matter of mandatory law, to have his sentence converted to an 80 year term. To deny this relief to Mr. Long would be to ignore the plain and definite meaning of the statute and contravenes legislative intent.

**4.    The sentence imposed on Mr. Long is invalid as a matter of law due to significant changes in North Carolina's sentencing law.**

Case 1:16-cv-00539-CCE-LPA   Document 1-3   Filed 05/26/16   Page 43 of 47

Under the laws in effect at the time of Mr. Long's conviction, the sentences imposed on him for first degree rape and burglary exceed the maximum sentence he could have received for those charges under the Structured Sentencing Act of 1994 ( the "Structured Sentencing Act"). On October 1, 1976, Mr. Long was sentenced to two concurrent terms of imprisonment "for the rest of his natural life). (Ex. U.) Mr. Long has now been in continuous custody for over 32 years. In contrast, under the Structured Sentencing Act, the longest sentence Mr. Long could receive on the rape charge with his Prior Record Level II is imprisonment for 360 months (30 years) to 441 months (36 years and 1 month). For the burglary charge, at Prior Record Level II the longest sentence Mr. Long could receive is imprisonment for 95 months (7 years and 11 months) to 123 months (10 years and 3 months). In short, with the concurrent sentences, Mr. Long has already been imprisoned for almost as long as, if not longer, than he could possibly serve under the Structured Sentencing Act.

When the General Assembly enacted the Structured Sentencing Act, it determined that the appropriate sentences for rape and burglary were substantially less than the life sentence Mr. Long received. More specifically, it determined that an individual at Mr. Long's Prior Record Level should not be sentenced to life imprisonment for the crimes of which he was convicted. In other words, the Structured Sentencing Act serves as an authoritative yardstick of proportionality for sentences in North Carolina. The enactment of the Structured Sentencing Act shows that as a matter of "evolving standards of decency" under the Eighth Amendment, Trop v. Dulles, 356 U.S. 100 (1958), Mr. Long's continued incarceration under a sentence of life imprisonment is grossly disproportionate to the maximum sentence he could receive today.

Four major decisions by the United States Supreme Court support Mr. Long's position. In Lockyear v. Andrade, 538 U.S. 63 (2003), and Ewing v. California, 538 U.S. 11 (2003), the Supreme Court adhered to its traditional precedent requiring courts to consider Eighth Amendment challenges of non-capital sentences on a case-by-case basis. See also State v. Todd, 313 N.C. 110, 326 S.E.2d 249 (1985); State v. Garcia, 309 N.C. 780, 309 S.E.2d 436 (1983); State v. Parks, 146 N.C. App.

44

568, 553 S.E.2d 695 (2001) (stating that a trial judge has authority to decide whether a particular sentence in a particular case complies with the Eighth Amendment).

In Roper v. Simmons, 543 U.S. 551, 561 (2005), the U.S. Supreme Court relied on its landmark decision of Trop v. Dulles in explaining that it is necessary to refer to "'evolving standards of decency' to determine whether a punishment is so disproportionate as to be cruel and unusual." In Roper, the Supreme Court used legislative enactments as objective evidence of such evolving standards of decency. Roper also shows that a sentence that was valid under the law in effect at the time it was imposed may subsequently be deemed constitutionally invalid due to evolving standards of decency. The murder at issue in Roper was committed by a 17-year-old defendant in 1993. At the time he was convicted and sentenced to death in 1994, Stanford v. Kentucky, 492 U.S. 361 (1989), provided that the Eighth Amendment did not prohibit the execution of a defendant who was between 16 and 18 years old at the time of the murder. Nevertheless, in Roper, the Supreme Court held that as a result of evolving standards of decency between 1994 and 2005, the Eighth Amendment no longer permitted Roper's death sentence.

This Court should note that on the basis of Roper, Superior Courts in North Carolina in at least two cases have granted motions for appropriate relief to vacate death sentences for defendants who were younger than 18 at the time of their crimes, even though those cases had become final. State v. Golphin, 97 CRS 047312 (Super. Ct. Cumberland County (Year)) (Mot. for Appropriate Relief granted on December 12, 2005); and State v. Adams, 88 CRS 010457 (Super. Ct. Iredell County (Year)) (Mot. for Appropriate Relief granted on May 9, 2005).

As in Roper, legislation – in this case, the enactment of the Structured Sentencing Act – serves as an objective index of the evolving standards of decency relevant to this case. In light of the Structured Sentencing Act, Mr. Long's life sentence is now grossly disproportionate to the offense and, therefore, his continued custody under that sentence violates the Eighth Amendment. Mr.

45

Long's 1976 life sentences should be vacated and he would be re-sentenced to a term that is proportionate to the maximum sentence he could receive under the Structured Sentencing Act, and for a term of incarceration no greater than the time he has already served.

This Court has the authority to re-sentence Mr. Long. Under N.C. Gen. Stat. §15A-1415(b) (8), a superior court judge has authority to grant a motion for appropriate relief on the ground that "[t]he sentence imposed . . . is otherwise invalid as a matter of law." N.C. Gen. Stat. §15A-1415(b) (8) (2007). In addition, §1415(b) (7) gives a superior court judge the authority to grant a motion for appropriate relief if "[t]here has been a significant change in the law . . . and retroactive application of the standard is required." N.C. Gen. Stat. §15A-1415(b)(7) (2007). Mr. Long's sentence is invalid as a matter of law in that it is grossly disproportionate to the maximum sentence he could receive today and as such is violative of the 8th Amendment prohibition against "cruel and unusual punishment." Mr. Long's sentence should be recalculated in accordance with the Structured Sentencing Act.

## CONCLUSION

Mr. Long has been deprived for over thirty one years of his constitutional rights due to the withholding of exculpatory evidence by the Concord Police Department and the District Attorney's office. He has claimed his innocence from the outset of this matter. His family has stood behind him for over 31 years. It is long past time for the truth to come to light and for justice to prevail. Mr. Long's conviction should be vacated as a matter of law.

Mr. Long is entitled to an amendment of his Judgment and Commitment to provide for a specific term of imprisonment of eighty years under N.C. Gen.Stat. 14-2. Alternatively, this Court should enter a separate order specifically directing the North Carolina Department of Correction to

46

consider his life sentence "as a sentence of imprisonment for a term of 80 years in the State's prison" in calculating a projected release date for Mr. Long, such calculation to include any and all credit for good time, gain time, and merit time which he may have accrued, as well as pretrial credit granted by the trial judge.

This the  27th day of August, 2008.


Donna E. Bennick, Esq.
NC Bar ID No. 18561
Of Counsel to the
NC Center on Actual Innocence
Law Offices of Donna E. Bennick, P.C.
1829 East Franklin Street, Bldg. 600
Chapel Hill, North Carolina 27514
(919) 968-6883

Janine Zanin, Esq.
NC Bar ID No. 32539
UNC School of Law
Van Hecke-Wettach Hall
Campus Box 3380
Chapel Hill, NC 27599-3380
(919) 962-4068