# EXHIBIT 2

Trial transcript

265P09

STATE OF NORTH CAROLINA

COUNTY OF CABARRUS

                         IN THE GENERAL COURT OF JUSTICE

                            SUPERIOR COURT DIVISION

STATE OF NORTH CAROLINA  )    DOCKET NUMBERS 76CR5708,

         VS.         )    AND 76CR5709 CONSOLIDATED.

RONNIE WALLACE LONG,     )

           DEFENDANT  )


VOLUME I


SELECTION OF THE JURY

1   MR. FULLER: Please the Court, from a visual inspection

2   of the jury and based upon the representation, there were

3   only forty-nine people called, there were only two black

4   people in the forty-nine. We move at this time to quash

5   that panel. My understanding that the relative per-

6   centage of black in the State of North Carolina in this

7   County is in the approximate area of twenty per cent.

8   That it is obvious that the percentage of blacks included

9   in this panel is four per cent, and we think this---

10  COURT: Do you want to be heard? Do you want to put on

11  evidence and be heard?

12

13  MR. FULLER: I think, in this particular case, the dis-

14  parity is so great the burden should be on the State to

15  go forward. This is also especially true where special

16  jurors are brought in, and we are frankly unaware for the

17  prospect of those being brought in.

18

19  COURT: I'll let you examine the Clerk and Court Officials

    if you want to.

20

21  MR. FULLER: All right, sir.

22

23  COURT: Who do you want to call, the Clerk of Court?

24  MR. FULLER: Yes, sir.

25

1  COURT:  The Court is going to ask that the jury be taken

2  back to the back here while we hear this matter, which

3  ought not to be heard in their presence.

4

5  MR. ROBERTS:  The State objects to the conduction of this

6  voir dire hearing, and takes exception thereto on the

7  basis the Motion should have been made prior to the entry

8  of the plea and not subsequent thereto and therefore, the

9  State registers its objection to the hearing.

10                    OVERRULED.          EXCEPTION.

11

12  MR. FULLER:  Please the Court, I would like to note for the

13  record that I approached the Court this morning, and

14  indicated that we would be forced to raise this Motion if

15  an inspection revealed there were not many, or any blacks

16  in the panel, and we did not make it at that time this

17  morning because we didn't have any idea how many people

18  by race would be in here.

19  COURT:  The jury panel did not get here until Two o'clock;

20  and let the record also show that the Counsel for the de-

21  fendant did talk with me about this early this morning.

22

23  ESTUS B. WHITE, BEING FIRST DULY SWORN, TESTIFIED AS

24  FOLLOWS:

25  DIRECT EXAMINATION BY MR. FULLER:

1  Q  Would you state your name, please, sir?

2  A  Estus B. White.

3  Q  And your occupation?

4  A  Clerk of the Superior Court, Cabarrus County.

5  Q  Mr. White, did you have occasion to summon jurors for

6  service this week?

7  A  Through my office, yes.

8  Q  And would you describe in your own words what process

9  you used to bring in the jurors for this week?

10  A  Process followed would be as normal for a one group---

11  we actually made a two summons group, as I will explain

12  that in a minute.  There was a panel of jurors selected

13  on the 4th day of August, 1976.  On this list there were

14  forty jurors summonsed for the week of court beginning

15  today, September 27, 1976, to appear at Two o'clock this

16  afternoon.  This jury list was prepared in the same manner

17  as all of our jury lists for Superior Court, Ciminal,

18  Superior Court, Civil, or District Court Civil, requiring

19  a jury; and, of course, it was done in accordance with the

20  following of the General Statutes 9-1 and 9-2, relating

21  to the preparation of the jury list.  The sources of names

22  and, also, of course, the basis list was selected by a

23  Jury Commission of three; one appointed by the Senior

24  Resident Judge, Judge Thomas W. Seay; one appointed by

25  the Board of County Commissioners of Cabarrus County; one

1  appointed by me, as a Clerk of Superior Court, through the

2  process of a selection of a jury for any County as pre-

3  scribed in Section 9-1, and 2, and 3, of the General

4  Statutes. A list is prepared of approximately five to

5  six thousand numbers. I do not know exactly the exact

6  amount of names that comprise a jury list. This list is

7  reviewed by the three members of the Jury Commission who

8  serve as members as selected as I indicated. From this a

9  number is assigned to each of the prospective jurors

10  ranging anywhere from number one through five thousand, or

11  six thousand depending on the number. The numbers, of

12  course, are on a disk. There's no relation of individual's

13  names, addresses, or any other identification that is

14  given to the Clerk of Superior Court other than a number

15  on a disk. I keep a disk box, I might call it, or a jury

16  disk box, in my office. A jury is summonsed for a term

17  of court normally at least thirty days prior to the court

18  being in session, so that we may properly give the jurors

19  time to prepare themselves for serving on jury service.

20  After having reviewed, which I have reviewed the jury date

21  of summons, when we refer to summons, actually I merely

22  deliver a list of names to the Register of Deeds, I do not

23  have that list with me, I can make it available. These

24  numbers are placed on a form simply by number as one of my

25  deputy clerks pull the numbers in preparing a jury list for

1 a particular term of court. In this particular instance,
2 we would have been delivered this list by number only.
3 In this particular case there were forty jurors. These
4 numbers are then matched by the Register of Deeds to a
5 file that he maintains under lock and key, and, of course,
6 his maintenance of that I will let him explain. From this
7 the Register of Deeds would match the numbers of the
8 jurors with that of the name and address of the juror,
9 which the matching numbers would appear. At this point
10 a list is prepared by a Register of Deeds, and I have a
11 copy of that particular preparation, which is addressed
12 to the Sheriff of Cabarrus County, indicating the name of
13 each prospective juror, the address of each prospective
14 juror, and a card number related to the prospective juror.
15 This list is then given to the Sheriff of Cabarrus County
16 for his summonsing the jurors to a particular session of
17 Court. In this particular case, this was prepared on the
18 4th day of August, 1976. The jurors were requested to
19 appear for court at two p.m., on the 27th day of Sept-
20 ember, 1976, early this morning; and then, of course, each
21 juror is being summonsed during the process of selection,
22 for after summons there is a letter or a memo sent to each
23 prospective juror by the Sheriff's Department indicating
24 their process for request for deferments, or requests for
25 jury service at a particular session. The process has

1   been assigned to the Cabarrus County to one of our Dis-
2   trict Court Judges, a resident of Cabarrus County, Randy
3   Grant, Adam Grant, Jr., is his proper name, District
4   Court Judge who will review properly any jury excuses and
5   any excuses will be made by Judge Grant. Also, indicated
6   is that a prospective juror for a deferment, or an excuse
7   may appear before a Superior Court Judge any Monday at
8   the beginning of Court prior to his being on the jury, or
9   the day he is to appear for jury. So, the excuses would
10  be rendered by either Judge Grant in the District Court
11  prior to the day of Court, or may be done so by a Superior
12  Court Judge holding regular session in this District. At
13  this particular time we found that there were, when I say
14  this particular time, in reviewing the jury list just this
15  morning we found that five jurors had been transferred,
16  or deferred from a previous term to this term of Court.
17  We found that the total of all of the jurors that were
18  either deferred or excused properly by the Judge, or
19  Judges, that we only had a panel of approximately twenty-
20  four I believe is the number of jurors that we had.

21
22  COURT: This is out of the forty?

23  A   This is out of the forty we had plus those deferred.

24
25  COURT: How many of those were excused of the forty, or

1  deferred, were black?

2

3  A   Your Honor, there is no record in my office which, of

4  course, is only that of the disk, or to my knowledge there

5  is no record indicated anywhere in the selection of a

6  jury panel, or a group that would indicate anything as to

7  race, religion, or sex, really other than a person's name,

8  maybe Mrs. or Mr., but there is nothing denoted that I

9  know of.

10  COURT:  So, you have no idea about it?

11  A   I have no idea.

12

13  COURT:  Whether any of them were black or white?

14

15  A   I have no idea whether they're black, or indian, or

16  caucasian, or white, I do not know.  I have no knowledge

17  in my opinion.  The Jury Commission has no knowledge, nor

18  does the Register of Deeds, nor the Sheriff in summons.  I

19  do not know how many members of this jury that were ex-

20  cused were black, or white, or indian, whatsoever.  I have

21  no knowledge because there is no record maintained as to

22  race.

23  COURT:  Now this morning pursuant to my order you have had

24  summonsed sixty and I talked with you this morning, and I

25  believe you had talked with the attorneys of the State and

1  Defense, you indicated to the Court, well, I actually

2  ordered the Court to summons an additional fifty jurors

3  to appear in Court today at Two p.m., this afternoon.  I

4  also instructed you that none of these were to be excused,

5  except those which were obviously infirm by you, and no

6  other Judge was to have any other authority to excuse them.

7  A    That is correct.

8

9  COURT:  How many did you excuse of those while we are on

10  this subject?

11  A    Your Honor, each that I have excused I have personally

12  talked with you as Judge, and given you the circumstances

13  of the excuse.

14

15  COURT:  I believe there were two of them.  One of them was

16  a doctor who had an operation to be performed, or---

17  A    He was the anesthesiologist at the hospital.

18

19  COURT:  He was the only one at this hospital, and had two

20  or three operations he had to be there for.  The other was

21  a lady too infirm to be brought in here, and the others I

22  excused here in your presence.  None of them that I have

23  excused were black people.

24  A    Your Honor, I might mention that, of course, this jury

25  we knew nothing of this prospective jury list issued this

morning until 10:15 this morning, and it was almost twenty-

1  five until eleven before we had the fifty names pulled

2  and ready to go with the Sheriff's office. About twenty

3  minutes it took us to get prepared and have the names

4  pulled.

5  COURT: Were they pulled in the same manner?

6

7  A  They were pulled in the exact manner in which the

8  other list was prepared.

9  COURT: Who drew them?

10

11  A  My deputy clerk, Jean Sherrill, drew the list from our

12  jury box of disks, and I have the disks here also that she

13  did pull, and this is the list and the certification as I

14  gave it to the Register of Deeds.

15  COURT: And the disks are in here?

16

17  A  I have the disks separate. I normally do not keep the

18  disks separate, and I must confess the reason I did this,

19  I was not sure, it was indicated to me this morning there

20  may be certain Motions. I did not know if we would need

21  this jury until given the go ahead, although I indicated

22  to you, Your Honor, I would prepare for this as early as

23  I could do so. I do not normally maintain a separate disk

24  for we normally put it in another pot, what we call the

25  selected juror's disks. This is unusual that we did this.

   This was done in anticipation there may be certain Motions

1  and we would not need to notify additional jurors.

2  Q    Do you know how the jury panel is selected, the total

3  number?

4  A    The jury pool is selected by the Jury Commission

5   Members of three.  The Jury Commission use a random

6  choice selection.  They do have a report in my office as

7  to a report, and if you will get that report for me.

8
   COURT:  Maybe copies of that ought to be put in the record.
9

10  MR. FULLER:  Since all the jurors are out, I wonder if we

11  might request the Court that people in the audience not

12  express any emotion or feeling.  I don't think it would be

13  advantageous to either side.  It's already happened twice.

14
   COURT:  As you and I have already discussed, the main thing
15
   the Court is concerned with and the main duty I have is to
16
   see that this defendant gets a fair trial.  Now, if you
17
   want to help the defendant I'd suggest to you as strongly
18
   as I know how, and his lawyer is now requesting me to
19
   suggest that to you, is that you not allow your emotions
20
   to be aroused, and that you conduct yourselves in a proper
21
   manner and, of course, speaking to those who are specta-
22
   tors here in the courtroom, you are guest of the Court.
23
   You have a right to be here if you conduct yourselves
24
   properly, but you don't have much right to be here.  I can
25

have you removed from this Courtroom about that fast, and
will do it before we'll tolerate any sort of outburst in
here; and I want to have a definite understanding about
that because I don't want this jury to be influenced
against the defendant, and he has no control over it.  If
his lawyers had some control over it then he ought to be
prejudiced by it, but he has no control over it, and it
is my duty to see that his rights are protected, that he
gets a fair an impartial trial, and I intend to do just
that.  Now, I don't want there to be any misunderstanding
about it.  Somebody told me there were some people outside
marching around.  I don't want no people coming in con-
tact with the jury that's the reason I have instructed
that all marching be done out in the front of this build-
ing, so that when the jurors leave they won't come in
contact with anybody that could prejudice this defendant.
I'm going to do everything that I can, I assure you
gentlemen of that, to see that your client gets a fair
trial, as I do in every case that I try.  The last thing
that this Court wants is to convict an innocent man. That
is my primary concern as I think it should be.  The laws
are designed in this State and this country solely with
the ideal that it is better to turn loose ten guilty men
than to convict one innocent man, and that is my theory
and my feeling about it, but I say to you again, as the

Defendant's attorney said, your emotional outburst can do nothing but hurt this Defendant. That is my feeling about it and, of course, I'm not going to allow it in here in the courtroom; and I say to any people who have strong feelings on the other side of this thing that surely you don't want to see anything other than justice done, but any of you on either side however your feelings are, this Court is not going to tolerate any emotional outburst in this Courtroom. And I think we have a definite understanding about that now, and we won't have any problems here and we can give this man a fair trial that he is entitled to as a citizen of this free country of ours.

Q   Mr. White, you were talking about the method of selection of those to go into the jury pool?

A   I have a letter addressed to Mr. James O. Bonds, which is a record of the Clerk of Superior Court's office for John R. Robinson Jr., on his letterhead, as accountant in Cabarrus County.

Q   Mr. Robinson is Chairman of the Jury Commission?

A   He is Chairman of the Jury Commission and the letter is signed by Edward G. Boggs, Jr., a member of the Commision, and Mrs. Dale Nixson, a member of the Jury Commission, which are the three members of the Jury Commission. If I may read the letter on file it tells the

process in which it is reported as to how this jury panel, or group was selected... (READS LETTER). The date of the letter to Mr. Bonds, which is on file in the Clerk of Superior Court's office is November 7, 1975, which we are now using that prepared list.

COURT: Can you duplicate a copy of that? Well, let a copy of that letter be introduced into evidence as Court's Exhibit Number One.

Q  Mr. White, were you involved in the process at which time the names were purged from the original roll list?

A  I'm going to have to think because in the past I may have been asked a question by the Jury Commission as to the manner in which to proceed.  I do not recall of any incidence on this particular list that I was asked of any names, or any information.  Mr. Robinson has been our Chairman since the beginning of the new jury selection system, which I believe was about in 1967, or '68.  I don't recall the exact date of the new selection process.

Q  How long have you been the clerk?

A  Nine years.  It was 1967 that this new procedure began.

Q  Is there anything about the process that you followed this morning after instructions to obtain fifty extra jurors, that would cause you to have an opinion as to why there were only two blacks out of a panel of forty-nine

1  that appeared today?

2  A  I have no opinion at all.  I must admit, and I had no

3  knowledge of who the jurors were, and naturally-- unless

4  I happen to know a particular person, knew of his race, or

5  color, there was nothing unusual in the preparation of

6  this list and I would like to be able to answer that, and

7  say that I can recall each particular jury group that we

8  have had, but I'm honest in saying I never pay any

9  attention to the number of women on a jury, the number of

10  blacks, or numbers of whites, it has never conscientious-

11  ly been a factor.  In fact, I was asked this question

12  after I had called the names of the prospective jurors,

13  I was asked this name by certain court officials, and I

14  honestly could not tell you if there were any, or if half

15  of them were, and I believe you may have been in the

16  presence, I do not recall, but anyway I could not answer

17  the question because I did not know after having seen

18  them, I was not conscious of the color.

19  Q  Is the Chairman present?

20  A  He is.

21  Q  Do you have any further information based upon your

22  personal observation and experience concerning the

23  selection process for the jurors who are present here

24  today?

25  A  Restate it.

    -15

Q   Did you observe anything further concerning the
selection process?

A   The selection process for the additional fifty that
were called today?  The procedures were handled as normal,
other than the fact that we were, of course, in a greater
hurry, which is not a good word but we had to have them
here by two o'clock, and we didn't start on it until
fifteen minutes after ten, so I would say the process was
speeded rather rapidly and we were proud in our office
that we were able to have a number of these jurors here
today.  Approximately twenty-five of the fifty, I believe,
did appear, or twenty-six of the fifty, so we were able
to get about half of this group.

COURT:  Now, the others haven't been contacted by you?

A   There are some who have not been contacted due to the
fact that the Sheriff's Department was not able to contact
them by phone, or find out where they live.  The only
thing we have on the card is their mailing address, or
address that we would have as obtained from the process in
selecting them.

COURT:  They're still stying to contact them, I guess?

A   The Sheriff's Department would be, in my opinion, still
trying to contact them.  There will still be some coming
in, in my opinion, of this particular group.  Each that

1  has been excused has been excused personally by me with

2  a doctor's excuse, or by Your Honor. The ones that are

3  excused I did have two doctors, I believe, that did call

4  in from their office, and I did excuse these on a tele-

5  phone medical excuse under the circumstances of being in

6  this manner. Doctors that called in for their patients

7  I did excuse maybe two or three on the phone, I have a

8  note of the ones that I did on my list. Dr. Nance and

9  Dr. Lyle's office called, I did e cuse two under that

10  circumstances.

11  COURT: Do you know whether they were black or white?

12

13  A   I have no idea and did not ask, Your Honor. I had no

14  concern as to their color.

15  Q   Does your office have addresses for the potential

16  jurors?

17  A   No. After the list is prepared, we have it. We do

18  not have addresses of the prospective jurors until the list

19  has been pulled.

20  Q   At the time you get the list, that is the names and

21  addresses, are you able to tell from the examination of

22  the prospectives as to the race?

23  A   I would say if I examined the list of the addresses,

24  and would happen to be familiar with the residential area

25  that would be predominantly black, or white, I could tell,

1  yes.  To my knowledge I have never looked at a list in

2  this manner.

3  Q  Were you present and did you participate at any time

4  when the check was made for those who had criminal

5  records, disqualified, or undesirable as the letter

6  indicated?

7  A  I was not to my knowledge present in the preparation

8  of any of this particular list.  As I said, in the

9  earlier days in 1967, I was more active because it was a

10  completely new law that we were to comply with, and there

11  were more questions.  Mr. Robinson has been the Chairman

12  of this Board since the beginning in Cabarrus County.  I

13  have not participated to my knowledge in the last three,

14  four, or five years in any selection.

15  CROSS-EXAMINATION BY MR. ROBERTS:

16

17  Q  Mr. White, when the original disks were drawn on Aug-

18  ust 4, 1967, for the petty jurors to appear for the Sept-

19  ember 27, 1976, term was the same procedure utilized then

20  that has been utilized in the last nine years?

21  A  To the best of my knowledge it was.  My information

22  indicates that it was.

23  Q  On these disks there is no indication of race, age,

24  or what not, is there?

25  A  No, sir.

Q   And when you deliver these disks to the Register of
Deeds, you have no idea of the composition of the disks,
is that not correct?

A   No, sir, none whatsoever.

Q   With regards to the particular petty jurors that was
summonsed to be here September 27, 1976, as a matter of
fact, the case of State versus Ronnie Wallace Long was
not on calendar for the September 27, term was it?

A   Mr. Roberts, I'm not sure the date of the preparation
of the calendar.  I believe it was only two weeks ago it
was prepared, I don't recall.

Q   To refresh your memory the case of Mr. Long was
scheduled for trial at the August 7, term.

A   I recall it was at an earlier date, I do not recall
the exact date, I'm sorry.

Q   Insofar as the preparation of any jury list, or the
mechanism that go into it from your statutory duties, and
from what you control and govern, there is absolutely no
way to determine a race, age, or anything, is there?

A   There's nothing that is visible to me that I have any
knowledge of that would indicate age, sex, religion,
politics, or whatever, no indication on the cards.

Q   Thank you.

JOHN R. ROBINSON, JR., BEING FIRST DULY SWORN, TESTIFIED
AS FOLLOWS:

DIRECT EXAMINATION BY MR. FULLER:

Q    Would you please state your name, sir?

A    John R. Robinson, Jr.

Q    I believe you are the Chairman of the Jury Commission-
ers for this County?

A    Yes, sir.

Q    How long have you been so?

A    Ever since the law has been enacted, I think that was
in '67, I believe.

Q    Did you participate in the preparation of the report
that was previously read by the Clerk?

A    Yes, sir.

Q    Let me show you a copy of what has been previously
identified as Court's Exhibit One.  I ask you if you could
explain, please, sir?  Paragraph number three and more
particularly definition employed by the Commission in
determining who was ineligible and undesirable?

A    I don't have the law.  One of them is nolo contenders
and, of course, there's three or four things in the law
which I do not have.  I have got it in my office but I do
not have it here.  Some of the things that would dis-
qualify was the fact anybody over about seventy-seven,
who cannot hear well, we disqualify them.

Q    How do you determine?

A   We generally find out from the police department, or
sheriff, or Kannapolis Police Department.  They know a
lot of people in Cabarrus County.  Most of them have been
raised right here in Cabarrus County.  Now, about these
roll lists you are speaking of, we take the roll list to
the sheriff's department and sometimes the sheriff comes
over to our office on Church Street, and go over name by
name and he knows most of them himself personally, but
sometimes he also brings a couple of deputys with him;
and they in turn help him check the names off of the ones
who are supposed to be disqualified, or the same thing is
done in the Concord Police Department.  The Police Chief
and some of his deputys and myself all together go down
the list name for name.  This also occurs in Kannapolis
now.  Mr. Boggs, Edgar G. Boggs, takes the list to
Kannapolis to the Kannapolis Police Department, that is
his territory from the standpoint of the jury list, and
he goes over the list with the Chief in Kannapolis, and
that's the way we disqualify these people who are not
eligible to be on the jury.

Q   On the disqualifications you made, is that in the
nature of a recommendation from the Sheriff to the
Commissioners, or does the Sheriff just line through the
names?

A   Well, I give him a red pencil and he marks that red

through that particular name.

Q    Any record made of the reason he lines through the names with the red pencil?

C    He generally tells us as we go down the line. When you are running through about twenty thousand names, it would be pretty hard to keep a record of every name disqualified.

Q    Does the Commission vote in each case where the Sheriff red pencils anyone as to whether they are to be kept on?

A    I'm generally there with him and I generally question him as---

Q    What reason does he give to red line these particular people?

A    If I had the law which I do not have, some of the people are mentally incompetent, nolo contendere and anything, and anybody who has had a felony, those three things stick out in my mind at the present time.

COURT:  You are talking about nolo contendere to a felony, or plea of guilty?

A    The book just says nolo contendere.  I mean the law I'm speaking of now.

COURT:  I believe it says nolo contendere to a felony.

1  Q   Do you take the Sheriff's, or Chief's statement

2  concerning a person, or do you make some kind of

3  independent inquiry?

4  A   I don't make any independent inquiry because I don't

5  actually have the time to, but I know all these individual

6  people personally, and I know they are honest people, and

7  they wouldn't take these people off that wouldn't make a

8  good juror.

9  Q   Is there some understanding the Chief, or Chief of

10 Police believe they would make a good juror before they'd

11 be on the list?

12 A   No, but just some people they know by law should be

13 disqualified.

14 Q   What did you have with you when you were talking to

15 the Sheriff?

16 A   A stack of papers about that thick, yellow sheets,

17 and we go down the list.

18 Q   Do you go over the law and question with the Sheriff?

19 A   Yes, sir.

20 Q   Describe what you did when you did that?

21 A   I gave him the law for him to read himself.  He knew

22 the law himself.  I had the book and he read the law.

23 Q   How did you and the Sheriff define the term un-

24 desirable?

25 A   Well, as I say, some people are hard of hearing, which

1 he knows in person himself, and some mentally incompetent,

2 and as I said, nolo contenderes, and felonies, and any-

3 thing this law requires that they not be on the jury.

4 Q   You say mentally incompetent, you talking about

5 people in the Sheriff's opinion are not competent, or the

6 ones declared by the law?

7 A   In his opinion the ones he brings down to Raleigh and

8 brings back, and most of them are declared by the Court to

9 be mentally incompetent.

10 Q   Are you just assuming, or do you know for a fact that

11 the only people who are removed are those who have been

12 judicially declared mentally incompetent?

13 A   I'm just assuming.  To tell you the truth about it,

14 I don't think we actually marked through too many people

15 that were mentally incompetent because we don't have too

16 many around here.

17 Q   Did you make an independent determination of those

18 suggested for disqualification by the Sheriff, or Chief

19 of Police?

20 A   I didn't make any personally, no, sir.

21 Q   To your knowledge, did anybody on the Jury Commission

22 make such?

23 A   Well, now we have had these two individuals which were

24 on my Commission, Mr. Edgar G. Boggs, and Mrs. Nixson. Mr.

25 Boggs investigated some in Kannapolis and Mrs. Nixson in-

1   vestigated some in Mt. Pleasant and Harrisburg.

2   Q   Did you cause anyone to be removed from the list?

3   A   Not me personally, no, sir.

4   Q   Is it correct to say then that you turned over all the

5   red penciling to the Sheriff?

6   A   Well, all those three people, yeah.

7   Q   Then on your own you did not have anybody stricken,

8   is that right.

9   A   No, sir, for I'm not that familiar with Cabarrus

10  County.

11  Q   So, is it correct to say then that basically when you

12  start with the roll list and you end up with those who

13  have not been marked out by either the Sheriff of

14  Cabarrus County, or Chief of Police, or Kannapolis?

15  A   Yes, sir, that is correct.

16  Q   What is the race of the Sheriff of Cabarrus County?

17  A   The what, sir?

18  Q   What is the race of the Sheriff of Cabarrus County?

19  A   I don't understand what you mean?

20  Q   Sheriff, is the Sheriff black or white?

21  A   White.

22  Q   And Chief of Police in Kannapolis?

23  White.

24  Q   How about the members of the Jury Commission?

25  A   All white.

Q   And the third person you indicated?

A   Mr. Boggs?

Q   You indicated the Sheriff and Chief of Police and one other person?

A   Chief of Police of Kannapolis, and Chief of Police Concord, and Chief of Police of Cabarrus County.

Q   What is the race of the Chief of Police of Concord?

A   He's a white man.

Q   Have you ever checked the criminal record of anyone whose name was red lined by the Sheriff, or the Chief of Police for having any criminal record, have you ever verified that such criminal record existed?

A   No, sir, I have never verified it for they have already verified it.

Q   Now, I'm not trying to be repetitious but I would like to get you to say with some specifity, in that letter when you say people were removed you say both disqualified and undesirable. I'd like you to tell the Court what you mean when you say they were undesirable?

A   I am assuming as one who is too old to be on the jury, mentally incompetent, or has some criminal offence which prevents them to be on a jury.

Q   Now the law disqualifies somebody with a felony conviction anyway, doesn't it?

A   That's right.

Q   So, they are disqualified by operation of the law?

A   That's right.   Correct.

Q   Not because they are in a category called undesirable. What I'm trying to find out is who is included in this particular County in a category including undesirable to be on the jury?

A   I would say those to be mentally incompetent and too old.

Q   Are the people who are mentally incompetent also prohibited of serving on a jury by law?

A   By law, yes.

Q   Do you know what standard is applied by the Sheriff and Chiefs of Police in determining who is undersirable as opposed to who is legally disqualified?

A   Well, as far as I know the Sheriff and the Chief are well qualified to determine whether a person is desirable or undesirable.

Q   And what standard as a member of the Commission, what standard did you give them to use in determining whether or not somebody is desirable, or undersirable?

A   Well, we discuss it among ourselves, and also, as I said before, I let them read the law, which was passed by the General Assembly.  We don't mark everybody off, you'd be surprised how few people we mark off.  That's the reason we have got four thousand people on this list here.

1   We actually don't need but about twenty-five hundred.

2   COURT:  How many were marked off?

3

4   A   I just couldn't call off the top of my head.

5   COURT:  Is there a list available of those who were

6   marked off?

7

8   A   I don't know for sure, I'll have to go back and check

9   my file.

10  COURT:  How long would that take you to get that file?

11  A   I just moved from my office to another office, and

12  I'm really messed up in my office, and files and every-

13  thing.

14

15  COURT:  We'll take a brief recess.

16  A   I say there's not anything wrong, I'm sure I got the

17  list somewhere.

18  Q   Mr. Robinson, I want to show you, if Your Honor please,

19  the Court, this is a xerox copy from the census data thing

20  at the library.  This report shows the approximate pop-

21  ulation of Cabarrus County?

22  A   Yes, sir.

23  Q   Eighteen thousand for the City of Concord, isn't it?

24  A   I'm not really sure.

25

1    Q    What is the population for?

2    A    I don't know about Cabarrus County but the City of

3    Concord is approximately eighteen thousand people.

4    Q    Well, does it sound about right that the population

5    for Cabarrus County is approximately seventy-eight

6    thousand?

7    A    No, it doesn't.

8    Q    Do you know what the population is?

9    A    I don't know exactly what the population is.  I know

10   on the vote of registration books we have approximately,

11   seems like thirty-four thousand people registered on the

12   vote of registration books.  We took one name out of

13   every seven.

14   Q    Now, as to those people who were excluded, say you

15   can't find the list?

16   A    I can't find it right now because I just moved into a

17   new office and my stuff is mixed up all over creation.  I

18   don't know for sure I even have the list.

19   Q    Is there a duplicate list of those lists?

20   A    Not of that, no, sir.  All the cards were typed from

21   that list.

22   Q    I think that's all we have of this witness, Your Honor.

23   CROSS-EXAMINATION BY MR. ROBERTS:

24

25   Q    Mr. Robinson, to your knowledge was any member deleted

from that list solely on the basis of race?

A    No, sir.  Certainly wasn't.

Q    Thank you very much.

J. B. ROBERTS, BEING FIRST DULY SWORN, TESTIFIED AS
FOLLOWS:

DIRECT EXAMINATION BY MR. FULLER:

Q    State your name and position, please?

A    J. B. Roberts, Sheriff of Cabarrus County.

Q    I believe you heard Mr. Robinson testify concerning---

A    Well, now I wasn't in here, I was out and I came in
just before the recess and I didn't get to hear.

Q    Would you tell in your own words what function you had
in the selection, or for that matter the exclusion of
prospective jurors in the County?

A    Mr. Robinson gives us a list, or has a list, and I
believe it has, I believe the last time I went up to the
registration board on Church Street, he had a list, and I
can't remember in times past, either my chief or some of
the lieutenants go with me and we go over the list; and
people that are old, people we have carried to State
Hospitals that we feel are not able, we draw a line
through their names, people that we know that have been
convicted of a felony, or people, if we find a name, a lot

of the times we'll find the same name on the list twice,
and we mark through that.

Q  Now, Mr. Robison indicated in a letter, let me show
you this, Sheriff, I'd like your attention to paragraph
three.

A  Yes, sir.

Q  Now, Mr. Robinson indicated that one of the criteria
for exclusion was people who were undesirable.

A  Yes, sir.

Q  How did you apply? What was the standard?

A  People that are old, that can't get to the courtroom,
over in the old courthouse, I remember there was one man,
his name was on, he was on crutches not able to get up
because we didn't have an elevator.  People that can't
hear, people we carried to State Hospitals, they are
people that are undesirable.  This is my definition.  We
used to pick the jury years ago with the county commi-
ssioners and this was the same rule that we used then, and
then after we changed to the Jury Commission we practi-
cally---just the same thing.

Q  As far as your function in the process it is the same
as it has been for some number of years?

A  Yes, sir.  Picking what he says are undesirable,
people that would be disqualified because of old age, not
able to make it to town.

Q   What else is included in undesirable, or disqualified?

A   That's the only thing other than a felony, if we know of somebody that's been convicted of a felon we take them off.

Q   That's all.

CROSS-EXAMINATION BY MR. ROBERTS:

Q   Sheriff Roberts, out of the list of raw lists of approximately twenty thousand names, I think Mr. Robinson referred to, how many red lines would you think that you would draw on that list?

A   Oh, I don't know.  Probably a dozen or so.  Through the years by doing it for years I can't remember from one time to another how many that I drew through.

Q   A dozen out of twenty thousand?

A   I'd say a couple of dozen probably, that many or more.

Q   Did I understand your testimony to be as the only time you drew the line was when you had personal knowledge that a person either could not see, nor hear, or you were per- sonally aware that they had been taken to Raleigh for mental problems?

A   Somebody we personally knew.  If we don't know them, we couldn't mark them off.  This is only people that I know, and that's why I took some of the lieutenants, or other people usually with me because they know people I

1   wouldn't know, or don't remember, and you look over that
2   list so long, you know, the names after awhile run
3   together, you just can't remember. People you don't know
4   the names, of course, we wouldn't bother them. A lot of
5   people we would actually summons them, we get them that
6   have died, and people that have been dead, and all the
7   checking we do, we still miss them and some of them we
8   might know, but we look over the list, and you still miss
9   some of them.
10  Q   Sheriff, have you or anyone working under your
11  supervision and authority ever deleted a name from that
12  roll list because of their race?
13  A   No, sir.
14  Q   And how long have you been Sheriff of this County?
15  A   Twenty years. I have been with the Sheriff's Depart-
16  ment about twenty-five years.
17  Q   And in your opinion have not negroes served regularly
18  on the juries here?
19  A   Yes, sir. Ever since I've been connected with the
20  Sheriff's Department we have always had---
21  Q   To your knowledge has anyone ever been excluded be-
22  cause he was a black man?
23  A   No, sir.
24  Q   Or a red man?
25  A   No, sir.

1   Q   I believe we used to have several Chinamen who lived
2   in the County who couldn't serve because they couldn't
3   understand English, is that right?
4   A   We have never taken anybody off because of race.
5   Q   And the list that's prepared by the Register of Deeds
6   and given to you has no symbol, or anything there to tell
7   you what their race is, does it?
8   A   No, sir. We don't know unless we personally know the
9   person. We have no way of knowing what their race is
10  according to the registration books.

11  RE-DIRECT EXAMINATION BY MR. FULLER:

12
13  Q   You know the approximate population of Cabarrus
14  County?
15  A   The last census was about '74, probably close to
16  eighty thousand now. That's just a guess, we've grown
17  several thousand the last few years. I'd say since '74,
18  we're close to eighty thousand.
19  Q   Do you know the percentage of whites in the County?
20  A   Well, the City I believe we probably have more
21  colored in the City than we would have in the County.
22  Our County population approximately is about fourteen,
23  fifteen per cent maybe.
24
25  COURT:  Total all over the County including the towns?

A   I wouldn't say it would be that much all over the County, I think the City would be probably higher.

Q   Let me show you a xerox of the document taken from the census record. I'll ask you if that looks about right to you that the '74 census shows seventy-four total, and sixty-five thousand white?

A   This is nearer now, and this is the no non-white.

Q   Based on your experience does that look about right, it would be about twenty per cent black in the County?

A   Well, I doubt it would be quite that much in the County, but probably a little more in the City. And I believe our population, I was thinking our '70 census was seventy-four thousand instead of seventy-eight, that doesn't look right to me.

A   I think I'm misleading you with my question. Sheriff Roberts, when I say that the population of Cabarrus County is about twenty per cent black, I don't mean the County excluding the City, but I mean the whole County taken together.

A   I don't think it was quite that high, could be, it was just a guess.

COURT:  The Clerk I believe testified here a few minutes ago that out of the fifty that the Court ordered this morning special venire, that so far, as I believe, he said twenty-six had been served and had come in here less three or maybe four people that had been excused because

of illness, or one was a doctor at the hospital needed there that I excused. Those other twenty people were they not reached because they were black?

A   No, sir. We wasn't able to find them on our thinking that we continue to try because a lot of them working and were out of the county, we hope to pick the rest of them up tonight. We have no way of knowing whether they're black until we contact them.

COURT: You will continue to try and find all those people tonight?

A   Yes, sir.

COURT: Do you have any idea what ratio?

A   I have absolutely no idea we have no idea what their race might be until we contact them, because we just have a name, we don't know by the name what the race is.

COURT: But you haven't systematically, or have you systematically failed to subpoena somebody that was on the list after they were drawn because they were black?

A   No, sir. We subpoena everybody we don't excuse any-body. We had people to come in today that we subpoenaed that were not able to get up here. If they're not able, we'll go pick them up and bring them. We feel the Judge

or somebody else other than us excuses. We don't excuse anyone after they have been summonsed after they are on the list.

DEBORAH BALLINGTON, BEING FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION BY MR. FULLER:

Q   Would you state your name, please, and where you are employed?

A   Deborah Ballington.  I work for Chambers, Stein, Ferguson and Beckham.

Q   Did you obtain some census information at my request earlier today?

A   Yes.

Q   Would you describe in your own words what you did and what you got?

A   I went to the library and told the records librarian what information I needed.  She handed me the book and I looked over the information.  I said I'd like to have a copy of this.

Q   What information did you tell her to look for?

A   That I needed the total population of Cabarrus County, and then when she gave me the information I said I needed it broken down.

Q   Is that a copy of the official census data you were

1   shown in the library?

2   A   Yes, it is.

3   Q   What does that show to be the overall population as of

4   the 1974 update of the 1970 census?

5   A   Seventy-eight thousand, one hundred and ninety-six.

6   Q   What does it show the white population?

7   A   Sixty-five thousand, four hundred and eighty-six.

8   Q   And the non-white?

9   A   Twelve thousand, seven hundred and ten.

10  Q   Do you know what percentage that makes the white

11  population according to those figures?

12  A   Well, no.

13  Q   That's all.

14  CROSS-EXAMINATION BY MR. ROBERTS:

15

16  Q   In your non-white population according to that census,

17  I think you saw something less than thirteen thousand

18  people, is that correct?  Does it tell you how many of the

19  non-white population are black?

20  A   No, it just says non-white.

21  Q   It does not distinguish between other minority groups?

22  A   No, sir.

23  Q   Thank you very much.

24

25  JAMES O. BONDS, BEING FIRST DULY SWORN, TESTIFIED AS

FOLLOWS:

DIRECT EXAMINATION BY MR. FULLER:

Q    Would you state your name and occupation, please, sir?

A    James O. Bonds, Register of Deeds, Cabarrus County.

Q    How long have you been so served?

A    Be twelve years this December.

Q    Would you state briefly in your own words what process you followed in the selection and notification of prospective jurors in Cabarrus County?

A    Yes, sir.  Well, now where I came in the picture I kept the cards that the Jury Commission compiled, and then when the Clerk draws the cards, the disks from his box of unused disks why he transcribes the numbers to a paper and brings them to me and I match the numbers with the cards I have in my office.

Q    What information is contained on the cards and who places it there, please?

A    Just the persons the jurors number, which is the number he has, plus his name and address.

Q    What do you do with the cards after they are first established?

A    You mean when they are brought to me?

Q    Yes, sir.

A    I kept them under lock and key in my vault room, and

1  when the disks are brought to me then we open the cabinet,

2  select the card accordingly to the number, and then we

3  print the jury list.

4  Q    What steps are involved in printing the jury list?

5  A    We just take it by the card and put the person's name

6  and address and his disk number beside his name.

7  Q    After the list, or pool is initially formulated do

8  you take any steps to purge it periodically?

9  A    I don't follow.

10  Q    Let's say number ten is Mr. Smith and Mr. Smith passes

11  away, do you at any time do a periodic systematic review?

12  A    No, sir, not once it's in my hands.

13  Q    What did you do with respect to the special jurors

14  requested for today?

15  A    When we got the numbers, we put them on the list,

16  delivered them to the Sheriff. I'd say it took us just

17  about thirty, thirty-five minutes to compile it.

18  Q    That's all.

19

    CROSS-EXAMINATION BY MR. ROBERTS:

20

21  Q    Mr. Bonds, at any time in performing your duties under

22  status with regards to jury selection, do you know at any

23  time the race of the person that you are dealing with on

24  that card?

25  A    No, sir.

Q   Unless of course you'd happened to recognize someone's name you knew?

A   That is correct.

COURT:  Any other witnesses you want me to call for you, Mr. Fuller?

MR. FULLER:  No, Your Honor.

MR. ROBERTS:  The State would ask the Court to take judicial notice that on the figures introduced it is sixteen per cent not twenty.

COURT:  Well, they speak for themselves on percentage. From this evidence here I don't believe it shows any systematic exclusion of jurors because of race, and the Court so finds.  I'll deny your Motion, and if it is agreeable I'll make what other findings needed to be made later on.

COURT:  Out of the presence of the jury, let the record show that by stipulation the District Attorney for the State and Attorneys for the Defendant have agreed that the Court can instruct the jury, prior to the voir dire examination, which I'll instruct them on first thing tomorrow morning when we start the selection of the jury in this case that if the defendant is found guilty of first degree rape, that he will receive a mandatory life

imprisonment sentence; that if he's found guilty of
second degree rape he will receive a sentence in the
discretion of the Court up to life imprisonment, from
zero to life imprisonment. In the case of first degree
burglary, that if the defendant's found guilty of that,
of first degree burglary, that he will receive a
mandatory life sentence. If the defendant should be
found guilty of second degree burglary he would receive
in the discretion of the Court from zero to life im-
prisonment.

MR. FULLER: The defendant moves to quash the indictment
charging rape alternatively to require the State to elect
upon which indictment to proceed.

MOTION DENIED.

COURT: For the record, how many of you are black, would
you hold up your hands? Let the record show of those who
are here this morning two of them are black. The Court
instructs you that the defendant, Ronnie Wallace Long,
was charged in a Bill of Indictment with first degree
rape. I instruct you that the penalty for first degree
rape is a mandatory life imprisonment sentence. I instruct
you that the penalty for second degree rape is from zero
to life imprisonment in the discretion of the Court. The

defendant is also charged in a Bill of Indictment with
first degree burglary. The Court instructs you that the
penalty for first degree burglary is a mandatory life
sentence. The Court instructs you that the penalty for
second degree burglary is from zero or nothing to life
imprisonment in the discretion of the Court. Madam
Clerk, will you call a jury into the jury box. (There
are five total blacks among this jury). Twelve jurors
are called into the box.

MR. ROBERTS: Ladies and gentlemen of the jury, yesterday
you heard the Bills of Indictment read in this matter
wherein the State of North Carolina alleges in a Bill
of Indictment that the defendant, Ronnie Wallace Long,
did on, or about the 25th day of April, 1976, vagariously
entered the home of one Juddy McKinney Bost, and after
having done so committed rape upon her body. To these
charges through his attorney he has entered a plea of not
guilty. The burden therefore falling upon the State of
North Carolina to prove his guilt, and to prove his guilt
beyond a reasonable doubt, before the State is entitled
to a conviction in this matter. Now, how many of you
people have ever served on any type of jury before, would
you please raise your hand? One. By way of explanation,
let me say this that the trial of any law suit particular-

1    ly criminal law suits is not what you are accustomed to

2    to seeing on television, none of the testimony you hear

3    is according to a prepared transcript. Essentially a

4    trial is the selection of the jury, presentation of evi-

5    dence, the contention of the attorneys, the statements

6    of the Court as to the evidence and the law, and then the

7    jury's deliberation of a verdict. It took me about ten

8    seconds to say that but this trial could conceivably last

9    for days, therefore, the State and the defendant is con-

10    cerned about the health of all of you. Do any of you

11    know any -- have any problems with your health that a

12    prolonged trial would interfere with? Now, it is obvi-

13    ous as you have found out there's going to be a lot of

14    sitting, a lot of waiting and trials are by necessity

15    long. It could be tedious, laborous, so if any of you

16    have any health problems, we would like to know that

17    because if someone has a problem bothering them, we are

18    of the opinion you cannot give the evidence the attention

19    it needs. If any of you have any physical illness that

20    could keep you from being attentive to this evidence,

21    would you please raise your hand at this time? Mrs.

22    Fortson, do you feel that a long prolonged trial would

23    be difficult for you to sustain?

24    MRS. FORTSON: Well, I have arthritis real bad in my

25    knees and sometimes it bothers me from sitting too much,

1   or bothers me from walking too much.

2   MR. ROBERTS: I assume from my knowledge of arthritis

3   that the damp weather aggravates it?

4   MRS. FORTSON: It bothers me about all the time practical-

5   ly.

6   MR. ROBERTS: Is this situation painful to you if you

7   can't get up and move?

8   MRS. FORTSON: Sometimes I can't hardly walk. Awhile ago

9   when I got up here, I kind of staggered a little bit, you

10   know, got overbalanced.

11   MR. ROBERTS: The State would ask the Court in its dis-

12   cretion to excuse this lady because of the anticipated

13   time of this trial.

14   COURT: All right, I'll excuse her and I'll excuse her for

15   the term.

16   CLERK: Holland James Skidmore.

17   MR. ROBERTS: Mr. Skidmore, sir, from where you were

18   seated did you hear the questions I just put to the jury?

19   MR. SKIDMORE: Yes, sir.

20   MR. ROBERTS: Do you have any physical ailments that would

21   interfere with your sitting?

22   MR. SKIDMORE: No, sir.

23   MR. ROBERTS: Now, ladies and gentlemen of the jury, His

24   Honor, told you briefly a little bit about jury selection.

25   I want to be a little more particular about it. The State

1   of North Carolina is entitled to a fair trial. The De-

2   fendant is entitled to a fair trial, and the whole purpose

3   of our asking you questions is to take your answers and

4   evaluate them and determine whether or not you can be

5   impartial in this particular trial. We have to ask

6   questions to evaluate your predisposition to sit in this

7   case and be fair to both sides, because under the law we

8   are both entitled to a trial by twelve jurors who are

9   impartial, who at this moment have no opinion as to guilt,

10   or innocence, no prejudices that would prevent you from

11   hearing the evidence as it is, and we have to ask these

12   questions. We have to be blunt in certain circumstances,

13   and in certain areas so we can evaluate your ability to

14   sit as jurors, and as His Honor says neither the State

15   or defendant wishes to embarrass you, but we have to ask

16   you these questions. Now, does any member of this jury

17   personally know the defendant in this case, Ronnie Wallace

18   Long, who sits with his attorneys at the far end of this

19   table with the tinted glasses? If you know him, please

20   raise your hand and indicate that fact to me. Seated

21   behind him are his parents, Mr. & Mrs. Long. Do any of

22   you know them? If you do, please raise your hand. The

23   defendant is represented by Mr. Carl Atkins seated im-

24   mediately to my right; Ms. Evoynne Mims seated to his

25   right, and Mr. Jim Fuller who is not in the courtroom at

1   this time.  Do either of you know either of those

2   attorneys?  If you do, please raise your hand to indicate

3   that fact.  The State alleges, ladies and gentlemen of

4   the jury, that this crime occurred on April 25, 1976.

5   There was considerable publicity in the newspaper.  I

6   want to ask you at this time if you have read, or heard

7   anything about this case, would you please raise your

8   hand and keep your hand raised until I ask you please to

9   lower them.  Thank you.  Now, Miss Causby, ma'am, you did

10   not raise your hand.

11   <u>MISS CAUSBY</u>:  I don't know nothing about it.

12   <u>MR. ROBERTS</u>:  Do you subscribe to the Concord Tribune?

13   <u>MISS CAUSBY</u>:  No.

14   <u>MR. ROBERTS</u>:  Kannapolis Daily Independence?

15   <u>MISS CAUSBY</u>:  No.

16   <u>MR. ROBERTS</u>:  Do you recall reading anything in these

17   newspapers?

18   <u>MISS CAUSBY</u>:  I hardly ever read any paper.

19   <u>MR. ROBERTS</u>:  Do you recall seeing or hearing anything

20   about this matter on your television set?

21   <u>MISS CAUSBY</u>:  No.

22   <u>MR. ROBERTS</u>:  What part of the County do you live in,

23   Miss Causby?

24   <u>MISS CAUSBY</u>:  I don't know what you mean what part of the

25   County.

MR. ROBERTS:  What is your address?

MISS CAUSBY:  Route four.  I live in Shady Brook Section.

MR. ROBERTS:  Of Kannapolis?

MISS CAUSBY:  Yes.

MR. ROBERTS:  Mr. Johnson, I believe you indicated, sir, you knew nothing about this case is that correct?

MR. JOHSON:  Yes, sir.

MR. ROBERTS:  Do you not recall reading about it in the newspapers.

MR. JOHNSON:  I don't take the newspaper right now. I just moved and I'm on the Salisbury route.  It's Rockwell, but it's Salisbury route.

MR. ROBERTS:  You live in Cabarrus County?

MR. JOHNSON:  Yes, sir.

MR. ROBERTS:  But the route is a Salisbury route?

MR. JOHNSON:   Route 1, Rockwell.

MR. ROBERTS:  What particular road?

MR. JOHNSON:   Kluttz Road.

MR. ROBERTS:  How long have you lived at that particular location?

MR. JOHNSON:  Three months.

MR. ROBERTS:  Where did you live prior to that time?

MR. JOHNSON:  In Kannapolis.

MR. ROBERTS:  At that time you didn't subscribe to the Daily Independence?

1  MR. JOHNSON: Yes, sir. At that time I did.

2  MR. ROBERTS: And do you not recall reading anything about

3  this case?

4  MR. JOHNSON: Well, I was building a house. I built it

5  by myself, I worked day and night on it, sir.

6  MR. ROBERTS: Mr. Haigler, you did not raise your hand

7  did you, sir?

8  MR. HAIGLER: Yes, sir.

9  MR. ROBERTS: You did raise your hand?

10  MR. HAIGLER: No, sir, I didn't.

11  MR. ROBERTS: Where do you live in the County, Mr.

12  Haigler?

13  MR. HAIGLER: Mt. Pleasant.

14  MR. ROBERTS: Do you not subscribe to the Concord Tribune?

15  MR. HAIGLER: Yes, sir, but I hardly ever read the paper.

16  It's very seldom I pick it up.

17  MR. ROBERTS: So you have never read nor heard anything

18  about this case?

19  MR. HAIGLER: No, sir.

20  MR. ROBERTS: Ladies and gentlemen of the jury, as you

21  arrived at the courthouse this morning, if you came in the

22  front door, I assume you saw people there with picketing

23  signs. If you saw that, would you please raise your hands

24  and indicate that fact? All right. Thank you. Now,

25  ladies and gentlemen of the jury, the State of North

Carolina, as well as the defendant and his attorneys,
intend for this case to be tried in this courtroom, and
not on the public streets of the city of Concord.  Now,
I propose this to all twelve of you, if you are affected
by that, that is if you feel that these people are in-
timidating you, you cannot be fair to the State.  If you
feel and get angry with the defendant over it, then you
can't give him a fair trial.  Now, I assure you that the
attorneys sitting to my right and the people sitting here
want to try this case independent of anything that may go
on outside this courtroom, and we would like to ask you,
at this time, if any of you feel any sense of intimida-
tion merely by the fact that people are picketing, or
parading in the streets, if this would possibly affect
your verdict? Would you please raise your hands and
indicate that fact at this time?  You see, don't you,
this could affect you in two ways.  It could make you
prejudiced either against the defendant, or the State
and, of course, if that occurs then we would not be
getting a fair trial in this courtroom, based on the evi-
dence and the law, and it is tremendously important to
both parties that this case be tried in this courtroom
and not on the streets.  Do I understand that none of you
have raised your hands, that you will not become intimi-
dated by these people and hold it against the State or

the defendant?  We do not want people to be affected by
anything that happens outside this courtroom.  Do any of
you feel, or even suspect that you would possibly be
affected by anything that happened outside this court-
room this week?  Can I assume then by your failure to raise
your hands, you could care less about what is going on in
the streets and by guided by the evidence you hear in this
courtroom?  If you can't do that, please raise your hand
and indicate that fact.  Now, ladies and gentlemen of the
jury, it's obvious in this case that the defendant is a
black man and that the prosecuting witness for the State,
Mrs. Bost, is a white woman.  In the State of North Caro-
lina the laws apply equally to all people.  All of our
people are citizens of the State and shall be treated as
citizens, given all rights that accrue to citizenship.
Are there any members of this jury who cannot judge this
case solely between the acknowledgment of citizens
against each other, rather than as an issue of black
against white, or white against black?  If you cannot do
that, would you please raise your hand and indicate that
fact at this time?  The very first thing His Honor will
tell you in his charge is that you must take the law as
he said it is, as our Legislature has enacted and apply
it to the facts in this case, so that all people in this
State will be treated equally under the law.  Now, the

reason he says that is this, some people have mis-
conceptions about what the law is.  They want to put the
law that they think it is to the facts rather than what
he says it is.  Some people want to put the law to the
facts that they think the law ought to be rather than
what it is.  So, therefore, it becomes very important
that you commit yourselves to the proposition that you
can and will accept the law that His Honor says applies
in this State without substituting applied conceptions,
or substituting your own opinion as to what the law ought
to be.  If you can't take the law as exists in this case
and apply it to the facts in this case, please raise your
hand and indicate that fact to me.  Mr. Richey, sir, where
do you live in the county?

MR. RICHEY:  City of Concord, Odell Drive Northwest.

MR. ROBERTS:  What is your occupation, sir?

MR. RICHEY:  Telephone technician, Concord Telephone
Company.

MR. ROBERTS:  Are you married, Mr. Richey?

MR. RICHEY:  Yes, sir.

MR. ROBERTS:  Is your wife publicly employed?

MR. RICHEY:  No, sir.

MR. ROBERTS:  Homemaker?

MR. RICHEY:  Yes, sir.

MR. ROBERTS:  You have any children, sir?

1    MR. RICHEY: Yes, sir.

2    MR. ROBERTS:  Mr. Richey, you indicated, sir, that you

3    had heard something about this case, or that you had

4    heard it discussed, or that you had seen something about

5    it on the television.  I ask you do you recall at this

6    moment what, if anything, you read, saw, or heard?

7    MR. RICHEY:  Nothing specifically, sir.

8    MR. ROBERTS:  And by the way, ladies and gentlemen, if the

9    State of North Carolina through me, or the defense lawyers

10   ask you if you have opinions that you formed, please don't

11   state those opinions.  We are not interested and it is not

12   fair to say what you think.  What we want to know is, if

13   you have an opinion, and please answer yes, or no, don't

14   please blurt out an opinion, because your opinion at this

15   point doesn't mean a thing.  We are merely, as I said,

16   trying to evaluate your impartiality.  Now, Mr. Richey,

17   you say you have some recall of the facts?

18   MR. RICHEY:  Yes, sir.

19   MR. ROBERTS:  Did you at the time that you read, or heard,

20   or saw what you experienced, form or express any opinion

21   as to guilt, or innocence of this defendant?

22   MR. RICHEY:  No, sir.

23   MR. ROBERTS:  More importantly, do you, at this moment,

24   have any opinion as to his guilt, or his innocence?

25   MR. RICHEY:  No, sir.



1   MR. ROBERTS: You understand do you that when a defendant

2   pleads not guilty, the law of North Carolina enshrouds

3   him with a cloak of innocence, and he remains innocent

4   unless, and until the State can prove his guilt to you

5   beyond a reasonable doubt? You understand that, do you?

6   MR. RICHEY: Yes, sir.

7   MR. ROBERTS: And at this moment, you say you have no

8   opinion as to his guilt, or his innocence?

9   MR. RICHEY: Yes, sir.

10   MR. ROBERTS: Mr. Allison, where do you live in the county?

11   MR. ALLISON: Township 12, City of Concord.

12   MR. ROBERTS: Are you publically employed?

13   MR. ALLISON: I am.

14   MR. ROBERTS: Where do you work?

15   MR. ALLISON: Field Engineer, Burroughs Corporation.

16   MR. ROBERTS: Are you married, Mr. Allison?

17   MR. ALLISON: Yes, sir.

18   MR. ROBERTS: Do you have children?

19   MR. ALLISON: Yes, sir.

20   MR. ROBERTS: Is your wife publically employed?

21   MR. ALLISON: Yes, sir.

22   MR. ROBERTS: What is the nature of the work she does?

23   MR. ALLISON: Bookkeeper.

24   MR. ROBERTS: Now, Mr. Allison, you sir, also stated that

25   you had some prior knowledge of this case through either

the newspaper, or news media. Do you recall presently

what you have read?

MR. ALLISON: Just paper

MR. ROBERTS: Now, Mr. Allison, after having read it did

you at that time form, or express any opinion as to the

guilt or innocence of the defendant?

MR. ALLISON: No.

MR. ROBERTS: Do you, more importantly, at this time, have

any opinion as to his guilt or innocence?

MR. ALLISON: No.

MR. ROBERTS: And you, sir, if you are chosen to sit on

this jury do you feel that you could hear the evidence in

this case and apply the law to that evidence, and reach

your verdict solely on what you see or hear in this court-

room?

MR. ALLISON: Yes, sir.

MR. ROBERTS: Mr. Bonds, sir, where do you live in the

county?

MR. BONDS: I live in Kannapolis at Cartown.

MR. ROBERTS: Mr. Bonds, are you presently employed?

MR. BONDS: No, sir, I'm retired.

MR. ROBERTS: And who did you work for before your

retirement, Mr. Bonds?

MR. BONDS: Cannon Mills.

MR. ROBERTS: And are you married, sir?

1    MR. BONDS: Yes, sir.

2    MR. ROBERTS: Was your wife ever publically employed?

3    MR. BONDS: Yes, she's working now.

4    MR. ROBERTS: Where?

5    MR. BONDS: She works for Cannon Mills now.

6    MR. ROBERTS: Did you and Mrs. Bonds have any children,

7    Mr. Bonds?

8    MR. BONDS: Yes, sir.

9    MR. ROBERTS: Mr. Bonds, do you recall reading, or hearing

10   anything about this case?

11   MR. BONDS: Well, I read a little about it and seen it on

12   television a little, or news.

13   MR. ROBERTS: Now, Mr. Bonds, we don't live in a vacuum,

14   we can't escape newspapers, or televisions, but the im-

15   portant thing is, is whether from what you have seen, or

16   read, whether or not at that time, or now, you have any

17   opinion as to the guilt or innocence of the defendant, and

18   do you, sir, have an opinion at this moment?

19   MR. BONDS: Nothing only what it read, that's all I know.

20   A lot the times they publish things that ain't exactly

21   right.

22   MR. ROBERTS: In other words, if you are chosen to sit on

23   this jury you can completely disabuse your mind from what

24   you read in the newspaper, and be guided solely from the

25   testimony you heard in this courtroom, can you do that?

MR. BONDS: Yes, sir.

MR. ROBERTS: And at this moment you understand that the defendant is innocent under the laws of this State?

MR. BONDS: Yes, sir.

MR. ROBERTS: And you are willing to give him that presumption at this time, and nothing in your experience leaves you to think at this moment that he is guilty? That might be a little confusing to you. In other words, you have no opinion, can I be assured of that?

MR. BONDS: No, I have no opinion.

MR. ROBERTS: Miss Allman, is it Miss or Mrs.?

MRS. ALLMAN: Mrs.

MR. ROBERTS: Mrs. Allman, are you publically employed?

MRS. ALLMAN: Yes, sir, to Cora Yarns in Mt. Pleasant.

MR. ROBERTS: Is your husband publically employed?

MRS. ALLMAN: Yes, sir. Cannon.

MR. ROBERTS: Do you and Mr. Allman have children?

MRS. ALLMAN: Yes, sir.

MR. ROBERTS: Mrs. Allman, you indicated, ma'am, that you read or heard something about this case. I assume it's newspaper and television. Do you at this moment, Mrs. Allman, have any opinion as to the guilt, or innocence of this defendant?

MRS. ALLMAN: No, sir.

MR. ROBERTS: And, ma'am, if you are chosen to sit on this

1   jury can you be guided solely by the evidence that you

2   heard in this courtroom?

3   MRS. ALLMAN:  Yes, sir.

4   MR. ROBERTS:  Mr. Skidmore, sir, where do you live, sir,

5   in the county?

6   MR. SKIDMORE:  In Kannapolis, 615 Leonard Avenue, sir.

7   MR. ROBERTS:  Are you publically employed?

8   MR. SKIDMORE:  Yes, sir.

9   MR. ROBERTS:  What is the nature of your work?

10  MR. SKIDMORE:  Cannon Mills.

11  MR. ROBERTS:  You married, Mr. Skidmore?

12  MR. SKIDMORE:  Yes, sir.

13  MR. ROBERTS:  Is your wife publically employed?

14  MR. SKIDMORE:  Yes, sir.

15  MR. ROBERTS:  What is the nature of her work?

16  MR. SKIDMORE:  Cannon Mills.

17  MR. ROBERTS:  Textile?

18  MR. SKIDMORE:  Yes, sir.

19  MR. ROBERTS:  Do you and Mrs. Skidmore have children?

20  MR. SKIDMORE:  Yes, sir, we do.

21  MR. ROBERTS:  Mr. Skidmore, you also indicated that you

22  read something about this case, or heard this case.  Did

23  you at that time, or do you now have any opinion as to the

24  guilt or innocence of the defendant?

25  MR. SKIDMORE:  No, sir, I sure don't.

1  MR. ROBERTS: And do you feel, sir, that you could sit on

2  this jury and be guided solely by the evidence that you

3  heard in here?

4  MR. SKIDMORE: Yes, sir, I sure do.

5  MR. ROBERTS: I noticed awhile ago when I referred to the

6  case being tried on the street, you shook your head in

7  agreement it should be tried in this courtroom, and I

8  assume you firmly believe that?

9  MR. SKIDMORE: Yes, sir, in this courtroom only.

10  MR. ROBERTS: Now, Miss Causby, are you publically em-

11  ployed?

12  MISS CAUSBY: Yeah.

13  MR. ROBERTS: Where do you work?

14  MISS CAUSBY: Chinagrove Cotton Mill.

15  MR. ROBERTS: Are you married, ma'am?

16  MISS CAUSBY: No.

17  MR. ROBERTS: Are you a native of Cabarrus County?

18  MISS CAUSBY: Yes.

19  MR. ROBERTS: You say you neither read nor heard anything

20  about this case?

21  MISS CAUSBY: I didn't even know there was a rape until

22  I came down here.

23  MR. ROBERTS: Is it Miss or Mrs. Slupe?

24  MRS. SLUPE: Mrs.

25  MR. ROBERTS: Mrs. Slupe, are you publically employed,

ma'am?

MRS. SLUPE: Yes.

MR. ROBERTS: What is the nature of your work?

MRS. SLUPE: Cannon Mill.

MR. ROBERTS: And is your husband publically employed?

MRS. SLUPE: At Cannon Mill.

MR. ROBERTS: Do you and Mr. Slupe have children?

MRS. SLUPE: Yes.

MR. ROBERTS: Now, Mrs. Slupe, you also indicated, ma'am, that you had read or heard something about this case. Did you at the time you read or heard, or do you at this moment have any opinion as to the guilt or innocence of this defendant?

MRS. SLUPE: No, sir.

MR. ROBERTS: And you heard my explanation of the law of this State that this defendant is presumed innocent until he is proven guilty?

MRS. SLUPE: Yes.

MR. ROBERTS: And you adhere to that rule of law, I assume you agree with it?

MRS. SLUPE: Yes.

MR. ROBERTS: And you are willing if chosen to sit on this jury, apply those principles to this trial and be guided solely by the evidence you shall hear in this courtroom?

MRS. SLUPE: Yes.

1  MR. ROBERTS:  Mrs. Slupe, would the activity on the public

2  streets out here have any effect on your verdict?

3  MRS. SLUPE:  No, sir.

4  MR. ROBERTS:  None whatsoever?

5  MRS. SLUPE:  No, sir.

6  MR. ROBERTS:  Mr. Johnson, sir, where do you work?

7  MR. JOHNSON:  For Laxton Construction Company.

8  MR. ROBERTS:  Are you married, sir?

9  MR. JOHNSON:  Yes.

10  MR. ROBERTS:  Is your wife publically employed?

11  MR. JOHNSON:  Yes, sir.

12  MR. ROBERTS:  What is the nature of her work?

13  MR. JOHNSON:  Secretary.

14  MR. ROBERTS:  She's not a secretary to a lawyer, I assume?

15  MR. JOHNSON:  No, sir.

16  MR. ROBERTS:  Do you and Mrs. Johnson have children?

17  MR. JOHNSON:  Yes, sir.

18  MR. ROBERTS:  And you say, sir, that you have absolutely

19  no knowledge of this case.  You don't know anything about

20  it at all?

21  MR. JOHNSON:  No, sir, not at all.

22  MR. ROBERTS:  And when you were suopoenaed to come here

23  you had no idea this case was docketed for trial, I

24  assume?

25  MR. JOHNSON:  The sheriff's department that came out said

there was a rape case coming up, but he didn't know when
and I didn't really have any idea what it would be until
I came in.

MR. ROBERTS: Now, Mr. Johnson, I assume then that if you
have neither read nor heard, nor seen anything about this
case that you could not possibly have any opinion about
it, is that correct?

MR. JOHNSON: True.

MR. ROBERTS: Is it Miss or Mrs. Sides?

MRS. SIDES: Mrs.

MR. ROBERTS: Mrs. Sides are you publically employed,
ma'am?

MRS. SIDES: No, I'm not.

MR. ROBERTS: Homemaker?

MRS. SIDES: Yes.

MR. ROBERTS: And what kind of work does your husband do?

MRS. SIDES: He's a construction worker.

MR. ROBERTS: Do you and Mr. Sides have children?

MRS. SIDES: Yes.

MR. ROBERTS: Mrs. Sides, you indicated, ma'am, that you
had read, or heard something about this case. At the
time you read, saw or heard whatever it was, or know, do
you have any opinion as to the guilt, or innocence of the
defendant?

MRS. SIDES: No.

1   MR. ROBERTS:  Would your verdict in this case possibly

2   be effected by the activity outside the courtroom?

3   MRS. SIDES:  No.

4   MR. ROBERTS:  Is it Miss or Mrs. Snyder?

5   MRS. SNYDER:  Mrs.

6   MR. ROBERTS:  Mrs. Snyder are you publically employed,

7   ma'am?

8   MRS. SNYDER:  I own my own business.

9   MR. ROBERTS:  What is it?

10  MRS. SNYDER:  It's a craft shop.

11  MR. ROBERTS:  Where is this situated?

12  MRS. SNYDER:  215 West A Street, Kannapolis.

13  MR. ROBERTS:  Is your husband publically employed?

14  MRS. SNYDER:  Yes, he's a mechanic.

15  MR. ROBERTS:  And do you and Mr. Snyder have children?

16  MRS. SNYDER:  Yes, we do.

17  MR. ROBERTS:  Now, Mrs. Snyder, you indicated, ma'am,

18  that you read, saw, or heard something about this case.

19  Did you at any time, or do you now have any opinion as to

20  the guilt, or innocence of the defendant?

21  MRS. SNYDER:  No.

22  MR. ROBERTS:  Do not?

23  MRS. SNYDER:  No.

24  MR. ROBERTS:  Would you in any way be intimidated, or

25  affected by the activity on the street?

MRS. SNYDER:  No, I wouldn't.

MR. ROBERTS:  This would create no prejudice against the State, or the defendant in your opinion?

MRS. SNYDER:  No.

MR. ROBERTS:  Mr. Haigler, sir, what is your line of work?

MR. HAIGLER:  I work for the State Highway Department.

MR. ROBERTS:  In what capacity, sir?

MR. HAIGLER:  The Department of Transportation.

MR. ROBERTS:  Are you married?

MR. HAIGLER:  No, sir, single.

MR. ROBERTS:  Now, you indicated that you had not read, seen, nor heard anything about this case, is that correct?

MR. HAIGLER:  Yes.

MR. ROBERTS:  So, then can I assume that you have no opinion as to the defendant's guilt, or innocence?

MR. HAIGLER:  Yes, sir.

MR. ROBERTS:  Would you, sir, be affected by the activity in the streets out here?

MR. HAIGLER:  No.

MR. ROBERTS:  Create no influence upon you at all?

MR. HAIGLER:  No, sir.

MR. ROBERTS:  Mr. Vartania, sir, what part of the County do you live in?

MR. VARTANIA:  Concord, Sunnyside Drive Southeast.

MR. ROBERTS:  Are you employed at the time?

1   MR. VARTANIA:  Retired government employee.

2   MR. ROBERTS:  What governmental agency did you work for?

3   MR. VARTANIA:  Missile Base Engineer.

4   MR. ROBERTS:  How long have you lived in the County?

5   MR. VARTANIA:  Two years, three months.

6   MR. ROBERTS:  Where is your home?

7   MR. VARTANIA:  Sunnyside Drive Southeast here in Concord.

8   MR. ROBERTS:  I believe prior to coming to Concord---

9   MR. VARTANIA:  Long Island, New York.

10  MR. ROBERTS:  Has your wife ever been publically employed,

11  sir?

12  MR. VARTANIA:  Yes, she's a dental assistant.

13  MR. ROBERTS:  Did you and Mrs. Vartania have children?

14  MR. VARTANIA:  Yes.

15  MR. ROBERTS:  Now, Mr. Vartania, you indicated you read,

16  or heard something about this case.  Do you recall, sir,

17  whether, or not at the time you read it that you formed

18  any opinion as to the guilt, or innocence of the de-

19  fendant?

20  MR. VARTANIA:  No opinion whatsoever.

21  MR. ROBERTS:  Do you at this moment have any opinion as to

22  his guilt, or innocence?

23  MR. VARTANIA:  No.

24  MR. ROBERTS:  Would you, sir, be affected by any activity

25  that has been going on in the streets around this court-