1 house?

2 MR. VARTANIA: No way, sir.

3 MR. ROBERTS: Feel no intimidation, or no prejudice about

4 it?

5 MR. VARTANIA: No, sir.

6 MR. ROBERTS: Now, ladies and gentlemen of the jury, I

7 believe that I asked you earlier, only one of you

8 intimated that you had served on a jury before. Let me

9 advise you that jury duty is not easy. It is a very

10 difficult thing. You will be eventually called upon to

11 reach a verdict in this case. To do that you have to

12 hear all of the evidence. The word verdict itself means

13 to speak the truth. That is what you'll have to do. Find

14 the facts, find out where the truth lies and render your

15 verdict based on it. Now, a verdict in the State of

16 North Carolina has to be a unanimous verdict. That is all

17 twelve people must agree on the same verdict, and when

18 His Honor charges you in this case, in each of these

19 charges there may be several alternatives. To be a ver-

20 dict all twelve have to agree on that particular verdict.

21 Now, there are twelve people who will sit on the jury.

22 There should be twelve opinions, there should be twelve

23 voices, and His Honor will tell you that it is your duty

24 to consider all of the evidence, consider all opinions and

25 let each voice be heard. Now, this is what we call a

deliberated verdict. That is a verdict arrived at after
deliberation, and in his preliminary remarks His Honor
will caution you to not walk into a jury room, and blurt
out he's guilty, or he's innocent, before you deliberate,
and listen to other opinions, because as he told you, you
are liable to stake yourselves out and prior vanity
wouldn't let you reverse your position. That is the
purpose in having twelve people so that there are twelve
opinions, twelve interpretations of the evidence, guid-
ance with each other, talking to each other. It is not
a case of one, or two people going back there and dic-
tating to others, nor is it a case of being stubborn, just
for being stubborn's sake. The jury system is not perfect
but it is the best system man has come up with to judge
other people. We could do it with two people, two, three,
five, but the law of this State is twelve. We ask you,
can you deliberate with each other, can you go back in
that jury room and respect the opinions of each other,
explore all the evidence, and arrive at a deliberated
verdict. Not a dictated verdict, whimsy verdict, foolish
verdict, but a deliberated verdict. It means working
together with people. Now, are there any of you because
of any reason that you might know, who cannot do this?
Would you please raise your hand and indicate that fact?
Now, ladies and gentlemen of the jury, prior to this case

1 being called there has been an orginazation, or the

2 people putting on activity in the streets.  Do any of

3 you personally know any of these people who are demon-

4 strating?

5 MR. ROBERTS:  Mr. Richey, who do you know in that group?

6 MR. RICHEY:  Mrs. Seahorn.

7 MR. ROBERTS:  Would the fact that you know her, or the

8 fact that she's on this committee affect your verdict,

9 Mr. Richey?

10 MR. RICHEY:  No, sir.

11 MR. ROBERTS:  Now, Mrs. Allman, I believe you are related

12 to Mrs. Seahorn are you not?

13 MRS. ALLMAN:  I might be distantly, but I didn't know she

14 was demonstrating, or had anything to do with it.

15 MRS. SIDES:  I also know her but I didn't know she was

16 demonstrating.

17 MR. ROBERTS:  Mrs. Sides, would that make any difference

18 to you?

19 MRS. SIDES:  No, sir.

20 MR. ROBERTS:  Mrs. Allman?

21 MRS. ALLMAN:  No, sir.

22 MR. ROBERTS:  If she's related to you, it would be on

23 your husband's side, would it not?

24 MRS. ALLMAN:  No, sir, on my father's side.

25 MR. ROBERTS:  If Your Honor please, at this time the

1 State is going to exercise a pre-emptory and excuse Mrs.

2 Causby. Thank you very much, Mrs. Causby.

3 MRS. CAUSBY: Do I step down?

4 MR. ROBERTS: Please. Now, ladies and gentlemen of the

5 jury, you may think that jury selection is easy, but Mr.

6 Atkins and I are trying to evaluate twelve people that

7 we don't know. I assume that none of you people know

8 me, or Mr. Ron Bowers on my staff, if you do please

9 raise your hand and indicate that fact. Mrs.Allman, you

10 stated that someone distantly related to you was one of

11 the demonstrators, how long have you seen her, ma'am?

12 MRS. ALLMAN: I don't know that she is, if her name is

13 Seahorn, she may be but I do not know if she is related

14 to me.

15 MR. ROBERTS: You do not know?

16 MRS. ALLMAN: I don't.

17 MR. ROBERTS: Can I assume then that you have not seen

18 her in the recent past?

19 MRS. ALLMAN: No, sir, have not.

20 MR. ROBERTS: Now, ladies and gentlemen of the jury,

21 sometimes the State of North Carolina is at a distinct

22 disadvantage, in that you have probably never seen Mr.

23 Atkins, or Ms. Mims before, but we bring you into Court

24 on traffic tickets before, and sometimes you people get

25 a traffic ticket and never forgive us for issuing it,

1    that is law enforcement.  Have any of you ever got a

2    traffic ticket that you felt was so unjustified that your

3    prejudice against the State or some source of irritation

4    to you, these things happen, we are aware of that, we're

5    just interested in the fact that you wouldn't let a little

6    thing like that affect your judgement in this case.  If

7    that has happened to you, would you please raise your

8    hand and indicate that fact to me in all candor?  Your

9    Honor, I'd like the twelfth juror seated, please.

10   COURT:  You pass these eleven?

11

12   MR. ROBERTS:  No, sir, but I'd like the twelfth one.

13   COURT:  No, sir, I'm going to let you pass on the other

14   jurors.

15

16   MR. ROBERTS:  Well, I want to speak in generalities.

17   COURT:  Well, they can hear you in the courtroom.

18

19   MR. ROBERTS:  Ladies and gentlemen, I have been talking to

20   you approximately fifty-five minutes, and it is obvious

21   that I can't get to know you in that brief amount of time,

22   and I'm having to make an evaluation.  The only thing in

23   this world that the State of North Carolina is interested

24   in is a fair and an impartial jury, and I could ask you

25   endless questions running into next week to try to

1   evaluate that. Now, you have heard by the tenor of my

2   voice what the State's interested in, what the Defendant

3   is interested in, but really we don't care but about one

4   thing and that is whether or not you can give the State

5   of North Carolina a fair and an impartial trial; and the

6   Defendant a fair and an impartial trial. Now, whether I

7   have asked you or not for some reason you had rather not

8   give, or for something that's bothering you about this

9   whole thing, if without giving me the reason, if you

10  can't be a fair and impartial juror, without explaining

11  it would you please raise your hand to me at this time

12  and express that fact? Can I assume from your failure to

13  raise your hands that none of you know of any reason

14  consciously that you can't serve as an impartial juror in

15  this case? If I'm wrong about that please raise your

16  hand. May it please the Court, the State is content with

17  the eleven.

18

19  CLERK: Leonard C. Witherspoon.

20  MR. ROBERTS: Ladies and gentlemen, before I forget it if

21  we take a recess or something, when you come back please

22  memorize your seat because the only way Mr. Atkins and I

23  know where you are is on this diagram, and if you don't

24  take the same seats we won't be calling you by your name,

25  because we have got the seats numbered and this is the

1  only way we can identify you.  Now, Mr. Witherspoon,

2  sir, from where you were seated, did you hear the questions

3  that I have been asking this jury?

4  MR. WITHERSPOON:  Yes, sir.

5  MR. ROBERTS:  Where do you live in the County, Mr. Wither-

6  spoon?

7  MR. WITHERSPOON:  Kannapolis.

8  MR. ROBERTS:  Is that Easter Circle?

9  A  Correct.

10  Q  Where is that?

11  A  Off Little Texas Road.

12  Q  At, or near Cary Products?

13  A  Yes.

14  Q  And are you publically employed, Mr. Witherspoon?

15  A  Yes.

16  Q  Where do you work, sir?

17  A  Celenese Coating in Charlotte.

18  Q  Mr. Witherspoon, do you personally know the defendant

19  in this case, Ronnie Wallce Long seated at the defence

20  table?

21  A  I know his father.

22  Q  How long have you known his father?

23  A  For a long time.

24  Q  Would you ever happen to ride to work with his father

25  in Charlotte?

1   A   No.

2   Q   When you say a long time, Mr. Witherspoon, how long

3   we talking about?

4   A   Something like twelve years.

5   Q   You ever visited in his home, or him in yours?

6   A   Well, once.

7   Q   Go places together?

8   A   No.

9   Q   Just describe the nature of the relationship to me,

10   Mr. Witherspoon.

11   A   Well, he made me a bird bath.

12   Q   You consider him your friend?

13   A   Well, yes, sir.

14   Q   Now, I want you to be candid and open with me, Mr.

15   Witherspoon, because of the relationship with this de-

16   fendant's father could you completely detach yourself

17   from that relationship and look at this evidence im-

18   partially?

19   A   Yes.

20   Q   You think you could?

21   A   Uh huh.

22   Q   And it wouldn't affect you, sir, if you were to---

23   you wouldn't keep in the back of your mind, if I convict

24   this boy I'd have to go over and face his father?

25   A   Well, not really. I hadn't thought of it that way.

Q   It wouldn't affect you at all?  Since I suggested it, I want you to think about it a little bit, would it embarrass you at all?

A   Well, I'd like to disqualify myself.

Q   Well, I want you to be fair with me.  I'm trying to be fair with you.  After my suggesting that, would it affect your deliberation on this verdict if you were sitting on this jury?

A   Well, I'd like to be disqualified from it.

Q   And is that the reason, Mr. Witherspoon, because you feel it would be extremely difficult for you to sit on the jury?

A   Yes.

Q   I appreciate your candor.  Your Honor, I would challenge for cause.

COURT:  All right.  The Court will excuse Mr. Witherspoon.

CLERK:  Herman Franklin Flowers.

MR. ROBERTS:  Mr. Flowers, sir, where do you live in the County?

MR. FLOWERS:  I live on Boy Scout Camp Road.

Q   East of Kannapolis?

A   West.

Q   Excuse me, I was at the Girl's Scout.  West of Kannapolis.  Mr. Flowers, I believe that's a semi-rural area

1   out there?

2   A   Yes, sir.

3   Q   And where do you work, Mr. Flowers?

4   A   I work in Charlotte.   Transcon Trucking Line.

5   Q   Are you married, Mr. Flowers?

6   A   Yes, sir.

7   Q   Is your wife publically employed?

8   A   Textile.

9   Q   Did you and Mrs. Flowers have any children?

10   A   Yes, sir.

11   Q   Now, Mr. Flowers, from where you have been seated in

12   the courtroom have you heard everything I have been

13   saying?

14   A   Yes, sir.

15   Q   Then you know the purpose of this question asking I

16   hope.

17   A   Yes, sir.

18   Q   Now, Mr. Flowers, do you recall reading, or hearing

19   anything about this case in the paper?

20   A   I read a little bit about it in the paper when it

21   happened.

22   Q   Recently have you read anything in the paper?

23   A   No, sir.

24   Q   Mr. Flowers, do you recall whether or not you formed,

25   or expressed any opinion as to the guilt, or innocence of

1    the defendant at the time you read it?

2    A    No, sir.

3    Q    Do you at this moment have any opinion as to his

4    guilt, or innocence?

5    A    No, sir.

6    Q    Did you understand my explanation to the other jurors

7    that under the laws of this State he is presumed to be

8    innocent unless and until the State proves his guilt

9    beyond a reasonable doubt?

10   A    Yes, sir.

11   Q    Do you believe in that theory of law?

12   A    Yes, sir.

13   Q    You willing to give him that privilege?

14   A    Yes, sir.

15   Q    Now, you heard me refer to some people for whatever

16   reasons demonstrating in the street, Mr. Flowers, would

17   you be possibly intimidated by the activity?

18   A    No, sir.

19   Q    Wouldn't frighten you?

20   A    No, sir.

21   Q    Would you, or in the other opinion, would you feel

22   that these people are operating as an instrument of the

23   defendant and hold it against him?

24   A    No, sir.

25   Q    You understand, do you, that we are trying the

1   lawsuit in this courtroom, and as State's attorney, and

2   Defence attorney, we are content to try it in here, and

3   not try it in the streets?

4   A   Yes.

5   Q  Everybody in this courtroom wants to try it in this

6   Court rather than in the street, and you can do that?

7   A   Yes.

8   Q   And wouldn't be affected at all by pickets around the

9   courthouse?

10   A   No.

11   Q  Now, Mr. Flowers, you say you heard all of the

12   questions that I asked, do you have any question about

13   anything I asked the other jurors?

14   A   No, sir.

15   Q  And you heard my final question, and the only one

16   that anybody in this courtroom is interested in, is after

17   considering all these questions I have asked, and the

18   answers thereto, and so forth, whether I have asked you,

19   or not, or whether you want to express it, do you know

20   of any reason that would prevent you from giving both the

21   State and the defendant a fair trial?

22   A   No, sir.

23   Q   Do not know of any reason?

24   A   No reason.

25   Q   And you can hear the evidence and make up your mind

1   solely on what you hear come from that witness stand?

2   A   Yes, sir.

3   Q   Do you, sir, feel that you could deliberate with the

4   other jurors?

5   A   Yes, sir.

6   Q   And you feel that if you had an opinion would you

7   express it in the jury room?

8   A   Yes, sir.

9   Q   If someone said something that you didn't believe,

10  would you challenge them on it and say that's not what

11  happened out there, if you heard it different?

12  A   Yes, sir.

13  Q   You wouldn't challenge them?

14  A   I would challenge them, but I wouldn't go any further.

15  Q   The point I'm making is this, we all go to football

16  games, and depending on whether you are on the home team,

17  or visiting team we don't quite see it alike as to who

18  was offsides, or something like that.  We don't want one

19  side telling the other side.  We want you to think to-

20  gether, and deliberate all of it and explore it, and if

21  you feel you could sit with the other jurors, and be fair

22  minded respecting their opinion, and demanding that they

23  respect yours, until it is all settled to the satisfaction

24  of all, and then that's when you arrive and return a

25  verdict.

1    A   Yes, sir.

2    Q   And you don't think you'd have any difficulty on

3    that?

4    A   No, sir.

5    Q   Now, the defendant is a black man.  The prosecuting

6    witness is a white woman.  Would that in and of itself

7    affect your verdict in this case?

8    A   No, sir.

9    Q   And you can base your deliberation and your verdict

10    solely on the fact that they are both citizens of this

11    State?

12    A   Yes, sir.

13    Q   I don't recall, Mr. Flowers, if I asked you, did you

14    personally know the defendant, Ronnie Wallace Long?

15    A   No, sir.

16    Q   You know either of his parents seated immediately

17    behind him?

18    A   No, sir.

19    Q   Or his attorneys Mr. Atkins, or Ms. Mims?

20    A   No, sir.

21    Q   Mr. Flowers, have you ever gotten a speeding ticket,

22    or anything that aggravated you to the extent that you

23    never forgot about it, and that you are prejudiced against

24    law enforcement?

25    A   No, sir.

Q   How is your health, sir?

A   Good.

MR. ROBERTS:  Your Honor, if Your Honor please, the State is content with the jury.

MR. ATKINS:  Ladies and gentlemen of the jury, my name is Carl Atkins, and we represent the Defendant, and like Mr. Roberts, we have a duty to the Defendant and to the Court to inquire of you to see if we feel that you can be fair and impartial jurors in this case.  To this end I am going to ask you questions.  Some of them may be rather personal questions, and I would ask that you not feel that we are trying to pry into your lives, but understand that we, as Mr. Long's lawyers, have to try to make an assessment of the twelve of you people who we have never met before, and have no knowledge of your opinions about things.  So, don't hold any questions that I  might ask you that may embarrass you, or even make you angry, don't hold that against the Defendant.  I ask you to that at the outset.  Now, Mr. Richey?

MR. RICHEY:  Yes, sir.

MR. ATKINS:  Where were you born?

A   Cabarrus County.

Q   Have you lived here all your life?

A   Yes, sir.

1   Q   Now, you said, I believe, that you were married and

2   you had children.

3   A   Yes, sir.

4   Q   How many children do you have?

5   A   One daughter.

6   Q   How old is she?

7   A   Twenty-three.

8   Q   Mr. Richey, well, let me ask the jury as a whole to

9   listen to the names of some possible witnesses in this

10  case, and if you know any of the witnesses would you

11  please raise your hand?  The State would propose to

12  possibly call the following people, that is Mrs. Sarah

13  Judson Bost, the victim of this crime; Mrs. Phennel; Mr.

14  Phennel; and Dr. Lintz Monroe.  In what capacity do you

15  know Dr. Monroe?

16  JUROR:  He's my wife's physician.

17  MR. ATKINS:  Are you social friends?

18  JUROR:  No, sir.

19  MR. ATKINS:  What about you?

20  JUROR:  He just delivered all my children.

21  MR. ATKINS:  Who else raised their hand?  Let me just ask

22  you generally, are most of you acquainted with him in his

23  professional capacity as a physician?  Are any of you

24  social friends with Dr. Monroe?  Do any of you feel the

25  fact that you know him, or he's provided some service for

1    you, or your family would cause you to give any undue

2    weight to whatever he might have to say in the courtroom,

3    that fact alone? How about James Greer; Bernard Steele;

4    Carl Young; Mary Bonds, local teacher? Yes, sir, Mr.

5    Allison, you know Ms. Bonds?

6    MR. ALLISON: I do.

7    Q    In what capacity do you know her?

8    A    Friends, that's all.

9    Q    Do you visit in her home?

10   A    No.

11   Q    Has she taught any of your children?

12   A    Yes.

13   Q    How long have you known her?

14   A    Twenty, twenty-five years.

15   Q    If she were to testify in this case, Mr. Allison,

16   would you be inclined to give her word more credence be-

17   cause of the fact that you know her?

18   A    No.

19   Q    You think that you could listen to her testimony as

20   objectively as anybody else you didn't know?

21   A    Yes.

22   MR. ATKINS: Mr. Franklin Niblock, Jr. Do you know Mr.

23   Niblock?

24   JUROR: He's my children's doctor.

25   MR. ATKINS: This is Franklin Niblock, Jr.

     JUROR: Oh, Junior, no.

1   MR. ATKINS: That I think is his son, you don't know him?

2   JUROR: No, I'm sorry.

3   MR. ATKINS: Thomas M. Carr. Any of you know him?

4   Thelma E. Phifer from Washington, D. C. Do any of you

5   know her? Now, let me ask you about some other witnesses

6   that the State may call who are police officers: Sgt.

7   J. B. Parnell; Mr. E. T. Siefert; Mr. J. R. Keat; David

8   Taylor; Mr. G. M. Vogler.

9   JUROR: Sir, I know most all of them just by name, and by

10   seeing them on the streets.

11   MR. ATKINS: Mr. Van Eisenhower; Mr. Dennis Mooner; W. L.

12   Arthur, and C. C. Ludwick. Mr. Richey, you say you know

13   most of these officers?

14   MR. RICHEY: Yes, sir.

15   MR. ATKINS: In what capacity?

16   A   Just as officers.

17   Q   Have you ever been a witness for any of them, or had

18   any professional dealings with them?

19   A   No, sir.

20   Q   Have you visited in any of their homes, or have they

21   visited in your home?

22   A   No, sir.

23   Q   Mr. Richey, it's very possible sometimes for people to

24   take the attitude that a police officer should be given

25   more credence because of his position, and people some-

1  times tend to believe a police officer before they would

2  believe a civilian if there was a conflict in the testi-

3  mony.  Do you think that you could, well, do you think

4  you would believe a police officer more than you would

5  someone else who is testifying to a different opinion?

6  A    No sir.

7  Q    Have you ever been a victim of a crime of any sort?

8  A    No, sir.

9  Q    Have any of your relatives, or close friends been

10  victims of any crimes?

11  A    Relatives.

12  Q    Who is the relative?

13  A    Cousin.

14  Q    And what was the nature of the crime?

15  A    Driving under the influence and several others, I

16  don't know them all.

17  Q    I said victims.  I think you may not be talking about

18  the same thing.  I don't mean people who were charged, or

19  related to you, or has ever broken in a house of a close

20  friend, or relative that you know of?

21  A    No, sir.

22  MR. ATKINS:  Mr. Allison, let me just ask you how many of

23  these police officers do you know?

24  MR. ALLISON:  Well, I know about half of them.  Mr. Vogler

25  there, I'm a real good friend of his.

Q   Good friend of Mr. Vogler?

A   Yes.

Q   How long have you known Mr. Vogler?

A   Oh, ten years, I guess.

Q   Now, Mr. Allison, suppose that Mr. Vogler testified in this case and your verdict in this case was contrary to what you think Mr. Vogler would like the verdict to be, would you be embarrassed to run into him, or maintain your friendship with him, if you voted differently?

A   No.

Q   Would you be inclined to give his testimony more weight than you would that of the defendant?

A   No.

Q   You would not be at all concerned, or bothered about the fact that you have known Mr. Vogler ten years, and you would have no hesitancy in facing him should you hold against his position?

A   No.

MR. ATKINS:  Mr. Bonds, do you know any of the police officers?  Did you hear the names of the police officers, I read out?

MR. BONDS:  In the City of Concord?

Q   Which officers do you know in the City of Concord?

A   I don't know any by name much, or anybody in Concord, some in Kannapolis.

1  Q   In what capacity do you know them?  Do you visit with

2  them, or friends, or do you just knew that they are

3  police officers?

4  A   I just know they are police officers.

5  Q   Have you ever been a witness in a case where any of

6  these officers were involved?

7  A   No, I don't think so.

8  Q   Would the fact that you know these officers, or some

9  of them, and if they testify would that fact cause you to

10 give their word more credence than that of somebody else

11 who testified who was not a police officer?

12 A   Well, I don't think they are right everytime, myself.

13 Q   You tend to think that they would be right more often

14 than not, is that your view of it?  Were you ever in the

15 Service, Mr. Bonds?

16 A   No, sir.

17 MR. ATKINS:  Mrs. Allman, did you know any of the officers

18 whose names I called out?

19 MRS. ALLMAN:  No, sir, I didn't.

20 Q   Where were you born?

21 A   Cabarrus County.

22 Q   Have you lived here all your life?

23 A   Yes, sir.

24 Q   I believe you work for Tusacory Yarns?

25 A   That's right.

Q  Where is that located?

A  That is in Mt. Pleasant.

Q  And your husband worked at Cannon Mills?

A  Yes.

Q  Let me just ask you if the fact that a police officer took the witness stand, would you tend to give more credence to his testimony than you would to somebody else just because he was a police officer?

A  I don't believe so.

Q  Well, let me ask generally if there's anybody on the panel that feels a police officer's word is any better than anybody else just because he is a police officer? Mr. Allison, did you tell me your wife worked, or did you tell Mr. Roberts that?

MR. ALLISON:  Yes.

MR. ATKINS:  Where does she work?

A  Carolina Oil Company.

MR. ATKINS:  And Mr. Bonds, you are retired from Cannon Mills?

MR. BONDS:  Yes, sir.

Q  How long did you work for Cannon Mills?

A  Very near forty-eight years.

Q  You are aware, are you not, that the complaining witness in this case, Mrs. Juddy Bost, was related by marriage to a former officer of Cannon Mills?  Are you

1  aware of that?

2  A   No, sir.

3  Q   Well, if that should come out during the course of

4  this trial, would your past association with Cannon Mills

5  influence you to believe Mrs. Bost's testimony, or give

6  more weight to Mrs. Bost's testimony because of your

7  former association with Cannon Mills?  Would you feel in

8  any way intimidated, or influenced by her relationship to

9  an officer of Cannon Mills?

10  A   No.

11  MR. ATKINS:  Mrs. Allman, your husband works at Cannon

12  Mills at the present time?

13  MRS. ALLMAN:  Yes, sir.

14  Q   Again if it appears during the course of the trial

15  that Mrs. Bost was related to a former officer of Cannon

16  Mills, and that there may be people at Cannon Mills who

17  are interested in the outcome of this case, do you think

18  the fact that your husband is presently employed there

19  would cause you to develop any prejudice toward the De-

20  fendant on that basis?

21  A   No, sir.

22  Q   Do you feel that you can be completely free from any

23  pressure, or influence of Cannon Mills in that manner,

24  during the course of this procedure?

25  A   Yes, sir.

Q   You are employed by Cannon Mills?

A   Yes, sir.

Q   How long have you been employed there?

A   About ten years.

Q   What is your job title over there?

A   I run an electric doffer, and tie warps.

Q   Would that be considered management?

A   No, sir, it's just, you know, just regular employee, you know.

Q   Do you know Mr. E. Gray Bost?

A   No, sir, I don't believe I do.

Q   You don't recall hearing that name associated with Cannon Mills?

A   I have heard it called, yes, sir.

Q   I believe he's dead now, but at one time during the course of your ten year career he was Treasurer of the Company?

A   No, I don't---

Q   You don't remember that?

A   No, sir.

MR. ATKINS:  Mr. Bonds, did you know Mr. Bost?

MR. BONDS:  Well, I know him when I see him and every-thing, of course, I never had no dealings much with him, or even know him personally only just his name.

Q   You just know he was the Treasurer of Cannon Mills?

A   Yeah.

MR. ATKINS:  Mr. Flowers, do you work for Trans-

1   Continental Trucking Lines?

2   <u>MR. FLOWERS</u>: Yes, sir.

3   Q   How long have you worked for them?

4   A   I have been with them since May of this year.

5   Q   What kind of work did you do before that?

6   A   I drove a truck.

7   Q   For whom?

8   A   Central Motor Lines.

9   Q   Also in Charlotte?

10   A   Yes, sir.

11   Q   Have you ever been connected in any way with Cannon

12   Mills?

13   A   Some fifteen, twenty years ago.

14   Q   You worked for them fifteen or twenty years ago?

15   A   Uh huh.

16   Q   I believe you said that you had read something about

17   this case, is that correct?

18   A   I read it in the paper when it first came out.

19   Q   How old are your children?

20   A   Twenty-one and twenty-six---twenty-five.

21   Q   Twenty-one and twenty-five?

22   A   Yes.

23   Q   And what sex is the twenty-one year old?

24   A   Sir?

25   Q   What is the sex of your twenty-one year old?

A   She's a daughter.

Q   And the twenty-six year old?

A   Boy.

MR. ATKINS:  Let me continue.  I would like to ask each juror to raise their hand if they have ever been any member of the organizations I am going to name, and also raise your hand if any member of your immediate family were members at anytime, or members at the present, of these organizations.  Any of you, or members of your family now, or in the past have any of you ever belonged to the John Burke Society?  Have any of you, or any members of your family ever belonged to the Ku Klux Klan?  Have any of you, or any members of your family ever been members of any Veteran's Organization?

JUROR:  Service Organization, sir.

Q   Yes, like Veterans of Foreign Wars?

A   American Wars.  I'm not at the present, but I was a member of the Veteran's of Foreign Wars.

Q   Have any of you ever been members of the National Rifle Association, or are you presently a member of this Association?

JUROR:  Not at the present time.

Q   When were you a member?

A   I have been a member since 1945, and dropped my membership just last year.

Q   You do a lot of hunting?

A   Hunting, target practice.

Q   Anybody else raise their hand to that question? Have any members of the jury panel as it is presently con- stituted ever been the victim of any kind of crime?

JUROR: Yes, sir, I was in a robbery mugging case last July in Greenville, South Carolina.

Q   Were you the victim?

A   I was the victim.

Q   Was anybody ever apprehended or brought to trial?

A   No.

Q   Any of the rest of the Jurors, have you ever been victims of any kind of crime?  What about members of your immediate family, or close friends, have any of those people ever been victims of any kind of crime?

Q   Mrs. Slupe, I believe you indicated when Mr. Roberts was asking you questions that you had served on the jury before, is that correct?

MRS. SLUPE: Yes, sir.

Q   What kind of jury was that, criminal or civil?

A   It was criminal court.

Q   Was that here?

A   Yes.

Q   In Cabarrus County, when was that?

A   About four years ago.

1    Q    And what type of case was it?

2    A    Indecent exposure.

3    Q    What was the result of the jury's deliberation?

4    A    He was found guilty.

5    Q    Do you feel that your prior service on this jury will

6    affect you in deliberating on this case?

7    A    No, sir.

8    Q    Now, ladies and gentlemen of the jury, when Mr.

9    Roberts was asking you questions about your hearing of

10    this case, or reading of this case on prior occasions, he

11    asked you if you had any opinions as to the guilt, or

12    innocence of this defendant, Ronnie Long, and each of you

13    who indicated that you had heard of this case, said that

14    you had no opinion as to his innocence, or guilt.  The

15    standard as I understand it, Mr. Richey, is that a person

16    is presumed innocent until proven guilty.  Keeping that in

17    mind do you presently have an opinion?

18    A    No, sir.

19    Q    Do you think that Mr. Long has any kind of burden to

20    show you that he is innocent?

21    A    No, sir.

22    Q    You heard the phrase, the presumption of innocence

23    before?

24    A    Sir?

25    Q    Have you heard the phrase the presumption of innocence?

A   No, sir.

Q   Well, let me say to the whole jury panel, that under our system of justice a person, any person, is presumed innocent, and the State has the burden of proving him guilty, of proving him guilty to you beyond a reasonable doubt.  Therefore, Ronnie Long sits here presumed innocent at this moment.  Now, is there anybody who does not understand what I'm saying to you?  Mr. Richey, if, as the Court will instruct you later, that is the correct standard, can you now tell me that you presume Mr. Long to be innocent?

MR. RICHEY: Yes, sir.

Q   The District Attorney read to you and I assume you were sitting out here, and you heard him read the Bill, or Bills of Indictment, do you understand that these are nothing but pieces of paper that charge a crime; that it is simply a part of a procedure to get a person into court?  In other words, let me ask you Mr. Allison, do you feel that by the virture of fact that Mr. Long has been indicted and brought to court that he must have done something, or he wouldn't be here?  How do you feel about that?

MR. ALLISON: Well, he was brought here for some reason.

Q   Yes, sir, he was brought here because a Bill of Indictment was issued.

A    That's right.

Q    Do you feel that because these Bills of Indictment have been issued that some burden should go forward now on Mr. Long during the course of this trial to convince you that he didn't do something?  And I'd like for you to be candid with me.

A    Let me hear that last part again.

Q    Let me re-phrase it, and try to make it a little clearer.  Mr. Long has been indicted by a Grand Jury, and two pieces of paper were issued, which were read to most of you, some of you may not have been here.  These papers charged that Mr. Long committed the crime of First Degree Rape, and First Degree Burglary, do you feel, knowing that these papers have been issued, that Mr. Long during the course of this trial must come forward with some evidence to show you that he did not do what he was charged with? Do you feel he should do that?

<u>MR. ALLISON</u>:  No.

<u>MR. ATKINS</u>:  Mr. Bond, do you understand what I just asked Mr. Allison?

A    Yes.

Q    You understand that Mr. Long has been indicted?

A    Yes.

Q    Do you feel that he should, that he wouldn't be here if he hadn't done something to get himself here?

1   A   Well, it looks like he was brought here for something

2   like Mr. Allison said.

3   Q   All right, he was brought here because the Grand Jury

4   indicted him and charged him with these two crimes.   Do

5   you feel like because of this that you are going to expect

6   him to get up there and tell you something about why he

7   didn't do what he's charged with doing?

8   A   Well, I've been on the Grand Jury one time before, and

9   they generally find anything like that a true bill, I

10  don't know whether Mr. Long is, or whether he ain't. That's

11  the way I look at it.

12  Q   He was indicted by a Grand Jury and you know what a

13  true bill is?

14  A   Yes.

15  Q   Do you feel like that if Mrs. Bost gets up here and

16  says that's the man that raped me and broke into my house,

17  that he needs to get up there and tell you differently,

18  you feel like he should do that in order for you to find

19  him not guilty?

20  A   Well, I don't know.  If Mrs. Bost knows the man, and

21  all, it looks like she would be telling the truth, I don't

22  know.

23  Q   In other words, you'll expect if Mr. Long didn't take

24  that stand that he's hiding something, is that the way you

25  feel?

1    A    Yeah.

2    Q    And that you could not give him the benefit of any

3    doubt if he didn't take that stand?  Is that your position?

4    A    Yes.

5    Q    So you feel as if it will be necessary for the de-

6    fendant to take the witness stand if Mrs. Bost points him

7    out as being the person that she says raped her?  If you

8    don't understand me ask me.

9    A    I can't understand.  Anyway, they're supposed to take

10   the witness stand, or not, before we decide on it.

11   Q    You feel like the defendant should take the stand

12   before you decide anything?

13   A    Yeah.

14

15   COURT:  Let me say this to you, ladies and gentlemen, the

     Court will instruct you that the law in this State doesn't

16   require a defendant to take the stand, he has no duty to

17   prove anything; and I'll instruct you to that.  I think

18   that might clarify the thing some, and I'll instruct you

19   to that; he has no burden, the burden is on the State to

20   prove the defendant's guilt beyond a reasonable doubt, as

21   the Court will explain that term to you at the proper time,

22   and remains with the State all during the course of this

23   trial.

24

25   MR. ATKINS:  Mr. Bonds, you understand what the Judge just

1 said to you?

2 A   Yes, sir.

3 Q   Now, that you have been informed of the fact that the

4 defendant has no duty at all to take the witness stand,

5 do you feel that you could still give him a fair and im-

6 partial trial if he should choose not to take the witness

7 stand, without hearing from his side?

8 A   Well, it's just like the Judge said, the State, you

9 know, would decide on the case.

10 MR. ATKINS:  Mrs. Allman, do you understand the fact that

11 the defendant has no duty to take the stand?  Do you feel

12 that you could listen to the evidence as presented by the

13 State, and withhold making a judgement before you

14 deliberate, without hearing anything from the defendant?

15 MRS. ALLMAN:  Yes, sir.

16 Q   Do you understand the concept of reasonable doubt?

17 A   Yes, sir.

18 Q   What does that mean?

19 A   Did I have any boubt at all then I should not find him

20 guilty.

21 Q   You should remove from, of those doubts in favor of

22 the defendant under our law?

23 A   Yes, sir.

24

25 COURT:  Let me say one thing, I don't know that that

question is proper and the District Attorney is not object-
ing. The Court will instruct you as to the meaning of as
to reasonable doubt. Is there any person on this jury that
can't take the Court's instruction as to what reasonable
doubt means? I don't believe that at this point in the
trial-- that is a matter of law that I don't believe that
they would necessarily have to understand at this point.

MR. ATKINS: All right, let me just put it this way to all
of you. Are all of you willing to accept the fact that
Ronnie Long is innocent until the State proves to you with
convincing evidence that he is guilty? Can all of you
do that? Now, ladies and gentlemen, all of you I'm sure
at one point in your life have either read, or seen a
Perry Mason's book, or story. Is that a fair assumption,
is there anybody that's not familiar with Perry Mason's
TV show, and so on? There's something that happens to
people sometimes that defense lawyers call the Perry Mason
syndrome. That is the jurors expect like Perry Mason, the
defense lawyer will somehow pull a rabbit out of a hat,
and get the real person to stand up and say, I did it, I
did it. Do any of you expect that kind of thing to happen
in this trial? As Mr. Roberts pointed out to you, ladies
and gentlemen, the defendant is black and the prosecuting
witness in this case is white. Now, I think that it
wouldn't be unrealistic to say that people did not make

1  pre-judgments about other people. It may be because of

2  the length of their hair, it may be because of the way

3  they talk and behave. Frankly, it's a lot of times be-

4  cause of the difference in race. Now, I think that it

5  would be just as good to get that out in the open, and

6  talk about it some. Mr. Johnson--

7  MR. JOHNSON: Yes, sir.

8  Q  You are employed at the Lexington Construction Company?

9  A  Laxton.

10  Q  How long have you worked there?

11  A  Six years.

12  Q  How old are you, sir?

13  A  Twenty-five.

14  Q  In the course of your employment do you have an

15  occasion to work with, or alongside black people?

16  A  Yes, sir.

17  Q  In what capacity do you work with black people at this

18  Company?

19  A  Well, right now I'm carpenter but I started as a

20  helper, a laborer, and I worked with blacks and whites.

21  Well, the same as anybody that starts out in construction

22  work.

23  Q  Now, you are twenty-five years old, and I'll just ask

24  you candidly did you ever experience any feelings against

25  a person because of their race, that you would not have

1  experienced if they had been the same race as yourself?

2  A   Well, I don't know if I could truly say I'm not pre-

3  judiced to a certain extent, but I think everybody, if

4  you really came down to it would be.  It's something I

5  think everybody's learning to live with.

6  Q   Do you think that whatever prejudices you might have,

7  or have had will influence your hearing this evidence,

8  black defendant, white victim?

9  A   No, sir, not in this case.

10  Q   Do you think you could completely put aside any

11  feelings of prejudice in making a decision on the evidence

12  in this case?

13  A   Yes, sir.  That's a person sitting there and his color

14  doesn't make any difference in my opinion right now.

15  MR. ATKINS:  Mrs. Sides, how old are you?

16  MRS. SIDES:  Forty-six.

17  Q   Where do you live?

18  A   Concord.

19  Q   Are there any black people in your neighborhood?

20  A   No, there's not.

21  Q   Have you had many experiences with black people during

22  the course of your life?

23  A   No.

24  Q   Do you acknowledge that at one point, maybe even today,

25  that you have either consciously or sub-consciously

experienced feelings of prejudice because of a person's
race?

A   No.

Q   You have never judged a person on the basis of race?

A   Absolutely not.

Q   Your children go to public or private school?

A   Public.

Q   So, you believe that black people have the same rights
as any other people?

A   Yes.

Q   Do you think that over the number of years that black
people have been denied any rights because of their race?

A   Yes, I have.

Q   Do you feel that you could sit on this jury and judge
the witnesses without consideration of their race?

A   Yes.

MR. ATKINS:  Mrs. Snyder, you live in Concord?

MRS. SNYDER:  Yes, I do.

Q   Are there any black people in your neighborhood?

A   Yes.

Q   Do you know them well?

A   Well, I grew up with a lot of them.

Q   Where are you employed?

A   I own my own business in Kannapolis.

Q   What kind of business?

1   A   Dress shop.

2   Q   Do you have any blacks working there?

3   A   No, I'm the only one that works there.

4   Q   Can you candidly say that you have never experienced

5   any prejudice against black people?

6   A   I never have.

7   Q   You have never felt there was any difference between

8   black and white people?

9   A   No.

10  Q   And the fact of race from any witnesses would not

11  influence your decision on who you believed?

12  A   No, it wouldn't.

13  Q   Mrs. Snyder, did you attempt to get excused from the

14  jury panel yesterday?

15  A   Yes, I did.

16  Q   Is there any reason that you would want to be excused

17  from this jury panel today?

18  A   No.

19  Q   You have worked out whatever problem was you had

20  yesterday?

21  A   Well, the thing was, it was a financial hardship to

22  close my business up, since I run it by myself.

23  Q   So you had to close your shop to serve on this jury?

24  A   Yes.

25  Q   Do you feel that this financial hardship is going to

1  affect your ability to serve as a fair and impartial juror

2  in this case?

3  A   No.

4  Q   What was your response to the question by Mr. Roberts

5  as to whether you had heard anything about this case?

6  A   Well, I read it in the paper and that's about all.

7  Q   Have you read anything recently in the paper?

8  A   No.

9  MR. ATKINS:  Mr. Haigler?

10  A   Yes, sir.

11  Q   Do you work for the Department of Transportation?

12  A   Yes, sir.

13  Q   How old are you?

14  A   Twenty years old.

15  Q   Where do you live?

16  A   In Mount Pleasant.

17  Q   Do you live in a white neighborhood?

18  A   Yes, sir.

19  Q   Have you ever had any unpleasant experiences with

20  black people?

21  A   No, sir.

22  Q   Do you feel that black people are any less believable

23  than white people if they testify in this courtroom?

24  A   No, sir.

25  Q   Do any of the jurors feel that black people are more

1   likely to commit crimes, especially sex crimes, against

2   white women than a white person would be?  Under our

3   system of justice a person is entitled to be judged by a

4   jury of his peers.  Now, it is obviously impossible to

5   expect to have a jury in each case where the person is

6   the same age, same economical background, same educational

7   background, and same race.  That's obviously impossible,

8   so the best we can do is to ask each of you whether you

9   can sit in this case and put yourself in the shoes of

10   Ronnie Wallace Long, a young black man, with a life style

11   that's probably entirely different from any of you.  He

12   probably talks a lot differently, he probably doesn't have

13   the education that some of you have, and he looks different

14   than any of you.  Mr. Vartania?

15   MR. VARTANIA:  Yes, sir.

16   Q  Do you feel that you can sit as a juror in this case

17   and put yourself in the shoes of this defendant?

18   A  Yes, sir, I think I can.

19   Q  What is your educational background, sir, how far did

20   you go in school?

21   A  High School and refresher courses at different schools.

22   Q  Do you feel that if a person uses languages that you

23   are not accustomed to hearing that that will somehow

24   influence you against that person?

25   A  No, sir.

Q    Do any of you feel that any of the factors that I
delineated would keep you from being able to judge
Ronnie Long in a fair and impartial manner without regard
to those factors?  Let me ask you Mr. Richey, and I don't
mean to be picking on you, you just happened to be first.
How far-- let me ask you this question of the jury as a
whole.  Have you ever had an occasion to perhaps walk down
the street and you look across the street, or in a
restaurant, or wherever it might be, and you see somebody
and you recognize them, or at least you think you do, and
you holler, Hi, Joe, and they turn around and you get a
little closer and you see that's not who it is, has that
ever happened to anybody on the jury?  All of you under-
stand that it is possible even under normal circumstances
to mistakenly identify somebody.

                    OBJECTION.      SUSTAINED.

Q    Do any of you have any bumper stickers on your car
supporting your local police, or have you had any on
there?  Not that there would be anything wrong with that,
I'm just asking if you have ever had a bumper sticker like
that on your car?  Do any of you feel like that there are
increasing crime statistics?  I'm not sure how Concord
stacks up.  I'm sure in Charlotte the crime rate is up.
Do any of you feel that that will influence your ability

1   to sit on this jury without regard to what may be
2   happening in other cases? Any of you feel the rising
3   crime rate will influence you to favor the State in this
4   case? I briefly alluded to the fact that the judge will
5   instruct you, and has already said that the defendant has
6   no burden to take the witness stand in this case. Now, if
7   after you have heard all the State's evidence, and Mrs.
8   Bost, or whatever other witnesses they may have, has id-
9   entified the defendant as being the person that she says
10  broke into her house, will you be able to keep an open
11  mind until you've heard any evidence the defendant may
12  choose to present? Let me direct that to you, Mr. Allison,
13  do you feel that you can keep an open mind after hearing
14  the State's evidence?

15  MR. ALLISON: Oh, yes.

16  Q   Mr. Bonds, what about you, sir?

17  MR. BONDS: Yes, sir.

18  Q   Mr. Bonds, you understand, and all of you, do you
19  understand the way the process works? Is that the State
20  puts on all of its evidence before the defendant puts on
21  any, if it chooses to put on any, you understand that?

22  JURORS: Yes, sir.

23  Q   Mr. Bonds, if after hearing all the evidence you were
24  not convinced beyond a reasonable doubt of the guilt of
25  the defendant, could you hold that view once you got into

1   the jury room and deliberated with your fellow jurors,

2   even if all the rest of them had a different view?

3   MR. BONDS: Well, I say the different reviews, I say he

4   has a right to hold his, I reckon, as well as any of the

5   rest.

6   Q   What I'm asking you, if you got back there in the jury

7   room, after you heard the evidence, and you had decided

8   that the State had not proved its case beyond a reasonable

9   doubt, and the other jurors, some of them, or all of them,

10   felt that the State had proved its case beyond a reasonable

11   doubt, and after listening to them and deliberating, and

12   still not being convinced differently, would you be able

13   to hold to your views that they had not proven their case

14   no matter what the other jurors said?

15   A   I couldn't understand.

16   Q   Do you feel that you'd have to go along with the

17   majority?

18   A   Yes.

19   Q   You do?

20   A   Yes.

21   Q   Notwithstanding the fact you felt the State hadn't

22   proved their case you would go along with the majority of

23   the other jurors if they felt different?

24   A   I'd have to go with the majority, it looks like.

25   MR. ATKINS: Your Honor, I challenge him for call.

COURT: I'll excuse you.

MR. ATKINS: Mrs. Allman, did you hear and understand the question I asked of Mr. Bonds?

MRS. ALLMAN: Yes, sir.

Q   If you were not convinced that the State had proved its case beyond a reasonable doubt, could you stick to your view notwithstanding to what the other jurors said to you?

A   Yes, sir.

Q   In other words, do all of you understand that your verdict must be unanimous to reach a verdict, and do you understand that if you are not convinced by the evidence that you are entitled to vote your convictions notwithstanding what the other jurors may say, if you are not convinced by the evidence that they have shown the defendant guilty beyond a reasonable doubt? Mr. Skidmore, I believe you indicated that you'd read or heard something about this case?

MR. SKIDMORE: Yes, sir.

Q   Did you discuss what you read or heard with anyone?

A   No, sir, sure haven't.

Q   Didn't discuss it with your wife, or your family or anybody?

A   No, sir.

Q   Did you read about it?

A   Yes, sir, in the paper, yes, sir.

Q   Did any of you discuss or hear about this case at your places of employment, those of you who indicated you'd heard or read about it? Mr. Richey, you nodded your head

1    there?

2    <u>MR. RICHEY</u>: Yes, sir.

3    Q   Tell me what the context was?

4    A   Just talk.

5    Q   At your place of employment?

     A   Yes, sir.

6    Q   What about the nature of the talk that you--

7    A   Just pros and cons, sir.

8    Q   Did you at any time say anything to anybody about the

9    fact that the man has not been proven guilty by what's in

10    the newspaper?

11    A   Right.

12    Q   You said that to somebody you heard talking about it?

     A   Yes, sir.

13    Q   Mr. Allison, did you hear somebody discussing it in

14    your presence?

15    <u>MR. ALLISON</u>: I read it in the paper and my wife and I

16    discussed it.

17    Q   What was the nature of your discussion?

18    A   Discussion in general who he was and who she was.

19    Q   Did you express any opinions at that time as to the

     probable guilt or innocence?

20    A   I don't believe we did either way.

21    Q   Is there anybody else who discussed this case with

22    anybody?

23    <u>JUROR</u>: With my wife over dinner.

24    Q   Did your wife express any opinion?

25    A   No, just the fact that it was a terrible thing whoever

     the perpetrator was.

SECOND JUROR: It was discussed in my family also, but no decision as to who was the guilty party.

MR. ATKINS: Ladies and gentlemen, once you begin your deliberations in this case, should you be on the panel that's asked to decide the matter, and let's say the trial had gone on all week and we were here Saturday, and you had an opinion one way or the other, and there was disagreement among you in the jury room, would any of you be influenced to change your views, or your vote because of the fact that it had been a long time that you had been away from your homes, and your jobs, would you change your vote because of that, just to get the thing over with? Mrs.Snyder, how do you feel about that?

MRS. SNYDER: No, I would not change my mind no matter what.

Q Mr. Haigler, you are missing time from work, as I'm sure most of you are, would that affect you at all?

MR. HAIGLER: No, sir.

Q Is there anybody on the jury panel as it is presently constituted who has gotten offended, or angry, or anything about anything I have asked any of you, if so to the extent that you might hold it against the defendant, Ronnie Long, if so, I'd ask you to let me know. Is there anybody on the panel who for any reason, that you don't have to tell me, would rather not serve on this jury? Mr. Vartania, I asked you about your membership in the National Rifle Association.

MR. VARTANIA: Yes, sir.

Q Is there anything about your membership in that Associa-tion that would cause you to have a pretensity to lean

1   toward a conviction in a case?

2   A   None whatsoever.

3   Q   Is there anything that offends you about the question

4   I just asked you?

    A   No, sir.

5   Q   And you understand why I asked you?

6   A   Yes, sir.

7   MR. ATKINS:  Your Honor, we would at this time excuse Mr.

8   Allison, Mr. Skidmore, Mrs. Slupe, Mrs. Sides.

9   COURT:  Madam Clerk, call five jurors in the box, please.

10  CLERK:  Paul Wilson; Gene Timothy Barringer; Carl W. Wilson;

11  Eugene Kimball Clary; Drew Darrell Foster.

    EXAMINATION BY MR. ROBERTS:

12  MR. ROBERTS:  The gentleman in the yellow shirt, I did not

13  get your name?

14  JUROR:  Gene T. Barringer.

15  MR. ROBERTS:  And you, sir, are Paul Wilson?

16  PAUL WILSON:  Yes, sir.

17  Q   You are Paul Wilson?

18  A   Yes, sir.

19  Q   Mr. Clary, sir?  And you, sir, are Mr. Foster?

    A   Yes, sir.

20  Q   I address these questions solely to Mr. Barringer, Mr.

21  Paul Wilson, Mr. Carl Wilson, Mr. Clary, and Mr. Foster.

22  Now, from where you folk have been seated in the courtroom

23  were you able to hear, essentially hear all of the questions

24  that Mr. Atkins and myself have asked the other jurors?

25  JURORS:  Yes.

Q    Can I assume, and were you able to hear and understand the answers of the other jurors?

JURORS:    Yes, sir.

Q    Then you know, of course, what this case is about?  The defendant is charged with rape and burglary.  His Honer has explained what the punishment is, that is, up to life imprisonment on both counts.  Mandatory life imprisonment if he is convicted for what he's charged, and you understand that?  Now, Mr. Barringer, sir, where do you live here in the county?

MR. BARRINGER:    111 South Main Street, Mount Pleasant.

Q    And are you employed, Mr. Barringer?

A    Yes, sir, run an upholstery shop.

Q    Several employed I assume?

A    Yes, sir.

Q    And are you married, Mr. Barringer?

A    Yes, sir.

Q    Did you and your wife have children?

A    No, sir.

Q    Mr. Barringer, do you recall reading or hearing anything about this case?

A    Well, maybe what was in the newspaper.

Q    Well, certainly if you read the newspaper at any time in the last six months you would have read something about it.  The important thing is did you form any opinion as to his guilt or innocence from what you read?

A    No, sir.

Q    Have no opinion at this moment?

1   A   No, sir.

2   Q   Do you know any of the people involved in this lawsuit,

3   Mr. Barringer?

4   A   No, sir.

5   Q   The defendant, his relatives, prosecuting witness, her

relatives, the attorneys involved?

6   A   No, sir.

7   Q   Mr. Paul Wilson, sir, where are you from in the county?

8   MR. WILSON:  803 West B. Street, Kannapolis.

9   Q   And are you employed, Mr. Wilson?

10   A   No, sir, I'm retired.

11   Q   Who did you work for, sir?

12   A   Cannon Mills.

13   Q   Were you married, Mr. Wilson?

14   A   I was but my wife's dead.

15   Q   Did you and the former Mrs. Wilson ever have children?

16   A   Yeah, we had four.

17   Q   I assume they're grown?

18   A   Yeah, they're grown.

19   Q   Mr. Wilson, sir, did you recall reading or hearing any-

thing about this case in the newspaper?

20   A   No.

21   Q   Have no recollection of it at all?

22   A   No.

23   Q   Do you subscribe to the Daily Independent, Mr. Wilson?

24   A   Do what?

25   Q   Do you take the Daily Independent Newspaper?

   A   Yes, sir.