# EXHIBIT 4

1987 MAR transcript and Judge Walker's July 8, 1988 order denying the MAR

STATE OF NORTH CAROLINA            IN THE GENERAL COURT OF JUSTICE

COUNTY OF CABARRUS                      SUPERIOR COURT DIVISION

                                   Case No. 76-CRS-5708
                                            76-CRS-5709


STATE OF NORTH CAROLINA        )
                               )
     Vs.                       )        TRANSCRIPT OF PROCEEDINGS
                               )
RONNIE WALLACE LONG,           )
                               )
          Defendant.           )
_____)


APPEARANCES:

          For the State:    Mr. Bob Roberts
                            District Attorney
                            Cabarrus County, North Carolina

          For the Defendant:  Mr. Steven A. Grossman
                            Attorney at Law
                            Kannapolis, North Carolina


                    *        *        *


     THIS MATTER COMING ON TO BE HEARD during the week of

December 12, 1987, and being reached for hearing on the 16th

day of December, 1987, before His Honor, Russell G. Walker, Jr.,

Judge Presiding, the following proceedings were held, to wit:

# I N D E X

**WITNESSES FOR THE DEFENDANT:**

| | Direct | Cross | Redirect |
|---|---|---|---|
| 1. James Fuller | 5 | 27 | |
| 2. Erwin Spainhour | 34 | 35 | |
| 3. Karl Adkins | 38 | 49 | |
| 4. John Kennedy | 51 | 59 | |
| 5. Harvey Cannady | 65 | | |
| 6. Ira Padgett | 66 | 68 | 69 |
| 7. Estus White | 69 | 70 | 73 |
| 8. Dale Ritchie | 78 | 83 | |

**EXHIBITS FOR THE DEFENDANT:**

| | Introduced/Evidence | |
|---|---|---|
| 1. Transcript | 4 | 4 |
| 2. Transcript | 4 | 4 |
| 3. Transcript | 4 | 4 |
| 4. Transcript | 4 | 4 |
| 5. State v. Harbison transcript | 10 | 42 |
| 6. Brief | 42 | 64 |
| 7 - 26. Newspaper articles | 64 | 64 |

Case 1:16-cv-00539-CCE-LPA   Document 7-16   Filed 06/17/16   Page 3 of 54

MR. ROBERTS: Your Honor, at this time the State is calling State versus Ronnie Wallace Long, file numbers 76-CRS-5708, 5709.

Your Honor, on or about August 1, 1986, the defendant, Ronnie Wallace Long, filed a motion for post-conviction relief. That motion was filed pro se. Subsequently Mr. Steve Grossman was appointed to represent him in the post-conviction. Mr. Grossman filed a second motion on behalf of the defendant and then after State v. Cofield filed a supplement to the second motion, Your Honor. And the matter comes before the Court this morning for hearing based upon the allegations set forth in the defendant's original, amended and supplementary motions for post-conviction relief.

MR. GROSSMAN: Judge, Mr. Long is not in court at this time; he is in the county jail.

THE COURT: Have you given him a transcript?

MR. ROBERTS: I haven't given him anything.

MR. GROSSMAN: I will introduce the transcript of the original proceedings into evidence. Mr. Roberts, I believe, will make that available to the Court.

MR. ROBERTS: Yes, Your Honor, the State will do that.

Your Honor, I am advised that the defendant's family took

3

his clothing home to have it dry cleaned or laundered and has

not returned it to him and at this moment he only has jail

clothing. I think the law prohibits his entry in a courtroom

without proper attire.

THE COURT: That's an unusual wrinkle.

MR. GROSSMAN: I can assure Your Honor we didn't

plan it that way.

MR. ROBERTS: So if it pleases the Court, I will

bring Mr. Speas back in and we will proceed on the other

matter until the defendant gets properly attired.

THE COURT: All right. We don't want to do anything

improper.

-- SHORT RECESS --

MR. GROSSMAN: Before we broke, I introduced into

evidence the prior transcript. It's in four documents, or

rather four binders, so I marked them 1, 2, 3 and 4. If I

might introduce that formally into evidence and hand that up.

THE COURT: All right, petitioner's exhibits 1, 2,

3 and 4, being the copies of the transcript of the trial, may

be received into evidence.

MR. GROSSMAN: Thank you, Your Honor.

Your Honor, Mr. Long is present. We call Mr. James

Fuller to the stand.

MR. ROBERTS: Your Honor, I would like to get a

stipulation into the record before we proceed.

4

1    THE COURT:  All right, Mr. Roberts.

2    MR. ROBERTS:  It's obvious that the Court's going

3  to have to read those documents and so forth, and we would

4  call on the defendant to stipulate that the Court can enter

5  its order out of term and out of district after consideration

6  of all of the evidence.

7    MR. GROSSMAN:  So stipulated.

8    THE COURT:  All right, thank you, Mr. Roberts.

9  JIM FULLER, being duly sworn, testified as follows:

10  DIRECT EXAMINATION BY MR. GROSSMAN:

11  Q    State your name, please, sir.

12  A    Jim Fuller.

13  Q    Mr. Fuller, how are you employed, sir?

14  A    I'm a lawyer.

15  Q    All right, were you so licensed by the North Carolina

16  Supreme Court in 1972?

17  A    Yes.

18  Q    And the State Bar, I guess, actually.

19  A    Yes.

20  Q    All right, how long have you been licensed as a

21  practicing attorney?

22  A    '70 or '71.

23  Q    Did you formerly represent Ronnie Long in this case?

24  A    Yes.

25  Q    Do you recall what year and date this case was heard?

                              Jim Fuller - Direct        5

1   A.   No.

2   Q.   All right, to refresh your recollection, does September

3   of '76 sound about correct?

4   A.   Yes, sir.

5   Q.   Approximately, if you recall, how long had  you been

6   licensed as a trial attorney, or licensed as an attorney,

7   prior to September of 1976?

8   A.   Six years, I guess.

9   Q.   All right.  Mr. Fuller, what was your primary practice

10  in 1976, primary area of practice?

11  A.   Criminal law and civil rights law.

12  Q.   What law firm were you associated with?

13  A.   Well, it went through several combinations and permutations.

14  It was the Chambers firm; Chambers, Ferguson, Watt, Wallas,

15  Adkins and Fuller is the name I remember.

16  Q.   All right, and at that time what was the primary area of

17  practice of that law firm, do you recall?

18  A.   Well, in some respects it was a general practice  but with

19  a civil rights flavor.  There was a heavy amount of employment

20  discrimination, criminal law, and some general civil litigation.

21  Q.   As such did you and/or your law firm generally deal with

22  issues of racial discrimination or alleged racial discrimina-

23  tion?

24  A.   Yes.

25  Q.   All right.  In this case, and for the record, what is the

Jim Fuller - Direct          6

1    race of Ronnie Wallace Long?

2    A.    Black.

3    Q.    What were the charges in this case, to the best of your

4    recollection?

5    A.    Primary charge was rape.  I don't remember what --

6    Q.    All right.  What was the race of the victim?

7    A.    White.

8    Q.    What was her approximate age?  I don't mean specific but

9    generalities.

10    A.    Considerable older, sixty, seventy -- I don't --

11    Q.    Have you at my request reviewed some of the transcript

12    and attempted to remember some of this case from 1976?

13    A.    Well, let me back up a second.  I want to be clear about

14    it.  I really have not reviewed the transcript except for just

15    a few minutes this morning.  I didn't have a file because I'm

16    now in Raleigh.  The file, to the extent that we kept a file,

17    it was the firm in Charlotte.  So I think a more correct answer

18    would be I have tried to remember and I have talked with you

19    and I have talked with a former partner, Karl Adkins, but I

20    have not done, I have not gone through the transcript one

21    page at a time.

22    Q.    All right.  Do you recall then in 1976 hearing in this

23    case a motion regarding the racial makeup of the jury?

24    A.    Yes.

25    Q.    At that time were you representing or was your firm

1    representing a number of folks wherein that motion was made,

2    not specifically Ronnie Long?

3    A.    Yes.

4    Q.    Describe how you were generally hearing that motion,

5    leading up to the Ronnie Long case in September of 1976.

6    A.    Well, in general we would call the officials responsible

7    for putting together the jury list.  And that would include

8    the Clerk of Court, the Chair of the Jury Committee, the

9    Register of Deeds in some instances; could include a Clerk,

10   that was usually a little more difficult; could include a

11   district judge and that was equally difficult; but primarily

12   in each instance we attempted to set out the process by which

13   jurors came to be in the trial jury.

14   Q.    All right.  In doing so, what were the issues you were

15   attempting to look for?

16   A.    Well, we were attempting to show a prima facie case of

17   racial discrimination, a systemic discrimination.  We were

18   attempting, and I say this as a generality but I think in every

19   case, we were attempting to create an environment in which

20   prosecutors would be less likely to take blacks off the jury.

21   I'm saying there was a reason in which we hoped, but quite

22   frankly did not expect, to win on the merits; there was also

23   a tactical reason to sensitize, if you will, to put the issue

24   of race before the Court, before the prosecutor, before us

25   and our client.

1  Q.   Had you had any success at that prior to Ronnie Long's

2  case?

3  A.   I need to answer you a little bit indirectly there.

4  There was one case that my partner, James Ferguson, had had

5  a successful result at the trial level.  Seems to me that was

6  Judge Long and seems to me it was Forsyth Superior.  Judge

7  Long, as I recall, had quashed an entire panel.  That case

8  went to the Supreme Court and got pretty rough treatment,

9  which goes back to what I said a while ago that I honestly,

10 I'm not trying to volunteer if this is not what you're looking

11 for, but I didn't really expect most of those motions to be

12 granted --

13 Q.   I understand.

14 A.   -- because I thought it was a pretty difficult burden,

15 and in the one instance where our firm had had success, what

16 seemed to me like a pretty clear case, the State Supreme Court

17 had reversed.

18 Q.   All right.  Leading up to Ronnie Long's case, you were

19 still making these motions, correct?

20 A.   Yes.

21 Q.   Do you recall the case of State versus William Harbison,

22 Jr.?

23 A.   Yes.

24       MR. GROSSMAN:  Your Honor, if I may, the case is

25 cited as 293 N.C. 474, 238 S.E.2d. 440.  I have made a copy

                    Jim Fuller - Direct           9

1  of it, of course, it's in the Reporters; if I may mark it as

2  Exhibit 5 and approach the witness to show him.

3  THE COURT: All right.

4  Q  Have you seen the Supreme Court report in this case?

5  A  Yes, I was counsel of record on appeal to the Supreme

6  Court.

7  Q  Were you also counsel at the trial level, or co-counsel

8  at the trial level?

9  A  Co-counsel; that was a fairly unusual -- yes, I was co-

10  counsel.

11  Q  What was the date of that trial, if you would refer to

12  the opinion?

13  A  I don't know.  If you would know I would be happy for you

14  to point me to it.  I just don't see it.

15  MR. GROSSMAN: May I approach the witness, Your

16  Honor?

17  THE COURT: You may.

18  Q  Okay, in reviewing that case, do you see a date of

19  trial?

20  A  Yes, the opinion by Justice Huskins says the case was

21  called for trial on 30 August 1976.

22  Q  And that was approximately three or four weeks before

23  the Long case, the record speaking for itself?

24  A  I really can't answer; I can't argue either way.  I just

25  don't remember when, the date of the Long trial.

Jim Fuller - Direct          10

1    Q    All right.  In that case I believe you asked for con-

2    tinuance to explore the jury, the makeup of the jury -- in

3    the Harbison case.  Is that correct?

4    A    Yes, sir, Mr. Grossman, I asked for a bunch of continuan-

5    ces for a bunch of reasons in the case; we had only been in it

6    for about a week.

7    Q    All right, and the Court did what?

8    A    Well, I mean it was in several parts.  Judge Friday

9    denied the continuance and in what was a very unusual move

10   allowed appointed counsel to stay in the case, allowed the

11   State to pay my friend in Morganton, allowed us to participate

12   as co-counsel because coming in a week or ten days before

13   trial we were certainly in no position to be lead counsel.

14   On the morning of the trial we renewed -- that was done the

15   week before.  That was done the day after we got in the Harbi-

16   son case.  The morning of the trial we renewed a motion to

17   postpone.  We also in that instance for the first time made a

18   motion to delay to allow us to investigate.

19   Q    Regarding the jury?

20   A    Yes.

21   Q    And that was denied also, was it not?

22   A    Yes.

23   Q    The Supreme Court then affirmed the denial of that

24   continuance to investigate the jury?

25   A    Yes.

1   Q    Subsequently in Mr. Long's case?

2   A    Yes.

3   Q    Now, when you came to Cabarrus County to try Ronnie Long,

4   I believe you made a motion to quash the indictment or quash

5   the jury on the same grounds regarding systematic exclusion

6   of blacks, is that correct?

7   A    Generally correct; I don't remember with any precision

8   after eleven years.

9   Q    All right.  You did not file a written motion, to your

10  recollection?

11  A    I really don't remember.

12  Q    Do you recall talking to Judge Wood on the day of the

13  trial in that matter as to your intention to file the motion,

14  or to have the motion heard?

15  A    No.

16  Q    Do you recall making the motion on the morning of trial?

17  A    Yes.

18  Q    Did you talk with any of your witnesses prior to trial

19  in that matter?

20  A    I don't know.

21  Q    Do -- you called Mr. Estus White, Clerk of Court.  Do you

22  recall that?

23  A    Yes.

24  Q    Do you recall whether you spoke with him at any time

25  prior to trial in this case?

                          Jim Fuller - Direct        12

1   A.   Well, the reason I have to hedge is I remember talking

2   to Mr. White; I don't remember if it was in this case or

3   another case.  I just can't say for sure.

4   Q.   Okay.  Do you recall that you called Jim Bonds in the

5   case, the former Register of Deeds?

6   A.   I guess.

7   Q.   All right, do you --

8   A.   I mean no, I don't remember it, really, but that's what

9   we would usually do.

10  Q.   Do you recall whether or not you talked with Jim Bonds

11  before his testimony in the case?

12  A.   No.

13  Q.   Is that no you don't recall or no you did not talk with

14  him?

15  A.   Don't recall.

16  Q.   All right, you called the head of the jury commission,

17  James or John Robinson, Mr. Robinson.  Do you recall -- is

18  that a yes?

19  A.   I don't remember Mr. Robinson.  I certainly don't --

20  Q.   Is it your normal procedure to call the head of the

21  jury commission?

22  A.   Yes.

23  Q.   Would the record speak for itself as to whether you would

24  have called Mr. Robinson?

25  A.   Sure.

1   Q.   Okay.  Do you recall whether or not you ever spoke with

2   Mr. Robinson prior to hearing the motion?

3   A.   No.

4   Q.   No you do not recall or no you didn't talk to him?

5   A.   The question was did I recall and the answer is no.

6   Q.   All right.  Do you recall in that case that there arose

7   a question as to names being stricken off the master list for

8   the jury pool?

9   A.   No.

10  Q.   Do you recall whether or not in that case -- the Long

11  case, I'm speaking of -- there was a question as to the Sheriff

12  striking names from the master list under Mr. Robinson's

13  direction, or at Mr. Robinson's request?

14  A.   No.

15  Q.   Do you recall whether you subpoenaed the master list?

16  A.   No, sir.

17  Q.   Do you recall whether or not you called a Deborah

18  Ballington?  I believe you called her a different name back

19  then, D.J.  Do you recall that?

20  A.   I certainly remember that she was a secretary-paralegal

21  in the office.  I could not tell you under oath what we asked

22  her to do on that day in this case, eleven years ago.

23          MR. GROSSMAN:  May I approach the witness, please?

24          THE COURT:  You may.

25  Q.   Mr. Fuller, directing your attention to page 36 of

                    Jim Fuller - Direct          14

1  Defendant's Exhibit 1, if you would see if that might refresh

2  your memory.  Does that refresh your memory as to calling one

3  Deborah Ballington as a witness?

4  A.    No.

5  Q.    It does not?

6  A.    I'm not trying to be uncooperative.  I mean obviously she

7  was called; I certainly know who she was; but if you're asking

8  me do I have now an independent recollection of what she did

9  in this case eleven years ago, I just have to truthfully say

10 no.  Whatever it says, it says.

11 Q.    All right, whatever it says the record would reflect

12 what you did back in 1976?

13 A.    We did the appeal, so I'm sure we agreed that the

14 transcript and the record were correct because we filed it in

15 the Supreme Court.

16 Q.    Do you recall how many jurors there were in the jury pool

17 in 1976 on the Ronnie Long case?

18 A.    No.

19 Q.    Do you recall whether or not you spoke with Judge Wood

20 regarding the number of blacks in the jury pool?

21 A.    No.

22 Q.    All right.  Do you recall whether they had to bring in

23 extra witnesses -- or rather, excuse me, extra jurors?

24 A.    No.

25 Q.    All right.  You do recall, however, making the motion on

                    Jim Fuller - Direct        15

1  the day of trial?

2  A.   Well, no.  To be candid, I recall making the motion, and

3  I have heard from you or somebody that it was on the day of

4  trial.  So I won't argue with that.  I just --

5  Q   Do you recall whether or not you attempted to secure

6  statistical proof as to the percentage of blacks in the

7  community?

8  A.   I'd have to tell you that's what we usually did.

9  Q   All right.  Again --

10  A.   With census track data.

11  Q   All right, do you recall whether or not you reviewed

12  prior jury lists to determine prior jury pools and their

13  percentages of racial disparity, if any?

14  A.   No, but probably not.

15  Q   All right.

16  A.   In general, that was just not a very successful route.

17  You can cut me off if I'm answering something you're not

18  asking.

19  Q   No, that's fine.

20  A.   But whether in this case or another one, a prior jury

21  list would have a hundred and fifty names on it, say, and

22  other than going around and knocking on a hundred and fifty

23  doors, which didn't seem to be pragmatically possible, or

24  using some kind of sophisticated census track racial composi-

25  tion which was also difficult, to say the least, it just

Jim Fuller - Direct        16

wasn't very helpful to me to have a prior jury list with a hundred and fifty names on it, or whatever the names were, because there was no racial identification as I remember.

Q   All right, do you remember the average number of the jury pools in Cabarrus County in '75, '76, '74?

A   No, sir.

Q   Okay, you don't know if it was a hundred and fifty or forty?

A   Correct.

Q   All right. To change the subject, Mr. Fuller, are you familiar with Cabarrus County, North Carolina, or were you in 1976 familiar with Cabarrus County, North Carolina?

A   Well, generally. I mean I practiced law in Charlotte and we handled a few cases over here, but --

Q   Did you handle any cases in Cabarrus County of the severity of State versus Long?

A   Yeah.

Q   How many, do you recall?

A   No. I remember one murder case that I think ended up being a plea, not a trial. No, I would say that the firm had several, and as far as I can remember I was involved in two, this and the one I --

Q   Are you familiar generally, or were you familiar in 1976 generally with the racial makeup of Cabarrus County?

A   No.

1    Q    Did you investigate the racial makeup of Cabarrus County

2    prior to the State versus Long case?

3    A.    I'm not sure, but probably.

4    Q    This was a case of a black man, young black man, charged

5    with the rape and burglary of a middle-aged white woman,

6    correct?

7    A.    Correct.

8    Q    Was there, pretrial, some feeling within the community

9    regarding Ronnie Long?  Let me rephrase that.  Was there

10   prior to trial a defense network set up for Ronnie Long, to

11   your knowledge?

12   A.    I'm not sure what a defense network is.  There were a lot

13   of people who had an outspoken interest that on occasion they

14   shared with us.

15   Q    All right.

16   A.    It was a committee, as  I recall, the Ronnie Long

17   Committee.

18   Q    Were these people to your knowledge active in the

19   community pretrial?

20   A.    It seems to me they were not all from Concord, but I know

21   there were some people from Concord who lived in the black

22   community here who were active in civil rights issues and

23   who were very concerned about this case.

24   Q    All right.  Describe, if you would, to your knowledge the

25   racial makeup of that committee; that is, was it predominantly

                         Jim Fuller - Direct            18

1  black, predominantly white, or --

2  A.   Best I remember it was predominantly black but mixed.

3  Q.   When you came to the courthouse in September 1976 for

4  this trial, describe the atmosphere around the courthouse

5  to your recollection.

6  A.   It was very tense and racially polarized.

7  Q.   Describe the crowd, if that's a correct term, around the

8  courthouse.

9  A.   I'm not sure I understand how that --

10  Q.   Was it a predominantly black crowd, predominantly white

11  crowd?

12  A.   It was split literally in half.

13  Q.   All right.

14  A.   With half sitting on the prosecution side and half sitting

15  on the defense side, and the white folks were on the prosecu-

16  tor's side and the black folks, with a few, sort of a salt and

17  pepper sprinkling of whites who were in the group of

18  supporters, on our side.

19  Q.   Were there demonstrations going on or not at the time

20  the trial began?

21  A.   I don't remember any; I have heard that there were but

22  it just doesn't ring a bell with me today.  There were

23  demonstrations afterwards that I remember but not before.

24  Q.   All right.  Were there -- well, perhaps demonstrations

25  is the wrong word.  Were there supporters marching around the

                         Jim Fuller - Direct          19

1  courthouse for Ronnie Long at that time?

2  A.   I really don't remember.

3  Q.   Were there folks -- strike that.  Was there a crowd

4  in the courtroom at that time; was the courtroom crowded?

5  A.   Yes, sir.  I meant to say a minute ago -- what I was

6  describing in the sense of the two groups was in the courtroom

7  and as best I remember it was pretty well packed.

8  Q.   Standing room only, to your recollection?

9  A.   I just don't remember.

10  Q.   Do you recall whether it was necessary to be searched

11  to even enter the courtroom?

12  A.   No.

13  Q.   You don't recall?

14  A.   Correct.

15  Q.   Did you or Mr. Adkins investigate in the community the

16  feelings about Ronnie Long prior to trial?

17  A.   Well, I mean that's a little hard to get a clear handle

18  on, but yes, in general.  I mean we read newspaper articles,

19  we talked to a lot of people.

20  Q.   Did you consider the issue of change of venue?

21  A.   Yes.

22  Q.   Did you file a written motion to change the venue?

23  A.   I don't remember.

24  Q.   Did you make any oral motion for change of venue?

25  A.   I don't remember.

1  Q    Do you recall whether a motion for change of venue was

2  ever made?

3  A.    No.

4  Q    You don't recall?

5  A.    I do not recall if we made a motion; I don't believe so.

6  Q    All right, I believe you said you did discuss it.  Do you

7  recall what you were discussing about the issue?

8  A.    Yes.  I remember discussing it with my partner, Karl

9  Adkins.  I specifically remember discussing it with some

10  members of that committee, whatever the committee's official

11  name was.  And I believe we discussed it with the family more

12  in the sense of explaining why we were not going to file a

13  motion for change of venue.

14  Q    All right.

15  A.    The considerations were that we thought that it would be

16  likely if we were able to sustain the motion that the case

17  would go to Salisbury.  I had worked on an employment discrim-

18  ination case against Cannon Mills and I, as I remember one of

19  the bigger plants was in Rowan County.  So as we looked ahead

20  and considered the things that might happen, one of them was

21  to go to Salisbury -- I'm going to be really candid now -- I

22  grew up in Salisbury and I happened to know that there was

23  also some pretty heavy Klan activity over there.  As I recall,

24  the former Grand Dragon used to live down at China Grove or

25  one of those little towns around there.  And our thought was

                              Jim Fuller - Direct          21

1    we were getting out of the frying pan into the fire if that

2    happened, and to some extent the same was true if we ended up

3    in Monroe.  I guess what I'm saying is, as we considered the

4    options, we couldn't see that things were likely to get any

5    better.  We had no reason that I'm aware of, that I was aware

6    of, that we could go to Charlotte or Raleigh or someplace where

7    the issues would be more neutralized, and we thought it was

8    important that Mr. Long and his family have support.  I don't

9    know how many of the supporters could have gone to Monroe or

10   Southern Pines or somewhere else in the district.  We assumed

11   if it was changed it would be within the judicial district

12   somewhere.

13   Q    You made reference to Monroe.

14   A    Yes.

15   Q    Do you know what the judicial district was in 1976?

16   A    I don't remember.  As I recall, it was my assumption,

17   and I can't tell you now whether this was based on research

18   or just understanding, was that a judge would look first to

19   contiguous counties; secondly he would look to other districts

20   within -- would look at other counties within the district;

21   would then look to other geographically-close districts; and

22   all those things together made us think that Rowan, Union --

23   what's the railroad county south where Hamlet is -- anyway,

24   that there were a group of counties where it would be likely

25   to end up, and in our judgment the racial climate would not

                                    Jim Fuller - Direct      22

1    be any better, Mr. Long would be more isolated, if you will.

2    Q.    You did not, however, make a motion trying to set out

3    your reasons for why it should not go to a particular county,

4    did you?

5    A.    I really don't remember making any motion at all.

6    Q.    All right.

7    A.    I'm not saying that I did or didn't; I'm just saying

8    that we discussed that question and I could not tell you

9    whether we got the right or the wrong answer, but that was

10   the process that we used to get there.

11   Q.    In doing so, did you acknowledge, as you called it, the

12   racial polarity in this case?

13   A.    You mean in our consideration?

14   Q.    Yes.

15   A.    Certainly.  Also, I think that that's not always -- I

16   mean that's something that we all wished was not there, but

17   it doesn't always act against the defendant, particularly

18   if there are blacks on the jury.  And in this instance I think

19   there was a sense on our part that you kind of had, in one

20   sense  a giant corporation, and all the powers on one side,

21   and him on the other; sometimes that can appeal to a jury.

22   Q.    Coming to that, sir, the victim in this case we have

23   talked about a little bit.  Also, did she have some connection,

24   to your recollection, to Cannon Mills?

25   A.    That was my understanding, but I don't remember now what

Jim Fuller - Direct              23

1    it was.

2    Q    As such, did you consider -- well, strike that.  Do you

3    recall whether or not she was married to a former officer at

4    Cannon Mills?

5    A    Best I can do is say that sounds sort of right.  And

6    again, Mr. Grossman, I'm not trying to be evasive; I just

7    don't -- I guess I have decided there has been more water

8    under this dam than I might have guessed.  A lot of things

9    have happened in eleven years, and I just really don't remem-

10   ber a lot of things in this case. I'm not trying to be un-

11   cooperative, either with you or Mr. Roberts.

12   Q    Did you participate in the motion to suppress in this

13   case?

14   A    I did the case as equal co-counsel with my partner, Karl

15   Adkins, so in that sense I participated in everything, as did

16   he.  I don't remember who actually conducted the hearing or

17   exactly what took place.

18   Q    All right.  Do you recall whether or not you interviewed

19   witnesses prior to trial regarding the motion to suppress?

20   A    I think so.

21   Q    Beg your pardon?

22   A    I think so.  I know we talked to Mr. Long.  Seems to me

23   we talked to some police officers that Mr. Roberts made avail-

24   able over in the jail.

25   Q    At some time?

1    A.    I can't tell you when.  Here's my best recollection, and
2    I know I'm under oath, but I have to say I really can't swear
3    to this.  My best recollection is we went to Mr. Roberts and
4    said, "Here's what we need to do, we need to talk to this
5    person and this person," and as I recall he said not only fine
6    but he would sort of set it up.  I think he made the call.
7    Q.    How old was Ronnie Wallace Long at the time of this trial,
8    if you recall?
9    A.    Young, but I don't remember -- twenty?
10   Q.    All right.  Do you recall what his education was?
11   A.    No.
12   Q.    Do you recall how he got to the police station that night?
13   A.    No.
14   Q.    All right.  Did you at any time consider a motion regard-
15   ing blacks on the grand jury?
16   A.    No.
17   Q.    Did you at any time consider a motion regarding a black
18   grand jury foreman or lack thereof?
19   A.    No.
20   Q.    Were you familiar with the body of law regarding dis-
21   crimination of blacks on grand juries, similar law to petit
22   juries?
23   A.    I can't say with any clarity what I was familiar with
24   that long ago.
25   Q.    All right.

A.    I guess in general; our firm did a lot of cases involving racial discrimination.  I don't remember one involving a grand jury.  I am comfortable that we did not seriously consider one in this case.  Beyond that I can't tell you.

Q    Is it a fair statement that your firm in general, and you and Mr. -- well, you can't speak for Mr. Adkins -- and you in particular,  kept  up with discrimination law in 1976?

A.    Certainly tried.

Q    Is it a fair statement, Mr. Fuller, to say that it was standard to prepare a case before trial in 1976?

A.    Or any other time, yes.

Q    Is it a fair statement to say that when you make a motion, or made a motion in 1976, that you would prepare it prior to the hearing?

A.    Sure.

Q    Is it fair to say that that was a general standard in this area at that time?

A.    I would be uncomfortable saying what the standards were in this area, although I think it would be standard in any part of the state and it was certainly standard in our office.

Q    All right.

        MR. GROSSMAN:  May I have a moment, Your Honor?

        THE COURT:  Yes, sir.

        MR. GROSSMAN:  No further of this witness, Your Honor.

1    THE COURT:  Mr. Roberts.

2  CROSS EXAMINATION BY MR. ROBERTS:

3  Q    Mr. Fuller, at the time of this trial I think that the

4  firm of which you were a partner was commonly referred to as

5  the Chambers Firm?

6  A    Yes, sir.

7  Q    Headed by Julius Chambers?

8  A    Correct.

9  Q    And essentially your field of expertise or your reputa-

10  tion in this state was civil rights, racial discrimination and

11  matters of that nature, would that be fair to say?

12  A    Yes, sir.

13  Q    And every member of the firm was indoctrinated to those

14  purposes by nature that associated with your firm; they knew

15  that those were the endeavors of that firm?

16  A    I think -- let me just say it a slightly different way.

17  I don't think anybody would apply to that firm who didn't come

18  with a commitment to deal with issues of racial inequality

19  and, I mean everything from handling an auto case where we

20  were concerned that injured black people recover the same

21  types of money that injured white people did; the notion of

22  racial disparity, discrimination, really covered everything we

23  did from handling small businesses to handling major employ-

24  ment discrimination and criminal cases.

25  Q    And your reputation for those matters was well known

Jim Fuller - Cross        27

1  throughout the state?

2  A.   I wouldn't want to address mine, but the firm's certainly

3  was.

4  Q.   I'm saying the firm, too.

5  A.   Yes, sir.

6  Q.   And your firm was privately employed by the family of

7  the defendant, Ronnie Wallace Long?

8  A.   Yes.

9  Q.   Now, Mr. Fuller, Mr. Grossman referred to atmosphere

10  around the courthouse.   There were supporters of Mr. Long who

11  were picketing or otherwise doing something outside the court-

12  house while we were picking the jury, were there not?

13  A.   I really don't remember, Mr. Roberts.   I understood from

14  Karl that was correct.

15  Q.   All right, sir.

16  A.   But I just don't remember one way or the other.

17  Q.   All right, sir.   Now, do you recall, Mr. Fuller, whether

18  or not there were black jurors on the panel?

19  A.   There were.

20  Q.   Do you recall whether any were called to the actual jury

21  box?

22  A.   My best memory is that there were four blacks called and

23  seated.

24  Q.   I believe the defense excused them, did they not?

25  A.   You mean us?

1  Q    Yes.

2  A.    I don't think so.

3  Q    Do you not -- whether you recall or not, Mr. Fuller, I

4  can understand in the passing of eleven years -- do you

5  recall an elderly black man who had worked at Cannon Mills

6  for about forty years making a statement, "If they bring him

7  in the courtroom charged, he's guilty"?   He made that state-

8  ment, he was excused, and others.

9  A.    I really don't.

10  Q    And I think the State had to excuse two jurors because

11  they lived in the same block that the defendant and his fmily

12  lived; do you have any recollection of that?

13  A.    I remember one juror in particular, Mr. Roberts, because

14  I remember just really sweating blood trying to get a for-cause

15  challenge in hopes that we could get a black person into the

16  jury, and this is my characterization, not Judge Wood's, but

17  my sense of what he said was, "You all have fought so long and

18  hard on this, I ain't sure you are entitled to it, but I'm

19  going to give you the challenge because if you will quit."   I

20  mean we just went on and on and on.   And he allowed the

21  challenge because the black woman, as I remember, came into

22  the box and my recollection is that you asked a few questions

23  that basically said, "You'd rather not sit on this jury,

24  wouldn't you?" and she grabbed at the chance and was gone.

25  And I remember kind of feeling deflated.   That's the only

Jim Fuller - Cross          29

specific recollection I have of the three or four black people
who actually took a seat.

Q    All right, sir.  Now, Mr. Fuller, I believe, as I under-
stand your testimony, that it was a well thought out type of
strategy that you, in fact, did not want a change of venue,
based on all attendant circumstances and options that you
were faced with?

A    Mr. Roberts, it was a carefully considered; I would not
make a judgment as to whether it was right or wrong, I
think somebody else has to do that.  We did what we thought
was in Mr. Long's best interest.  There was no other consider-
ation.

Q    The suggestion in the motion here is that that decision
was made the day the trial started, but what I'm asking you,
that was a well thought out thing about your alternatives of
going to Rowan County which had all the Klan activity,
possibly Albemarle, and you knew the track records  of these
counties, and it was a determined strategy that your client,
with his local support, would be better off in Cabarrus County
than the alternatives that you could consider?

A    Let me take that in pieces.

Q    Okay.

A    Actually, I have never seen the petition in this case
so I can't respond to that.  I can tell you that whatever we
did in court on the day of trial, I am comfortable that we

didn't just -- well, we didn't wake up at 7:30 on the morning of trial and say, "Gosh, here's what we're going to do." And particularly with regard to the chance of venue. That was something we discussed over a long period of time and a decision that evolved. It wasn't an instant decision on the morning of trial nor two weeks before trial. It was our determination, given the totality of the situation, that Mr. Long, given some unattractive options, that trial here was probably best for him. And as I said, I don't know if that was right or wrong; I'm telling you that we did it with his best interests and for no other consideration.

Q    But it was done after deliberation and thought?

A.   Yes.

Q    All right, sir. Now, Mr. Fuller, at some time, do you recall, sir, being invited to speak to the District Attorneys Association in Chapel Hill at one of our educational conferences?

A.   I do, indeed.

Q    Do you recall, sir, approximately when that was?

A.   No, it's downstream a while but I don't remember exactly.

Q    All right, do you recall the subject of the panel that you were on, or were you a primary speaker? I can't recall.

A.   I think I was primary speaker and it had to do with pre-trial motions in a capital or life criminal case.

Q    All right, sir. And do you recall being generally

harrassed by the district attorneys?

A. I recall being ambushed by two in particular who came up later and smiled and said "no hard feelings," and I smiled back at them; I didn't say anything.

Q. All right, sir.

A. It was a pleasant environment; it was certainly sort of sharing the wares with the adversaries, if you will.

Q. All right, sir. And do you recall that in conclusion in your parting shots that you made a very serious plea to the district attorneys to be fair with regards to racial equality and so forth in the courtroom?

A. I do remember that.

Q. And do you also recall a district attorney insinuating to you that you claimed that no one had ever been treated fairly to your clients in the state of North Carolina, and more importantly do you remember what you told them about Cabarrus County?

A. I did not until right this minute because you and I have really not talked about this.

Q. That's right.

A. As I remember it, it was Don Jacobs from Goldsboro who basically wanted to know if I thought everybody I had ever represented had been unfairly treated, and I can't quote this, Mr. Roberts, but I believe I told him I thought you had been imminently fair in every case that we had had with you. I was

Jim Fuller - Cross                              32

not addressing any particular case, but as I said to Mr.

Grossman a minute ago, a series of cases with Chambers and

Ferguson and me and Karl and we were involved in every case.

I may be rambling more than you're asking for now, but what

I'm saying is that if Ferguson did a case, we met about it.

I may never appear in the courtroom, but we tried to share

ideas and help each other. When Karl and I did the Long case,

I don't have a distinct recollection but I'm as sure as I sit

here that Ferguson and Chambers and I don't know, whoever, and

everybody in the firm did what they could to help us.   I

remember the plea or the admonition to the district attorneys;

I remember telling them that I thought they wouldn't lose,

number one, they wouldn't lose convictions, that black people

would be fair, and that it didn't make sense to take blacks

off the jury; if people were guilty, they would be convicted.

And I remember saying secondly that in the sense of repre-

senting the whole community and having verdicts  that the

whole community would accept, it would be very helpful to the

cause of civil rights and human rights if black people, as

well as whites, sit on the jury.  But I do remember telling

him that you were fair and I still say that, certainly with

regards to any dealings that you and I had.

　　　　MR. ROBERTS:  All right, sir.  Thank you very much,

Mr. Fuller.

　　　　THE COURT:  Anything further, Mr. Roberts?

1    Mr. Roberts, anything further from this witness?

2         MR. ROBERTS:  No, Your Honor.

3         THE COURT:  All right, sir.  Mr. Grossman, anything

4    further?

5         MR. GROSSMAN:  No, sir.

6         MR. ROBERTS:  Your Honor, Mr. Fuller has a commit-

7    ment in Durham and with defense's permission I would like to

8    excuse him permanently.

9         MR. FULLER:  I would appreciate it.

10        THE COURT:  May he be excused, Mr. Grossman?

11        MR. GROSSMAN:  That's fine with me, Judge.

12        THE COURT:  Thank you, Mr. Fuller.

13             (The witness is excused.)

14   ERWIN SPAINHOUR, being duly sworn, testified as follows:

15   DIRECT EXAMINATION BY MR. GROSSMAN:

16   Q    What's your name, please?

17   A    Erwin Spainhour.

18   Q    Mr. Spainhour, do you practice law here in Cabarrus

19   County?

20   A    Yes, I do.

21   Q    For how long have you practiced law in Cabarrus County?

22   A    Since September of 1970.

23   Q    Do you recall the Ronnie Long trial?

24   A    Yes.

25   Q    Did you watch the trial?

Erwin Spainhour - Direct    34

1    A.    I was in and out of the courthouse; I don't recall having

2    the time to sit around and watch more than just a few minutes

3    of it at a time.

4    Q.    You weren't here during the course of the trial sitting

5    in the courtroom watching?

6    A.    No, but I was in and out of the courthouse all the time.

7    Q.    For a period of six years prior to the Ronnie Long

8    trial, did you practice in court in Cabarrus County regularly?

9    A.    Yes.

10   Q.    As such, were you familiar with the standards of

11   attorneys in Cabarrus County toward preparing motions prior

12   to court?

13   A.    Yes.

14   Q.    Was it a general standard or not in Cabarrus County to

15   prepare a motion prior to court and investigate it before pre-

16   senting it in court?

17   A.    Yes, it was.

18   Q.    Thank you.

19         THE COURT:  Mr. Roberts, do you want to ask anything?

20         MR. ROBERTS:  Yes, Your Honor.

21   CROSS EXAMINATION BY MR. ROBERTS:

22   Q.    Mr. Spainhour, do you know the prior witness, James

23   Fuller?

24   A.    Yes, I do.

25   Q.    How long have you known him?

Erwin Spainhour - Cross        35

1    A.    Since he and I were freshmen together at Davidson College

2    in 1960.

3    Q.    And have you kept in general contact with Mr. Fuller over

4    the years?

5    A.    On and off over the years we have run into each other,

6    yes.

7    Q.    And do you know Karl Adkins, the co-counsel in this case?

8    A.    Yes, I do.

9    Q.    And how long have you known Mr. Adkins?

10    A.    I've known him for several years.  We would run into each

11    other in court from time to time.  I remember one time in

12    Kannapolis we happened to run into each other.  But I have

13    known him well for the last two or three years.

14    Q.    Do you, Mr. Spainhour, hold any position with the North

15    Carolina State Bar?

16    A.    Yes, I do.

17    Q.    And what is that, sir?

18    A.    I'm the Counselor for Judicial District 19-A, represent-

19    ing Rowan and Cabarrus counties on the North Carolina State

20    Bar Council.

21    Q.    Are you familiar with any position that Mr. Adkins may

22    hold with the North Carolina State Bar?

23    A.    Yes.  He also is Counselor from the Mecklenburg District,

24    one of five, I believe, from Mecklenburg County, and Mr.

25    Adkins and I sit on several committees together, including the

grievance committee.

Q     And in 1976 when this case was tried, were you generally familiar with the firm referred to as the Chambers firm?

A     Yes, I was.

Q     Do you have an opinion, Mr. Spainhour, as to the reputation of that firm with regard to individual rights?

A     Yes, I do.

Q     And what is that opinion, sir?

A     An excellent law firm.

Q     And do you have an opinion, sir, as to the general reputation of Mr. Fuller with regards to the practice of law?

A     Yes, I do.

Q     And what is that?

A     He's an excellent trial lawyer.

Q     And do you have an opinion as to the general quality of Mr. Karl Adkins as a practicing attorney?

A     Yes, I do.

Q     What is that?

A     He also is known as an excellent trial lawyer.

          MR. ROBERTS:  That's all the questions I have, Your Honor.

          THE COURT:  You may step down, Mr. Spainhour.

          MR. SPAINHOUR:  Thank you.

          THE COURT:  You may be excused.

               (The witness leaves the stand.)

Case 1:16-cv-00539-CCE-LPA   Document 7-16   Filed 06/17/16   Page 38 of 54

1   KARL ADKINS, being duly sworn, testified as follows:

2   DIRECT EXAMINATION BY MR. GROSSMAN:

3   Q.   Your name, please, sir?

4   A.   My name is Karl Adkins.

5   Q.   Mr. Adkins, are you licensed as a practicing attorney in

6   the State of North Carolina?

7   A.   Yes, I am.

8   Q.   When did you receive your license?

9   A.   I received my North Carolina license in 1972.

10  Q.   Were you licensed in another state prior to that?

11  A.   In Michigan.

12  Q.   All right.  How long have you practiced law?

13  A.   Since 1972.

14  Q.   All right, sir.  You received Michigan the same year?

15  A.   I clerked for a federal judge for a year in Michigan.

16  Q.   All right. In 1976 were you associated with a law firm

17  in Mecklenburg County?

18  A.   I was.

19  Q.   What law firm was that, sir?

20  A.   The Chambers law firm.

21  Q.   The one we have referred to earlier this morning?

22  A.   Yes.

23  Q.   And as a part of your duties, were you active in the

24  representation of Ronnie Wallace Long in a trial in September

25  of 1976 in Cabarrus County?

                    Karl Adkins - Direct            38

1    A.    Yes, sir.

2    Q.    What was your position related to Ronnie Long?

3    A.    Jim Fuller and I were co-counsel.

4    Q.    All right.  Do you recall when this trial was?

5    A.    I know it was in 1976, and if you say September, that

6    sounds about right.

7    Q.    All right.  When did your firm, if you recall, and your-

8    self in particular, become involved with this trial or this

9    warrant or indictment or charge?

10    A.    I don't remember the date; sometime, obviously, before

11    September of '76.

12    Q.    Do you recall approximately how far before September of

13    '76 your firm became involved?

14    A.    I don't have any independent recollection of that.  There

15    is a note somewhere in the file of where, I think, Chambers --

16    my law partner, Julius Chambers -- talked with Mr. Long.

17    Q.    Was that Mr. Ike Long?

18    A.    Right.

19    Q.    All right, sir.

20    A.    But I don't remember the date.

21    Q.    For the record, who is Mr. Ike Long?

22    A.    The father of Ronnie Long.

23    Q.    Do you recall when you all talked with Ronnie Long for

24    the first time?

25    A.    The date, no.

1    Q    Do you recall approximately how far before September of

2    '76 you talked with Ronnie Long for the first time?

3    A    I don't remember.

4    Q    Did you at any time, to your recollection -- strike that

5    and let me go back.  Have you reviewed what is left of your

6    file?

7    A    I have looked over it, yes.

8    Q    All right, and has that in anyway  refreshed your recol-

9    lection towards this case or have you been able to recall much

10   about this case?

11   A    I don't recall much in the way of detail; the file has

12   been helpful on a couple of questions you asked me about.

13   Q    Regarding the search issue?

14   A    Yes, sir.  I reviewed the brief that we filed in the

15   North Carolina Supreme Court.

16   Q    All right, do you have any recollection, either indepen-

17   dently or after refreshing your recollection from your file,

18   as to aspects regarding the jury selection and the motion we

19   have talked about with Mr. Fuller?

20   A    What has been testified to sounded pretty much the way

21   I recall it.

22   Q    As to the standard practice of what's been called the

23   Chambers law firm, do you agree that the general rule was to

24   put up that list of witnesses Mr. Fuller testified to?

25   A    Best of my recollection, yes.

Karl Adkins - Direct        40

1  Q.    Did you participate in motions of that sort in other

2  trials?

3  A.    I'm sure I have but I couldn't tell you right now.

4  Q.    Prior to '76?

5  A.    Yes.

6  Q.    All right.  Do you recall whether you discussed with

7  Mr. Fuller that motion regarding Ronnie Wallace Long?

8  A.    That motion?

9  Q.    Regarding the systematic exclusion of jurors or the

10  racial disparity in the jury pool?

11  A.    I don't recall any specifics; I feel sure we talked about

12  it.

13  Q.    Do you recall whether there was ever any investigation

14  undertaken to determine percentages of blacks in the jury pool

15  in Cabarrus County?

16  A.    No, I don't recall.

17  Q.    You don't recall.  That is not to say that it was or it

18  was not?

19  A.    I just don't remember.

20  Q.    Do you recall whether or not there was any pretrial dis-

21  cussion with Mr. Robinson who testified at the trial?

22  A.    I don't remember.

23  Q.    Do you recall whether there was any pretrial discussion

24  with Mr. White who testified at the trial?

25  A.    Don't remember.

1    Q.    Do you recall whether there was any pretrial discussion

2 with Mr. Bonds who testified at the trial?

3    A.    I don't remember that either.

4    Q.    Do you recall whether there was any pretrial discussion

5 or investigation whatsoever of the motion to quash the indict-

6 ment due to systematic exclusion of jurors?

7    A.    I don't recall.

8    Q.    All right. Do you recall reading a transcript of this

9 case at sometime in the past?

10    A.    Yeah, when I prepared the brief.

11    Q.    You did prepare the appeal?

12    A.    I think that I did; I signed it.

13    Q.    All right. Let me --

14        MR. GROSSMAN: Your Honor, I have a copy of

15 defendant appellant's brief I'd like to mark as Exhibit 6.

16 For the record, I'm not sure I introduced Exhibit 5. If I

17 might introduce that which is the State versus Harbison. Let

18 me approach the witness, if the Court please, on Exhibit 6.

19    Q.    I hand you, Mr. Adkins, a copy of what I have marked as

20 Defendant's Exhibit 6.

21        MR. GROSSMAN: I'd introduce Defendant's Exhibit 5.

22    Q.    Could you check the last page to see if that is your

23 signature? Maybe it isn't on there.

24    A.    Well, it's typed; my name is typed on there.

25    Q.    To the best of your recollection in reviewing your records,

                                      Karl Adkins - Direct      42

1  did you file the brief in State versus Long and argue the

2  appeal?

3  A.    I'm sure I caused it to be filed; Mr. Fuller and I were

4  having a debate about who argued it.  I don't independently

5  remember arguing it, but I filed the brief.

6  Q.    Let me show you, if I might, a copy of the opinion in

7  State versus Long, which I will not introduce but just show

8  it, if that's all right.

9  A.    If it says I did, I don't have any doubt that I did.

10  Q.    Well, for the record, if I might approach the witness,

11  State versus Long, it says Karl Adkins for the defendant

12  appellant.  Do you agree, then, that you appeared for Mr.

13  Long in the appeal?

14  A.    Yes.

15  Q.    All right.  As such, and in preparing that brief, did you

16  at any time include in your issues which are in your brief

17  the issue of systematic exclusion of black jurors as argued

18  at the trial level?

19  A.    That is not an issue that is listed under the questions

20  presented.

21  Q.    All right, do you recall why that issue was not included?

22  A.    No.

23  Q.    Are you familiar with Cabarrus County, North Carolina?

24  A.    Yes, I have been over there several times.

25  Q.    Were you familiar with Cabarrus County, North Carolina in

Karl Adkins - Direct                    43

1     1976?

2     A.    Yes, probably more then than I am now.

3     Q.    All right.  As such, had you tried many cases in

4     Cabarrus County, North Carolina?

5     A.    In 1976?

6     Q.    Yes, sir.

7     A.    I had been involved in some cases, I couldn't tell you

8     the number.  And I think -- well, I have been involved in

9     some cases but I don't know how many.

10    Q.    All right.  Prior to your discussions with Mr. Fuller, I

11    believe within the last twenty-four hours, did you have any

12    independent recollection of the question of change of venue

13    in the Long case?

14    A.    No.

15    Q.    Has he refreshed your recollection?

16    A.    Yes, he did.

17    Q.    I believe you would corroborate what he testified to, is

18    that correct?

19    A.    I would.

20    Q.    Now, for the record, what is your race, Mr. Adkins?

21    A.    I'm black.

22    Q.    Did you review the issue, the potential racial issue, in

23    State versus Long prior to the trial in the case?

24    A.    Yes.  We were very concerned about that because, first

25    of all, it was a black man charged with raping a white woman

                        Karl Adkins - Direct            44

1  in a small town that had a reputation of being run by Cannon

2  Mills.    There was a lot of concern in the community, polari-

3  zation.

4  Q.    Would you reflect on that polarization for a minute?

5  I believe Mr. Fuller testified to the same thing.

6  A.    Well, there was a group of people who felt that Ronnie

7  Long had been unjustly charged and felt that the quality of

8  justice in this county in general was not what it should be,

9  and that this case was but another example of that racist

10  system.

11  Q.    Was that position or statement or feeling made general

12  to the public by that group of people?

13  A.    I don't know how general it was, but that was certainly

14  discussed.

15  Q.    All right.  Were there rallies on behalf of Mr. Long

16  prior to trial, to your knowledge?

17  A.    I recall there were some rallies, yes.

18  Q.    All right, and was that general feeling discussed at those

19  rallies?

20  A.    I think that it was.   I was not present at the rallies.

21  Q.    Were those rallies publicized, to the best of your

22  knowledge?

23  A.    I think there were some articles in the newspapers.

24  Q.    Did you discuss at anytime pretrial, or interview wit-

25  nesses, regarding the issue of potential change of venue?

Karl Adkins - Direct     45

1   A.   Did I, personally?

2   Q.   Yes.

3   A.   I don't recall that, but I don't think I did.

4   Q.   Do you recall whether anybody in your firm did, either

5   under your direction or under Mr. Fuller's direction?

6   A.   I don't remember.

7   Q.   All right.  Now, you made reference to Cannon Mills.

8   What was the relationship to this case of Cannon Mills?

9   A.   The victim in the case was the widow of a former Cannon

10  Mills executive.

11  Q.   As such, what was your concern about that?

12  A.   That because of the real or perceived feeling that Cannon

13  Mills ran this county, that it would be very difficult to

14  keep those kinds of feelings out of this courtroom.

15  Q.   Would this case not normally in your practice, Mr. Adkins,

16  have called for at least a motion to consider change of venue?

17  A.   I think given the limitations of where we were likely to

18  end up, that we -- we certainly talked about it, and I think

19  we talked with Ronnie about it, and --

20  Q.   I'm not asking you what Ron said.

21  A.   No, I'm not going to tell you what he said because I

22  don't remember what he said, but there was a lot of discus-

23  sion within our office about where we would likely end up,

24  where  we  would be better off; it wasn't likely that we

25  would end up in Charlotte.

Karl Adkins - Direct                    46

1  Q    You were trying to go to Charlotte if you could?

2  A.   No, I'm saying it was unlikely that we would, and the

3  alternatives that Fuller talked about were not very appealing

4  either.

5  Q    Were you familiar with what counties encompassed Judicial

6  District 19 in 1976?

7  A.   I'm sure I was in 1976 but I can't tell you now what they

8  are.

9  Q    All right, you all were concerned about Salisbury, Rowan

10 County?

11 A.   Rowan County and seems to me maybe Albemarle.

12 Q    Albemarle, which is Stanly County, for the record?

13 A.   Right.

14 Q    And Monroe?

15 A.   I don't specifically recall Monroe but that might have

16 been.

17 Q    Did you ever consider Randolph or Montgomery counties?

18 A.   We considered all the counties that we felt like the

19 case might get moved to; now whether Randolph and Montgomery

20 were in that group or not, I don't remember.

21 Q    Did you handle most of the search and seizure issue at

22 the trial?  I believe you reviewed some of that prior to --

23 A.   I believe I did.

24 Q    Did you at any time discuss the case with David Taylor?

25 Do you recall?

Karl Adkins - Direct          47

1   A.   I don't remember.  Who is David Taylor?

2   Q.   Did you at any time discuss the case with any of the

3   detectives in the case prior to the trial?

4   A.   I have been refreshed that we did talk with some officers,

5   but I couldn't tell you specifically which ones.

6   Q.   You don't remember whether they were the officers who

7   testified at trial or not, do you?

8   A.   I know we would not have talked to officers who were not

9   involved in the investigation.

10  Q.   Did you ever at any time seek discovery from the State

11  on the issue of the search?

12  A.   I don't remember.

13  Q.   Did you at any time -- do you recall whether you sought

14  discovery as to certain nontestimonial items which were taken

15  off Mr. Long?

16  A.   I just don't remember whether there were any formal

17  motions.

18  Q.   All right.  In reviewing the -- you reviewed the record

19  on appeal, I believe, did you not?  Or some parts of it?

20  A.   I looked at parts of it, right.

21  Q.   Okay.  Do you recall why you did not argue totality of

22  the circumstances on the issue of consent?

23  A.   No.

24  Q.   Is that, to your knowledge, an issue on the issue of

25  consent search, totality of the defendant's circumstances?

                          Karl Adkins - Direct          48

1  A.    I believe it is.

2  Q.    All right. Would you agree, sir, that it is appropriate

3  and standard to prepare motions prior to presenting them in

4  the courtroom, as a rule?

5  A.    Prepare? I would not argue a motion that I had not

6  prepared, if that's what you're asking.

7  Q.    Would you agree that it is appropriate to investigate

8  motions and facts surrounding them prior to making them in

9  the courtroom?

10  A.    Yes, sir.

11  Q.    Do you recall whether or not any issues on the jury list

12  were subpoenaed? Was the jury list subpoenaed?

13  A.    I don't remember.

14  Q.    Do you recall whether or not the master list ever made

15  it to the courtroom?

16  A.    I don't remember.

17  Q.    Do you recall whether or not -- well, would you agree,

18  having filed the brief, that the transcript would speak for

19  itself?

20  A.    Yes, whatever happened happened; I just don't remember

21  after eleven years.

22  Q.    All right. Thank you.

23       THE COURT: Mr. Roberts.

24  CROSS EXAMINATION BY MR. ROBERTS:

25  Q.    Mr. Adkins, you were asked about discovery. Now, the

State's discovery laws had not been enacted at the time this case was tried, had they been, sir?

A.   To the best of my recollection the discovery laws now are different than they were then.

Q.   Yes.  And do you have a recollection, Mr. Adkins, as to whether or not my office provided for you, notwithstanding the absence of law, virtually an open file for your preparation of your defense?

A.   I believe that's correct.

Q.   And I believe, as Mr. Fuller testified, that on at least one occasion that I made the arrangements for you to interview the arresting officer, or whoever it was you were having difficulty talking to?

A.   I don't have any independent recollection of that, Mr. Roberts.

Q.   All right, sir.  And with regard to the search and seizure of certain evidence, upon the State's attempt to introduce it, objection was made and a voir dire was conducted with regard to search, was it not?

A.   Yes, sir.

Q.   And after hearing extensive testimony from the defense and the State, the Court ruled that the items were admissible?

A.   That is correct.

Q.   And one of your issues on your appeal was the admissibility through a consent search and the Supreme Court of the

1  State of North Carolina ruled that the search, based on the

2  totality of circumstances, was consensual, Justice Moore

3  writing that opinion, is that not correct?

4  A.    I believe that's correct.

5        MR. ROBERTS:  Thank you very much, Mr. Adkins.

6        THE COURT:  Anything further from this witness?

7        MR. GROSSMAN:  No.

8        THE COURT:  Mr. Adkins, you may stand down.

9        (The witness is excused.)

10 JOHN KENNEDY, being duly sworn, testified as follows:

11 DIRECT EXAMINATION BY MR. GROSSMAN:

12 Q.    State your name, please.

13 A.    My name is John Kennedy.

14 Q.    Mr. Kennedy, what is your occupation?

15 A.    I'm the executive editor of the Concord Tribune.

16 Q.    Mr. Kennedy, what was your occupation in September of

17 1976?

18 A.    I was managing editor of the Concord Tribune.

19 Q.    As such, did you have an employee named Dale Ritchie?

20 A.    I did.

21 Q.    Did you review her articles?

22 A.    I have, briefly, yes.

23 Q.    Were you her supervisor at that time?

24 A.    Yes, I was.

25 Q.    Did you check with her regarding her articles?

1   A.   At that time, yes.

2   Q.   Did you try to determine whether those articles were

3   factually correct?

4   A.   Yes, sir, we certainly did.

5   Q.   To the best of your knowledge, your independent knowledge,

6   were those articles factually correct?

7   A.   They were.

8   Q.   Have you reviewed the general circulation of the Concord

9   Tribune in 1976?

10  A.   Yes, sir.

11  Q.   What is that general circulation?

12  A.   Eleven thousand two hundred.

13  Q.   Do you recall the population of Cabarrus County in 1976,

14  approximately?

15  A.   Population, eighty thousand.

16  Q.   Total, in the City of Concord?

17  A.   About eighteen thousand.

18  Q.   Okay.  Now, do you remember when this crime occurred?

19  A.   In reviewing the files, it occurred in April of '76.

20  Q.   All right, and do you recall when the trial was held?

21  A.   September, early October.

22  Q.   Describe generally the Tribune's coverage at that time of

23  the trial.

24  A.   I think the Tribune coverage was, as with any trial of

25  major, on a major crime, it was substantial but reasonable.

John Kennedy - Direct        52

1  Q    All right.  Did you report each and every day of the

2  trial?

3  A.    Yes, sir.

4  Q    Did you report -- have you been sitting here all morning?

5  A.    No, sir.

6  Q    Have you been here the majority of the morning?

7  A.    I have been here since about 11:15 to 11:20.

8  Q    All right, sir.  Do you recall these rallies on behalf

9  of Mr. Long that we have been discussing?

10  A.    Yes, sir, I certainly do.

11  Q    Describe those rallies as you know of them.

12  A.    They were -- there was a number of supporters of Mr. Long

13  who felt that, obviously that he had been improperly charged

14  and accused, mostly young people, mostly college aged, some

15  adults, most of them were black, a portion of them were white

16  citizens.

17  Q    In the community at that time -- were you active in the

18  community as the editor of the Tribune?

19  A.    Yes, sir.

20  Q    As such did you go out in the community to talk with

21  folks to prepare your news articles or to discuss current

22  events?  If you would state orally for the record.

23  A.    Yes.

24  Q    As such, did you talk with folks generally about State

25  versus Long?