A.  As I recall, I did, yes.

Q.  What was the general consensus in the community, to the best of your knowledge, in 1976, prior to September of 1976, toward Ronnie Long?

A.  I think that the community, there was some polarization within the community.  The community was obviously -- any time in a small town that there are marches and demonstrations, it certainly causes concern within the community.  I think generally there was an attitude of wanting to get this trial over with.  As to the guilt or innocence, I'm not sure that I am qualified to state how the community felt.

Q.  Was there a black-white issue, based upon your reflections in the community at that time, in this case?

A.  Oh, I think without question there was a black-white issue, yes.

Q.  Describe how you reach that conclusion, please.

A.  Well, there were the demonstrations that were obviously mostly black, there were rallies held in support of Mr. Long, fund-raising rallies.  These were publicized.  And generally there was conversation within the community about the concerns for the demonstrations and what might occur.

Q.  Had there been prior racial problems in Cabarrus County within recent years of '76?

A.  There had been in the early seventies, yes, and I don't recall the dates.

1    Q    Were you around the courthouse at the time of Ronnie

2    Long's trial?

3    A.   Yes, sir, I was.

4    Q    Describe what you observed at the courthouse in September

5    of '76 at the time of Mr. Long's trial.

6    A.   It was a tense situation.  There were -- the courtroom

7    was relatively full about the entire time of the trial, and at

8    the closing day of the trial it was, the courtroom was filled,

9    as I recall.

10   Q    Were the blacks on one side and the whites on the other,

11   or not?

12   A.   I really can't say; I don't recall.

13   Q    You don't recall.  What was the situation in the lobby?

14   Was that crowded or full or not?

15   A.   On the last day of the trial there were a number of

16   people in the lobby.

17   Q    Were these mostly black folks or mostly white folks?

18   A.   Mostly black, as I recall.

19   Q    Where was the jury?

20   A.   Where was the jury?

21   Q    Yes.  Mostly in the jury box?

22   A.   In the jury box.

23   Q    I guess I deserve that!  At the time leading up to the

24   trial, what was the Tribune's plans for reporting of this

25   trial?  Was it considered a major trial?

John Kennedy - Direct          55

1    A.    Ah --

2    Q     One worthy of front-page reporting?

3    A.    Well, certainly, a capital offense, yes.

4    Q     All right, at this time that was -- was that capital at

5    that time?  Rape and first-degree burglary, was it not?

6    A.    Right.

7    Q     All right, so you as a newspaper editor, managing editor,

8    had instructed your staff to treat this as a major case,

9    correct?

10   A.    Correct.

11   Q     And you had been doing this since April, is that a fair

12   statement?

13   A.    We had been following the case, right, since April.

14   Q     Prior to the arrest of Mr. Long, can you describe the

15   feelings in the community toward the crime itself?  Are you

16   familiar with that?

17   A.    No.  No, not actually; I don't think I'm qualified to

18   say.

19   Q     All right.  You know who the victim was, do you not?

20   A.    Yes.

21   Q     Would you describe her status in the community, to the

22   best of your knowledge, her character, her reputation.

23   A.    Until her, until the case occurred, I really didn't know

24   the lady.

25   Q  .  All right.

1  A.    She was, as I understand it, the widow of a retired

2  Cannon, former Cannon employee, or former Cannon executive.

3  But I was not personally familiar with her or her husband

4  except just knowing the name.

5  Q.    Where did she live, without getting specific about

6  addresses, but what portion of the city?

7  A.  She lived in the southwest side of the city.

8  Q.    All right, and that area in which she lived, does that

9  area have a general reputation -- meaning predominantly white

10  area, predominantly black area?

11  A.    At that time it was predominantly white area.

12  Q.    Upper middle class, is that a fair statement?

13  A.    I would agree with that.

14  Q.    All right.  Now, at the time Ronnie Long was arrested,

15  were you familiar at all with him?

16  A.    I did not know Ronnie Long.

17  Q.    You did not know Ronnie Long or any of his activities?

18  A.    I had no knowledge of Ronnie Long at that time.

19  Q.    All right.  Did you regularly report on these rallies?

20  A.    We did report on them; we had regular requests to announce

21  the location of these rallies, and as I recall we did that in

22  most cases.

23  Q.    Why would you do that, Mr. Kennedy?

24  A.    Well, it's a public function; this is a small community

25  and we're a small-town newspaper, and it was a function in

John Kennedy - Direct           57

1    which a gathering of people was taking place and we do that

2    on a normal, just a normal thing.

3    Q    Were those articles basically in a predominant section

4    of the paper?  In other words, front-page articles in some

5    cases?

6    A.    I don't recall the location of them.

7    Q    All right, actually what you have reviewed  is clippings

8    rather than actual newspapers?

9    A.    That is correct,  the  clip  file.

10   Q    All right, and that clip file is just a basic file kept

11   at the newspaper, is that correct?

12   A.    That's correct.

13   Q    Mr. Kennedy, do you have an opinion as to whether the

14   general facts of the reporting of this case were known in

15   the community prior to trial of this matter?

16   A.    Excuse me?

17   Q    All right, do you have an opinion as to whether this

18   case was generally known in the community prior to Mr. Long's

19   trial?

20   A.    You mean, by this case meaning what?  .

21   Q    Excuse me, in 1976, do you have an opinion as to whether

22   the community at large generally was familiar with the

23   charges against Ronnie Long?

24   A.    Yes, I think that most of the community was generally

25   familiar with the charges, yes.

John Kennedy - Direct          58

1   Q    Do you have an opinion as to whether most of the com-

2   munity was aware that this was a black defendant charged with

3   a crime against a white woman?

4   A.    Yes, I assume that most people would.

5   Q.    All right.

6        MR. GROSSMAN:  No further questions.

7        THE COURT:  Mr. Roberts.

8   CROSS EXAMINATION BY MR. ROBERTS:

9   Q    Mr. Kennedy, the atmosphere created at and around the

10  courthouse was generated by black people in support of the

11  defendant, were they not?

12  A.    That is correct.

13  Q    And I believe that you investigated an awful lot of this

14  and many of these people were from outside of Cabarrus County,

15  is that correct?

16  A.    There were a number of leaders in the group that were

17  from outside Cabarrus County.

18  Q    And I believe, if you know, sir,  if  these people, some

19  of them,  did not sleep in the basement of a local church?

20  A.    I think that's correct, yes.

21  Q    And that the local members of that church and in the

22  community resented their presence, as a matter of fact, did

23  they not?

24  A.    We had some communication to that effect, yes.

25  Q    So any atmosphere created was not by the State of North

                    John Kennedy - Cross          59

1  Carolina but by these people who were supporting Mr. Long,

2  is that a reasonable conclusion?

3  A.    That would be my conclusion, yes, sir.

4  Q.    Uh-huh.  Now, in the reporting of the case prior, during

5  and after, do you recall your newspaper printing anything

6  which you would consider inflammatory?

7  A.    No, sir, we were extremely cautious during that period

8  of time about that very thing because we feel a responsibility

9  to the community to try and prevent those types of things.

10  We certainly attempted to present the facts; we reviewed the

11  stories very carefully to prevent any inflammatory or racist

12  information being put out.

13  Q.    And you were, as I recall, Mr. Kennedy, you were person-

14  ally present throughout virtually all of this trial, were you

15  not?

16  A.    I was present throughout a good portion of the trial.

17  Q.    All right, sir.  And I believe that earlier witnesses

18  testified that there was some polarization in the courtroom,

19  that the supporters of the prosecuting witness got on one

20  side and supporters of the defendant on the other?

21  A.    I heard that earlier; I honestly did not observe that

22  personally, but I think it is reported in one of these articles,

23  but personally I do not recall.

24  Q.    All right, sir.  And by the very nature of this courtroom,

25  the smoking area and general leisure area of the courthouse

John Kennedy - Cross                60

is common; there is no way to polarize out there, isn't that correct?

A    That's correct.

Q    And from the beginning of the trial until the rendering of the verdict, there was no confrontation between these two groups supporting separate sides, was there?

A    Not to my knowledge, there was none.

Q    As a matter of fact, an atmosphere of geniality existed other than the seriousness of the situation?

A    It was a serious situation, but I did not observe any confrontations of any kind.

Q    No name calling?

A    No, sir.

Q    And I believe that after the verdict was rendered there was a virtual riot in the courtroom?

A    Almost, yes, sir.

Q    And police had to clear the courtroom?

A    That's correct.

Q    After the verdict was announced?

A    That's correct.

Q    That was a spontaneous occurrence as far as anyone was able to determine, I assume, particularly from your viewpoint?

A    It appeared to be such.

Q    And I believe at that time you were correct that arson, murder, rape and first degree burglary were capital offenses

but the death penalty had been outlawed by the Supreme Court

at that particular time in the evolution of the law, is that

not correct?

A.    Yes, sir.

Q.    All right.  And the reporter, Dale Ritchie, is no longer

with your newspaper?

A.    No, sir, she is not.

Q.    So far as you were able to ascertain, her reporting in

the newspaper was an accurate depiction of what, in fact,

occurred here, is that correct?

A.    That is correct.  Dale was a very efficient reporter

and a very good court reporter.

        MR. ROBERTS:  All right, sir, I have no further

questions.

        MR. GROSSMAN:  Judge, Mr. Kennedy has brought the

originals of all his articles and I intended to move the

introduction of those articles into evidence.  I don't know

of any other way around it except to try to get them copied

unless we put them in the record and return them at a later

time to the newspaper.  Of course, it's my understanding they

would have to stay with the record.

        THE COURT:  It's about lunchtime; why don't we stop

for lunch and let you --

        MR. GROSSMAN:  That's what I was hoping the Court

would say.  I'll mark them after lunch and we can get them

1    copied and then move their introduction.

2        THE COURT:  Do you anticipate calling further wit-

3    nesses after lunch?

4        MR. GROSSMAN:  Judge, I have Mr. Padgett.  He's

5    about ten minutes.  Mr. Cannady is coming at two o'clock,

6    he's not here, he's about ten minutes.  Mrs. Ritchie herself.

7    And that's about the length of time  as  Mr. Kennedy.  And

8    I believe Mr. White, who is about five minutes for me and

9    I don't know how long for Mr. Roberts.

10       THE COURT:  Mr. Roberts, do you plan to call

11   witnesses or relying on cross examination of defendant's

12   witnesses?

13       MR. ROBERTS:  Your Honor, at this point I verily

14   intend to rely on cross examination of the witnesses unless

15   I'm surprised.

16       THE COURT:  Then it's very likely we can conclude

17   this this afternoon?

18       MR. ROBERTS:  I would think so.

19       THE COURT:  Do we need to shorten the lunch hour?

20       MR. ROBERTS:  No, sir, I see no need or necessity

21   to do that, Your Honor.

22       THE COURT:  All right, we'll be in recess until two

23   o'clock.

24            (Prior to the lunch recess, the Court conferred

25   with Mr. Grossman and Mr. Roberts, inquiring if either of them

                                                         63

1   had any objections to his attending a prearranged luncheon

2   engagement with Deputy Ira Padgett; neither attorney objected.)

3                  -- RECESS FOR LUNCH --

4          MR. GROSSMAN:  Your Honor, Defendant's Exhibits 7

5   through 26 are simply numbers of each news story from the

6   Concord Tribune from the file of the Concord Tribune kept on

7   this case; if I might introduce those exhibits into evidence.

8          THE COURT:  All right.

9          MR. ROBERTS:  The State has no objection, Your

10  Honor.

11         MR. GROSSMAN: Your Honor, I cannot recall if I

12  introduced Exhibit 6 which was the brief.

13         THE COURT:  Not yet.

14         MR. GROSSMAN:  Then I would move to introduce that

15  into evidence.

16         MR. GROSSMAN:  And I believe I did introduce 5

17  which was the Harbison case, of course, the transcript.

18      Your Honor, I believe Mr. Roberts and I have a stipula-

19  tion that according to the 1970 census the percentage of

20  blacks in the population of Cabarrus County was sixteen point

21  nine percent.

22         MR. ROBERTS:  The State will so stipulate, Your

23  Honor.

24         MR. GROSSMAN:  Thank you.

25      Mr. Cannady, come around, please, sir.

                                                          64

1  HARVEY CANNADY, being duly sworn, testified as follows:

2  DIRECT EXAMINATION BY MR. GROSSMAN:

3  Q.   What's your name, please, sir?

4  A.   Harvey Cannady.

5  Q.   Mr. Cannady, are you a regular visitor to the courthouse,

6  sir?

7  A.   Well, I was for a good while but my wife got sick and I

8  had to quit.

9  Q.   All right.  In the middle seventies, sir, were you a

10  regular visitor to the Criminal Superior Court?

11  A.   A right smart.

12  Q.   Beg your pardon?

13  A.   Yeah.

14  Q.   So you came up here for most Criminal Superior Court

15  sessions in the seventies?  Were you here for most sessions

16  in '74, '75 and '76, sir, as best you can recall?

17  A.   Best I can recall, I was.

18  Q.   Do you remember, sir, the average number of people in a

19  jury pool in '74, '75 and '76?  Now, by pool, you understand

20  what I mean, don't you?

21  A.   That's all of them back there.

22  Q.   Right.  Do you recall the average number of folks in a

23  jury pool back in '74, '75 and '76, that general area?

24  A.   Best I remember it was about forty-five or fifty.

25  Q.   All right, do you remember, sir, the average number of

Harvey Cannady - Direct          65

1    blacks in each jury pool?

2    A.    Best I remember it was five or six.

3    Q.    All right.

4              MR. GROSSMAN:   Thank you Mr. Cannady.

5              MR. ROBERTS:   No questions.

6              THE COURT:   Thank you, Mr. Cannady; you may step

7    down.

8                    (The witness leaves the stand.)

9    IRA PADGETT, being duly sworn, testified as follows:

10   DIRECT EXAMINATION BY MR. GROSSMAN:

11   Q.    State your name, please, sir.

12   A.    Ira Padgett.

13   Q.    Mr. Padgett, how are you employed, sir?

14   A.    Deputy Sheriff's Department, Concord.

15   Q.    And how long, sir, have you been so employed?

16   A.    Thirty-two years.

17   Q.    Mr. Padgett, were you present during the trial of Ronnie

18   Wallace Long?

19   A.    Yes, sir.

20   Q.    Were you, in fact, on duty during that trial?

21   A.    I was the bailiff, one of the bailiffs, yes, sir.

22   Q.    All right.   Were you present during most trials of

23   Criminal Superior Court sessions in the years '74, '5 and '6,

24   sir?

25   A.    Yes, sir.

                          Ira Padgett - Direct              66

1   Q     Were you, in fact, present most of the time for Superior

2   Court during that time period?

3   A     Yes, sir.

4   Q     Do you recall jury pools during that time period?

5   A     Yes, sir.

6   Q     Approximately how many people do you recall being in a

7   jury pool?

8   A     Forty to forty-five.

9   Q     And approximately, sir, if you recall, how many blacks

10  were in each jury pool?

11  A     Three -- two, three, four and five.

12  Q     All right, and is that a fairly safe average --

13  A     Yes, sir.

14  Q     I used the wrong term, is that an accurate average, best

15  you recall?

16  A     Yes, sir.

17  Q     All right, you've been here thirty-two years?

18  A     Yes, sir.

19  Q     As such, are you familiar with grand juries in Cabarrus

20  County?

21  A     Well, some.

22  Q     All right, have there been blacks on grand juries in

23  Cabarrus County?

24  A     Yes, sir.

25  Q     Regularly?

                                  Ira Padgett - Direct          67

1   A.   I think so.

2   Q.   All right.  To your knowledge in thirty-two years, has

3   there ever been a black grand jury foreman in Cabarrus County?

4   A.   I can't remember if there has.

5   Q.   Thank you very much.

6   CROSS EXAMINATION BY MR. ROBERTS:

7   Q.   Mr. Padgett, are you familiar with how the foreman of

8   the grand jury is selected by the presiding judge?

9   A.   Not exactly.

10  Q.   You don't recall?

11  A.   No.

12  Q.   Do you recall, Mr. Padgett, that on many occasions that

13  terms of court would open and there would be less than twenty-

14  five jurors in the pool?

15  A.   Yes, sir.

16  Q.   And blacks were always represented, were they not?

17  A.   Yes, sir.

18  Q.   On the jury?

19  A.   Yes, sir.

20  Q.   And when they added the driver's license possessors to

21  the jury list, it has increased tremendously, has it not?

22  A.   Yes, sir, voter registration.

23  Q.   Uh-huh.  Do you have any --

24       MR. ROBERTS:  Your Honor, I have no further

25  questions.   Thank you.

                              Ira Padgett - Cross        68

1  REDIRECT EXAMINATION BY MR. GROSSMAN:

2  Q.    So since they have changed that law, black participation

3  has increased?

4  A.    Yes, sir.

5  Q.    That was changed -- strike that.

6           MR. GROSSMAN:  No further.

7               (The witness leaves the stand.)

8  ESTUS WHITE, being duly sworn, testified as follows:

9  DIRECT EXAMINATION BY MR. GROSSMAN:

10 Q.    What is your name, sir?

11 A.    Estus B. White.

12 Q.    Mr. White, how are you employed?

13 A.    State of North Carolina; I serve as Clerk of Superior

14 Court, Cabarrus County.

15 Q.    How long have you served as our Clerk?

16 A.    Little more than twenty years.

17 Q.    Mr. White, recently for the Administrative Office of the

18 Court, did you do a review of grand jury foremen in Cabarrus

19 County?

20 A.    Yes.

21 Q.    As such, were you able to determine that at least over

22 the last twenty years there had been no black grand jury

23 foremen in Cabarrus County?

24 A.    In response  to the report, I reported that I did not

25 recall that there had been a black as foreman of the grand

1  jury.

2  Q    All right, to the best of your knowledge has there been a

3  black foreman of the grand jury since at least your time

4  period 1967 forward?

5  A.    Not to my knowledge.

6  Q    Thank you.

7  CROSS EXAMINATION BY MR. ROBERTS:

8  Q    Mr. White, are you generally familiar with the process

9  by which the foreman of the grand jury is selected in the

10 Superior Court of Cabarrus County?

11 A.    Yes, I am.

12 Q    Could you state to His Honor the process that has been

13 employed since you have been the Clerk of Superior Court of

14 this County?

15 A.    Well, since we have been under the Uniform Court System

16 which is December 7, 1970, if I might use that date rather

17 than since because we were under a different system completely

18 before that date, but since that date when Cabarrus County

19 became part of the state system referred to as the Uniform

20 Court Reform, there has been a selection of members of the

21 grand jury chosen on an alternate basis, indicating that there

22 were nine members that were to serve a six-month period and

23 after that an additional nine.  Of course, the purpose of this,

24 of course, was that you would at all times have at least

25 half of your members of the grand jury who had served at least

                    Estus White -- Cross            70

1  six months.  The process, of course, by law is that the

2  presiding judge at the first session after January and the

3  first session after July would appoint a foreman of the

4  grand jury which would indicate that there would be two

5  foremen appointed a year, one after the first session in

6  January and one after the first session in July.  As I --

7  well, the procedure has been basically that the foreman who

8  has served the first six months makes a recommendation to

9  the Court of a member of the remaining nine that were to

10  serve the additional six months, would make a recommendation

11  that one of those nine members would serve, indicating his

12  willingness to serve and his ability to serve as a foreman

13  of the grand jury.  This name would be submitted with

14  consultation with the previous foreman.  From this there

15  would be a preliminary review, not an extensive review, of

16  the background and qualifications of this person, making sure

17  that there was no criminal record or whatever -- we normally

18  check judgment records and criminal records of a prospective

19  foreman.  From this a recommendation would be made to the

20  presiding judge.  And as I recall, in every instance the

21  recommendation of the foreman, the previous foreman, had been

22  accepted by the presiding Superior Court judge.

23  Q     And at any time, according to your knowledge, was race

24  a qualification of the grand jury foreman?

25  A     I have never heard the word "race" nor has the word "race"

Case 1:16-cv-00539-CCE-LPA   Document 7-17   Filed 06/17/16   Page 18 of 53

1    ever been mentioned, to my knowledge; certainly not by this

2    Clerk.

3    Q    All right, sir.  And, of course, the procedure for the

4    determination of the nine who go on the grand jury the first

5    session after July 1 and January 1 are drawn by lots, is that

6    not correct?

7    A.    By lots, yes; by a numbering system.  The first session

8    after January and the first session after July an additional

9    number of jurors, I'm sorry, I do not know exactly but I

10   believe it's either ten or twelve additional jurors are added

11   to the normal number of drawing of petit jurors.  From this

12   we will select by what we refer to as a numbering system --

13   if there are seventy-five jurors, each would have a number

14   and it would be called strictly by number and then be matched

15   against a list that would indicate the name of the individual

16   juror.  We do not actually pull the names of the juror but we

17   do it by lot, as you say, or by number.

18   Q    And conceivably if there were thirty-five or forty people

19   on a jury panel subpoenaed to appear at a particular session

20   of court, and when you draw out nine additional names, it

21   would be done by lot and without regards to race?

22   A.    Yes, that would be correct.

23   Q    And conceivably if out of the forty jurors ten were

24   black, it is conceivable that nine white names would be called

25   in the system, is that right?

Estus White - Cross.          72

1    A.    It would be conceivable it could be either way, Mr.

2    Roberts.

3    Q    All right, sir. Thank you.

4    REDIRECT EXAMINATION BY MR. GROSSMAN:

5    Q    To your recollection, Mr. White, have grand juries in

6    Cabarrus County been predominantly white over the past twenty

7    years?

8    A.    I really do not come in contact in many cases with all

9    of the members of the grand jury. Many years ago when we did

10   not have as many courts operating, I did attend the selection

11   by lot as Mr. Roberts referred to. I'm afraid that I have not

12   seen all the members of the grand jury; my conversation is

13   normally only with the foreman, and this conversation relates

14   to giving him, what we use is a copy of the statute related

15   to his duties and responsibilities. My assistant clerk has

16   more contact with the foreman, actually, than I because she

17   types the jury report. But as I recall, there have been, to

18   my knowledge there has not been a grand jury that there were

19   not members of the black race on it. But here again, I very

20   seldom come in contact actually with the grand jury itself,

21   face-to-face.

22   Q    All right, sir. Did you regularly keep in contact or

23   come in contact with the grand jury in '74, '5 and '6,

24   that area?

25   A.    For that period of time it's rather difficult, Mr.

                              Estus White - Redirect        73

Grossman, for me to recall something eight years ago or more or whatever the period of time would be. I possibly had more contact in those days than I presently do, but I do not recall the formation of the jury as such as individuals. I do not recall the name of the foremen of 1974, '75 or '76, which would have been in that case six jurors.

Q    All right.

A.    I do not recall the name of the foreman of that grand jury. I naturally have a record of that name but I do not recall the names even.

MR. GROSSMAN: No further questions.

THE COURT: If I might ask a couple of questions, when you refer to the drawing of the jurors by lot, are you referring to the drawing by lot of the jury panel to be called for each session of Superior Court?

THE WITNESS: Your Honor, at a session in January and a session, the first session after July, which sometimes might be August, sometimes would be July, we will draw approximately seventy names, or in the past; that number has been increased recently because of the number of jurors, but that has been done within the last year.

THE COURT: Your office draws a number?

THE WITNESS: We draw a number. The system is now set up on a computer. My office has no knowledge of who may serve on a jury. There is a list of some sixty-seven hundred

1   prospective jurors for a two-year period. From this sixty-

2   seven hundred jurors which are selected basically, and

3   certainly at random choice, mainly from a list of property

4   owners of Cabarrus County; also of persons who are registered

5   to vote, and now, in the last two years, we use in addition

6   to that a list of persons who have been issued a valid North

7   Carolina driver's license. The jury commission which is

8   appointed every two years -- in fact, the jury commission

9   just prepared a new list for the next two years which would

10   serve, those jurors that would serve in 1988 and 1989. This

11   is done by computer. In fact, the driver's license names are

12   sent to us from, or to the county from, the Department of

13   Motor Vehicles of those individuals who have a driver's license

14   to operate a motor vehicle. From this a number is assigned.

15   The number begins with number one and ends at number six

16   thousand seven hundred and something -- there, of course, are

17   a few, more or less. From this the computer randomly chooses.

18   If we need seventy jurors, which we are now pulling, the old

19   rule was we pulled fifty, for a grand jury selection, that

20   is the first session in January or after July. We added an

21   additional ten or eleven, I'm sorry, I'm not sure exactly

22   but I'm sure it's at least ten additional which at that time,

23   more than a year ago, we pulled sixty jurors for those sessions

24   in which a grand juror was to be selected. Those names are

25   then submitted to the Register of Deeds --

Case 1:16-cv-00539-CCE-LPA Document 7-17 Filed 06/17/16 Page 22 of 53

THE COURT: The numbers?

THE WITNESS: The numbers are submitted to the Register of Deeds which then matches them with the names of individuals. If we have a requirement for a jury which is assigned to us through the state court system of the jury sessions that we would need, we notify -- we did notify the Register of Deeds and they would select fifty or seventy jurors -- we now notify the computer, we are now authorized to use the computer. The Register of Deeds, though, still has the names and the list. These names are then submitted to the Sheriff. The Sheriff then summonses the jurors. We have no knowledge of who is being summoned. We are then given a printed list, now alphabetically because of the computer that can do it alphabetically -- originally we got it, or several years ago before the computer system, we got it just by names randomly. And in our selection of a petit jury or for the selection of a grand jury, it is done by numbers being placed into a box or into a container. From this a number shall be drawn. This number would then be matched with a list, numbering one to seventy, and juror number seven would either be called for a petit juror or for a --

THE COURT: That's what I was particularly interested in.

THE WITNESS: Right.

THE COURT: In your courtroom drawing procedure you use numbers rather than drawing slips of paper that have names on them?

THE WITNESS: Yes, and we have used this system for a number of years; I know it must be seven, eight, ten years, it's been a number of years, I feel sure since we have been in what we refer to as our new courthouse which I think is '74 or '75, we have used the numbering system with a disc that has a number.

THE COURT: Even in the courtroom at the time the grand jury or the petit jury is drawn, your clerk initially pulls a numbered disc, and when she first looks at what she draws she sees a number, not a name?

THE WITNESS: That is correct. We draw a number and juror number seventy-five would then be matched with juror number seventy-five on a list; we would then at that time and not until that time know who juror number seventy-five was. That person would then be selected to be a member of a grand jury selection if it were grand jury, or for a petit jury were it a petit jury.

THE COURT: Thank you, sir.

Any further questions of Mr. White?

MR. ROBERTS: Not from the State, Your Honor.

THE COURT: You may step down.

(The witness leaves the stand.)

Estus White                    77

1  DALE RITCHIE, being duly sworn, testified as follows:

2  DIRECT EXAMINATION BY MR. GROSSMAN:

3  Q   What is your name, please?

4  A.  Dale Ritchie.

5  Q   Ms. Ritchie, where were you employed in 1976, September?

6  A.  The Concord Tribune.

7  Q   Ms. Ritchie, where are you now employed?

8  A.  Koontz, Hawkins and Nixon.

9  Q   You're a legal secretary now?

10 A.  Yes.

11 Q   All right.  How long had you been employed at the Tribune

12 at the time Ronnie Long's trial came up?

13 A.  I began working at the Tribune in 1968.

14 Q   As such, what were your duties?

15 A.  At the time of the trial I was a reporter, covering

16 mainly courts.

17 Q   How long had you covered courts prior to September 1976?

18 A.  Probably it had been at least five years.

19 Q   Had you covered virtually every session of Criminal

20 Superior Court in Cabarrus County for five years leading up

21 to Ronnie Long's trial?

22 A.  Yes, sir.

23 Q   Did you cover, or not, most of the proceedings of the

24 Ronnie Long trial?

25 A.  I did.

Dale Ritchie - Direct          78

1    Q    Did you cover some of the proceedings leading up to the
2    trial?

3    A    I did.

4    Q    Did you cover some of the rallies which occurred?

5    A    I don't specifically recall covering any rallies.

6    Q    Were you familiar, and are you now familiar, with some
7    of those rallies that occurred?

8    A    Yes.

9    Q    Were you familiar by virtue of your job as a reporter
10   with feelings within the community regarding the case against
11   Ronnie Long?

12   A    Yes.

13   Q    Describe those feelings to the best of your knowledge.

14   A    There was a lot of tension; seemed to be a lot of anger
15   surrounding this case.

16   Q    By tension, do you mean racial tension?

17   A    Yes.

18   Q    When the victim originally reported the crime, there was
19   a period of time before Ronnie Long was arrested, is that
20   correct?

21   A    As I best recall, yes.

22   Q    What was the feeling within the community prior to the
23   time Ronnie Long was arrested, if you recall?

24   A    I don't recall.

25   Q    You do not recall.  Okay.  Leading up to the time of the

                          Dale Ritchie - Direct        79

1  trial, did you have conversation with a number of people with-

2  in the community or in the community regarding the trial?

3  A.    I'm sure I talked to people about it, yes.

4  Q.    Did the -- to your knowledge do you have an opinion as

5  to whether the community was well aware of the proceedings

6  against Ronnie Long, based upon your --

7  A.    I do have an opinion.

8  Q.    What is that opinion?

9  A.    Maybe I better let you finish your sentence again.

10  Q.    All right.  Do you have an opinion satisfactory to your-

11  self, based upon your duties as a reporter and your contacts

12  within the community as to whether the publicity in this case,

13  whether or not it was from the Tribune, permeated the

14  community?

15  A.    Yes, I do have an opinion and that --

16  Q.    What is that opinion?

17  A.    -- opinion is that they were well aware of this case.

18  Q.    Have you reviewed your articles at my request over the

19  last number of weeks?

20  A.    I have.

21  Q.    Were those articles factual at the time you wrote them,

22  to the best of your recollection?

23  A.    They were.

24  Q.    Based upon your review of those articles --

25       MR. GROSSMAN:  May I approach the bench to get the

Dale Ritchie - Direct        80

1  exhibit, Your Honor?

2       THE COURT:  Yes, sir.

3       MR. GROSSMAN:  Let me show Mr. Roberts.

4  Q    Do you recall -- well, let me show you Exhibit number

5  19, what's been marked as 19, did you write that article?

6  A    I did.

7  Q    Was it true to the best of your knowledge?

8  A    It was.

9  Q    Do you recall, or did you use that article to refresh

10 your recollection in the past couple of weeks?

11 A    I have.

12 Q    Do you recall how many jurors were in the jury pool in

13 this case?

14 A    Forty.

15 Q    I call your attention to a paragraph right above jury

16 selection.  Can you use that to refresh your recollection?

17 A    Yes.

18 Q    How many jurors were in that pool?

19 A    There were originally forty; only twenty-six appeared.

20 Q    How many later came?

21 A    There were an additional fifty called.

22 Q    All right.  Was there at sometime -- let me let you read

23 that paragraph, if you would, down there, to refresh your

24 recollection.

25 A    When the forty-nine --

                        Dale Ritchie - Direct        81

1    Q.    Just to yourself, please.

2    A.    All right.

3    Q.    How many jurors were in the jury pool, if you recall,

4    ma'am?

5    A.    Forty-nine.

6    Q.    How many of those were blacks?

7    A.    Two.

8    Q.    Did you recall from reviewing those articles whether

9    other jurors came in the next morning?

10   A.    I believe they did, yes.

11   Q.    How many of them were black, do you recall?

12   A.    As I best recall, there were two additional.

13   Q.    Okay.  And how many jurors total, do you recall?

14   A.    No, not unless I read this again to refresh my memory.

15         MR. GROSSMAN:  I'll let Mr. Roberts review one of

16   these exhibits.

17   Q.    Ms. Ritchie, based upon your review, do you recall

18   whether the final jury in this case was all white or not?

19   A.    As I best recall, it was all white.

20   Q.    All right.  I show you what's been marked as Exhibit 20,

21   and ask if you have reviewed this at my request over the last

22   number of days?

23   A.    Yes.

24   Q.    Did you write the article?

25   A.    I did.

                              Dale Ritchie - Direct          82

1    Q.    Is it factual, to the best of your knowledge?

2    A.    Yes.

3    Q.    I believe I asked you to review particularly the aspect

4    of the article as to what happened to the black jurors.

5    A.    Yes.

6    Q.    Do you recall that?

7    A.    Yes.

8    Q.    Based upon what you recall now, having refreshed your

9    memory, do you recall what happened to the black jurors in

10   this case?

11   A.    They were excused.

12   Q.    By whom?

13   A.    As I best recall, they were excused by the State or the

14   presiding judge.

15   Q.    All right.  Ms. Ritchie, based upon your work as a

16   reporter at the courtroom and as a journalist, do you have an

17   opinion as to whether the venue should have been moved from

18   Cabarrus County?

19           MR. ROBERTS:  State OBJECTS, Your Honor.

20           THE COURT: SUSTAINED.

21           MR. GROSSMAN:  No further questions.

22   CROSS EXAMINATION BY MR. ROBERTS:

23   Q.    Ms. Ritchie, I believe you sat through that trial, didn't

24   you, ma'am?

25   A.    Yes, I did.

                              Dale Ritchie - Cross          83

1  Q.   And did you view any racial intonations during the course

2  of that trial?

3  A.   No, sir, I did not.

4  Q.   Now, I think the State excused jurors because they didn't

5  want to sit because they knew the family and it would be

6  embarrassing for them to return a verdict?

7  A.   As I best recall, that's correct.

8  Q.   And then one black lady said that she lived a block from

9  the defendant, knew the family real well, knew Ronnie very

10  well, and a very intimate relationship but she said she could

11  be fair to the State, and I exercised a peremptory challenge.

12  Do you remember that?

13  A.   Yes, that's how I recall it.

14  Q.   Do you remember the defense excusing a black man who

15  stated that in his opinion the defendant was guilty?

16  A.   I don't recall; I'm sorry.

17  Q.   Let me see if I can refresh your memory.  He was a

18  retired Cannon Mill employee and he sat in seat number five,

19  and when asked if he could be fair to the State -- well, no,

20  he was asked, "Do you have an opinion as to the defendant's

21  guilt or innocence?"  And he said, "If he's here, he's

22  guilty."  Do you remember him saying that?

23  A.   No, sir, I'm sorry, I don't remember.

24  Q.   Ms. Ritchie, I believe you covered a tremendous number

25  of cases in this courtroom, particularly jury cases?

A.    Yes, sir.

Q.    Did you, ma'am, ever note any exclusion of blacks from the jury for no reason other than the fact that they were black?

A.    No, sir.

      MR. GROSSMAN:  I OBJECT to that; that's leading.

      THE COURT:  SUSTAINED.

Q.    All right, did you sit through the Craig and Anthony trial, first degree murder case tried in this courtroom?

A.    I believe that I did.

Q.    And the defendants were sentenced to death, do you remember that?

A.    Is this the Rocky River --

Q.    Stabbed forty-three times.

A.    Yes.

Q.    And blacks sat on that jury, do you recall that?

A.    I don't specifically recall; I'm sorry.

Q.    Uh-huh.  All right, thank you very much.

      MR. GROSSMAN:  Thank you, Ms. Ritchie.

      THE COURT:  Thank you.  You may step down.

            (The witness leaves the stand.)

      MR. GROSSMAN:  Judge, let me just review my notes for about fifteen seconds and make sure I'm not leaving any-body out.

            (Brief pause in proceedings.)

MR. GROSSMAN: That concludes the oral evidence. I believe the statute allows a review of the record itself. For the purpose of the record, I would move to introduce the two files into evidence in the case. I have not marked them.

THE COURT: All right, the Court will consider them to be in evidence.

MR. GROSSMAN: All right. Do you want them marked?

THE COURT: No, sir, I have them up here.

MR. GROSSMAN: That will conclude, then, this evidentiary hearing, or at least the defendant's aspects of the evidentiary hearing.

THE COURT: Mr. Roberts, do you have evidence to present?

MR. ROBERTS: No, Your Honor.

THE COURT: All right. I assume you gentlemen would like to be heard in oral argument?

MR. GROSSMAN: Yes, sir.

THE COURT: All right, I'm going to let you have about five minutes to get your thoughts together and then I'll hear from both of you.

We'll be at ease for five minutes.

-- SHORT RECESS --

THE COURT: Mr. Grossman, I would assume, since you have the burden in this, that you would be entitled to go first and last if you choose, or if you and Mr. Roberts have

86

1   worked out some other division of your --

2          MR. GROSSMAN:  We haven't truly discussed it, Your

3   Honor.  I prefer to go last and waive the first.

4          THE COURT:  All right.  Mr. Roberts, you're in the

5   unusual position of going first, then.

6          MR. ROBERTS:  Thank you, Your Honor.

7      Your Honor, the thrust of the motion is ineffective

8   assistance of counsel, and I think that through the witnesses

9   for the defendant that we have shown that the attorneys

10  involved in this matter are of a most reputable law firm,

11  one experienced in civil rights legislation, racial equality;

12  that firm is known throughout the entire Southeast.  Members

13  of that firm all enjoy excellent reputations.

14     The point of a change of venue and venire, I am and have

15  been aware of that strategy for eleven years.  They felt,

16  even then, and declared so, that they thought that Cabarrus

17  County was perhaps the safest harbor for this defendant at

18  the time, due to his local attachments and friends who have

19  been supportive of him in this courtroom and outside the

20  courtroom.  I don't think that their failure in that regard

21  reflects on ineffectiveness; I think it was a deliberated

22  decision on their part as they have testified to.

23     Your Honor, as to the supplemental motion filed under the

24  theory of Cofield, State conceded that I have no recollection

25  of a black foreman of the grand jury.  I do have a recollection

                        Argument by Mr. Roberts      87

of a black foreman of the petit jury. And I think through

Mr. White's testimony it should become obvious to the Court

that there has been no systematic exclusion of people. His

Honor is familiar with the practice that the outgoing foreman

recommends someone who has shown an interest, someone who

can handle the paperwork, the general demeanor as observed

by each other, whatever occurs in a grand jury room, has been

the system and as Mr. White testified race never entered into

it.

Jury selection in this county, I think Mr. Fuller kind

of summed that up by the testimony that I elicited with

regards to his appearing before the D.A. Conference in

Chapel Hill. At the time, and even now, I'm rather pleased

by his observation that only in this judicial district could

he say that that firm was always treated fairly and their

clients fairly with regards to racial equality and racial

situations.

I think, Your Honor, that the facts before the Court

with regards to any systematic exclusion of black people from

the jury certainly have not carried their burden forward;

that due to the nature of things prior to two years ago jurors

were taken from voter lists and property owners and so forth,

that perhaps there was an imbalance but it was not a systematic

exclusion on the part of the Court, it was jury qualifications

as set forth by the legislature.

Case 1:16-cv-00539-CCE-LPA   Document 7-17   Filed 06/17/16   Page 35 of 53

1  The newspaper articles that His Honor has before him I

2  do not think show anything inflammatory.

3  As I understand the thrust of the motion filed by the

4  defendant some ten years later, it says he did not get a fair

5  trial, essentially this is what he is saying, and I do not

6  think through his evidence that either through systematic

7  exclusion of blacks or any other reason has he shown the

8  denial of a fair trial. We guarantee, Your Honor, fair

9  trials, not perfect trials. And with regards to any implica-

10 tions of ineffectiveness of counsel with regard to search and

11 seizure of some of the evidence in the case, as I understand

12 the Supreme Court's decision affirming this conviction, they

13 considered it, found that it was consensual, that it met all

14 the requirements of the law with regard to a consensual

15 search.

16 So, Your Honor, the State feels that the defendant has

17 not met its burden through this post-conviction hearing, and

18 would request the Court to deny the affirmative relief sought

19 by the defendant.

20 THE COURT: Mr. Grossman.

21 MR. GROSSMAN:  Thank you, Your Honor.

22 This case comes on before the Court through somewhat

23 difficult circumstances, I suppose, for all parties eleven

24 years after conviction. We sit here and the attorneys this

25 morning testified a number of times that they simply could

Argument by Mr. Grossman        89

not recall, and that's unfortunate for all parties. However, the transcript does recall, Your Honor. The Court not having read the transcript, it's hard to speak of it here today, so I'll say what I oftentimes say to the jury, if something I say is wrong, of course, go by whatever it says on the paper. The transcript is before the Court; the Court will consider that, I suppose, in the next number of weeks in light of a lot of what it has heard this morning.

Your Honor, I can sit here for an hour and talk about law. What I have done is I have taken the liberty of preparing a short memorandum, recognizing that the Court will take probably a few weeks to review it and, of course, the District Attorney's office can prepare a memorandum if they would like. I would like to file that in the file to at least bring the Court's attention to some of what I think are the relevant cases rather than taking all of the next hour to tell you about the cases. I will serve Mr. Roberts with that. If the Court will allow me to file that in the file?

THE COURT: You may file it, it will be included in the court file.

MR. GROSSMAN: I do want to discuss some of the facts, Judge.

Systematic exclusion of blacks can be proven in a couple of different ways. The memorandum speaks to it, but basically you can show it by having a witness stand up there and say,

"Yes, we systematically excluded against blacks." You are never going to find that happening.

What these attorneys apparently did, as best we can tell and the transcript will speak to it, is they brought in a motion on the day of trial. The transcript, I believe when you read it you will see will speak to the attorney, Mr. Fuller, telling the judge, and this is in the record, that if the jury shows X amount, not enough blacks, we're going to have this motion, and then later in the record he calls this Ms. Ballington we talked about and makes mention that she got that morning some information from him. He didn't prepare, Judge, and a motion regarding constitutional protection, which is what racial discrimination is, it is protected by the constitution, let me phrase it correctly -- a motion of that nature requires the utmost preparation. All motions require preparation. Jim Fuller and Kark Adkins themselves said, "We ought to prepare motions," not specifically in this case, but "motions should be prepared prior to trial."

Erwin Spainhour, a man well known in the county, good reputation, "Yes, you ought to prepare a motion before trial, before hearing, and you ought to investigate."

When you read the transcript, Judge, you'll see that James Robinson or John Robinson, I can't remember his name, but Robinson, testified and apparently had lost relevant evidence that was never brought in by Mr. Fuller who was

Argument by Mr. Grossman        91

1    examining, or handling this motion.  It wasn't prepared.

2         And it's not the gist, Judge, of saying the jury had a

3    systematic exclusion of blacks.  That's important.  But the

4    gist of the motion of ineffective assistance of counsel is

5    failure to prepare or investigate when you have a motion.

6    Well, now I've got to go back after eleven years and show

7    that there was systematic exclusion which is mighty difficult

8    to do, very candidly.  And that's why Ira Padgett and Harvey

9    Cannady came in and said, "Judge, as best we can recall,

10   there were thirty-five or forty or fifty," I can't remember,

11   I hope the Court does, but some amount in the jury pool and

12   there was some amount of black folks, four, five or six, or

13   I believe Ira testified three, four or five, in there.  The

14   Court can come out with its own percentages.  We have a

15   stipulation of fifteen point nine percent blacks in the county

16   I think what the Court is going to find is when it runs the

17   percentages out is that you have got an under representation

18   of blacks in the jury pool.  It's not a terrible under

19   representation but it's a consistent under representation,

20   you see, and that's what makes the difference.  If we had had

21   ten percent at one term and twenty percent at another term,

22   we wouldn't be here arguing this, but we had a consistent

23   under representation of blacks in the jury pool in 1974, '5

24   and '6, mid seventies.

25        Now, I said we could put a man on the stand to testify

Argument by Mr. Grossman       92

that, "I systematically exclude blacks from the jury," but
we're never going to see that. The other way to do it is to
show disparity in percentages for a period of time leading up
to the trial, leading up to the motion before the bar. And
that's what I've done today. And I have carried the burden
on that, I believe, by showing that there was an under
representation.

The other test, of course, it's a two-fold test, is to
show that there's under representation on that jury, and I
believe Dale Ritchie did that from her newspaper articles
where she showed four out of fifty-five, I believe -- the
articles are in evidence, the Court can see that for itself
also. There is some information in the record but there was
an under representation of blacks in this jury; there was an
under representation of blacks in the entire jury pool;
there had been for a number of years. Mr. Roberts brought out
that it got better when we started putting in driver's licenses
which was two years ago, I believe he argued to the Court.
But that was 1985. This is 1976.

Judge, the Strickland case, which is the key case and
it's in the memo on ineffective assistance, which has been
adopted in North Carolina, says that I not only have to show
ineffective assistance but I've got to show some prejudice,
too; that is that the result might have been different. I
have carried that burden; I have shown the Court on the

1  systematic exclusion that there was problems with the jury,

2  and the State would have to go forward with that now and show

3  that, in fact, that jury was racially neutral and that juries

4  in '74, '5 and '6 were racially neutral.

5  All right, now, that's similar to what actually happened

6  in State versus Cofield, the grand jury case.  In State

7  versus Cofield, contrary what we seem to be hearing, we didn't

8  say that the case gets booted because there was no black

9  grand jury foreman in twenty years; that case, as I'm sure

10  the Court is aware, was remanded for a finding of racial, to

11  determine whether grand juries were racially neutral, selection

12  of grand jury foremen were racially neutral in that county.

13  I have put up evidence that there was no grand jury fore-

14  man in Cabarrus County who was black for at least twenty

15  years, at least nine years before Ronnie Long's trial.  The

16  State has put up rebuttal -- well, excuse me, by cross

17  examination of Mr. White, has put up a very good case to show

18  that there is no racial discrimination in the selection of

19  grand jury foremen in 1987; hasn't talked at all about 1976.

20  They admit what I put into evidence.  I put into evidence that

21  there were grand jury foremen problems throughout nine years

22  prior to Ronnie Long's trial.  Mr. White testified, as I

23  recall, if I'm wrong then I stand corrected and I apologize

24  to the Court, but as I recall Mr. White testified to what we

25  were doing and how we picked grand juries, and he said, "We've

Argument by Mr. Grossman     94

been doing that," and I remember this, "for the past six, eight, ten years." This is 1987, two weeks from 1988. Ronnie Long was tried in 1976. I don't think the State met.

Now, in all candor, the memo speaks to this, we have got a retroactivity problem but I've talked to that in the memo and I'll let the memo speak for itself. I'm aware that to my knowledge Cofield has not been determined to be retroactive or not. I have put this in this motion because the rule on these motions I think says you have to raise them when they're there.

All right. Now, the search and seizure --

THE COURT: Let me interrupt you just a minute. I understood Mr. White to say that since this courthouse had been in existence and had been used, rather than the last six to eight years. I believe that was the time, and we'll see from the transcript of this trial.

MR. GROSSMAN: Okay, if that's so, Judge, I'll stand corrected because I listened very carefully.

THE COURT: I have assumed, and just so that I'm not assuming any further, is it stipulated and agreed that Mr. Long's trial was held in this building, in this very room?

MR. GROSSMAN: I believe that's right; I was not here.

MR. ROBERTS: That's correct, Your Honor.

MR. GROSSMAN: Judge, if I'm wrong, of course, I'm

not intentionally misleading the Court. I have got it written down here in numbers, seven, eight, ten years, on my notes. Now, again, we'll let the transcript speak for itself on that, of course. I do recall him saying something about 1970; however, I took the grand jury selection to be in the past seven, eight, ten years; whatever, the transcript can speak, as far as I'm concerned.

On the search and seizure issue, Judge, I have introduced the brief. My problem with that, in all candor, the North Carolina Supreme Court has ruled on the substance of that issue. Mr. Long brings it back on the issue of ineffective assistance. I have presented very little evidence on that. What disturbs me most is there apparently is no evidence in the transcript, as I recall, there is no argument in the brief, regarding a twenty-year-old situation at that time, which is highly relevant, I think, to consensual search in a search and seizure question. The transcript and the brief which are in evidence will speak for themselves on that; I maintain that the failure to deal with that was ineffective assistance.

Finally, the change of venue. What concerns me, and I'm aware, of course, of the law that says that strategy shouldn't be second-guessed, what concerns me is that these gentlemen talk about Rowan County and certain activities in Rowan County. They talked, Mr. Fuller I think about Monroe, and Mr. Adkins about Albemarle. We're talking Judicial District 19 in 1976.

1   I asked them about Randolph and Montgomery and they didn't

2   respond that they had truly considered that; as I recall they

3   responded that they must have talked about it, but they had

4   no true recollection.  What concerns me in a change of venue,

5   and that was also the purpose of putting John Kennedy up and

6   in some respects the purpose of Dale Ritchie, is that this

7   was clearly a case with racial overtones.  I think the evi-

8   dence speaks to that.  It was clearly a case that was

9   manifest in the community.  It was clearly -- well, I shouldn't

10  say that, but I believe Dale Ritchie testified that the case

11  permeated the community.  I haven't shown, and I'll candidly

12  tell the Court, that the newspaper articles were inflammatory

13  or non-factual because they were not, but under the case law

14  the community and the feelings within the community can give

15  rise to a venue change.  And I maintain and have maintained

16  that these gentlemen should have made a motion for change of

17  venue and their failure to do so was ineffective assistance.

18  They have today testified that this was a strategy decision.

19  I recognize the case law on strategy decisions; however,

20  their strategy decision was marred by their statement that they

21  were afraid they were going to Rowan, they were afraid they

22  were going to Monroe, or they were afraid they were going to

23  Albemarle.  They could have considered the other towns in

24  the judicial district; they could have made a motion to not

25  only change from Cabarrus, but change and consider other

Argument by Mr. Grossman        97

venues, and why. Now, I realize that might have been a little
unusual but in a case of Ronnie Long's nature, and Mr.
Roberts, I believe, correctly pointed out that it was capital
at that time -- I was in law school at that time -- but it
was capital and it was an important case. It was a major case.
And the venue should have been changed in the case. I main-
tain that was ineffective assistance.

Briefly, my burden is by a preponderance of the evidence,
under G.S. 15-A-1420. I believe I have met that burden. I
believe Mr. Long is entitled to a new trial. There is some
point about him receiving a fair trial. Under the Vasquez
case which is cited in the memorandum, a new U. S. Supreme
Court case, the fact that he may have received a fair trial
does not mean he is not entitled to a new trial if the
errors of constitutional nature have indeed been made.

I realize it's been eleven years, Your Honor, but these
are constitutional errors of major import; they are grave
errors, and on behalf of Mr. Long, Your Honor, I would ask
that the motion be granted.

Thank you.

THE COURT: All right, gentlemen, pursuant to your
stipulation, I intend to take this motion under advisement
and rule upon it after I have had adequate time to review the
transcripts of the original trial as well as the transcript
of this hearing. Madam Court Reporter, I direct you to

1  prepare a transcript of these proceedings at the expense of
2  the State.  If you would, provide a copy both to Mr. Roberts
3  and to Mr. Grossman, as well as to the Court, and present any
4  order for your services to me and I will award you your fee.
5      If, Mr. Roberts, you or your office on your behalf, desire
6  to present any written memorandum in response to what Mr.
7  Grossman has filed and served on you this afternoon, you may
8  certainly do that.  I would hope that if you choose to do that
9  you might be able to do it within the next thirty days.
10         MR. ROBERTS:  All right, sir.
11         THE COURT:  Anything further, gentlemen?
12         MR. ROBERTS:  Not from the State, Your Honor.
13         MR. GROSSMAN:  No, Your Honor.  Thank you.
14         THE COURT:  Thank you, gentlemen.
15             *       *       *
16
17
18
19
20
21
22
23
24
25

STATE OF NORTH CAROLINA   )
                          :        C E R T I F I C A T E
COUNTY OF MECKLENBURG      )

I, Gena W. Kirby, Commissioner and Notary Public, do hereby certify as follows:

That I reported in shorthand the foregoing proceedings in the foregoing styled cause at the time and place stated in the caption hereof;

That I later reduced my shorthand notes to typewriting, or under my supervision, and the foregoing pages 1 through 99, both inclusive, contain a full, true and correct transcript of the proceedings as therein set out.

This the 23rd day of January, 1988.



Gena W. Kirby
P. O. Box 29037
Charlotte, NC 28212


My Commission Expires:
8/31/91

Case 1:16-cv-00539-CCE-LPA   Document 7-17   Filed 06/17/16   Page 47 of 53

NORTH CAROLINA

CABARRUS COUNTY

STATE OF NORTH CAROLINA

                vs.

RONNIE WALLACE LONG,
                Petitioner.

FILED

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
76 CRS 5708 & 5709

:
:
:
:
:
:
:

JUDGMENT ON MOTION
FOR APPROPRIATE RELIEF

     This Plenary Hearing was held on the 16th day of December, 1987.
The petitioner was present and represented by Steven A. Grossman.  The
State was represented by the Honorable James E. Roberts.

     This proceeding was initiated by the filing of a pro se motion
for appropriate relief on August 1, 1986, was supplemented by the filing
of a motion for appropriate relief prepared by appointed counsel on
August 10, 1987, and further supplemented by appointed counsel in a
motion filed December 8, 1987.  The trial complained of was held in
Superior Court of Cabarrus County, with judgment entered on October 1,
1976.  The defendant/petitioner was convicted by a jury of the crimes
of first degree burglary and first degree rape and was sentenced to
a term of life imprisonment in each case.

     The Court finds the defendant/petitioner has alleged and contends
that his constitutional or legal rights were denied or violated during
his original trial in each of the following respects:

     1.  That defendant/petitioner's constitutional right to the
effective assistance of counsel was denied by (a) trial counsel's
failure to seek a change of venue or a special venire; (b) trial
counsel's failure to move to quash the jury venire until the day of
trial; (c) trial counsel's failure on appeal to pursue an issue of

systematic exclusion of blacks from the jury pool; (d) and trial counsel's failure to file a pretrial motion to suppress certain evidence seized from defendant/petitioner's vehicle, to vigorously pursue said motion when made at trial and to properly represent the defendant/petitioner on this issue upon appeal; and

2. That the selection of the foreman of the Grand Jury which indicted the defendant/petitioner was conducted in a racially discriminatory fashion.

The Court heard the evidence presented by counsel for the defendant/petitioner, the evidence presented by the State through cross-examination of defendant/petitioner's witnesses and the arguments of counsel. Each side stated to the Court that it had no further evidence to present.

In consideration of all the competent evidence offered, and after considering the arguments of counsel, and after carefully reviewing the transcript of this hearing as well as the transcript of the original trial, the Court finds by the preponderance of the evidence that:

1. In case number 76 CR(S) 5708, the defendant/petitioner was found guilty by a jury on October 1, 1976, in the Superior Court of Cabarrus County, upon a true bill of indictment returned at the May 17, 1976 Session of the Grand Jury, which bill charged the felony of first degree rape;

2. In case number 76 CR(S) 5709 the defendant/petitioner was found guilty by a jury on October 1, 1976 in the Superior Court of Cabarrus County, upon a true bill of indictment returned at the May 17, 1976 Session of the Grand Jury, which bill charged the felony of first degree burglary;

3.  The sentence of the trial court in each case was life imprisonment;

4.  Attorneys James Fuller and Karl Adkins were privately employed to represent the defendant/petitioner at the original trial and continued to represent the petitioner on his appeal to the Supreme Court of North Carolina;

5.  The undersigned has heard and observed the witnesses on the stand and has determined what weight and credibility to give to their testimony;

6.  Defendant/petitioner's trial counsel fully considered the possibility of requesting a change of venue or special venire and discussed this possibility with defendant/petitioner and his family members;

7.  Defendant/petitioner's trial counsel concluded that defendant/petitioner's interests would be better served by having his trial held in his home county where he had substantial support within the community;

8.  Defendant/petitioner's trial counsel were members of a law firm recognized in North Carolina as being the State's leading firm with expertise in matters of racial discrimination;

9.  Defendant/petitioner's trial counsel had participated on earlier occasions in motions to quash jury panels for racial discrimination in the selection process;

10.  Defendant/petitioner's trial counsel were very familiar with and experienced in the presentation and examination of witnesses to support a motion to quash a jury panel for racial discrimination in the selection process;

11.  A supplemental jury panel was ordered drawn by the Presiding Judge on the morning of the first day of Court with those jurors to appear along with the original jury panel at the afternoon session of Court;

12.  The racial make-up of the jury panels summoned for defendant/petitioner's trial could not reasonably be ascertained prior to the arrival of the jurors in the courtroom;

13.  Defendant/petitioner's trial counsel advised the Presiding Judge on the morning of the day at which the jurors were to appear for the afternoon session of Court that a motion to quash the jury panel might be necessary depending upon the actual racial mix of the jury panel which appeared;

14.  Such motion was made by counsel and was heard by the Presiding Judge with a full presentation of witnesses by defendant/petitioner's trial counsel in support of their motion and was denied because the Presiding Judge found no evidence at all of a systematic exclusion of jurors because of race (Trial Transcript Volume I, Page 40);

15.  Defendant/petitioner's trial counsel moved during trial to suppress certain evidence seized from defendant/petitioner's car, a _voir dire_ was conducted, the denial of said motion was briefed and argued to the Supreme Court and was there affirmed (Trial Transcript Volume II, Page 193 _et. seq._ and State vs. Long, 293 NC 286, 293 (1977));

16.  In 1976 the traditional process for selecting the foreman of a Grand Jury in Cabarrus County involved the making of a recommendation by the outgoing foreman of a member of the nine

remaining Grand Jurors who was both willing and capable of serving as foreman for the next six months, a review of the person so recommended by the Clerk to determine if that person had a prior criminal record, and the forwarding of the recommendation to the Presiding Judge for his decision;

17. Race was not considered in determining the qualifications for Grand Jury foreman and that in all instances the Presiding Judge accepted the recommendation of the outgoing Grand Jury foreman.

BASED UPON THE FOREGOING FINDINGS OF FACT, THE COURT CONCLUDES AS A MATTER OF LAW THAT:

1. The bills of indictment upon which the defendant/petitioner was tried are valid;

2. The petitioner had a fair and impartial trial and none of his constitutional or other legal rights were denied or violated in any respects before, during or after his trial;

3. The evidence adduced supports a finding of guilty beyond a reasonable doubt and a rational jury could have found the defendant guilty beyond a reasonable doubt under the laws of North Carolina;

4. The decision of defendant/petitioner's counsel not to seek a change of venue or special venire was one of trial strategy made after full discussion with defendant/petitioner and his family and friends and was the result of reasonable professional judgment;

5. Defendant/petitioner's trial counsel timely made and pursued their motion to quash the jury panel for racial discrimination in its selection, fully presented evidence and vigorously examined witnesses in an effort to present to the Court evidence of such discrimination; the application of their special expertise to the pursuit of this motion was within accepted and reasonable standards of professional competence and judgment;

6. The decision of counsel not to pursue on appeal the issue of racial discrimination in jury panel selection, in the light of the absence of any evidence of such, was within the accepted and reasonable standards of professional competence and judgment;

7. The validity of the consent search of defendant/petitioner's car and the admissibility of the evidence seized was fully considered by the Supreme Court of North Carolina and is now moot;

8. The selection process for Grand Jury foreman traditionally followed in Cabarrus County at the time of defendant/petitioner's indictment has not been shown by the evidence presented to have been racially motivated nor to have excluded any qualified person simply because of race;

9. The evidence presented rebuts any such contention of racial discrimination in the selection of the Grand Jury foreman in Cabarrus County during the time at which this case arose.

NOW, THEREFORE, IT IS ORDERED THAT:

1. The petition of the defendant/petitioner for a new trial or dismissal of the charges against him is denied;

2. The defendant/petitioner is remanded to the custody of the Department of Correction to complete service of his sentence as provided by law;

3. Copies of this judgment are to be forwarded by the Clerk of Superior Court to the petitioner, the petitioner's attorney, the District Attorney and the Secretary of the Department of Correction.

This the 8th day of July, 1988.

A TRUE COPY
ESTUS B. WHITE
CLERK SUPERIOR COURT

By _____
Assistant Clerk Superior Court

_____
The Honorable Russell G. Walker, Jr.