# EXHIBIT 7

2008 MAR transcript

1    STATE OF NORTH CAROLINA     IN THE GENERAL COURT OF JUSTICE
                                   SUPERIOR COURT DIVISION
2    COUNTY OF CABARRUS            76 CRS 5708, 5709

3
   STATE OF NORTH CAROLINA   )
4                             )
                            )
5    VS.                        )        TRANSCRIPT
6                             )
   RONNIE WALLACE LONG       )
7                             )
   _____)
8

9    The above-captioned case coming on for hearing at the
     November 20, 2008 Criminal Session of the Superior Court of
10   Cabarrus County, before the Honorable F. Donald Bridges,
     Judge Presiding, the following proceedings were had, to
11   wit:

12
                             <u>APPEARANCES</u>
13

14   For the State:           Roxann Vaneekhoven
                          Ashlie Shanley
15                          Office of the District Attorney
                          P.O. Box 70
16                          Concord, NC 28026-0070

17   For the Defendant:       Donna E. Bennick
                         1829 E. Franklin Street, Bldg. 600
18                          Chapel Hill, NC 27514

19                          Janine Zanin
                         UNC School of Law
20                          5111 Van Hecke-Wettach Hall
                         Chapel Hill, NC 27599
21

22   Thursday and Friday, November 20 and 21, 2008

23   Reported by Stephanie W. Culpepper, CVR-CM

24   Date Requested:   February 25, 2009

25   Date Delivered:   July 6, 2009

1                          I N D E X

2                           WITNESSES

3   All Witnesses:                              Page:Line

4   Richard Rosen for Defendant
      Direct Examination by Ms. Zanin                96:24
5     Continued Direct Examination by Ms. Zanin     103:21
      Cross Examination by Ms. Vaneekhoven          109:10
6
    Les Burns for Defendant
7     Direct Examination by Ms. Bennick             110:21
      Cross Examination by Ms. Vaneekhoven          137:15
8     Redirect Examination by Ms. Bennick:          149:15
      Recross Examination by Ms. Vaneekhoven        151:18
9     Examination by The Court                      154:7
      Further Recross by Ms. Vaneekhoven            161:21
10    Examination by The Court                      165:23
      Further Redirect by Ms. Bennick               170:24
11
    Karl Adkins for Defendant
12    Direct Examination by Ms. Bennick             172:16
      Continued Direct by Ms. Bennick               182:13
13    Cross Examination by Ms. Vaneekhoven          196:9
      Redirect Examination by Ms. Bennick           215:6
14    Recross Examination by Ms. Vaneekhoven        219:17

15  Jim Fuller for Defendant
      Direct Examination by Ms. Bennick             246:16
16    Recross Examination by Ms. Shanley            264:14
      Redirect Examination by Ms. Bennick           284:19
17    Examination by The Court                      287:14

18  Ronald J. Bowers for Defendant
      Direct Examination by Ms. Bennick             294:2
19    Cross Examination by Ms. Shanley              314:9

20

21

22

23

24

25

1   (Court was called to order at 9:30 on November 20, 2008.)

2   (Counsel for the State, counsel for the defendant, and the

3   defendant are present in the courtroom.)

4           THE COURT:  All right.  Calling now the case of

5   State of North Carolina against Ronnie Wallace Long.  Would

6   counsel please announce their appearances for the record?

7           MS. VANEEKHOVEN:  Yes, Your Honor.  My name is

8   Roxann Vaneekhoven.  I'm the district attorney here in

9   Cabarrus County.

10          MS. SHANLEY:  I'm Ashlie Shanley.  I am the

11  chief assistant district attorney in Cabarrus County.

12          MS. BENNICK:  I'm Donna Bennick.  I am counsel

13  for Ronnie Wallace Long.  My office is in Chapel Hill, so I

14  am an Orange County bar member.

15          MS. ZANIN:  My name is Janine Zanin.  I am

16  co-counsel for Ronnie Wallace Long, and we are both of

17  counsel to the Innocence Project at the Law School at UNC.

18          THE COURT:  All right.  Thank you very much.

19  Before going into the hearing itself, I think there are a

20  number of pretrial issues that we might want to address.

21  And I have a list myself.  It may be that you all have some

22  matters to add to this list.  There may be some issues that

23  you all would like to deal with as well.

24          But the list of issues that I have noted that may need

25  to be addressed before going into the presentation of any

1 evidence or actually going into the evidentiary hearing, is

2 I understand the defendant had served a request for

3 discovery and *Brady* materials and a follow-up motion in

4 that regard, that the defendant has filed a motion for DNA

5 testing of a toboggan.

6         MS. BENNICK: That's correct, Your Honor.

7         THE COURT: The defendant has filed a motion

8 for preservation of notes and tapes. The defendant has

9 filed an application for a witness certificate. And the

10 defendant has filed a motion for appointment of an expert

11 to present testimony at this hearing.

12     Then one other issue that arises, not by virtue of

13 anything that's been filed by either the State or the

14 defendant, is we have a request from a local television

15 station to be able to film the proceedings. And I had

16 informed the person making that request that I would,

17 before making any decision on that, I wanted to have an

18 opportunity for him to hear from counsel for each side.

19     Now, do you all know of other matters that ought to be

20 addressed pre-hearing?

21         MS. BENNICK: Your Honor, I have just one or

22 two that may or may not arise. If Mr. Isenhour testifies,

23 I filed a motion in limine about admission of his criminal

24 convictions as impeachment material. That was filed

25 earlier this week and the district attorney was served. I

1    don't know if you want to deal with that as we go along

2    with the witnesses or not, but that's one of the issues.

3         And the other is that for some reason I sent a

4    subpoena to the hospital for the victim's medical records.

5    The victim's medical records had been provided to me by

6    Judge Spainhour at an earlier hearing.  He had gotten the

7    records, he had done an in camera inspection of those

8    records, redacted certain portions, and turned the

9    remaining pages over to me directly by letter that I

10   received by mail.

11        I sent a subpoena to the hospital custodian of

12   records, but for some reason they never signed for the

13   certified mail and it's been returned unsigned for.  I

14   would hope that maybe we could just dispense with the

15   custodian of records, but if not I guess I would ask Your

16   Honor if you would sign the subpoena and perhaps ask

17   someone from the sheriff's department to serve it since I

18   really can't explain why the hospital would not have signed

19   a certified mail.  I really don't understand it, but they

20   didn't.  And that's really a chain of custody issue.  If

21   that's not an issue we won't need to bother.

22             THE COURT:  Are there other matters that the

23   State knows of that may need to be addressed as pre-hearing

24   matters?

25             MS. VANEEKHOVEN:  Your Honor, we're not aware

1  of any additional matters.  However, we are not in receipt

2  of two of the items you mentioned.  One was the application

3  for witness certification; two is the request for expert

4  funds for the defense.  I'm not certain when they actually

5  filed those, but nonetheless, we have not received them.

6                MS. BENNICK  May I be heard?

7                THE COURT: Yes, ma'am.

8                MS. BENNICK:  Your Honor, the motion for

9  appointment of an identification expert is an ex parte

10  motion permitted by law, which is why Ms. Vaneekhoven was

11  not served.  That's just absolutely according to the

12  statute.  And the motion for certificate of out of state

13  witness is also by statute an ex parte motion.

14      Van Isenhour, who was the chief evidence custodian in

15  this case in 1976 lives in Savannah, Georgia.  I don't have

16  the power as an attorney in the State of North Carolina to

17  issue a subpoena as I do with witnesses who reside in the

18  state, and I had sent that for you for -- because my

19  understanding of the law is that that certificate has to be

20  transmitted to a court in Georgia and then someone in

21  Georgia with power, a sheriff or police department there

22  has to serve Mr. Isenhour.

23      I do notice since Monday afternoon Ms. Vaneekhoven had

24  him on her list, and if he's going to be here and she's

25  going to call him, that's fine. But I do believe that

1  Mr. Isenhour is a fairly critical witness in this hearing.

2        THE COURT:  Is the State planning to call

3  Mr. Isenhour as a witness in this case?

4        MS. VANEEKHOVEN:  Your Honor, until we've seen

5  what the defense has actually put forward, because the

6  burden is theirs, we're not going to commit one way or the

7  other.  We included him on our witness list.  We will

8  certainly make that decision once we see what they have

9  actually presented.

10      If I could be heard with regard to one other matter.

11  We did file a motion for reciprocal discovery, and the

12  defense, if they intend to seek expert testimony, (a) has

13  not provided us any background or opinion or names of those

14  intended to testify.  Furthermore, they've told us they

15  would have no experts.  And certainly we would like to be

16  heard about the expert they've now brought to the Court's

17  attention because we think it would be completely not

18  permitted under the law.

19      THE COURT:  Well, let's talk about Mr. Isenhour

20  first of all.  If the defendant wishes to call Mr. Isenhour

21  to testify, does the State have the power to produce him or

22  to arrange for him to come voluntarily?

23      MS. VANEEKHOVEN:  Not that I'm aware of, Your

24  Honor.  Our understanding is that he was in the State of

25  Georgia, and so their subpoena power is no different than

1  ours when it comes to subpoenaing out of state witnesses.

2         THE COURT: Well, of course, we had a telephone

3  conversation last week, a conference call with both counsel

4  on the line at that time and there were some issues about

5  scheduling of witnesses and we talked about the possibility

6  that we may need to have further hearings other than just

7  the two days that initially had been set aside for this

8  hearing, that being today and tomorrow.

9      It appears to me that if Mr. Isenhour is needed and if

10 his appearances is going to have to be compelled rather

11 than provided voluntarily, that the defendant may indeed

12 need that certificate that you received.

13     Now, the question is, and obviously when I received

14 that in the mail -- and first of all let me say that I

15 simply haven't acted on anything I've received in the mail

16 up to this point. I've held on to everything and I have

17 not signed any orders or taken any action ex parte in the

18 case because I felt it would be best to address all these

19 matters in open court. But it appears that if the

20 defendant wishes to offer the testimony of Mr. Isenhour,

21 that certificate may indeed be needed. But it would seem

22 to me also in view of the time that's going to be involved

23 in getting that certificate served and an order issued by a

24 judge out of the State of Georgia, that that process is

25 going to involve scheduling another date at some point in

1 time for that witness to appear and testify. Now, how

2 would you like to proceed in that regard?

3         MS. BENNICK: Well, Judge, I'm prepared to

4 proceed today with the witnesses that I have and to do our

5 two full days now. And I suppose if at the end of that I

6 decide, you know, not to call Mr. Isenhour, I will just

7 tell you honestly at this point I do believe that he's

8 needed and that I do need him. If something in the next

9 two days changes obviously I'm going to let you know. I'm

10 not going to waste the Court's time or a Georgia Court's

11 time for a witness I decide not to have. But at this

12 juncture I do believe I'm going to need that certificate

13 issued, transmitted and served according to the procedure.

14         THE COURT: Does the State wish to be heard on

15 that point as to whether or not I ought to sign a

16 certificate?

17         MS. VANEEKHOVEN: No, Your Honor, we don't care

18 to be heard.

19         THE COURT: Well, I'm inclined to issue that

20 certificate concerning that witness. Well, the certificate

21 that's been prepared of course calls for Mr. Isenhour's

22 attendance on November 20th and 21st, and as a practical

23 matter I doubt that that's going to be feasible. Would you

24 like to prepare a -- well, if you want to just wait and see

25 when we reach that point --

1          MS. BENNICK:  Judge, we can just wait and see

2     and then I can just change the dates, because obviously it

3     will be a date if we're going to continue it for

4     Mr. Isenhour, that you are available to take, to hear that

5     testimony.

6          THE COURT:  All right.

7          MS. VANEEKHOVEN:  Your Honor, I have actually

8     one question and one comment with regard to the scheduling

9     you just mentioned, if I may.

10          THE COURT:  Yes, ma'am.

11          MS. VANEEKHOVEN:  Pursuant to our telephone

12     conference call last week, after defense refused to allow

13     us to put those witnesses up today, we had instructed them

14     to be here tomorrow morning based on the conversation that

15     we had that their evidence should take about a day.  They

16     will be here.  As I mentioned, they're both coming from out

17     of town, one from out of state.  So we did get that matter

18     ironed out late last week.

19          THE COURT:  All right.

20          MS. VANEEKHOVEN:  The other matter, I do have

21     one question.  Is the motion that the defense filed with

22     regard to this expert witness, I know that it's been filed

23     as an ex parte motion.  We can address that at the

24     appropriate time.  But I am curious the date of that

25     filing.

1    THE COURT:  That appears to have come in a
2    letter dated October 10, 2008.

3         MS. BENNICK:  That's correct, Your Honor.

4         MS. VANEEKHOVEN:  Your Honor, I just bring that
5    to the Court's attention because in a letter dated to the
6    State November 12th of 2008 the defense said at that time
7    they had no intention or does not have any expert
8    witnesses.  And so we would just bring that to the Court's
9    attention.

10        THE COURT:  All right.  We'll come back to that
11   in just a few minutes.  But there are no other motions or
12   issues from the State's perspective in a pretrial matter
13   for purposes of at least creating our checklist of things
14   to be done this morning before we begin.  Is that correct?

15        MS. VANEEKHOVEN:  That's correct, Your Honor.

16        THE COURT:  Then let's return, if it's
17   agreeable with you all, let's go back to the top of the
18   list and that would be the request for discovery and Brady
19   materials as they may pertain to this hearing today.  What
20   says the defendant in that regard?

21        MS. BENNICK:  Your Honor, I've received
22   discovery from the district attorney's office starting last
23   week.  I suppose at this point I would just ask for
24   representation that she has complied with the discovery
25   requests that I've made, including request for any

1   additional Brady that might have been discovered in any of

2   the police department files or in the district attorney's

3   file, because we have not had any opportunity to review the

4   district attorney's files, of course.

5          MS. VANEEKHOVEN: Your Honor, we did comply

6   with their discovery request. I believe we've given them

7   197 pages of discovery. I have made an additional copy of

8   that that I would like to file with the clerk's office

9   right now so this can become part of the record. Attached

10  to this is a letter dated November 7th to Ms. Bennick

11  outlining the first 183 pages of discovery. The remaining

12  14 pages we sent over the course of the last week. So if I

13  might hand this up to the clerk.

14         THE COURT: All right. Ms. Bennick, does that

15  satisfy your concerns in that regard?

16         MS. BENNICK: Unless something comes up during

17  the hearing, Judge, yes.

18         THE COURT: Then we have a motion for DNA

19  testing as it pertains to the toboggan.

20         MS. BENNICK: Yes, Your Honor.

21         THE COURT: All right, Ms. Bennick?

22         MS. BENNICK: Your Honor, we had previously

23  asked Judge Spainhour in April, I believe, of 2005, hearing

24  was held in June of 2005, if I have my dates correct, and I

25  think I do, yes, that's right, to allow us to test hair

1  that can be seen in the toboggan.  I was given an
2  opportunity to inspect the hat by Judge Spainhour and it is
3  clear that there is hair in that hat.

4      When I made -- and their testimony at the trial was
5  that the hair that can be seen in the toboggan is light or
6  reddish in color.  At the time that I made the application
7  for the DNA motion we had not yet discovered these SBI
8  reports which is the big subject of today's hearing.  The
9  SBI reports, as we contend, are exculpatory in nature, not
10  turned over, and violated Mr. Long's rights under *Brady v.*
11  *Maryland* and its progeny under the 14th Amendment.  At the
12  time Judge Spainhour denied us the right to test, DNA test
13  the hair in the hat, but we did not have those reports.

14      We got those reports in January of '06 from the SBI
15  pursuant to an order that Judge Spainhour had issued to
16  them to locate and preserve evidence.  In one of those SBI
17  reports the examiner says that the hair that was found at
18  the scene of the crime which was tested, which nobody knew
19  about until January of 2006, trial counsel in 1976 did not
20  know about a suspect hair being found or tested by the SBI,
21  that SBI report says that the suspect hair found at the
22  scene is reddish.  It is my contention that the hair that
23  can be seen in the toboggan both in 1976 and pursuant to my
24  inspection of it pursuant to Judge Spainhour's order is the
25  hair in that toboggan is reddish.

1    We have no other DNA evidence in this case, Judge.

2  The DNA evidence is gone. The evidence that's left is

3  evidence that was introduced against Mr. Long.  The rape

4  kit is nowhere to be found.  The victim's clothing is

5  nowhere to be found.  The only thing we have left that

6  could possibly be DNA tested is the hair in that hat.  I

7  believe that that is a critical piece of evidence in this

8  case.  Mr. Long has always denied from the very beginning

9  that that hat belonged to him.  He said that hat did not

10 belong to him.  At a suppression hearing in 1976 he

11 testified that he had never seen that hat and it was not

12 his.

13    So I believe that there is a chance, since all the

14 rest of the DNA evidence is gone, for whatever reason, I

15 don't know if it was lost, misplaced, destroyed.  I have no

16 idea.  I just know we have not been able to find it and at

17 this point I don't have any reason to believe, you know,

18 that will turn up.  And we've looked hard and long.  We've

19 looked for three years for this evidence everywhere, all

20 across the state.  That this is Mr. Long's shot at having

21 today's science of DNA exonerate him in the crimes for

22 which he spent the last 32 years in prison.

23              THE COURT:  Now, with respect to this motion

24 for DNA testing, is this a new motion for DNA testing?  Is

25 it a motion for reconsideration of Judge Spainhour's

1  ruling?  What is it I will be doing?

2         MS. BENNICK:  I'd ask -- it's a new motion,

3  Judge.  It's a new motion based on the newly discovered

4  evidence which is the SBI report that says that the suspect

5  hair at the scene was reddish in color.  So it is a new

6  motion.

7         THE COURT:  So we're talking about a motion

8  filed when?

9         MS. BENNICK:  The motion was filed, I believe

10 you had it right, November 3rd, sorry, November 3rd.

11        THE COURT:  November 3rd is the date on the

12 cover letters that I have from you.

13        MS. BENNICK:  Well, it's file stamped November

14 4th.

15        THE COURT:  Okay.  November 4th, 2008.

16        MS. BENNICK:  Correct.

17        THE COURT:  One reason I ask about that is I

18 believe, hasn't there been at least some change in that

19 statute between the time of the first motion and this

20 motion?

21        MS. BENNICK:  Judge, if you give me a minute to

22 check, I don't believe so, but we have the books here.  I

23 have a copy of the statute.

24        THE COURT:  Wasn't there some change --

25        MS. BENNICK:  Is 15A-269 and --

1      THE COURT:  Wasn't there at least some change

2  that was effective in March of this year?

3      MS. VANEEKHOVEN:  Your Honor, there was.  It is

4  under subsection (b)(3) according to the headnotes after

5  the statute, and that simply was that the defendant has to

6  sign a sworn affidavit of his innocence.  That was amended

7  March 1st of 2008.

8      THE COURT:  What's the effect of that?  What

9  does that really mean?

10      MS. VANEEKHOVEN:  Well, according to the

11  endnotes it says it's really just a stylistic, minor

12  stylistic change.  And I gather, not trying necessarily to

13  interpret what the legislature meant, is that in order for

14  the defense to require more tax dollars to be spent on

15  proving his innocence, they're requiring him to sign a

16  sworn affidavit claiming that he is innocent.

17      THE COURT:  What's the effect of that?

18      MS. BENNICK:  I don't have a clue.  I mean,

19  Mr. Long is prepared to sign it.  I mean, I really don't

20  know.  I don't see any commentary in my handbook about what

21  the intent was behind the legislature either, Judge.

22  Unless it had, I don't know, Ms. Zanin has some contact

23  with the Innocence Inquiry Commission.

24      (To Ms. Zanin) Do you know anything?

25      THE COURT:  And that's exactly what I was

1    getting at.  I was wondering if that, and frankly I'm not
2    familiar with the procedural aspects of the actual
3    Innocence Commission and what may be done in that regard.
4    I was wondering if that language had any special meaning
5    other than a plain reading of the words, those words in
6    that statute.

7            MS. ZANIN:  I don't believe it does.  I know
8    that defendants who are inmates who request that their case
9    be heard in front of the Innocence Inquiry Commission are
10   required also to sign a sworn affidavit of innocence.  And
11   again, I don't know that this is what the legislative
12   intent was behind it, but I imagine that it's just to
13   discourage false claims of innocence would be the only
14   intent that I could gather from it or fathom from it to
15   manage the case load of the Innocence Inquiry Commission.

16           THE COURT:  All right.  What says the State as
17   to that motion for DNA testing?

18           MS. VANEEKHOVEN:  Your Honor, we would ask you
19   to deny that motion first and foremost.  I understand
20   they're trying to claim that this is brought under the
21   guise of newly discovered evidence.  However, when Judge
22   Spainhour denied this motion back in June of 2005 he
23   actually gave an analysis of why he denied it.  And
24   essentially my argument to the Court would be is that he's
25   stating that this is not material to the defendant's

1    defense, which is one of the requirements under the
2    statute.  In my response to the defendant's request I
3    forwarded a letter and a copy of Judge Spainhour's order to
4    Your Honor.  I don't know if you have that --

5              THE COURT:  I have it.  I have it right here in
6    front of me.

7              MS. VANEEKHOVEN:  And so I would direct the
8    Court's attention to subsection 2 of the Conclusions of Law
9    on page three where Judge Spainhour states, assuming
10   arguendo the DNA testing revealed that someone's hair other
11   than the defendant's were to be found on the toboggan, such
12   evidence would not exonerate the defendant.

13        Instead, such evidence would merely tend to show that
14   at some uncertain time someone other than the defendant
15   wore the toboggan and would arguably tend to show only a
16   lack of DNA evidence that the defendant wore the toboggan.
17   Such evidence is not sufficient as a matter of law to
18   compel DNA testing to prevent manifest injustice.  It would
19   only tend to corroborate the testimony of the defendant
20   that he knew nothing about a toboggan and so forth.

21        Your Honor, I would also like to state for the Court
22   that this toboggan was recovered hidden under the
23   defendant's seat of his car 15 days after the crime.  But
24   what's more important than that is 32 years later as we
25   stand before this Court, that toboggan has been handled by

1    numbers and numbers and numbers of people.  In fact, the

2    defendant's own attorney Mr. Adkins put the toboggan on his

3    head, his own head, during closing arguments.

4        If I might approach with this document, Your Honor.

5    This was Defendant's Exhibit 23 in the previous trial.

6    Your Honor, I think the Court can note that Mr. Adkins is

7    of the same race as the defendant.  Furthermore, Your

8    Honor, I think it's important to note that what the defense

9    is referencing as to a hair in the toboggan from 32 years

10   ago, we can't be certain that whatever it is they're

11   talking about, if we were to flip that toboggan inside out

12   today, (a) is even still there, or (b) has not been

13   contaminated in some form or fashion, or (c) that it's even

14   the same thing that they talked about 32 years ago.

15       Your Honor, I know for a fact that when that case was

16   tried that toboggan was obviously handled by trial counsel.

17   I feel confident the bailiffs touched it because they had

18   to have shown it to the jury, attorneys then in the case.

19   Furthermore, Your Honor, I know that current defense

20   counsel has gone down and reviewed the evidence that's in

21   the clerk's file.  The clerks have certainly touched it.

22   We've gone down and reviewed it.  Investigators have

23   reviewed it.

24       So Your Honor, I would say that any hair that could be

25   in that toboggan today, there is no indication that it's of

1   the same nature or the same hair from 32 years ago. It's

2   been touched by a number of people. In fact, the media has

3   even gone down and looked at that evidence and photographed

4   it and touched it and so forth.

5       So Your Honor, I would state for the Court, based on

6   Judge Spainhour's ruling, on his rationale, in addition to

7   the fact that this is not material to the defendant's

8   defense and would prove nothing, even if it came back if

9   it's still there or if it's the same hair, not being the

10  defendant's.

11          THE COURT: Now, tell me again what this

12  document is I'm holding. It's labeled Defendant's Exhibit

13  23. And if I understood correctly, this is something that

14  has been received into evidence at some prior stage of this

15  case.

16          MS. VANEEKHOVEN: Yes, Your Honor that --

17          THE COURT: Obviously it's not a trial

18  exhibit,is it?

19          MS. VANEEKHOVEN: Your Honor, that was

20  contained in the court file for the motion for appropriate

21  relief that was filed in 1988. And I believe that many of

22  the things that they were trying to show in that motion had

23  to do with composition of the jury, composition of the

24  grand jury. It discussed the issues that happened in the

25  community at the time. And it was marked, as you can see,

1    as a defendant's exhibit.  So that is in the Court's --
2    it's not in the file.  It's actually in the evidence box
3    that the clerks have maintained.

4                    THE COURT:  Ms. Bennick?

5                    MS. BENNICK:  Your Honor, Mr. Adkins is here.
6    He's going to be testifying this morning.  He has
7    volunteered, would be more than happy to give a sample of
8    his hair so his hair can be excluded.  He obviously is
9    going to, you're going to hear him testify he doesn't
10   remember whether he put the hat on or not.  He thinks he
11   probably did put the hat on at the trial in front of the
12   jury, but that he is more than happy to give a sample of
13   his hair.

14       That hat has been in the courthouse evidence box in
15   this case for all of the past 32 years.  My understanding
16   is that evidence box was downstairs and had not been
17   touched until Judge Spainhour allowed me to take a look.  I
18   did -- I wore gloves and we did not touch the hat.  We
19   really just looked in the box and looked at the hat with
20   our own naked eyes to see if we could see it.  I believe
21   that there was a filming of the hat by the television crew.
22   I was certainly not present when that happened.  I can't
23   speak to that on any kind of personal knowledge.

24                    THE COURT:  Tell me again, you used the words
25   that this is evidence which could exonerate the defendant

1  in this case.  Now, tell me again, walk me through that as

2  to how taking a DNA sample or analysis of this hat could

3  exonerate this defendant.

4      MS. BENNICK:  Well, Your Honor, there are any

5  number of things.  At the trial, at the first trial the

6  victim had testified that her attacker was, excuse my

7  words, light skinned, "yellow", black man.  And when we

8  found the SBI test report it notes that there are a number

9  of differences between the suspect hair at the scene and

10  the defendant's hair which was compared at the time.  I

11  believe that the hair that can be seen in the hat today

12  which is apparently the same hair that his trial lawyers

13  saw 32 years ago now, which is reddish in color, if you

14  have that to see what the characteristics are of the hair

15  in that hat not only to exclude Mr. Long's hair, and Mr.

16  Adkins' hair, if need be, that there could be some

17  comparison made at least from the report about the

18  characteristics of the hair.

19      The suspect hair found at the crime scene 32 years ago

20  is gone.  I have not been able to find it anywhere, just

21  like the rape kit and just like the victim's clothing.  All

22  the physical evidence that could be tested in this case is

23  gone except for the hair and the hat.  And they claim that

24  Mr. Long wore it.  They introduced it at trial against him

25  as evidence against him.  And I believe it is material and

1   it's really his only shot at showing that he had never had
2   that hat on his head.
3           THE COURT: Now, so --
4           MS. BENNICK: And also, Judge, as Ms. Zanin is
5   pointing out to me, is that if there is hair in the hat
6   that's tested that could match something that is in the
7   current DNA database, there may be somebody who has been
8   convicted of any number of rapes and served time over
9   the last 32 years and has been in and out of jail for it,
10  there to be a comparison between what the hat in that --
11  the hair in the hat against the current existing database.
12          THE COURT: All right. So if the DNA testing
13  was done on the toboggan, the type of information that
14  might be helpful in this situation would be, first of all,
15  as you have said, if that hair sample was tested, run
16  against current DNA database and was found to be a match
17  against some other possible or likely perpetrator, then
18  that would tend to point away from the defendant.
19          MS. BENNICK: That's correct, Your Honor.
20          THE COURT: Another possibility would be if the
21  DNA test was run and the DNA sample indicated a match
22  between hairs found in the toboggan currently with the hair
23  sample that was found at the victim's residence, but, if I
24  understand correctly, that because that hair is gone, it
25  was examined by the SBI Lab but at that time it was not

1  examined from the standpoint of DNA analysis, and I believe
2  the records I read indicated that the hair had been cut on
3  one end and torn on the other end -- was that the language
4  that was used?

5           MS. BENNICK:  Something similar that, Your
6  Honor, but my understanding --

7           THE COURT:  It didn't have a root ball, in any
8  event.

9           MS. BENNICK:  Right.  But my understanding is
10  that while the SBI today cannot test if there is not a root
11  ball attached, LabCorp in Burlington has the technology to
12  test even if a hair was cut or yanked but the root ball
13  didn't come out.  And now we're into an area, I'm certainly
14  not a scientist and I know very little about DNA, I must be
15  honest with you.

16          THE COURT:  If we had the hair.

17          MS. BENNICK:  Right.

18          THE COURT:  But we don't have the hair.  Is
19  that right?

20          MS. BENNICK:  That's -- yeah, I don't have the
21  hair.

22          THE COURT:  Is there any other finding that
23  would be helpful in exonerating this defendant from that
24  DNA test?  I believe that Judge Spainhour in his order
25  fully addressed the -- one of your arguments that I heard

1    was that the defendant had always denied that the toboggan
2    was his hat.
3              MS. BENNICK:  Correct.
4              THE COURT:  And so his contention has always
5    been you won't find any of my hair in that hat.
6              MS. BENNICK:  That's correct.
7              THE COURT:  And I believe that Judge Spainhour
8    in his order fully addressed that aspect of the case, that
9    if DNA testing was done on the toboggan and no hairs were
10   found in the toboggan that matched this defendant, that
11   would not be exonerating evidence.  And then whether you
12   agree or disagree with Judge Spainhour, I believe he at
13   least addressed that issue.
14             MS. BENNICK:  Yes, Your Honor, he did.  I mean,
15   I do disagree, but yes, I mean, he said what he said.
16             THE COURT:  So the only possible, the only
17   possibilities for exoneration based on a DNA testing of the
18   toboggan would be either a match on the hair sample, which
19   is impossible because that hair is no longer available, or
20   a match in the DNA database and some other known possible
21   perpetrator.
22             MS. ZANIN:  I think we can also request that a
23   visual official inspection of the hair in the toboggan be
24   done to compare the qualities of that hair with the report
25   that the SBI has issued on the hair that was found at the

1   scene and certainly to see if those two are a likely match,
2   which we know that that hair did not compare to Mr. Long's.
3              THE COURT:  Okay, let's talk about that.  What
4   kind of detail do we have about the SBI analysis of that
5   previously found hair sample that is now missing?  Are
6   there sufficiently detailed notes that will enable a lab
7   analyst to go back now and tell us through a visual
8   inspection whether or not the hairs in this toboggan seem
9   to match, could possibly match up with that previously
10  known hair sample?
11             MS. BENNICK:  Well, Judge, you know, in part I
12  think that's a question for an expert to answer.  The best
13  I can answer it as a lawyer with the limited knowledge that
14  I have, is that the bench notes of the SBI examiner from
15  1976 talk about a comparison of the hair that was at the
16  scene and Mr. Long's hair in terms of color, pigmentation,
17  the medulla, the scale structure, the texture, you know,
18  kinky as compared to flat to oval.  There are any number of
19  handwritten notations that the then SBI examiner considered
20  when he did the comparison of the suspect hair with the
21  hair of Mr. Long at the time.
22       You know, I honestly can't tell you -- I am not, I
23  have absolutely no knowledge about hair comparisons.  I am
24  a family lawyer.  I took this case pro bono four years ago.
25  I haven't practiced criminal law in a very long time.  And

1   so I am not one that's constantly in a courtroom trying

2   cases and current scientific evidence. So I honestly don't

3   know what the status is today of hair comparison and I

4   don't know whether, you know, I can't represent to the

5   Court that there is enough here. I happen to think there

6   is. I think this is a fairly detailed report and they talk

7   about any number of different types of structure of the

8   hair, the suspect hair, and I believe that it would be

9   possible for somebody far more skilled than I to make that

10  comparison.

11          THE COURT: What about, Judge Spainhour also,

12  part of the basis for his ruling was that 15A-269 pertains

13  to biological evidence and that this motion is not directed

14  toward biological evidence. At least that's the way I

15  understood what he was saying in his order.

16          MS. BENNICK: You know, Judge, I don't recall

17  that from this order. I'd have to --

18          THE COURT: Do you have a copy of his order?

19          MS. BENNICK: I have it. I mean, I recall the

20  prior part, but I don't recall that specific part.

21          THE COURT: Maybe I read that wrong.

22          MS. BENNICK: I see -- are you referring, Your

23  Honor, under paragraph one of the Conclusions of Law in

24  Judge Spainhour's order, saying that since there's no

25  biological evidence located for DNA testing that's --

1    THE COURT:  Yes.

2         MS. BENNICK:  Is that what you're referring to?

3         THE COURT:  Well, yeah, and also Finding of

4    Fact Number 8, there is no biological evidence that has

5    been located and is available for DNA testing.

6         MS. BENNICK:  Your Honor, I believe what Judge

7    Spainhour was referring to at the time was the fact that we

8    had not been able at that point to locate the rape kit or

9    the victim's clothing or the suspect's hair.  We had asked

10   Judge Spainhour -- we filed a motion to locate and preserve

11   evidence and filed a motion for DNA testing.  We had a

12   hearing on the motion to locate and preserve evidence some

13   time prior to the hearing on the DNA motion, because when

14   we reconvened on the day we were to argue the DNA motion

15   the State was to report back to the Court as to what they

16   had been unable to find.

17        At the hearing that day the SBI had faxed a letter

18   saying that they were looking, but to date had found

19   nothing.  I believe Ms. Vaneekhoven made a representation

20   that nothing had been found in the Concord Police

21   Department file except that Sergent Ledwell testified he

22   had found some documents and in fact it's those documents

23   that he found that led us to find the SBI reports.

24        At the time that Judge Spainhour ruled on the DNA

25   motion everybody was honestly still looking to see if we

1  could find what we think of as traditional DNA evidence, I

2  suppose, rape kit, victim's clothing, and the suspect hair.

3  All of that effort was under way and continued on for some

4  period of time after Judge Spainhour's order.  So I believe

5  that's what he is referring to in here about biological

6  evidence.  At that time we had not found anything, but the

7  search was still under way.

8      THE COURT:  Was he drawing any distinction in

9  his order between the treatment to be afforded to the rape

10  kit type evidence as distinguished from the hair residue or

11  hairs inside the toboggan?  Was he drawing any distinction

12  between those as to one being biological evidence and one

13  not being biological evidence?

14      MS. BENNICK:  Judge, I don't think that's clear

15  from the way the order is written.  I don't think he was,

16  because I'll tell you that after we had the DNA motion on

17  his own accord *sua sponte* Judge Spainhour issued an order

18  to hospital, Northeast Medical Center, what was then known

19  as Cabarrus Memorial Hospital.  He issued that order all of

20  his own accord asking them to look.

21      He issued another order *sua sponte* to a Dr. Lance

22  Monroe who was the gynecologist and the doctor on call at

23  the ER the night this victim was admitted to the hospital.

24  Somehow Judge Spainhour discovered that Dr. Monroe still

25  had a storage unit in Concord and he actually directed

1    Concord Police Department to seize the storage unit, secure

2    it, and to search it.  I believe that Sergent Ledwell here

3    and his crew with great diligence, I will give them that

4    credit, went and looked and did not find anything in Dr.

5    Monroe's storage unit that was of relevance to this case.

6        So all of that was happening after the DNA motion had

7    been heard and denied.  The search for the biological

8    evidence was really still on at the time based on our

9    motions and based on the efforts of Judge Spainhour all on

10   his own.

11                   THE COURT:  All right.  What says the State?

12                   MS. VANEEKHOVEN:  Your Honor, I think to start,

13   they have not clearly shown how, even if some hair out of

14   this toboggan is tested, proves to not match the

15   defendant's, that it would exonerate him, which is exactly

16   what Judge Spainhour outlined.  So it is not material,

17   which is a requirement under the statute.

18       And not to take up time by repeating myself, but the

19   fact of the matter is this.  We can't show, we can't prove

20   that if there is a hair still in that toboggan, it's the

21   same hair that was referenced 32 years ago.  We can't show

22   that it's not the clerk's or a juror's or an attorney's or

23   an investigator's.  The -- you know, hair is a very

24   transient type of material.  It could have -- there is a

25   hundred, there is a thousand different scenarios that we

1    could be talking about.

2         I think the defense knows that if there is some hair

3    plucked out of a toboggan and we certainly don't know whose

4    it was or where it came from, if it was there 32 years ago,

5    if it's been transferred there in the last week or in the

6    last year or in the last ten years, would more likely than

7    not come back to the defendant, because we don't know what

8    hair is even in there and if that hair is the same hair

9    that we talked about 32 years ago.  The hat has been

10   contaminated by a number different factors I've already

11   mentioned.  Even if it were or something were in the hat

12   and we plucked it out and tested it, it would not exonerate

13   the defendant from having committed this rape.

14             THE COURT:  And I apologize, I'm sorry for

15   going back and forth so many times, and I'll try not to do

16   this throughout the hearing.  But there is one other

17   question I need to ask her (indicating), is you alluded to

18   the fact that there's some additional information available

19   now that was not available at the time you presented this

20   issue to Judge Spainhour in June of 2005 and you alluded to

21   the lab test, the SBI lab test on other items.

22             MS. BENNICK:  Correct.

23             THE COURT:  Tell me how that factors in,

24   because it appears that Judge Spainhour did in fact address

25   most, if not all, of these concerns.  And whether you or I

1   agree or disagree with what Judge Spainhour did, I'm not an
2   appellate court and I don't have any authority to decide
3   differently simply because I might disagree with what he
4   did.  So what's the other information that was not
5   available at the time he decided that issue?

6           MS. BENNICK:  Just simply what I said before,
7   Your Honor, which is that Judge Spainhour did not know we
8   had an SBI report about the testing of the suspect hair
9   which contains, that report talks about the color of the
10  medulla, all of those things.  When he denied it then he
11  did not know that there was a chance that now we have a
12  report, although we don't have a hair, we have a report
13  that could, you know, possibly, you know, I would think it
14  would be germane if the hair in the hat was DNA tested or
15  even hair comparison tested again, looks an awful lot like
16  that suspect hair at the crime scene that doesn't look like
17  Mr. Long's.

18          MS. SHANLEY:  Your Honor, if I could just
19  comment.  I don't think our side commented on the lab
20  report regarding that hair.  The issue with the hair that
21  was found at the scene, according to the lab report, is
22  because of the condition the lab analyst could tell very
23  little about it.  In his notes he put that the scale
24  structure was so worn down that it was indistinguishable.
25  So he could not even give us the scale structure of that

1  hair.  He could give, he said heavier pigmentation, he

2  could give a size of the medulla, and that's it.  In fact,

3  in the section where he should be putting human hair, he

4  wrote, appearance of a human hair, two question marks.

5  He's not even sure the hair found at the scene was of

6  human.

7  So I contend again the value of the hair found 32

8  years later in a toboggan in an uncontrolled clerk's box is

9  just not material.  And just to point that out, our

10  investigator with forensic training pointed out the clerks

11  aren't trained about chain of custody.  And even when the

12  clerks were bringing up the box this morning one of the

13  clerks had her hair leaning in the box and we noted that.

14  And we saw that that shows this is not a controlled

15  environment.  It was never meant to be.  And so now to take

16  this toboggan and find a hair that could have happened --

17  and in it you might find Ms. Vaneekhoven or our hair in

18  there.  We also photographed those toboggans when we

19  learned about this motion for appropriate relief.  So we'd

20  ask that you would deny the motion.

21  THE COURT:  Does someone have a copy of that

22  report handy that I could look at?

23  MS. BENNICK:  I do, Your Honor.  May I

24  approach?

25  THE COURT:  Yes, ma'am.

1       All right. Then with respect to defendant's motion

2  seeking an order for DNA testing of any hair samples

3  contained in the toboggan presently in custody of the

4  clerk, an item that was introduced into evidence during the

5  course of this trial, it is noted first of all that the

6  same or similar motion was presented before the Honorable

7  W. Erwin Spainhour and an order was entered by Judge

8  Spainhour on June 17, 2005 addressing the defendant's

9  request for certain DNA testing of physical evidence. In

10  that order Judge Spainhour specifically addressed the

11  defendant's request for DNA testing of the toboggan, the

12  same evidence to which the instant motion is directed.

13       So in considering the defendant's motion in this

14  regard today, it's necessary to determine first of all

15  whether any new issues are being presented in this motion

16  that have not previously been considered in the motion that

17  was before Judge Spainhour in June of 2005. In that regard

18  the defendant's contention is that at the time of

19  submission of the previous motion in the hearing conducted

20  by Judge Spainhour the defendant was not aware of certain

21  laboratory analyses that had been conducted by the State

22  Bureau of Investigation prior to the defendant's trial.

23  Those analyses included, among other things, an analysis of

24  a hair sample found at the crime scene denominated in a

25  laboratory report dated May 19, 1976 as Item Number 9 "one

1  plastic bag containing suspect hair found at the crime
2  scene."

3      The defendant contends that DNA testing of the
4  toboggan and any hair samples now present in the toboggan
5  could serve to exonerate the defendant in this case under
6  one or more of the following possible theories:
7  (A)  That hair samples now contained in the toboggan might
8  be found similar to the hair sample described above found
9  at the crime scene and previously submitted to the SBI
10  laboratory for testing;
11  (B)  That any hair samples found in the toboggan today
12  could match with information contained in a current DNA
13  database pointing toward another person as being the
14  perpetrator of this crime; or,
15  (C)  That an analysis of any hair samples now contained in
16  the toboggan would simply point toward the exclusion of the
17  defendant as someone having previously worn that toboggan.
18      With regard to those contentions Judge Spainhour in
19  his order entered on June 17, 2005 concluded the following,
20  and I quote:
21      "The Court rejects as a matter of law the contention
22  that the toboggan should be tested for DNA.  Assuming
23  arguendo that DNA testing revealed that someone's hair
24  other than the defendant's were found on the toboggan, such
25  evidence would not exonerate the defendant.  Instead such

1  evidence would merely tend to show that at some uncertain
2  time someone other than the defendant wore the toboggan and
3  would arguably tend to show only a lack of DNA evidence
4  that defendant wore the toboggan.  Such evidence is not
5  sufficient as a matter of law to compel DNA testing to
6  prevent manifest injustice.  At most such evidence would
7  only tend to corroborate the testimony of the defendant
8  that he knew nothing about a toboggan.  There is no
9  authority for post conviction DNA testing for corroborative
10  purposes or for any purpose not specified in the North
11  Carolina General Statute 15A-269."

12       "This precise point has been considered and rejected
13  in the case of *State v Brown*, a case from the North
14  Carolina Court of Appeals in 2005, in which that appellate
15  court stated first defendant is arguing that testing the
16  clothing would show a lack of DNA evidence, thereby
17  corroborating his testimony.  The statute, however,
18  provides for testing of biological testing and not evidence
19  in general.  Since defendant desires to demonstrate a lack
20  of biological evidence, the post conviction DNA testing
21  statute does not apply."

22       So then my conclusion is that as to the lack of
23  presence of defendant's hair in the toboggan, that point
24  has been fully addressed by Judge Spainhour.  The existence
25  or nonexistence of any additional SBI lab reports would not

1    be relevant for that consideration.

2         With respect to the SBI lab records which are now

3    known, there is a report that addresses certain matters

4    pertaining to a suspect hair found at the crime scene or

5    something referenced as a "suspect hair found at the crime

6    scene." Both the State and the defendant agree, however,

7    that such hair is no longer available for analysis. That

8    the only information available with respect to that hair is

9    the description contained in notes of the laboratory

10   analyst which indicate one hairlike fiber found in plastic

11   bag mounted on a slide for study and comparison. Very

12   heavily pigmented with a reddish sheen. Medulla at least

13   one-third to one-half diameter. Appearance of a human

14   hair, question mark, question mark. May be Negroid or

15   Mongolian, oval. Scale structure worn down,

16   indistinguishable. Broken at one end and cut at other.

17   Comparison with 4 and 5. Color more reddish versus more

18   brownish gray. Heavier pigmentation versus more scattered

19   pigment. Medulla wide versus narrow. Scale structure

20   unidentifiable versus identifiable -- I can't read this

21   next word. Identifiable -- does anybody know what that

22   says?

23              MS. BENNICK: Judge, I've never been able to

24   figure it out either. I don't know what it says.

25              THE COURT: More oval versus flat or ribbony.

1  Texture similar versus similar.  Different from suspect's

2  hair.

3      Results of examination, microscopic examination and

4  comparison of the hair found at the scene and item number 9

5  showed it to be different from the suspect's hair and items

6  number 4 and 5.  No hair or hair fragments similar to the

7  suspect's were found in the victim's clothing in item

8  number 13.

9      With respect to the hairs presently contained in the

10  toboggan, the State contends that this item of evidence has

11  been subjected to a number of points of possible

12  contamination, including the following factors:

13  (A)  The mere fact that the item has been retained in the

14  custody of the clerk's office for more than 31 years.

15  (B)  The fact that the item has been handled by a number of

16  persons, including at least one of defendant's counsel who

17  placed the toboggan on his head for demonstrative purposes

18  during closing arguments in the defendant's trial.

19  (C)  The item has been handled by a number of persons over

20  the years, including employees of the clerk's office,

21  prosecutors, defense attorneys, and members of the media at

22  various times.

23      This Court finds and concludes that the motion by the

24  defendant for DNA testing of the toboggan as presented on

25  this day does not present substantial or sufficient new

1 information or contentions other than those previously

2 addressed by Judge Spainhour so as to merit a

3 reconsideration or modification of the prior order entered

4 by Judge Spainhour.

5       Further, this motion does not relate to or it does not

6 establish by a preponderance of the evidence any likelihood

7 that the DNA testing would produce evidence that would be

8 material to the defendant's defense or provide a reasonable

9 probability of producing evidence that would have been more

10 favorable to the defendant than that presented at trial.

11       For those reasons the defendant's motion for DNA

12 testing of the toboggan is hereby denied.

13       Now, what about the motion for preservation of notes

14 and tapes?

15             MS. BENNICK:  Your Honor, just before that --

16             THE COURT:  Yes, ma'am.

17             MS. BENNICK:  I'd like to make a motion to ask

18 that the Court consider asking, allowing a hair comparison

19 to be made, if not the DNA testing.

20             THE COURT:  A hair comparison.

21             MS. BENNICK:  Correct.  From the hair in the

22 hat so its characteristics could be analyzed and compared

23 to what the characteristics were of the suspect hair at the

24 crime scene compared to the defendant's hair.

25             THE COURT:  What says the State in that regard?

1    MS. VANEEKHOVEN: Your Honor, we would repeat
2  all of our previous arguments. We cite you to the order
3  that you just essentially drafted, the same conclusions.
4  It's meaningless. It would not exonerate him. And we
5  can't tell if what they're claiming in the hat is what was
6  there 32 years ago. Furthermore, whether it's any of the
7  parties you mentioned that have handled the hat in the
8  meantime.
9    THE COURT: Yes, ma'am?
10   MS. ZANIN: I would just ask the Court take a
11 look at the hair that's in the hat and see if it does in
12 fact fit the description, or it seems to resemble the hair
13 as it's described in the State Bureau of Investigation
14 report prior to issuing an order on the motion to do the
15 hair comparison.
16   MS. BENNICK: Or it's at least the color, Your
17 Honor, as what was testified to at trial and as what is in
18 the State SBI report, because the hair that can be seen in
19 the hat in my view, and you will have your view, is
20 reddish. You can use the naked eye. It's there and it was
21 there 31 years ago because that was testified to at the
22 trial.
23   MS. SHANLEY: No, at the trial the only comment
24 about a hair was they showed one of the officers, do you
25 see hair in this hat? It was never placed in an envelope.

1  It was never given a sticker.  The officer said yes.

2  Describe the color.  I can't.  Would you say it's light in

3  color?  It is light in color.  That is what the testimony

4  is at trial.

5      Here we have a description of a hair being reddish.

6  Your Honor, how many of the hairs of the people of this

7  county could be described in the same way?  So the

8  materiality of even doing any type of analysis or looking

9  to see if we in our opinion think it's reddish would be

10  moot.  Again, for the same reasons, we don't know -- the

11  State -- I don't even know, we've never pointed, if you

12  look in the toboggan, we've never all agreed that's a hair

13  to be tested.  So we don't know what they're saying.  To

14  look and see, yes, that could be similar in color to

15  something they suggested the value would not be, would not

16  rise to the level, Your Honor, as required by the statute.

17          MS. ZANIN:  Your Honor, in addition to being

18  reddish in color, the hair also appears to the naked eye to

19  be potentially a Negroid hair which is also another factor

20  that was listed in the SBI report and makes it a rather

21  unusual looking hair.

22          MS. SHANLEY:  Again, Your Honor, it could be

23  defense counsel's who wore it, but also the report says may

24  be Negroid or Mongolian.  And the SBI laboratory said that

25  Mongolian back then stood for Native American, Eskimo, and

1   also Asian.  So that every race could be covered by this
2   hair but for Caucasian.  Again, the value is just not
3   there, Your Honor.
4            MS. BENNICK:  May I be heard?
5            THE COURT:  Yes, ma'am.
6            MS. BENNICK:  If the hair in that hat is
7   Mongolian or Indian or Asian, that's not Mr. Long.
8            THE COURT:  Well, again, it seems that Judge
9   Spainhour has addressed that.  He's addressed the issue of
10  if the hair simply is not that of the defendant, the effect
11  of that would be simply to corroborate his testimony that
12  he was not wearing the toboggan or that he had not worn the
13  toboggan.
14           MS. BENNICK:  And Your Honor, I would submit
15  that that is evidence that goes to the weight of the
16  cumulative evidence of the testimony at the trial and at
17  this MAR hearing.  But even if it's not evidence of
18  exoneration, it's evidence that goes to the weight of the
19  amount of the evidence and the weight of the evidence
20  against Mr. Long or not against Mr. Long.  And the law is
21  clear that you don't look at it item by item.  You have to
22  look at the cumulative effect of the evidence in assessing
23  the weight of the evidence against the defendant.  And that
24  same standard is the standard under Brady and the related
25  cases under the MAR hearing for which we are here today.

1   So I suggest that it does go to the weight.

2       We're not here today to retry the case. We don't have

3   a jury here. But I suggest that that is something that

4   might be very pertinent for a jury if Your Honor decides to

5   grant Mr. Long a new trial, vacate his conviction and grant

6   a new trial. It certainly would go to the weight and I

7   think the jury would be entitled to hear it. It

8   substantiates his statement.

9           THE COURT: Given the arguments that have been

10  presented, particularly those that relate to the possible

11  contamination, the difficulty or the impossibility of today

12  reaching any kind of match between that hair and a hair

13  sample that is now missing, and again considering the

14  factors that I had mentioned in the prior order, my

15  conclusion is that that request also will be denied.

16      By the way, there was mentioned during the course of

17  the arguments that have been presented so far of a prior

18  motion for appropriate relief, Madam Clerk. Do you have

19  that in the file? Could I see that motion, just the motion

20  for appropriate relief?

21          CLERK: Do you know what year?

22          THE COURT: Somebody mentioned that. Was it

23  1988?

24          MS. VANEEKHOVEN: That's correct. It was heard

25  in December of '88.

1          THE COURT:  I think before -- is that the only

2    previous motion for appropriate relief that's been heard?

3          MS. BENNICK:  To my knowledge, Your Honor, it

4    was.  The basis of that motion was systematic exclusion of

5    blacks from the jury and an ineffective assistance of

6    counsel claim which had been raised.  But mainly it was

7    about the systematic exclusion of jurors.  That was the

8    gist of the entire MAR transcript at least.

9          THE COURT:  Let me take out and review this

10   motion before we go any further, and I need to make sure

11   that --

12   (Pause in the proceedings.)

13         THE COURT:  All right.  It does appear that the

14   issues that we've been dealing with, I don't believe any of

15   the issues raised by this motion were addressed in that

16   motion for appropriate relief.

17         MS. BENNICK:  That's correct, Your Honor.

18         THE COURT:  All right.  What about the motion

19   for preservation of notes and tapes?

20         MS. BENNICK:  Your Honor, I'm just simply

21   asking that the if officers who are present in the

22   courtroom have any notes from back then or current notes,

23   that the DA preserve them and if an issue arises on cross

24   examination that you could certainly do an in camera

25   inspection to determine whether or not I'd be entitled to

1  see any of those notes for purposes of cross examination

2  impeachment.

3          THE COURT:  State oppose any aspect of that

4  motion?

5          MS. VANEEKHOVEN:  Your Honor, we do not.  We

6  stated earlier we have given them everything that law

7  enforcement had in their file and up to the current day

8  we've included in that 197 pages.

9      There is one small packet I'd like to hand up to the

10 Court that we did not give the defense.  I will tell you

11 that it was generated by Detective Bobby Ledwell and it was

12 simply a search for the officers who have retired from the

13 police department.  It has Social Security numbers, wife's

14 names, former addresses, and so forth.  We felt like that

15 information was not discoverable.  And I'll be happy to

16 hand this packet up for Your Honor to look at.  But there's

17 about probably ten pages here.  It's an accurate check for

18 each of those officers as we began to look for them in the

19 beginning of this --

20         THE COURT:  Do you have any concerns about

21 that?

22         MS. BENNICK:  No, Judge.  I have no concern

23 about that.

24         THE COURT:  I'm going to allow the defendant's

25 motion in that regard and direct that all notes and tapes

1  of any law enforcement officer pertaining to the
2  investigation of this matter, either at the time of the
3  original investigation and ensuing trial or at any time
4  thereafter, be preserved.

5      And Ms. Bennick, if you wish to prepare a written
6  order to that effect, please do so and I will sign that
7  order.

8          MS. BENNICK:  Thank you, Your Honor.

9          THE COURT:  The application for witness
10 certificate we have already addressed.  I've indicated that
11 I will sign such a certificate, if needed.

12         MS. BENNICK:  For Mr. Isenhour?

13         THE COURT:  For Mr. Isenhour.

14         MS. BENNICK:  Thank you.

15         THE COURT:  Do you wish to address also your
16 motion in limine with respect to -- did I understand
17 correctly you're talking about the criminal record of
18 Mr. Isenhour?

19         MS. BENNICK:  That's correct, Your Honor.  I'm
20 perfectly prepared to address that, you know, at the
21 relevant time, if I decide I am going to call --

22         THE COURT:  When and if you call him to
23 testify?

24         MS. BENNICK:  -- issue the certificate.  I'm
25 prepared to hold that in abeyance for the moment --

1    THE COURT:  Let's defer that and address that
2 when and if needed.
3    All right.  Motion for appointment of an expert.  Now,
4 Ms. Bennick indicated that that would be a matter that
5 could be addressed ex parte pursuant to *Ake v. Oklahoma.*
6    MS. BENNICK:  That's correct, Your Honor.
7    THE COURT:  Why don't we first address that
8 aspect of it and I'll hear from you all as to whether or
9 not that is indeed a matter that I can or should consider
10 ex parte in that regard.
11    MS. VANEEKHOVEN:  Can you give the cite for
12 that case since we don't have the motion, Your Honor?
13    THE COURT:  *Ake v. Oklahoma?*
14    MS. VANEEKHOVEN:  Yes, sir.
15    THE COURT:  I think it's contained in the
16 motion, I think it was, as I recall.  Let me see.
17    MS. BENNICK:  Judge, I'm sorry.  I had the
18 motion out earlier, but -- if I could just have a moment.
19 I'm really sorry.
20    THE COURT:  Okay.  *Ake v. Oklahoma*, 470 U.S.
21 68.
22    MS. BENNICK:  Are you ready for me, Your Honor?
23    THE COURT:  Yes, ma'am, I'm ready.  Is the
24 State ready on this matter?
25    MS. SHANLEY:  Your Honor, actually I can be,

1    but again, the defense said they would have no experts.
2    For the first time we're learning today, one, an expert
3    witness, and feel like they have -- we're just learning
4    just now.
5              THE COURT:  Okay.
6              MS. BENNICK:  Judge, the reason for --
7              THE COURT:  Well, I'll tell you what.
8              MS. BENNICK:  What I asked for is an
9    appointment of an expert for the Court to provide the funds
10   for me to be able to hire one.  And pursuant to the
11   statute, which is 7A-450 and 7A-454, that is not an
12   application which the State is entitled to notice by
13   statute.  Because I don't have an expert unless Your Honor
14   will appoint one that can be paid.  I've not been able to
15   find anybody that is willing to testify here in this matter
16   pro bono as an eyewitness identification expert.
17             MS. SHANLEY:  Your Honor, the reason I asked is
18   I have *State v. Garner*, which is a Court of Appeals case
19   from August 23, 1999, which would have been after the *Ake*
20   *v. Oklahoma* case.  And in this case the Superior Court
21   Judge denied the defendant's ability to ask for an ex parte
22   order for eyewitness identification.  And he distinguished,
23   based on cases from the Supreme Court, that the defense
24   would not be entitled to an ex parte order in that type of
25   hearing because of the nature of it.  Let me see if I can