1    find the language.  "In *State v. Abraham*, 338 NC 315, a
2    1994 case, our Supreme Court upheld the trial court's
3    denial of the defendant's motion for an eyewitness
4    identification expert."

5         And then it goes further that, they distinguished,
6    because this is a psychiatric expert, they quoted *State v.*
7    *Ballard*, a 1993 North Carolina Supreme Court that said, an
8    ex parte hearing, in order to apply for funds in that case
9    for a fingerprint expert, distinguished the case before
10   them.  And Your Honor, what the Court found instructive was
11   that when you request a psychiatric expert, you are asking
12   for things that the State should not be aware of, you are
13   allowing the State to have notice of your defense, where
14   the physical -- however, when they found the physical
15   evidence and not the defendant is the object of adversarial
16   scrutiny, then that was the issue.

17        Here in this case, the *State v. Garner*, they found
18   that an eyewitness identification expert is offered to
19   undermine the reliability of the testimonial identification
20   of the defendant, whereas the absence of a psychiatric
21   expert puts at risk the availability of an insanity or a
22   diminished capacity defense strategy.  So finding *Phipps*
23   controlling, the decision to deny an ex parte hearing was
24   within the trial court's discretion.

25        And then they went on to find that since the defendant

1    was unable to establish a threshold showing of a need for

2    an expert, there was no prejudice in this case when the

3    Court denied the defense an identification expert.

4       Now, this is just a case I have for another matter,

5    but when she began speaking of this I pulled it. Another

6    aspect that was interesting, in this case the defendant

7    goes on later to apply in a motion for appropriate relief

8    and say that there is new evidence of an identification

9    expert. And the Court found that since an identification

10   expert would merely tend to contradict, impeach, or

11   discredit the testimony of a former witness, that it did

12   not meet the standard for a motion for appropriate relief

13   new evidence and denied the defense the ability to claim

14   new evidence in the form of this type of witness.

15      So, Your Honor, I know there's two matters here. One,

16   should you appoint one ex parte, and two, what would be the

17   bearing or weight here. The State would argue that an

18   identification expert is not new evidence and thus it is

19   irrelevant to the hearing at hand. All the defense wants

20   to do is take the testimony of Miss Bost and contradict it,

21   and that is what is not allowed under the seven step

22   process of new evidence.

23         THE COURT: Ms. Bennick, what would take this

24   motion within the purview of *Ake* so as to make it something

25   that I ought to consider ex parte?

1          MS. BENNICK: Well, Your Honor, my

2  understanding of *State v. Ballard, State v. Bates,* the

3  commentary to the General Statute of 7A-450, 7A-454, *State*

4  *v. Anderson, State v. Gambrill*, that these applications are

5  entirely to be made ex parte. I have not seen anything

6  contrary to the law. Whether it's granted or not is not

7  the issue. It's clear to me from my research that the

8  application -- and honestly, from the IDS web site and the

9  defense manual there, that these are done ex parte.

10       And I believe actually, Your Honor, so you know, I

11  haven't read the *Garner* case. Ms. Vaneekhoven just handed

12  me a copy of it. But I just told that ultimately Terrence

13  Garner was exonerated.

14           THE COURT: I'm sorry?

15           MS. BENNICK: That Terrence Garner was

16  exonerated in the case that she's cited to. I, in my

17  research I can't honestly tell you that I found this case

18  and I honestly have not had an opportunity to read it. He

19  was ultimately exonerated after he had been convicted of

20  first degree murder.

21           MS. SHANLEY: Your Honor, I contend that's

22  irrelevant to whether this Court should ex parte order a

23  motion for an eyewitness identification expert, and also

24  whether that would be admissible at a motion for

25  appropriate relief.

1          THE COURT:  And that's the reason I wanted to
2   address this first of all from the standpoint of whether or
3   not it ought to be an ex parte matter, and then secondly as
4   to whether or not the motion ought to be granted.
5   Obviously this request is somewhat different from a
6   situation in which a defendant is at least investigating
7   the possibility of mounting a defense that might include
8   psychiatric or psychological testimony.  If we're talking
9   about a defense strategy of wanting to use an eyewitness
10  identification expert, does the defendant have any interest
11  in wanting to -- I mean, obviously at this point we're
12  talking about an area of expertise that has been disclosed
13  in open court.  So --
14          MS. BENNICK:  I just can only quote, Your
15  Honor, I mean, honestly, from *State v. Moore* where the
16  Court of Appeals, the North Carolina Supreme Court, "The
17  question of whether defendant should have been provided" --
18  this was a fingerprint expert -- "the question of whether
19  the defendant should have been provided with the assistance
20  of a fingerprint expert is controlled by *Ake v. Oklahoma*.
21  *Ake v. Oklahoma* requires an ex parte special showing that
22  the matter subject to expert testimony is likely to be a
23  significant factor in the defense."
24          Your Honor, the *State v. Moore* panel Supreme Court
25  went on to say that an indigent defendant is not required

1    to apply for funds in the open Court since he would be

2    forced to reveal to the State the identity of the expert he

3    intends to consult and make a public showing of this

4    evidence in the case which is not required by the law.  And

5    I'm quoting from *State v. Moore* in 321 NC 327 (1988).

6          And then there were a few Fourth Circuit opinions that

7    I also found.  The Fourth Circuit case is *U.S. v. Little*,

8    17 F3d 1435, which is also citing *U.S. v. Harris*, 95 F2d

9    532.  These are Fourth Circuit cases 1994 and 1993.  And

10   that's I found.  That's what law I relied upon.

11                THE COURT:  Well --

12                MS. SHANLEY:  Your Honor, just to respond I

13   think to that argument, the case she cited, *State v. Moore*,

14   was a 1988 case.  However, in the *Garner* case -- and Your

15   Honor, I do have a copy of that if you would like.  In this

16   case the case quotes *State v. Ballard,* and that's a 1993

17   case, and again said that our courts have said that when

18   granting a psychiatric expert, yes, the defendant should

19   have ex parte order.

20                THE COURT:  I'm sorry?

21                MS. SHANLEY:  That in *State v. Ballard*, a 1993

22   Supreme Court case, that if the issue of a psychiatric

23   expert for the defendant, that yes, the defendant is

24   entitled to an ex parte hearing.  However, the Court also

25   notes *State v. Phipps*, and that is a North Carolina Supreme

1  case, it's a 1992 case, would be older than the *State v.*
2  *Moore.*  It's on page 8 of the opinion.  And here they
3  quote, "The Supreme Court considered whether defendant's
4  rights to due process, effective assistance of counsel, and
5  reliable sentencing in a capital murder trial mandated that
6  his motion for funds to employ a fingerprint expert be
7  heard ex parte."  And the Court notes that the defendant's
8  right to obtain the expert assistance without losing the
9  opportunity to prepare a defense in secret was a strong
10  reason.
11      However, the *Phipps* Court held that the defendant was
12  not entitled to an ex parte hearing, nor was he actually
13  entitled to funds to employ a fingerprint expert in that
14  case.  The Court went on to state that an indigent
15  defendant's access to the basic tools of the adequate
16  defense is a full requirement, the need for an parte
17  hearing for a motion for expert assistance is not.  So what
18  we have is the Supreme Court making a distinction,
19  depending on what type of expert you're requesting.  If
20  it's something that would need to be discussed in secret
21  between defense counsel and the judge, such as psychiatric
22  expert testimony, then yes, an ex parte hearing is
23  appropriate.  However, when you are asking for other
24  evidence such as fingerprint evidence in *State v. Phipps*,
25  or in this case, an eyewitness identification expert, *State*

1    *v. Garner*, an ex parte hearing is not appropriate.

2         THE COURT: With respect to the defendant's

3 motion for an ex parte hearing for purposes of considering

4 whether or not to appoint or approve funds for the

5 employment of an expert in the area of eyewitness

6 identification, this Court determines that the following

7 reasoning of the North Carolina Supreme Court in *State v.*

8 *Ballard* and *State v. Phipps*, that the question here is

9 whether or not the defendant is entitled to an ex parte

10 hearing at the stage in which the defendant attempts to

11 make a threshold showing of the need for an expert in this

12 particular area, and that an expert in the field of

13 eyewitness identification is substantially different from

14 the issues presented by a request for approval of funds to

15 employ a psychiatric or psychological expert in connection

16 with a proceeding.

17      As the Court noted in the *Ballard* case, there is a

18 difference between a hearing on a question of an indigent

19 defendant's right to certain types of experts as contrasted

20 with the right to a psychiatric expert in that a

21 psychiatric or psychological expert relates to an object of

22 adversarial scrutiny relating not only to mere physical

23 evidence, but the defendant himself. The matter is not

24 tactile and objective, but one of an intensely sensitive

25 personal nature, and that the defendant's constitutional

1    rights in the present area of inquiry are far less likely
2    to be jeopardized by the presence of the prosecutor when
3    the defendant attempts to make the threshold showing for
4    the use of an eyewitness identification expert as
5    contrasted with the field of psychiatric or psychological
6    experts.  For that reason I conclude that this matter ought
7    to be addressed in open court rather than through an ex
8    parte proceeding.

9         Now, with that having been said, are the parties ready
10   to go forward with the issue of addressing this motion in
11   open court?

12              MS. VANEEKHOVEN:  No, Your Honor.  We'd like a
13   copy of the motion.  We'd like to see any cases that they
14   might reference and do our research accordingly.

15              THE COURT:  Let's hold that at least
16   momentarily then and proceed with any other issues we have.
17   The other point I had is on the question of subpoena for
18   hospital records, is that a contested issue?

19              MS. BENNICK:  I would need to ask Ms.
20   Vaneekhoven if that would be objectionable to her to have
21   the victim's medical records admitted into evidence without
22   having the custodian come over here and say we had them and
23   we, here they are and give them to Judge Spainhour.  In
24   fact, I believe --

25              THE COURT:  So the question is whether or not

1  you need a records custodian for purposes of authentication
2  of those hospital records.
3            MS. BENNICK:  That's correct.
4            MS. SHANLEY:  I'm sorry.  I was under the
5  impression that she wanted to subpoena the hospital now and
6  get the full records, although Judge Spainhour went through
7  them and only gave redacted copies.
8            MS. BENNICK:  No, Your Honor --
9            THE COURT:  I take it you're merely talking
10  about authentication, getting the records into evidence.
11            MS. BENNICK:  I was talking about
12  authentication, right.  I'm not asking --
13            THE COURT:  Is the State prepared to stipulate
14  as to the authenticity of those records that the defendant
15  would seek to offer?
16            MS. SHANLEY:  Your Honor, if perhaps you could
17  just let us see the records she seeks to offer --
18            MS. BENNICK:  I'd be happy to, Your Honor.
19  It's exactly the ones that Judge Spainhour turned over to
20  me and to --
21            THE COURT:  We're going to take a short break
22  in a few minutes and perhaps that's something -- what I
23  would request is that during the time we're in recess for
24  the morning break, that you all exchange, one, whatever
25  information you wish to share concerning motion for funds

1  for an expert witness, and two, anything you wish to

2  exchange concerning hospital records.

3            MS. BENNICK:  Sure.

4            THE COURT:  So we can streamline that process.

5  The final point that I'd like to raise before we have that

6  morning break is the issue of cameras in the courtroom.

7  Does either side wish to be heard with respect to the

8  request for media to bring cameras into the courtroom for

9  the purposes of filming these proceedings?

10           MS. BENNICK:  No.  We have no position on that

11 one way or another.  It's in your discretion.

12           THE COURT:  Does the State have any position

13 one way or the other?

14           MS. SHANLEY:  No, Your Honor.  I know our last

15 capital case was filmed by the media and I think the media

16 outlets agreed to have one camera that they would share

17 with some arrangement.  That helped without having to

18 disturb the proceedings if something like that were to be

19 ordered.

20           THE COURT:  The request that I have is from

21 Mr. Stewart Watson.  Is Mr. Watson present in the

22 courtroom?

23           MR. WATSON:  Yes, sir, Your Honor.

24           THE COURT:  Mr. Watson, are you speaking only

25 on behalf of your station or do you have any sharing or

1  collaboration arrangement among media?

2          MR. WATSON:  We do when there's a request.

3  There's been no request.  If there were a request we'd be

4  happy to share.

5          THE COURT:  I'm going to grant your request.  I

6  will allow one camera in the courtroom beginning

7  immediately after the morning break.  How long will it take

8  you to get that in and set it up?

9          MR. WATSON:  Five minutes.

10         THE COURT:  So obviously we don't have any

11 jurors in this case, so we don't have the restrictions that

12 are normally in play as to filming of the jurors.  But I

13 will allow one camera in the courtroom in a stationary

14 position so long as it does not present any distraction.

15         MS. SHANLEY:  Your Honor, in the last case we

16 had the camera in the back of the room there focused this

17 way (indicating) and that seemed to be beneficial to

18 everyone.

19         THE COURT:  All right.

20         MS. BENNICK:  Your Honor, if there is going to

21 be a camera in the courtroom, depending on what your

22 limited instructions might be about where it's pointed, I

23 would ask if Mr. Long would be allowed to put on the suit

24 that his family took to the sheriff's department last

25 evening.

```
 1              THE COURT:  State wish to be heard?
 2              MS. VANEEKHOVEN:  I don't think he has any
 3  right to that.  There's not a -- there aren't jurors here
 4  and I think that would strictly be for show.
 5              THE COURT:  Sheriff's office have a position on
 6  that point?
 7              BAILIFF:  That's not something we normally do
 8  unless it's a jury -- but I don't know of a case where
 9  we've ever dressed somebody out in their street clothes
10  that wasn't in front of a jury.
11              THE COURT:  Are there any security concerns in
12  this case?
13              BAILIFF:  Well, we haven't had time to go
14  through the clothing that was dropped off.  It would have
15  to be thoroughly searched and all before we would able to
16  dress him.
17              MS. SHANLEY:  Your Honor, as a security
18  concern, yes, the defendant has at least 50 violations in
19  Department of Corrections --
20              MS. BENNICK:  I'm going to object to this, Your
21  Honor.  We're getting way off kilter here.  This is nothing
22  but prejudicial and I have a real problem with that.
23              THE COURT:  Well, in the exercise of discretion
24  in order to avoid any delay, I'll deny the request for a
25  change of clothes for the defendant at this time.
```

1    I will note for the record that it makes absolutely no
2    difference to me.  I will certainly not be influenced, as
3    the fact finder I'll certainly not be influenced by
4    whatever clothes the defendant is wearing for these
5    proceedings.
6              MS. BENNICK:  Your Honor, I have one last thing
7    if you're done.
8              THE COURT:  Yes, ma'am.
9              MS. BENNICK:  I'd like to make a motion that
10   all of the witnesses, including my own, be, you know,
11   excluded from the courtroom.  They testify one at a time.
12   They're not all in here listening to one another testify.
13             THE COURT:  Motion for sequestration of
14   witnesses.
15             MS. BENNICK:  Correct.
16             THE COURT:  All right.  Does the State wish to
17   be heard in that regard?
18             MS. VANEEKHOVEN:  Your Honor, I would not
19   oppose the motion to this extent.  When we exchanged
20   witness lists, I believe it was like Thursday or whatever
21   day we had our conference call last week, we were
22   over-inclusive in that list because we weren't certain what
23   their list would entail.  So I would ask you to restrict
24   that order to those that we intend to call, because there
25   are some names on that list that based on what they sent

1    us, we will not call.

2              THE COURT:  Well, here's the problem.  If I

3    enter a sequestration order and it applies only to certain

4    witnesses and then one side or the other changes your mind

5    after that order is entered and I have sequestered only

6    witnesses on a specified list and then someone wanted to

7    add to the list, those witnesses would be disqualified by

8    virtue of the sequestration order.

9              MS. BENNICK:  Judge, that's right.  I have a

10   real problem with that.  I mean, the State has reserved its

11   right to call rebuttal witnesses.  I understand that.  I

12   have a right to call rebuttal witnesses.  At this point I

13   don't think it's anybody other than who I have told the

14   State, but I do not know what's going to unfold here this

15   afternoon or tomorrow or, you know, we have the certificate

16   for Mr. Isenhour, the issue is fair.  So I have a problem.

17   If it's going to be sequestered it should be all of them,

18   and I feel strongly about this.

19             THE COURT:  Is there anyone that either side

20   wishes to exclude from the sequestration order that is

21   needed to help you assemble and coordinate the presentation

22   of evidence?  Specifically what I mean by that is it is

23   often customary in the case of trials that each side might

24   wish to have their lead investigator excluded from that

25   sequestration so that that person could be at or near a

1   counsel table to assist in the coordination and

2   presentation of evidence. Does either of you have anyone

3   that falls into that category that you would seek to

4   exclude?

5           MS. BENNICK: I don't think so, Judge. I don't

6   have an investigator in this case. I have an investigator

7   who was in the case in '76 but not he is working for me as

8   an investigator. I don't have anyone.

9           THE COURT: Does the State?

10          MS. VANEEKHOVEN: Yes, Your Honor, we do. He

11  was the chief investigator of the case back in the '70s.

12  He's in the front row here along with the other officers

13  that worked this case and we'd ask that he at least be able

14  to remain.

15          THE COURT: Who was that chief investigator?

16          MS. VANEEKHOVEN: It was David Taylor.

17          THE COURT: What says the defendant in that

18  regard?

19          MS. BENNICK: Well, Your Honor, you know, this

20  is an old case and this is not a current case. This is an

21  MAR hearing for violation of defendant's constitutional

22  rights among a few other sentencing arguments. I don't see

23  why that chief investigator today is like something they

24  might need to run out and do something to investigate it.

25  That's not the issue that's before the Court. So yes, I do

1  have a problem with that.

2          THE COURT:  Tell me why Mr. Taylor would need

3  to be excluded from the order.

4          MS. SHANLEY:  I'm sorry, why he would need to

5  be excluded or need to be here?

6          THE COURT:  Why he would need to be excluded

7  from the sequestration order or why he would need to be

8  here.

9          MS. SHANLEY:  Your Honor, I counted in the

10  defendant's motion for appropriate relief they have alleged

11  16 times that the officers, including Sergent Taylor,

12  attempted to mislead the Court, the jury, and that's going

13  to be the basis I believe to mislead them about this

14  evidence, about these lab reports.  So I feel like his name

15  is going to come up over and over about what he did or did

16  not do.

17      We've also learned that the defense attorneys for Mr.

18  Long back then had an interview with the officers prior to

19  trial and we believe they did obtain information about this

20  case.  So when they're up upon the stand I'm going to want

21  to be asking Detective Taylor what he recalls about the

22  interviews with them, what they discussed, if they

23  discussed pieces of evidence and things like that.  So I do

24  believe that we are going to be needing to discuss things

25  with him.  Certainly this case occurred 32 years ago.  Ms.

1    Vaneekhoven and I have done a good job reading the

2    transcript, but we need someone who was actually there and

3    will know the people involved and the issues at hand.

4         MS. BENNICK:  Judge, I don't know where this is

5    coming from about Mr. Taylor.

6         THE COURT:  You don't know what?

7         MS. BENNICK:  They haven't had any interviews

8    with Mr. Taylor.  They never, they didn't have any

9    interviews with Mr. Taylor in 1976.  There's been no

10   interviews by any of my witnesses with Mr. Taylor since

11   I've been entered in this case.  I don't know what the

12   reference is to.

13        MS. SHANLEY:  Your Honor, I don't know what

14   she's talking about.  The defense was kind enough to send

15   me a transcript for the first motion for appropriate

16   relief.  In that transcript both Mr. Adkins and Mr. Fuller

17   testified.  And in that the State asked them is it not true

18   that I arranged a meeting with you and the officers to

19   discuss discovery and motions to suppress, and both said

20   yes.  And I think it was Detective Taylor specifically who

21   they met with.  Of course we'll need to pursue that.  So in

22   the transcript they did meet with them prior to trial to

23   discuss some of these issues.

24        MS. BENNICK:  That's not the testimony in the

25   MAR transcript.  The testimony is the colloquy between then

1    district attorney Bob Roberts who was cross examining

2    Mr. Adkins and Mr. Fuller, cross examination of their

3    testimony in regard to the jury systematic exclusions of

4    blacks from the jury issue. And the colloquy was between

5    Mr. Roberts, and Mr. Fuller and Mr. Adkins were asked by

6    Mr. Roberts, then DA Bob Roberts, whether or not he had

7    provided to them full file discovery in the case. And

8    their answer was, to the best of their knowledge he had

9    given them full discovery. That is all. It has nothing to

10   do with David Taylor.

11        I'm happy to give Your Honor a copy of this. David

12   Taylor's name is not mentioned in this MAR transcript.

13   This MAR transcript had nothing to do with what we're here

14   to do today.

15             MS. SHANLEY: Your Honor, if I could --

16             MS. BENNICK: It's a totally different issue

17   and the only exchange was between Mr. Roberts and these two

18   gentlemen who tried Mr. Long's case (indicating) about

19   discovery that was provided. David Taylor appears nowhere

20   in here.

21             MS. SHANLEY: Your Honor, if I could just read

22   on page 24, this is the question of Mr. Fuller. All right.

23   Do you recall whether or not you interviewed witnesses

24   prior to trial regarding the motion to suppress?

25        I think so.

1     Beg your pardon?

2     Answer:  I think so.  I know we talked to Mr. Long.

3   Seems to me we talked to some police officers that

4   Mr. Roberts made available.

5     At some time?

6     And then his answer:  I can't tell you when.  Here's

7   my best recollection.  I know I'm under oath.  But I have

8   to say, I really can't swear to this, my best recollection

9   is we went to Mr. Roberts and said, here's what we need to

10  do.  We need to talk to this person and this person.  And I

11  recall he said, not only fine, but he would set it up.  And

12  then I think he made the call.

13    So based on their testimony of what they recall back

14  in 1988, they did meet with officers and discuss this case.

15  Detective Taylor was the chief officer.  We believe that

16  the lead detective in that case, that he would have of

17  course been the one they spoke with.

18              THE COURT:  Here's what I'm going to do.  In

19  the exercise of discretion, the defendant's motion for

20  sequestration of witnesses is allowed.  Any witness that

21  will be called on by the defendant or by the State to

22  testify in this proceeding shall be excluded from the

23  courtroom prior to the testimony of that witness.  After

24  completing their testimony each such witness may remain in

25  the courtroom from that point forward, provided that if

1   remaining in the courtroom that person may not again be
2   called as a witness at any later time in this proceeding,
3   nor shall any witness or potential witness in this case
4   engage in any conversations or discussions with any other
5   witness, directly or indirectly, concerning the subject
6   matter of the testimony of such other witness or potential
7   testimony of such witness.
8       And of course in the event that I learn of any witness
9   having spoken with any other witness, then that will result
10  in such sanctions as I determine, including, but not
11  limited to, the exclusion or striking of any testimony
12  offered by such witness found to have violated the terms of
13  this order.
14      There will, however, be excepted from this order the
15  following persons:  David Taylor, who may remain in the
16  courtroom at all times during this proceeding to assist
17  counsel for the State in the coordination and presentation
18  of evidence.  Secondly, Mr. Karl Adkins and Mr. James
19  Fuller, who may remain in the courtroom at all times during
20  this proceeding to assist defendant's counsel with the
21  coordination and presentation of the evidence in this
22  matter.
23      Now, I'm excluding or I'm excepting Mr. Taylor,
24  Adkins, and Fuller from being excluded from the courtroom,
25  but I am not excepting them from the other provisions of

1    the order.  In other words, the fact that they will be

2    remaining in the courtroom throughout the proceedings does

3    not give them the right to discuss their testimony or other

4    witness' testimony with those witnesses.

5        Does everyone understand the effect of that order?

6            MS. BENNICK:  I do, Your Honor.

7            MS. SHANLEY:  Yes, Your Honor.

8            THE COURT:  Let's take a ten-minute recess

9    during which time you all can exchange those items we

10   discussed.  We will come back and have a little bit less

11   than 30 minutes to proceed.  Then we'll take a lunch hour

12   and then we'll go forward this afternoon.

13       All right.  We'll be in recess for about ten minutes

14   then.

15   (A recess was taken from 11:53 until 12:10.)

16   (Counsel for the State, counsel for the defendant, and the

17   defendant are present in the courtroom.)

18           THE COURT:  All right.  Were you all able to

19   exchange that information during the break?

20           MS. BENNICK:  Yes, Your Honor.

21           MS. SHANLEY:  We were, Your Honor.  And also

22   that is a revised witness list we just did, taking names

23   off, not adding to.

24           THE COURT:  Okay.  What other matters then do

25   we need to address?  As I said, we've got about 20 minutes

1    left before the lunch hour.  Let's see if we can address
2    any remaining issues and at least be in a position to
3    proceed with presentation of evidence immediately after
4    lunch.

5             MS. BENNICK:  I suppose only, Your Honor, if
6    they want to address the authentication issue on whether I
7    really need to get somebody from the hospital here or not.

8             MS. VANEEKHOVEN:  Your Honor, we can't address
9    that matter.  I would like to know what they intend to use
10   these records for or if they're just simply going to
11   introduce them.  I don't see what the relevance of these
12   would be for this specific hearing.

13            MS. BENNICK:  The relevance, Your Honor, make a
14   proffer, is that these records were not turned over to the
15   defense counsel in 1976.  And contained in those records is
16   a form where the Concord Police Department signed to pick
17   up evidence from the hospital and take it back to the
18   police department, which is a piece of the whole puzzle
19   here.  And that information was never given to defense
20   counsel in 1976.  It's another sort of withheld piece of
21   evidence that while not directly exculpatory, it's sort of
22   part of the, I can't think of the, lack of a better word,
23   the scheme and it also is also newly discovered.

24            THE COURT:  I'm sorry?

25            MS. BENNICK:  And it also was newly discovered.

1          MS. VANEEKHOVEN:  Your Honor --

2          MS. BENNICK:  I think it will tie in if I'm

3  allowed to, when I start to begin to question the

4  witnesses.

5          THE COURT:  Well, the question at this point is

6  not the admissibility, but the authenticity.  I mean,

7  that's really what we're talking about is whether or not to

8  bring the records custodian.  Does the State have concerns

9  about the authenticity of the records?

10         MS. VANEEKHOVEN:  We do not have a concern with

11 regard to the authenticity.  However, we will certainly

12 make the argument, when the Court would like to hear from

13 us, regarding the admissibility of these records.

14         THE COURT:  So can the parties agree then that

15 the records may be received without further authentication,

16 but also without any determination as to the actual

17 admissability of the records?

18         MS. BENNICK:  That's fine with me, Your Honor.

19         MS. VANEEKHOVEN:  Yes.

20         THE COURT:  And by doing that we can at least

21 alleviate the need for a records custodian coming in and

22 provide the authentication of the record.

23         MS. BENNICK:  I think so, Your Honor.

24         THE COURT:  Well, that addresses that issue.

25    The other issue then would be the issue of motion for

1   funds for preparation of the defense case.

2             MS. BENNICK:  Correct.

3             THE COURT:  Is the State ready to proceed on

4   that matter?

5             MS. VANEEKHOVEN:  Your Honor, actually we are

6   not.  They were kind enough to make a copy of this at the

7   break.  We honestly haven't had a chance to read it.  It's

8   13 pages.  We were doing a couple of other things at the

9   break.  We would like to have some time over the lunch

10  break to review cases they've cited, as well as try and

11  have our own.

12            THE COURT:  Let's hold that until after lunch

13  then.

14       Now, are there other matters in the nature of

15  housekeeping matters, preliminary matters, anything that

16  either the State or the defendant would like to address at

17  this time?

18            MS. BENNICK:  I can't think of anything else,

19  Your Honor.

20            THE COURT:  Do you wish to proceed with opening

21  statements at this time or hold that until after lunch?

22            MS. BENNICK:  Your pleasure.

23            MS. SHANLEY:  Your Honor, we are planning to

24  waive our opening until our case anyway.

25            MS. BENNICK:  And I'll waive opening statement,

1  too.

2          THE COURT:  Well, Ms. Bennick, let me ask you

3  for something which frankly you may want to take some time

4  over the lunch hour to prepare this for me.

5          MS. BENNICK:  Yes, Your Honor.

6          THE COURT:  One thing, I have read through as

7  much of this material as I could before today.  I haven't

8  been able to read through the entire trial transcript yet.

9          MS. BENNICK:  I understand.

10          THE COURT:  But one thing that would be

11  extremely helpful to me would be if at some point in time

12  in the presentation if defense counsel could present me

13  with in effect a laundry list or a checklist of the items

14  that you contend are newly discovered evidence.

15          MS. BENNICK:  Oh, sure.  I mean, Your Honor, if

16  you want I can do that now.

17          THE COURT:  Okay.

18          MS. BENNICK:  The newly discovered evidence

19  would be the -- can I consult with --

20          THE COURT:  Yes, ma'am.

21  (Pause in the proceedings.)

22          MS. BENNICK:  Your Honor, I believe that we're

23  talking about two reports signed by Van Isenhour dated May,

24  I believe, 12, 1976 -- one has no date on it actually.  The

25  other one is dated May 12th, 1976.  And the three SBI lab

1  reports which have been sent to me with an authenticating
2  affidavit from the records custodian at the SBI, a cover
3  letter of John Waters, general counsel, and the victim's
4  medical records which contain some other pieces of paper
5  relevant, as I said, the police department picked up the
6  rape kit from the hospital, but is all contained within the
7  victim's medical records.  So I think we're talking about
8  two reports from Van Isenhour, three SBI lab reports, and
9  the victim's medical records.

10          THE COURT:  I just wanted to make sure that I
11  knew exactly what items we're talking about.

12          MS. BENNICK:  Sure.

13          THE COURT:  Are right.  Are there other matters
14  the you all would like to address at this time?

15          MS. BENNICK:  I don't have anything else at
16  this time, Your Honor.

17          THE COURT:  Then from the State?

18          MS. VANEEKHOVEN:  No, Your Honor.

19          THE COURT:  I think probably the best use of
20  our time, rather than putting a witness on the stand to
21  testify for ten minutes and then stop and take a lunch
22  recess, I'm going to go ahead and recess for lunch at this
23  time and plan to come back at 1:45.

24          MS. BENNICK:  That's fine.  Whatever time you
25  say.

1    THE COURT:  We'll be in recess until 1:45 this
2  afternoon.
3  (A recess was taken for lunch from 12:20 until 1:50.)
4  (Counsel for the State, counsel for the defendant, and the
5  defendant are present in the courtroom.)
6          THE COURT:  All right.  I'll hear from the
7  defendant.
8          MS. BENNICK:  Your Honor, are we back to the
9  identification motion; is that where we are?
10         THE COURT:  Is the State ready to go forward on
11  that, the eyewitness identification expert?
12         MS. VANEEKHOVEN:  We're ready.
13         MS. BENNICK:  Your Honor, the crux of the
14  motion is that it's our view that this was in essence a one
15  witness identification case.  There was no real physical
16  evidence introduced against Mr. Long linking him to the
17  crime.
18      The one piece of evidence that was tested which was
19  the shoe print evidence, the SBI officer at the time, Agent
20  Mooney, testified ultimately that he could not say that the
21  shoe impression lifted from the scene of the crime matched
22  either one of Mr. Long's shoes which had been taken from
23  him and inked impressions taken that had been compared.  So
24  if you strip that away, the case really comes down to a one
25  witness identification case.

1    Since 1976 there has developed a whole body of

2 scientific evidence about the inherent unreliability of

3 eyewitness identification. And in speaking with, when I

4 was writing the MAR application and speaking with a number

5 of those people across the country, was, you know, they

6 helped me to identify any number of factors in this case

7 that are highly suspect as what we know today. And those

8 factors, include, but are not limited to, that there was no

9 independent administrator.

10    Mr. Long's identification, original identification was

11 made, my words, a courtroom show up, which is highly

12 unusual. No lineup, no photo array. They then

13 subsequently shortly after that array, after that

14 identification a photo array was shown. I think research

15 now shows, I'm told, that, you know, a subsequent

16 identification is highly likely since a victim just picked

17 it out. Cross racial identification is an enormous

18 problem.

19    And so -- and there were many other factors present in

20 this case. The suspect wore a hat, a weapon was used, a

21 knife was used when the victim was first attacked. And

22 there are any number of factors that have been identified

23 as contributing to the possibility of a false

24 identification. And given that this is down, we are down

25 to what I believe is a one witness identification case,

1  that to understand the context in which this ID was made

2  and all the factors that come into play that make the

3  identification unreliable, it's important for the Court to

4  consider in the totality of the circumstances, which is one

5  of the tests under *Brady*, and some of the other relevant

6  cases, looking at the cumulative effect and the totality of

7  the circumstances at the time.

8      And, you know, the question is not whether Mr. Long

9  would more likely than not have received a different

10 verdict, but whether in its absence he received a fair

11 trial, understanding that as a trial resulting in a verdict

12 worthy of confidence, which is *Strickler v. Greene* and

13 *Kyles v. Whitley*, two U.S. Supreme Court cases.

14     In the motion -- and in addition, to sidetrack for a

15 moment, I think the fact that eyewitness identification is

16 now widely recognized as a problem, and a big problem, as

17 reflected in our legislature's own enactment of the Statute

18 15A-284.52 just this year, and the statute is entitled

19 Eyewitness Identification Reform.  And a big piece of the

20 statute is, I believe, the legislature recognizing that

21 lineups and photo arrays need to be meticulously conducted.

22 The statute really addresses how the lineups should be

23 conducted, an independent administrator, not one of the

24 arresting or investigating officers, the way in which the

25 lineups should be presented, the way in which photo arrays

1    should be presented, what kind of instructions the
2    eyewitness should or should not receive prior to the lineup
3    or the photo array being given.  The eyewitness is now
4    required to acknowledge receipt of those instructions in
5    writing.
6         The statute goes on to talk about the fillers and what
7    kind of fillers are appropriate or inappropriate in a
8    lineup or even in a photo array.  And the statute, you
9    know, is lengthy.  And I believe that that is all in
10   support of what we now know is that eyewitness
11   identification is inherently unreliable.  And I believe
12   it's not only recognized in the scientific fields, but now
13   is recognized in the legal community, has been nationwide
14   for some time, and now I believe our legislature has given
15   credence to that idea by adopting the statute.  And so
16   that's the basis of my application.
17              THE COURT:  Why am I not barred from even
18   considering this issue?
19              MS. BENNICK:  I don't understand why you would
20   be barred.
21              THE COURT:  Under 15A-1419(a)(2).
22              MS. BENNICK:  1419, Your Honor?
23              THE COURT:  The issue was confirmed by the
24   North Carolina Supreme Court in this case.  On the direct
25   appeal did not the North Carolina Supreme Court directly

1   address the issues pertaining to eyewitness identification

2   in this case?

3           MS. ZANIN:  Yes, Your Honor, but we believe

4   that with respect to the current motion that's before the

5   Court that the new scientific evidence is relevant and the

6   accuracy of the ID is relevant for the Court's

7   determination of the materiality element of the *Brady* claim

8   that Mr. Long is making today.  It goes towards how much

9   weight the Court should give in looking back at whether or

10  not Mr. Long received a trial that resulted in a verdict

11  worthy of confidence.  And the weight that the

12  identification should be given when you're making that

13  determination legally has been impacted by the change in

14  science since the time that the Supreme Court made that

15  decision.  And therefore it's relevant not in terms of

16  precluding her identification or suppressing her

17  identification, but rather in terms of deciding whether

18  just her identification and what we know today about

19  eyewitness identification would have been enough or is

20  enough to support the verdict against Mr. Long, or whether

21  in light of the recent science, that the verdict should not

22  be worthy of confidence.  So in other words, it goes to the

23  materiality element.

24          THE COURT:  Okay.  Well, take me through the

25  analysis then.  What would the defendant, what

1  determination would the defendant have me make?  In other
2  words, as I go back and read the opinion in this case from,
3  that was written by Justice Moore -- did this predate the
4  existence of the North Carolina Court of Appeals such
5  that --
6              MS. SHANLEY:  No, Your Honor, this was a
7  capital case.
8              THE COURT:  Oh, it was?
9              MS. SHANLEY:  Yes.
10             MS. BENNICK:  I don't believe this was a
11 capital case.
12             MS. ZANIN:  This was not a capital case.
13             MS. SHANLEY:  It was a capital case, but the
14 death penalty had been suspended at the time.  My
15 understanding is that the appeal went directly to the
16 Supreme Court.
17             THE COURT:  This was during the time that a
18 person could still receive the death penalty for first
19 degree burglary or first degree rape?
20             MS. SHANLEY:  Yes, even though the death
21 penalty was suspended at that time.
22             THE COURT:  It was not tried capitally.
23             MS. SHANLEY:  That's correct, but it was a
24 capital offense.
25             THE COURT:  And that's how it wound up, how the

1  direct appeal wound up in front of the Supreme Court.

2              MS. BENNICK:  I honestly don't know.

3              THE COURT:  So in any event, the case did go to

4  the North Carolina Supreme Court and I believe Mr. Adkins

5  represented the defendant in that appeal, according to the

6  opinion.  And there were issues raised in the direct

7  appeal, in fact the defendant's first assignment of error

8  was based on the contention that the pretrial

9  identification procedure was so impermissibly suggestive

10  that admission of the in-court identification violated due

11  process.

12       Now, since the North Carolina Supreme Court has

13  already dealt with that issue which under the statute tells

14  me that that operates as a bar to my granting a motion for

15  appropriate relief based on that same issue, the issue

16  underlying the motion was previously determined on the

17  merits upon an appeal or upon the previous motion or

18  proceeding in the courts of this state or a federal court,

19  unless since the time of such previous determination there

20  has been a retroactively effective change in the law

21  controlling such issue.

22       Now, you mentioned the fact that the legislature has

23  adopted a new procedure for identification proceedings.

24              MS. BENNICK:  That's correct.

25              THE COURT:  So I guess a number of questions

1    then arise from that.

2         One, would those procedures apply to the particular

3    process, the particular identification process that was

4    used in this case if the law were applicable at the time?

5         Two, does that since enacted statute apply

6    retroactively to this case either under the present

7    scenario or in the event that a motion for appropriate

8    relief is granted and the case is sent back for retrial,

9    would the statute apply to this case upon retrial?

10        And three, why would that, why would this issue not be

11   barred by the fact that issue has been litigated both at

12   the trial level and through the direct appeal?

13             MS. ZANIN:  Your Honor, I don't think we're

14   asking you to re-evaluate the due process claim made on

15   either of those levels.  What we're saying is that in light

16   of the new evidence that we're bringing to the Court today,

17   that the weight or the probative value of the original

18   identification should be weighed again in the context of

19   the evidence that is available and was available at the

20   time that Mr. Long was tried.

21        So the method of identifying the defendant that was

22   used is relevant to determining the *Brady* claim itself in a

23   different way than the Court looked at it.

24             THE COURT:  Okay.  As to the materiality aspect

25   of the Brady --

1           MS. BENNICK:  That's right.

2           THE COURT:  Then let me ask you again something

3   I asked a while ago.  I guess I got myself a little bit

4   sidetracked on that.  Then help me by, let's walk through

5   the analysis that the defendant would have me make in that

6   regard.  In other words, in order to rule favorably for the

7   defendant on this point, what's the logical progression I

8   would need to go through to get, to arrive at that end?  Do

9   you see what I'm asking?

10          MS. ZANIN:  I'm trying to see what you're

11  asking.

12          MS. BENNICK:  I think we're not --

13          MS. ZANIN:  I'm not sure that I understand the

14  question.

15          THE COURT:  Okay.  Let me put it another way.

16  If after hearing the evidence I rule in favor of the

17  defendant on this point, what are the steps, what are the

18  findings I'm going to need to make to arrive at that order

19  that grants relief to the defendant?

20          MS. BENNICK:  Well, I think, Your Honor, that

21  if you were to rule in favor that the evidence that was

22  excluded, the exculpatory evidence that was not turned over

23  in 1976 is in fact a basis of the *Brady* claim, then perhaps

24  in making that decision you have to, I believe the case

25  requires you to look at the totality of the circumstances

1    and the weight of the evidence in reaching the materiality

2    decision, unless I am misreading the cases. But that, I

3    believe that it's not that things are looked at in a

4    vacuum. It is that things are looked at together. So had

5    this evidence been available to Mr. Long at his trial and

6    not have denied him his due process right to a fair trial

7    -- now I've lost my train of thought.

8        THE COURT: If this evidence had been evaluated

9    when considered together with the evidence that was

10   actually introduced and weighed against the eyewitness

11   identification evidence, would a different result likely

12   have ensued?

13       MS. BENNICK: And that's the point. That's

14   where I was going. Thank you. Sorry.

15       THE COURT: All right. Tell me how the

16   eyewitness identification expert becomes necessary in that

17   regard.

18       MS. ZANIN: The eyewitness identification

19   expert would be able to share with the Court the recent

20   developments in science that have taken place since

21   Mr. Long's trial that demonstrate the weight that should be

22   given to that method that was used to identify Mr. Long in

23   this case.

24       THE COURT: What says the State?

25       MS. SHANLEY: Your Honor, the State says that

1    the defendant to no avail has had at least four

2    opportunities to attack the identification of the victim

3    that she identified the defendant.

4         First, at the pretrial suppression motion they

5    extensively questioned her about that and the judge let it

6    in.  Then when she was on the stand they cross examined her

7    about all of these issues that they want you to consider

8    appointing an expert to discuss.  They questioned her about

9    her fear, whether she thought she was going to die; her

10   opportunity to observe the defendant; the fact that she --

11   how familiar was she with people of another race, with

12   cross racial issues.  Your Honor, they were able to cross

13   examine Detective Taylor when he had her identify the

14   defendant at his court proceeding.  And then in the closing

15   argument to the jury they argued all these things that

16   they're bringing up again to that jury.  And yet he was

17   convicted.

18        Then as you mentioned, they took this same issue to

19   the Supreme Court.  The Supreme Court analyzed the

20   identification and found "there is little likelihood of

21   mistaken identification".  And now they want to dance over

22   two difference standards to ask you to appoint an expert

23   who, based on my research and training by the Institute of

24   Government, has never been allowed in North Carolina.  I

25   cannot find one case where an expert witness on

1   identification has been admitted.

2       I've already addressed the *Garner* case, the *State v.*
3   *Garner* where the defendant wanted this type of expert in
4   its underlying case and then for his motion for appropriate
5   relief.  It was denied.  And in this case the Court of
6   Appeals cites *State v. Abraham*.  That's a North Carolina
7   Supreme Court.  That's 338 NC 315, a 1994 case.  And in
8   that case the defendant was claiming error because he did
9   not, he was not able to procure funds to hire an
10  identification expert.  And the Court, the Supreme Court
11  found there, just like the Court of Appeals Court found in
12  *Garner*, that the reason that identification expert is not
13  related to the case or is not something the defense should
14  have because an expert would have only testified to matters
15  within the common understanding of the jury.  Cross racial,
16  whether the victim had a knife at her throat, her
17  opportunity to see, are all factors that a jury would be
18  able to determine, and thus an expert would not be able to
19  help them assess that.

20      Your Honor, those are cases involving jurors.  In a
21  case such as this one, the issues would be before a judge,
22  someone with much more experience to draw on.  I contend
23  that North Carolina has never admitted this type of
24  evidence and shouldn't do so here.

25      Now, in *The State v. Garner* the defendant wanted to

1  allow this evidence for the motion for appropriate relief,
2  and as we discussed before, it did not meet the seven
3  factors of the *State v. Britt* case for new evidence.  They
4  want to talk about that this is new scientific evidence.
5  Well, this evidence would merely tend to contradict,
6  impeach, or discredit the testimony of our former witness.
7  That's it.  That's all it does.  And that's what's not
8  admissible.

9       So the State would pay for this expert, the State
10 would review the case, and then what would they do?  They
11 never met the victim.  They were not here in district court
12 when she had the opportunity to observe 12 other
13 African-American males the same general age range as the
14 defendant, because that's what Detective Taylor said was in
15 the room when she came.  She wasn't there when the victim
16 was at the hospital bed and instead of just the six photos
17 that the new law requires, she was given a lineup of 13
18 photos.  And yet she did not identify anyone in those 13
19 photos and the defendant's photo was not among them.  And
20 then after she came to the district court and she was there
21 with these people, she had been there an hour, and she sees
22 the defendant.  She identifies him.  The expert wouldn't
23 have been there.  And then the expert wasn't there when she
24 goes back to the police department and they produce more
25 photographs for her, this time including the defendant's

1  photograph, and she picks it out.

2      Your Honor, in this case the defense consistently says
3  that the identification was not strong. And it reminds me
4  of the saying, saying it doesn't make it so. The witness'
5  identification was very strong. By reading the transcript
6  you can tell she was a very intelligent woman and she had
7  her thoughts about her, even on this night. She says in
8  her testimony that she thought she wasn't going to make it,
9  so she promised him, let me make a phone call and I'll get
10 you all the money I can get you.

11     She had her wits about her that when he wanted to take
12 her up the stairway. She thought I will not make it alive
13 if he takes me there. So she fought and she stayed
14 downstairs. When he said he needed to go she rushed after
15 and slammed the door because she knew the door would lock
16 and he couldn't re-enter. Your Honor, she had her wits
17 about her and she was very bright.

18     But on that stand and in front of that jury she
19 testified that she had three different opportunities to
20 observe the defendant in a position closer to her than most
21 people are ever close to another. She said that when he
22 attacked her at first in the den that the light from the
23 television was there and there was also a lamp in the den.
24 And she said that she saw his face. She said at some point
25 he kept telling her, don't look at my face. And she said,

1  I had to look after he said that, and he said it over and
2  over and over.

3    And then he took her to a bedroom where he wanted her
4  money. And she said there was a lamp on in the bedroom and
5  she saw his face again. And she said he even tried to step
6  out of the light so I couldn't see it, but I saw it. And
7  then when he took her back to the stairwell and raped her,
8  Your Honor, there was the hall lamp on and she said, he was
9  on top of me and I saw his face. She never hesitated. She
10  never wavered. When she picked out the defendant she
11  didn't change then, and 32 years later she has not changed.

12    Now, when the officers asked her, how sure are you,
13  how sure of your description? She not only described his
14  face, she described his walk. She said when she saw him in
15  the courtroom it was his voice, it was his mannerism. She
16  said when he walked by me it was just like him walking out
17  of my house the night of the rape.

18    The defense in their brief says that she never
19  mentioned the facial hair. That is incorrect. And the
20  transcript of the trial shows that to be true. She says
21  she always identified him by the scruffy beard that he had
22  and the little slight mustache. Although the defendant at
23  trial had shaved all that off, the defense had introduced
24  photos of him a couple days before at a party with that
25  scruffy beard and the mustache. The State also introduced

1  his booking photo where he had that mustache and that
2  beard.

3       She said that she would never forget him. She said,
4  I'll never forget the way he talked to me, the way the
5  voice sounded. She got to hear that again in that district
6  court. She said his general appearance left no doubt in my
7  mind he was the person who raped me. She has never
8  wavered. With the 13 photos at the hospital, the 12
9  African-American men who were in the district courtroom,
10 the seven photos she saw in the lineup after that, she had
11 the opportunity to look at 31 African-American men and she
12 picked out one and that was the defendant.

13      So, Your Honor, this expert who comes in won't know
14 any of that, wasn't there to see it, wasn't there to see
15 her hesitate or not, and to be strong and to be sure.
16 She'll just come or he'll just come and speak in vague
17 generalities about things we already know. They attempted
18 it at the trial and they failed. They attempted it at the
19 Supreme Court and they failed.

20      Your Honor, I'd ask that we not or that you would deny
21 their motion to appoint this expert, someone who has never
22 been able to testify in North Carolina anyway, and deny
23 their motion.

24           MS. ZANIN:  May I be heard, Your Honor?
25           THE COURT:  Yes, ma'am.

1    MS. ZANIN:  The State is placing a lot of
2    emphasis on the certainty of the witness in making her
3    identification of the defendant.  And in fact, one of the
4    things that's now been determined by the new science is
5    that witness certainty is not a factor in determining
6    whether or not the identification is accurate.  Research
7    demonstrates that witness confidence, although believed by
8    lay people to be a strong predictor, in this case the jury,
9    of the accuracy of an eyewitness identification, is not
10   actually a strong predictor of identification accuracy.
11        In fact, also in our motion are some statements from a
12   woman named Jennifer Thompson who was also the victim in a
13   rape case and has now made it her life's mission to go
14   around the country talking about her experience, because
15   the person that she identified as raping her, Darryl Hunt,
16   ultimately was exonerated.  And what Ms. Thompson says in
17   an article that she wrote for the New York Times on June
18   18th of 2000, she says I studied every single detail on the
19   rapist's face.  I looked at his hairline.  I looked for
20   scars, for tattoos, for anything that would help me
21   identify him.  When and if I survived the attack I was
22   going to make sure that he was put in prison and he was
23   going to rot.
24        She wrote, I knew that this was the man.  I was
25   completely confident.  I was sure.  Later DNA evidence

1  proved that another man, Bobby Poole, was in fact the
2  perpetrator.  And I believe I said Darryl Hall.  It was
3  actually Ronald Cotton who was the defendant in her case.
4  Mr. Poole, the man whose DNA was found, was brought to Ms.
5  Thompson who told the police, that's not him.  I've never
6  seen him before my life, when in fact the DNA evidence
7  proved that it was Mr. Poole that had raped Ms. Thompson.
8       Witness certainty is not a factor.  However it does
9  have a huge impact on the jury and that's one of the
10 reasons that we're asking you to appoint the expert in this
11 case to discuss issues such as that.  In addition, the
12 evidence that we're seeking to, the evidence that we have
13 raised in this *Brady* motion, the three SBI reports, go
14 directly to identification of the defendant in this case
15 and we believe they contradict the identification that was
16 provided by the victim in this case and in that regard
17 outweigh the weight of the identification done by the
18 victim and contradicts the evidence that --
19          THE COURT:  Well, isn't that a determination
20 for the Court though?
21          MS. ZANIN:  Isn't -- I'm sorry, Judge.  We
22 didn't hear you.
23          THE COURT:  Isn't that a determination for the
24 Court to make, that is, doesn't it ultimately come down to
25 my weighing of that evidence, the identification evidence,

1   whatever evidence was used at trial to convict the

2   defendant against the Brady material, that it has now been

3   located and to make a determination as to whether or not a

4   different result likely would have ensued had that *Brady*

5   material been available to the defendant at the time of his

6   original trial?

7           MS. ZANIN:  Yes, as the finder of fact that is

8   your decision.  And we'd like to present this additional

9   testimony to be considered by Your Honor as he is making

10  that finding of fact.

11          THE COURT:  How is that going to assist me in

12  that regard, your proposed expert?

13          MS. ZANIN:  By walking through the current

14  science involved in making identifications and helping the

15  Court determine the weight that the identification should

16  be given as additional factual information for the Court in

17  deciding weight.

18          THE COURT:  It appears to me this determination

19  depends at least in part upon application of Rule 702 of

20  the Rules of Evidence.  If scientific, technical, or other

21  specialized knowledge will assist the trier of fact to

22  understand the evidence or to determine a fact in issue, a

23  witness qualified as an expert by knowledge, skill,

24  experience, training, or education may testify thereto in

25  the form of an opinion.

1    The defendant is requesting funds to retain an expert
2    in the field of eyewitness identification to provide
3    testimony to the Court as to the, what appears to be, as I
4    understand it, what the defendant contends to be the
5    probative value or the lack of to be attributed to
6    eyewitness identification testimony when considered and
7    balanced against Brady material that has now been
8    discovered by the defendant and his counsel pertaining to
9    this matter.
10    As I understand it, the testimony anticipated from
11    such expert would include, among other things, testimony as
12    to the scientific advancements which have been made since
13    1976 with respect to the reliability of eyewitness
14    identification and the weight or probative value which
15    should be attached to such forms of evidence in making
16    those determinations.
17    It appears, however, that the ultimate issue in that
18    regard is what would a jury likely have done, how would the
19    jury have weighed the eyewitness identification evidence
20    that was actually produced at trial if the jury also had
21    had an opportunity to consider any evidence which could and
22    likely would have been presented by the defendant in light
23    of the information now available under the *Brady* material
24    discovered by defendant's counsel in connection with this
25    motion for appropriate relief.

1      In this regard what I'm going to do is I'm going to
2   provide an opportunity to counsel to present to the Court
3   any published writings, any learned treatise, or
4   professional articles containing information which may be
5   of assistance to the Court in making these determinations
6   which I will consider and of which matters I will also
7   consider, I'm not saying that I definitely will, but I will
8   consider taking as a matter of judicial notice.  And having
9   done that, with that avenue being made available to provide
10  that information to me in making this determination, my
11  conclusion is, aside from that, that the testimony of the
12  requested expert, that there is not a forecast that the
13  testimony of the expert would assist the trier of fact to
14  understand the evidence or to determine any facts in issue
15  in the case, and therefore the motion for funds for the
16  expert witness as to eyewitness identification is denied.
17      All right.  With that, I believe we are ready to go
18  into the evidence.
19              MS. BENNICK:  I believe we are, Your Honor.
20              THE COURT:  All right.  Who is the first
21  witness?
22              MS. BENNICK:  The first witness is outside.  Do
23  you want us to get him or how do you want to work it?
24              THE COURT:  Well, it would be nice if we'd come
25  up with some method whereby we can bring these folks in in

1   a timely basis without somebody having to -- if we can kind

2   of coordinate them.  And if you don't mind, perhaps even

3   tell the bailiff who the next witness is going to be so

4   that we can --

5           MS. BENNICK:  We can do that.

6           THE COURT:  -- kind of expedite that process as

7   much as possible.  Frankly that's the biggest down side to

8   sequestration of witnesses is all the dead time we have

9   while we're waiting for people to get in.

10          MS. BENNICK:  Mine are all right outside the

11  courtroom, Judge.

12          MS. VANEEKHOVEN:   I just wanted to address the

13  other matter.   There are two other witnesses still in the

14  courtroom that she informed me that she may call.  They are

15  officers here in the front row.  So I'd like just a minute

16  to talk with them and have them step out.

17          THE COURT:  All right.  Let's take care of

18  those matters and in the meanwhile let's bring the first

19  witness in.

20  RICHARD ROSEN, having been first duly sworn, testified as

21  follows on,

22                      DIRECT EXAMINATION

23  BY MS. ZANIN:

24  Q.   Good afternoon, Professor.  Could you please state

25  your name for the record?

1    A.    Richard Rosen.

2    Q.    Can you share your educational background with the

3    Court?

4    A.    I am a graduate of Vanderbilt University and I have a

5    JD degree from University of North Carolina School of Law.

6    Q.    Where are you currently employed?

7    A.    I'm a professor of law at UNC School of Law.

8    Q.    And do you hold any other positions with the law

9    school?

10   A.    At the present, no.  I was the senior associate dean,

11   but I am now in called the phase retirement program.  No

12   other positions.

13   Q.    Have you been affiliated with the Innocence Project at

14   the law school?

15   A.    I started the law school's Innocence Project back in

16   the late 1990's.

17   Q.    Did there come a time, Professor Rosen, when you

18   became aware of the case of State versus Ronnie Long?

19   A.    There was.  I got a call and then a visit in my office

20   from Mr. Pharr and I believe it was Mr. Long's sister came

21   to me and asked me whether I would consider looking at

22   Mr. Long's case.

23   Q.    And did you consider it?

24   A.    I told them that I would look at the transcript, read

25   whatever materials they have, and at least make a

1  preliminary determination whether there was any possibility
2  of doing anything with the case.
3  Q.   And ultimately did the Innocence Project decide to
4  look at the case?
5  A.   Well, if I may, the usual protocol was for, when
6  people made request for the students to -- it's a student
7  project.  It's a volunteer project which I supervise.
8  Usually what happens is we would send the case to the
9  students.  They would make a determination whether there
10 was a credible claim of innocence and any possibility of
11 further investigation of the case.  When I read the
12 transcript in this case I was able to skip that stage and
13 determine that it was a case worth pursuing, and I did that
14 on my own without sending it to the students.
15 Q.   Do you know an individual named Les Burns?
16 A.   Yes.  I know Les well and I have all my professional
17 career.
18 Q.   And how do you know Mr. Burns?
19 A.   When I was in law school, I guess it was from '74
20 through 1976 I was interning at the Julius Chambers Law
21 Firm and Les was a private investigator with that firm.  I
22 worked with him on some cases then.  After I graduated and
23 returned to North Carolina in 1980 I became involved in
24 some capital post conviction cases and some claims of
25 innocence and I worked very closely with Les on several of