**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| RONNIE WALLACE LONG, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 1:16CV539 |
| | ) | |
| FRANK LEE PERRY, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION, ORDER, AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Petitioner, a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Docket Entry 1.) Respondent has moved for summary judgment (Docket Entry 6) and Petitioner has requested leave to conduct discovery (Docket Entry 10). Because Petitioner has not exhausted his fingerprint-related Brady claim in state court, the undersigned United States Magistrate Judge will deny Petitioner's discovery request and will recommend that the Court dismiss his Petition without prejudice.

## I. Procedural History

On October 1, 1976, in the Superior Court of Cabarrus County, a jury found Petitioner guilty of first-degree rape and first-degree burglary in cases 76 CRS 5708 and 76 CRS 5709, respectively. (See Docket Entry 1 at 6; see also Docket Entry 7-34 at 5-6.)[1] The

---

[1] Page citations refer to the page numbers that appear in the footer appended to documents upon their docketing in the CM/ECF system.

trial court sentenced Petitioner to two concurrent life sentences. (Docket Entry 1 at 6.)

Petitioner appealed (see id.), alleging that the victim's pretrial identification qualified as impermissibly suggestive, see State v. Long, 293 N.C. 286, 289, 237 S.E.2d 728, 730 (1977), law enforcement officers unlawfully searched Petitioner's vehicle, see id. at 292, 237 S.E.2d at 731, and the trial court improperly admitted evidence of a latent shoe print, see id. at 295, 237 S.E.2d at 733. On October 11, 1977, the North Carolina Supreme Court found no prejudicial error. See id. at 296, 237 S.E.2d at 734 ("Evidence of [Petitioner's] guilt was clear. His convictions result from a trial free from prejudicial error. The verdicts and judgments of the trial court must therefore be upheld. No error.").[2] Petitioner did not thereafter seek review by the United States Supreme Court. (See generally Docket Entry 1 at 6.)

On August 1, 1986, Petitioner submitted a pro se motion for appropriate relief ("1986 MAR") to the Cabarrus County Superior Court, alleging that (1) law enforcement officers illegally searched Petitioner's vehicle (see Docket Entry 7-15 at 4-8); (2) the state improperly selected the jury venire on the basis of race

_____

[2] Because a conviction for first-degree rape carried a mandatory death sentence at the time of Petitioner's indictment in May 1976, see N.C. Gen. Stat. §§ 14-21 (1966), Petitioner's appeal of right lay in the North Carolina Supreme Court. On July 2, 1976, the United States Supreme Court struck North Carolina's death penalty statute as unconstitutional, which converted the sentence for first-degree rape to life imprisonment. See Woodson v. North Carolina, 428 U.S. 280, 301 (1976).

(see id. at 8-23); and (3) Petitioner received ineffective assistance of trial counsel in connection with the motions to quash the jury venire and to suppress evidence seized from Petitioner's vehicle, and Petitioner received ineffective assistance of appellate counsel generally (see id. at 23-28). Following appointment of counsel, Petitioner filed, through counsel, an amendment to his 1986 MAR, adding claims that (1) selection of the grand jury's foreperson qualified as racially discriminatory; (2) trial counsel provided ineffective assistance by failing to move for a change of venue or special venire; and (3) appellate counsel acted ineffectively by not arguing the race discrimination in jury pool selection claim on appeal. (See Docket Entry 7-17 at 48-49.) After a hearing, the Honorable Russell G. Walker, Jr., denied the 1986 MAR on the merits on July 8, 1988. (See id. at 48-53.) The North Carolina Supreme Court subsequently denied certiorari review. State v. Long, No. 530P88, 377 S.E.2d 228 (Mem.), 1989 WL 14003 (N.C. Jan. 4, 1989).

On April 24, 1989, Petitioner filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court, alleging that (1) the trial court improperly admitted evidence seized during an illegal search of Petitioner's vehicle (Docket Entry 7-41 at 5); (2) the trial court improperly interfered with Petitioner's challenge to the jury pool selection process (id.); and (3) Petitioner received ineffective assistance of trial counsel

3

generally and in regards to the challenge to the jury pool selection process (<u>id.</u> at 6). On May 3, 1990, United States District Judge N. Carlton Tilley, Jr., adopted United States Magistrate Judge Russell A. Eliason's recommendation of dismissal of Petitioner's Section 2254 petition on the merits, <u>Long v. Dixon</u>, Civ. No. C-89-278-S (M.D.N.C. May 3, 1990) (unpublished). (<u>See</u> Docket Entry 7-43.)

Years later, after enlisting the assistance of the University of North Carolina Innocence Project (<u>see</u> Docket Entry 7-25 at 49-50; Docket Entry 7-26 at 1-2), Petitioner filed, through pro bono (and later appointed) counsel, a Motion for Location and Preservation of Evidence in Cabarrus County Superior Court, specifically seeking any biological evidence taken from the victim and/or her home, the victim's clothing, hair samples taken from Petitioner, as well as the green toboggan law enforcement found in Petitioner's vehicle and any hair contained therein (Docket Entry 7-18). Petitioner also filed, through counsel, a Motion for DNA Testing, seeking to test any available biological evidence, including the hair in the green toboggan. (<u>See</u> Docket Entry 1-2 (hearing transcript on Motion for DNA Testing); <u>see also</u> Docket Entry 7-20 at 20-22 (state court's order denying Motion for DNA Testing).)[3] On May 23, 2005, the Honorable Erwin Spainhour granted

---

[3] The record does not contain a copy of Petitioner's Motion for DNA Testing.

Petitioner's Motion for Location and Preservation of Evidence, ordering the Cabarrus County District Attorney's office, the Concord Police Department ("CPD"), and the State Bureau of Investigation ("SBI") to locate and preserve all evidence. (Docket Entry 7-20 at 16-19.) In response, the SBI initially reported that it possessed no evidence related to Petitioner's case. (Docket Entry 7-21 at 23.)

At a subsequent hearing to determine whether new evidence existed, a sergeant with the CPD testified that he had located the master case file in Petitioner's case and a spiral evidence notebook. (See Docket Entry 1-2 at 5-13, 19-20.) On June 17, 2005, Judge Spainhour denied Petitioner's Motion for DNA Testing, but granted his counsel the right to examine the master case file and spiral notebook. (See Docket Entry 7-20 at 20-22.) The master case file contained two reports from an identification officer with the CPD, Van Isenhour, detailing items of evidence he had delivered to the SBI. (Docket Entry 1-5, ¶ 5; see also Docket Entry 7-37 at 3-8.) One undated report listed only the latent shoe print and inked impressions of the bottoms of Petitioner's shoes as items Isenhour had delivered to the SBI for testing. (Docket Entry 7-37 at 7-8.) The other report, dated May 12, 1976, listed numerous additional items of evidence Isenhour had delivered to the SBI for testing, including Petitioner's leather jacket, toboggan, and gloves, as well as paint samples, carpet fiber samples, a sample of

the victim's head and pubic hair, a sample of Petitioner's head and pubic hair, matchbooks from Petitioner's car, burned matches obtained from the scene, and the victim's clothing. (See Docket Entry 7-37 at 3-6.)[4]

On January 13, 2006, the SBI, with the assistance of the State Archives, located and provided Petitioner's counsel with copies of three SBI test reports (and associated handwritten notes) corresponding to the items of evidence detailed in Isenhour's May 12, 1976 report. (See Docket Entry 7-44; see also Docket Entry 7-36 at 31-51.) The newly disclosed SBI reports (and associated handwritten notes) revealed that SBI agents (1) compared a hair found at the scene with both the victim's and Petitioner's hair samples, and concluded that the hair from the scene did not match either individual (see Docket Entry 7-36 at 43-51); (2) examined Petitioner's leather jacket and gloves and did not find any trace of the paint or carpet fibers from the victim's home (see id. at 31-40); (3) evaluated the victim's clothing and did not find any of Petitioner's hairs thereon (see id. at 43-51); (4) compared the matchbooks from Petitioner's car with the burned matches from the scene, and found insufficient identifying characteristics to establish a linkage (id.); and (5) compared the latent shoe print with the inked impressions of Petitioner's shoe bottoms, and

_____

[4] The May 12, 1976 report also referenced a hair "appearing to be human in origin" found at the base of the victim's stairs where the rape occurred (see Docket Entry 7-37 at 3), but did not specifically list that hair as an item delivered by Isenhour to the SBI for testing (see id. at 5).

concluded that Petitioner's shoes could have made the shoe print, but that insufficient identifying characteristics existed to conclude that Petitioner's shoes did make the shoe print (see id. at 41-42).

In response to another order from Judge Spainhour to locate and preserve evidence (id. at 24-25), Northeast Medical Center (formerly Cabarrus Memorial Hospital) produced 26 pages of the victim's medical records from her hospitalization following the rape (see id. at 28). After in camera review, Judge Spainhour authorized the release of 11 pages of those medical records to Petitioner's counsel. (Id.; see also id. at 52-56; Docket Entry 7-37 at 1-2) Those records made clear that examining physician Dr. Lance Monroe prepared three slides of semen, took two swabs of vaginal secretions and placed them in test tubes, and took pubic combings from the victim. (See Docket Entry 7-20 at 30; Docket Entry 7-36 at 52-56; Docket Entry 7-37 at 1-2.) Subsequent orders from Judge Spainhour in 2007 to locate that biological evidence produced no results. (See Docket Entry 7-20 at 31-53.)

On August 29, 2008, Petitioner filed, through counsel, a second MAR ("2008 MAR") with the Cabarrus County Superior Court (Docket Entries 7-19 to 7-23), claiming that (1) the state failed to disclose exculpatory material to the defense in violation of Petitioner's right to a fair trial under the Due Process Clause of the United States Constitution, Article I, Section 19 of the North

Carolina Constitution, and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963); and (2) Petitioner discovered new evidence with a direct and material bearing on Petitioner's guilt or innocence under N.C. Gen. Stat. § 15A-1415(c) (<u>see</u> Docket Entry 7-19 at 1).[5] At the evidentiary hearing on Petitioner's 2008 MAR, Petitioner called (1) Richard Rosen, a professor at University of North Carolina Law School and founder of the school's innocence project (<u>see</u> Docket Entry 7-25 at 48-50; Docket Entry 7-26 at 1-12); (2) his trial counsel's investigator, Les Burns (<u>see</u> Docket Entry 7-26 at 12-73); (3) his trial counsel, Karl Adkins and James Fuller (<u>see</u> <u>id.</u> at 74-92; Docket Entry 7-27 at 1-30, 56-67; Docket Entry 7-28 at 1-35); (4) the assistant district attorney at Petitioner's trial, Ron Bowers (<u>see</u> Docket Entry 7-28 at 36-63); and (5) a rebuttal forensic evidence expert, Jeffrey Morris Hollifield (<u>see</u> Docket Entry 7-30 at 20-70).[6]

On February 25, 2009, the Honorable L. Donald Bridges denied Petitioner's claims under <u>Brady</u> and N.C. Gen. Stat. § 15A-1415(c), but granted sentencing relief on grounds not relevant to the instant Petition (which ultimately resolved in a manner unfavorable to Petitioner). (Docket Entry 7-31.) Petitioner, through new

---

[5] Petitioner also made two arguments relating to sentencing relief which do not bear on the instant Petition. (<u>See</u> Docket Entry 7-19 at 2-3.)

[6] Despite obtaining the 2008 MAR court's permission to procure the attendance at the hearing of Isenhour (<u>see</u> Docket Entry 7-24 at 5-11), Petitioner did not call Isenhour (or any other CPD officer involved in the case) as a witness at the evidentiary hearing (<u>see</u> Docket Entries 7-24 to 7-30).

counsel, submitted a petition for writ of certiorari to the North Carolina Supreme Court (Docket Entries 7-33 to 7-38), reasserting his Brady claim, and arguing that the state's failure to preserve the rape kit and the victim's clothing violated Arizona v. Youngblood, 488 U.S. 51 (1988), and California v. Trombetta, 467 U.S. 479 (1984) (see Docket Entry 7-33 at 3-5, 21-63). On February 4, 2011, the North Carolina Supreme Court issued a three-three per curiam decision, with one justice abstaining, resulting in affirmance of the trial court's denial of Petitioner's 2008 MAR. See State v. Long, 365 N.C. 5, 705 S.E.2d 735 (2011).

On February 3, 2012, Petitioner submitted, through North Carolina Prisoner Legal Services counsel, a second petition for a writ of habeas corpus under Section 2254 to this Court, alleging a Brady claim. Long v. Lancaster, No. 1:12CV119, Docket Entry 1 (M.D.N.C. Feb. 3, 2012). On August 2, 2012, the Honorable Catherine C. Eagles dismissed the action as successive, as Petitioner had not first applied to the United States Court of Appeals for the Fourth Circuit for permission to file a second or successive petition. Long v. Lancaster, No. 1:12CV119, 2012 WL 3151179 (M.D.N.C. Aug. 2, 2012) (unpublished).

Thereafter, at Petitioner's counsel's request, the North Carolina Innocence Inquiry Commission ("NCIIC") agreed to review his case under the Postconviction DNA Testing Assistance Program.

(See Docket Entry 1-5, ¶ 7; see also Docket Entry 9-3.)[7]  Upon

inquiry by the NCIIC, the CPD located three envelopes containing 43

latent fingerprint lifts the CPD had taken from the scene.  (See

Docket Entry 9-3 at 2; see also Docket Entry 1-1.)  An independent

expert analyzed the prints, and excluded Petitioner and several

alternate suspects as sources of the prints.  (See Docket Entry 9–3

at 2.)[8]  Additionally, the CPD ran the four latent fingerprint

lifts of sufficient value to test through an Automated Fingerprint

Identification System ("AFIS"), which returned "no possible

contributors" for the lifts.  (See Docket Entry 1-1.)  The NCIIC

provided Petitioner's new (and current) counsel with the Duke

University Wrongful Convictions Clinic with a copy of the CPD's

report reflecting the AFIS queries.  (See Docket Entry 9-3 at 2.)

On July 30, 2015, the NCIIC decided not to pursue Petitioner's

case, because of the lack of evidence appropriate for DNA testing.

(Id.)  Shortly thereafter, Petitioner requested a copy of the

NCIIC's file in his case (which also contained the Cabarrus County

District Attorney's file and the CPD's file in Petitioner's case),

but the District Attorney, Roxann Vaneekhoven, refused to consent

---

[7] The North Carolina Administrative Office of the Courts established the eight-member NCIIC as a state agency in 2006 for the purpose of "investigat[ing] and evaluat[ing] post-conviction claims of factual innocence." www.innocencecommission-nc.gov (last visited Nov. 23, 2016); see also N.C. Gen. Stat. § 15A-1460-75.

[8] According to Petitioner, CPD records previously provided to the defense included information about only one of the alternate suspects. (See Docket Entry 9 at 7.)

to release of the District Attorney's file and the CPD's file. (See Docket Entry 9-2 at 2.) The NCIIC also refused to consent to production of its file due to the "undu[e] burden[] for [the NCIIC] to separate out investigative materials and documents related to [the District Attorney's and CPD's] files from the [NCIIC's] files." (Id.)

On April 4, 2016, Petitioner filed, through his current counsel, a motion under 28 U.S.C. § 2244 in the Fourth Circuit for an order authorizing this Court to consider a second or successive petition under Section 2254. In re: Ronnie Wallace Long, No. 16-295, Docket Entry 2 (4th Cir. Apr. 4, 2016). The Fourth Circuit granted that motion. (Docket Entry 1-6.) Thereafter, Petitioner, proceeding through counsel, filed the instant Petition in this Court. (Docket Entry 1.) Respondent moved for summary judgment both on the merits and on the procedural grounds of successiveness, non-exhaustion, and untimeliness (Docket Entries 6, 7), Petitioner responded (Docket Entry 9), and Respondent replied (Docket Entry 12). Petitioner subsequently filed a Motion for Leave to Conduct Discovery (Docket Entry 10) (with a memorandum in support (Docket Entry 11)), which Respondent opposed (Docket Entry 13), whereupon Petitioner replied (Docket Entry 14).

## II. **Petitioner's Claims**

The Petition nominally identifies two grounds for relief: 1) Petitioner's "credible claim of actual innocence creates a 'gateway' to federal habeas relief" (Docket Entry 1 at 39 (bold font and capitalization omitted)); and 2) "the state violated Petitioner's constitutional rights under <u>Brady v. Maryland</u> by failing to disclose SBI reports and notes, the victim's medical records, and Detective Isenhour's Reports" (<u>id.</u> at 54 (bold font and capitalization omitted)).  However, elsewhere, the Petition describes "[t]he evidence withheld from defense counsel at trial" as including certain biological evidence taken from the victim, four SBI reports, "[a]nd latent fingerprints discovered in 2015." (<u>Id.</u> at 3; <u>see also</u> <u>id.</u> at 67-68 (arguing for relief under <u>Brady</u> based on "the additional consideration of the newly discovered latent fingerprint evidence discovered by the defense in 2015").)

## III. **Facts**

On direct appeal, the North Carolina Supreme Court described the trial evidence as follows:

> The State offered evidence tending to show that on the evening of 25 April 1976, [the victim], a fifty-four-year-old widow, was alone in her home [in] Concord.  She walked into her den around 9:30 p.m. and was grabbed from behind by a black man wearing a black leather jacket, black gloves, and a green toboggan cap covering his ears but not his face.  He threw her onto the floor, put a knife at her throat, and demanded money. He pushed her into her bedroom to her bed, where she rummaged through her pocketbook only to find that her money was gone.  He then shoved her into a lighted hall, threw her onto the floor, and raped her.  Other sordid

12

details concerning [the assailant's] acts, not necessary to decision, are omitted. The assault continued until the phone rang, at which time the assailant jumped up and left. [The victim] then ran unclothed out the back door to her neighbor's home, and was rushed by ambulance to the hospital.

A gynecologist found live active spermatozoa in her vagina, as well as numerous scratches and bruises on her face and body.

[Petitioner] offered evidence tending to show that on Sunday, 25 April 1976, [he] attended a class reunion planning meeting. He made arrangements with friends to go to Charlotte later that night. [Petitioner's] mother[] testified that her son was at home from around 8:30 p.m. until after 10:00 p.m. Mrs. Long, [Petitioner] and [Petitioner's girlfriend] participated in a phone conversation which lasted about forty-five minutes. [Petitioner's girlfriend] indicated that she called the Long residence at 9:00 p.m. She said that she and her son talked with [Petitioner] and Mrs. Long until 9:45 p.m. Shortly after 10:00 p.m., [Petitioner's] father returned home with the car and [Petitioner] left for a party in Charlotte.

. . . .

[O]n 5 May 1976 officers came to [the victim's] house and requested her to come and sit in district court to see if there might be a man she could recognize as her assailant. The officers told her that they did not know who would be in court, and that she may have to come to court on two or more occasions before she could identify anyone. [The victim] went to the courthouse on 10 May and talked with officers before entering the courtroom. Again, they made no suggestion to her that [Petitioner] or anyone else in particular would be in the courtroom. They simply told her to sit in the courtroom and look around and see if she could recognize the man who raped her. [The victim] entered the courtroom with her friend . . . and sat apart from the officers. There were as many as sixty people in the courtroom, and as many as a dozen black males. [The victim] testified that when the judge called the name Ronnie Wallace Long, a name she had never heard before, a man she recognized as her assailant walked down the aisle past her. She testified that she immediately recognized him, and that, without prompting,

she motioned to police that [Petitioner] was the
man. . . .

[A]fter the courtroom identification the police took [the
victim] to the station and showed her six or eight
photographs, and once again, without prompting, she
identified [Petitioner].  She also testified that
officers did not point out any particular picture to her,
and that she recognized [Petitioner] from seeing him at
the time of the assault. . . .

[Petitioner] agreed to [a] search [of his vehicle on 10
May 1976] . . . .  Upon search, [an officer] found a
green toboggan cap under the front seat, and a pair of
black leather gloves over the sun visor.  [Petitioner]
was wearing a black leather jacket.  [The victim]
described the jacket, the toboggan cap and the gloves as
similar or identical to those worn by [her assailant] at
the time of the assault. . . .

[According to] an expert on prints, . . . [a] shoe print
[lifted from the banister of the front porch of the
victim's home near a post leading to the roof which
provided access to an unlocked, second-story window above
the porch] . . . could have been made by shoes worn by
and taken from [Petitioner] at the time of his arrest.

Long, 293 N.C. at 288, 290, 292, 295, 237 S.E.2d at 729, 730-31,

732, 733-34.

## IV. <u>Discussion</u>

**A. Exhaustion**

Respondent argues in support of his motion for summary

judgment that "any claim for relief based upon [the] 2015 discovery

of latent fingerprints[] is non-exhausted and Respondent[] [does]

not waive non-exhaustion." (Docket Entry 7 at 22 (citing N.C. Gen.

Stat. §15A-1415(c) (providing that "a defendant at any time after

verdict may by a [MAR], raise the ground that evidence is available

which was unknown or unavailable to the defendant at the time of

trial, which could not with due diligence have been discovered or made available at that time, . . . and which has a direct and material bearing upon the defendant's . . . guilt or innocence"), 28 U.S.C. § 2254(b)(1)(A) (declaring that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State"), and Rose v. Lundy, 455 U.S. 509, 522 (1982) ("hold[ing] that a district court must dismiss habeas petitions containing both unexhausted and exhausted claims")).) In response, Petitioner does not expressly address exhaustion, but argues, more generally, that "[a] petitioner's otherwise defaulted claims, including those filed outside of the one-year statute of limitations under [the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")] or where facts are not first developed in state court, are excused when a petitioner satisfies the actual innocence gateway." (Docket Entry 9 at 8 (citing Schlup v. Delo, 513 U.S. 298, 319-22, and McQuiggin v. Perkins, ___ U.S. ___, 133 S. Ct. 1924 (2013)) (emphasis added).)[9]

---

[9] By describing "otherwise defaulted claims" (Docket Entry 9 at 8), Petitioner does not appear to contest Respondent's position that the matter of the 2015 disclosure regarding latent fingerprints rises to the level of a new Brady claim not presented to the state courts, as opposed to new evidence that merely bolsters the Brady claim that the state courts already adjudicated on the merits. Moreover, Petitioner separately listed the "latent fingerprints discovered in 2015" as an item of suppressed evidence in his Petition. (Docket Entry 1 at 3.) Under such circumstances, Petitioner's assertions about the 2015 disclosure regarding latent fingerprints constitute a new claim under Brady. See

Thus, Petitioner and Respondent apparently disagree regarding whether a <u>Brady</u> claim founded on the 2015 disclosure regarding latent fingerprints would constitute an unexhausted claim or a procedurally defaulted claim. <u>See</u> <u>Morabito v. Krysevig</u>, No. 06-1415, 2007 WL 2071889, at *2 (E.D. Pa. July 18, 2007) (unpublished) (remarking that, "however much they may overlap in practice, exhaustion and procedural default are analytically distinct categories, and the excuses of 'cause and prejudice' or 'miscarriage of justice' are only applicable to procedural default"). Petitioner must exhaust available state court remedies before this Court can consider granting relief on a federal habeas claim, unless "there is an absence of available State corrective process[] or . . . circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1); <u>see also</u> <u>Engle v. Issac</u>, 456 U.S. 107, 125 n.28 (1982) (exhaustion "refers only to remedies still available at the

---

DeMoss v. McCollum, No. 13-CV-0202-JED-PJC, 2016 WL 204497, at *4 (N.D. Okla. Jan. 15, 2016) (unpublished) (holding that, although "'not every new piece of evidence makes a claim a new one,' new evidence not presented to the state courts may be sufficient to convert a claim formerly raised in state court proceedings into a new claim that was not adjudicated on the merits – thus rendering the petition a mixed petition – if the 'new evidence so changes the legal landscape that the state court's prior analysis no longer addresses the substance of [Petitioner's] claim.'" (quoting <u>Fairchild v. Workman</u>, 579 F.3d 1134, 1148-49 (10th Cir. 2009)); <u>see also</u> <u>Cullen v. Pinholster</u>, 563 U.S. 170, 186 n.10 (2011) (observing that dissenting "Justice [Sotomayor's] hypothetical involving new evidence of withheld exculpatory witness statements may well present a new claim," but declining to "decide where to draw the line between new claims and claims adjudicated on the merits" (internal citation omitted)); <u>Sells v. Stephens</u>, 536 F. App'x 483, 491 (5th Cir. 2013) (noting that the court had "consistently refused to consider a habeas petitioner's claims exhausted where the petitioner . . . offers new evidence that could not have been derived from the state court record").

16

time of the federal petition"). If an avenue for pursuing a non-exhausted claim in the state courts remains available, a federal court will generally decline habeas review, see Browne v. Heath, No. 11 CV 1078 DLI, 2014 WL 8390320, at *14 (E.D.N.Y. Aug. 25, 2014) (unpublished), recommendation adopted, No. 11-CV-1078 DLI CLP, 2015 WL 1469182 (E.D.N.Y. Mar. 30, 2015) (unpublished); conversely, where no potential avenue in the state courts exists for a claim, requiring its presentation in the state courts would amount to an exercise in futility, see Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001). Under such circumstances, the claim faces a procedural bar, and Petitioner must demonstrate cause for the default and actual prejudice, or that failure to consider the defaulted claim would amount to a fundamental miscarriage of justice (such as in the case of actual innocence). See Coleman v. Thompson, 501 U.S. 722, 748-50 (1991).

In this case, neither party disputes that the state courts have not had an opportunity to consider Petitioner's Brady claim based on the 2015 disclosure regarding latent fingerprints. (See Docket Entry 7 at 22; see also Docket Entry 9 at 8.) Thus, the analysis narrows to whether avenues remain in state court for Petitioner to bring his fingerprint-based Brady claim. See Browne, 2014 WL 8390320, at *14. Under North Carolina's post-conviction relief procedure, Petitioner can raise at any time in a MAR "the ground that evidence is available which was unknown or unavailable

17

to [Petitioner] at the time of trial, which could not with due diligence have been discovered or made available at that time, . . . and which has a direct and material bearing upon the [Petitioner's] . . . guilt or innocence." N.C. Gen. Stat. § 15A-1415(c). Moreover, North Carolina's rules for procedural default would not bar Petitioner's fingerprint-based <u>Brady</u> claim under the circumstances presented here. <u>See</u> N.C. Gen. Stat. § 15A-1419(a) (providing as grounds for denial of MAR that, upon a previous MAR or appeal, the petitioner "was in a position to adequately raise the ground or issue underlying the present motion but did not do so"). Thus, Petitioner's fingerprint-based <u>Brady</u> claim qualifies as unexhausted, but not procedurally defaulted.

Respondent urges the Court to deny Petitioner's fingerprint-based <u>Brady</u> claim on its merits, notwithstanding the failure to exhaust, under 28 U.S.C. § 2254(b)(2). (<u>See</u> Docket Entry 7 at 22-23.) However, given that Petitioner (as discussed in subsection IV.B.) has requested leave to conduct discovery regarding his <u>Brady</u> claim based on the 2015 disclosure regarding latent fingerprints, the Court should decline to exercise its discretion to deny the claim on its merits and instead should allow Petitioner to return to state court to develop the claim. <u>See</u> <u>Carter v. Ballard</u>, No. 2:14-CV-11952, 2015 WL 966127, at *13 (S.D.W. Va. Mar. 4, 2015) (unpublished) (noting that "[m]any of [the petitioner's] unexhausted claims relate to ineffective assistance of counsel, and

the record for these claims has yet to be developed in state habeas proceedings," and that, absent such development, "at this stage, the court is not in a position to definitively determine that [the petitioner's] ineffective assistance of counsel claims lack merit"); <u>Ward v. Trent</u>, 19 F. Supp. 2d 608, 613 (S.D.W. Va. 1998) (observing that, although "a district court has the authority to deny a petitioner's unexhausted habeas claims on the merits, . . . principles of comity, federalism and fairness favor exhaustion in state court unless it is obvious that the petitioner is not presenting a colorable federal claim or some other extreme circumstance is present" (internal quotation marks omitted)), <u>aff'd in part, dismissed in part on other grounds</u>, No. 98-7267, 188 F.3d 505 (table), 1999 WL 638606 (4th Cir. Aug. 23, 1999) (unpublished).

In the event that a federal habeas petitioner presents a "mixed petition" consisting of both exhausted and unexhausted claims, the district court may (1) dismiss the petition in its entirety without prejudice; (2) order a stay and abeyance while the petitioner exhausts his claims in state court; or (3) allow the petitioner to remove the unexhausted claims and proceed with the exhausted claims. <u>Rhines v. Weber</u>, 544 U.S. 269, 277–78 (2005). In regards to stay and abeyance, the court noted that, "[a]s the result of the interplay between AEDPA's 1-year statute of limitations and <u>Lundy</u>'s dismissal requirement, petitioners who come to federal court with 'mixed' petitions, run the risk of forever

losing their opportunity for any federal review of their unexhausted claims." Rhines, 544 U.S. at 275. "The [Rhines court] recognized, however, that applying the 'stay and abeyance' procedure could undermine Congress' design in the AEDPA to encourage finality in criminal proceedings and to streamline the federal habeas process." Al-Amin v. Stevenson, No. CA 0:10-2023-CMC-PJG, 2011 WL 3439531, at *1 (D.S.C. Aug. 5, 2011) (unpublished). Thus, "[t]o obtain a stay of a mixed petition, the petitioner must show 'good cause' for failing to exhaust his state remedies, that his unexhausted claims are potentially meritorious, and that he has not engaged in dilatory tactics." Id. (quoting Rhines, 544 U.S. at 278). "[T]he practice of staying a federal habeas case while a petitioner returns to state court to exhaust his claims should be used sparingly." Kanode v. Waid, No. 1:08–1113, 2011 WL 2633645, at *1 (S.D.W. Va. July 5, 2011) (unpublished).

Many federal district courts have found good cause for a stay where any subsequent federal habeas petition, filed after exhaustion of state remedies, would face a potential time bar. See, e.g., Smith v. Wolfe, No. PJM–10–2007, 2011 WL 4548315, at *6 (D. Md. Sept. 27, 2011) (unpublished); Clement v. Blair, No. 06–00351, 2007 WL 57782, at *3 (D. Haw. Jan. 5, 2007) (unpublished). However, by logical extension, other courts have held that, if the AEDPA statute of limitations already bars a

petitioner's unexhausted federal habeas claims, such that the petitioner must rely upon equitable tolling, see Holland v. Florida, 560 U.S. 631, 645 (2010), or the actual innocence exception to the limitations period, see McQuiggin, ___ U.S. at ___, 133 S. Ct. at 1928, 1931-33, no good cause for a stay exists. See Doe v. Jones, 762 F.3d 1174, 1182-83 (10th Cir. 2014) ("In light of McQuiggin, petitioner here does not face a similar dilemma to the . . . petitioners in the other courts finding that the Rhines good cause standard was met. If petitioner does have a substantial actual innocence claim, . . . under McQuiggin the existence of such a claim will serve as an exception to the AEDPA statute of limitations and he therefore does not have a legitimate concern that the claim will be time barred in federal court."), cert. denied sub nom. Doe v. Patton, ___ U.S. ___, 135 S. Ct. 1424 (2015); accord Long v. Ballard, No. 2:13-cv-26, 2013 WL 6858415, at *6 (N.D.W. Va. Dec. 30, 2013) (unpublished).

In the instant case, Respondent has argued that, to the extent Petitioner alleges a Brady claim based on "the victim's medical records provided to [Petitioner] on 12 July 2005, the [CPD master case] file provided to [Petitioner] in July of 2005, and the SBI file provided to [Petitioner] (through counsel) on 13 January 2006" (the "SBI Brady claim") (Docket Entry 7 at 22), such a claim

qualifies as time-barred (see id. at 23-24).[10]  In response, Petitioner argues that "the actual innocence gateway overcomes Respondents' [sic] affirmative defenses," and that claims "filed outside of the one-year statute of limitations under AEDPA . . . are excused when a petitioner satisfies the actual innocence gateway." (Docket Entry 9 at 8 (citing McQuiggin, ___ U.S. at ___, 133 S. Ct. at 1931-32, and Schlup, 513 U.S. at 319-22).)  Thus, Petitioner has conceded that his SBI Brady claim already faces a time bar, and that he must rely on the actual innocence gateway to overcome that bar.  (Id.)  Under such circumstances, no good cause exists for this Court to stay the case pending Petitioner's exhaustion of his fingerprint-based Brady claim in the state courts.  See Doe, 762 F.3d at 1182-83; Long, 2013 WL 6858415, at *6.

In conclusion, the Court should dismiss the Petition without prejudice to enable Petitioner to exhaust his fingerprint-based Brady claim in the state courts.

---

[10] A letter dated July 30, 2015, from the Associate Director of the NCIIC to Petitioner's current counsel, notified counsel that the CPD had located three envelopes of latent fingerprints from the crime scene, and provided counsel with a copy of the CPD's latent fingerprint AFIS query report. (Docket Entry 9-3.) Although the record does not clarify that this letter reflects the date of counsel's first knowledge of the CPD's discovery of latent fingerprint evidence, the Court need not determine that date or the timeliness of Petitioner's Brady claim based on the fingerprint evidence.  As discussed above, that claim remains unexhausted, and the Court should decline to review it at this time.

**B.    Motion for Leave to Conduct Discovery**

Petitioner has moved for discovery under Rule 6 of the Rules Governing Section 2254 Cases on the following topics:

> (i) the late disclosed crime scene fingerprints; (ii) potential alternative suspects identified in the files of the [NCIIC], CPD, and the [District Attorney's] [o]ffice; (iii) the completeness of the State's compliance with obligations under <u>Brady</u> following the untimely disclosure of suspect fingerprints and the 2005 production of favorable, exculpatory SBI lab reports; and (iv) files and communications between agencies regarding alternate suspects and crime scene evidence that provided no match to [Petitioner].

(Docket Entry 10 at 4.)

Petitioner seeks to pursue those topics by "obtain[ing] files from the [CPD], the [NCIIC], and the District Attorney's Office for Cabarrus County, and [by] tak[ing] the depositions of . . . former [CPD] detective Van Isenhour and District Attorney Roxanne [sic] Vaneekhoven[,] . . . the [CPD,] and the [NCIIC]." (<u>Id.</u> at 1; <u>see also</u> Docket Entry 11 at 6-7 ("[Petitioner] seeks production of the following documents: (1) [NCIIC] file for Petitioner's case; (2) Cabarrus County [District Attorney's] file for Petitioner's case; (3) [d]ocuments related to any fingerprint match search conducted in connection with the underlying criminal case and/or Petitioner's innocence claim; and (4) [a]ny files and communications between agencies regarding alternate suspects and crime scene evidence that provided no match to [Petitioner].").) Respondent opposes discovery, arguing that Petitioner has failed to demonstrate good cause for his requests. (<u>See</u> Docket Entry 13.)

23

"Unlike other civil litigants, a § 2254 habeas petitioner 'is not entitled to discovery as a matter of ordinary course.'" Stephens v. Branker, 570 F.3d 198, 213 (4th Cir. 2009) (quoting Bracy v. Gramley, 520 U.S. 899, 904 (1997)).  Instead, to conduct discovery, a habeas petitioner "must provide reasons for the request," Rule 6(b), Rules Governing Sect. 2254 Proceedings, that establish "good cause," Rule 6(a), Rules Governing Sect. 2254 Proceedings.  "A showing of good cause must include specific allegations suggesting that the petitioner will be able to demonstrate that he is entitled to habeas corpus relief." Stephens, 570 F.3d at 204.  Moreover, "[a]n evidentiary hearing is not a fishing expedition for facts as yet unsuspected, but is instead an instrument to test the truth of facts already alleged in the habeas petition."  Lenz v. Washington, 444 F.3d 295, 304 (4th Cir. 2006) (internal quotation marks and citation omitted).

1.  Discovery Related to the SBI Brady Claim

Petitioner seeks discovery regarding "the completeness of the State's compliance with obligations under Brady following . . . the 2005 production of favorable, exculpatory SBI lab reports; and files and communications between agencies regarding . . . crime scene evidence that provided no match to [Petitioner]."  (Docket Entry 10 at 4 (internal parenthetical numbering omitted).)  To the extent these topics encompass evidence related to Petitioner's SBI Brady claim, Petitioner lacks good cause for such discovery.

As an initial matter, given the recommendation of dismissal without prejudice pending exhaustion of the fingerprint-related Brady claim, discovery should not proceed in federal court unless and until Petitioner presents an entirely exhausted petition for review. See Christian v. White, No. CV 04-00743 DAE-LEK, 2007 WL 4611303, at *3 (D. Haw. Feb. 6, 2007) (unpublished) (finding that "a court should not grant a discovery request if the habeas petition . . . involves both exhausted and unexhausted claims" (internal quotation marks omitted)). Alternatively, the United States Supreme Court has made clear that, "[a]lthough state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme [as codified in § 2254] is designed to strongly discourage them from doing so." Cullen v. Pinholster, 563 U.S. 170, 186 (2011) (emphasis added). In this regard, if a state prisoner's petition under § 2254:

> includes a claim that has been "adjudicated on the merits in State court proceedings" . . . that [petition] "shall not be granted with respect to such a claim unless the adjudication of the claim":
>
>> "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Id. at 181 (quoting 28 U.S.C. § 2254(d)) (internal brackets and ellipses omitted). "This is a difficult to meet and highly

deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Id. (internal citations and quotation marks omitted).[11]

In light of that principle, the <u>Cullen</u> Court held that, "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on <u>the record that was before that state court</u>." Id. at 185 (emphasis added). Because "§ 2254(d)(2) includes the language 'in light of the evidence presented in the State court proceeding,'" the restriction of federal review under that provision to the state court record applies with "additional clarity." Id. at 185 n.7. Thus, any new evidence unearthed during discovery in federal court and "later introduced in federal court is irrelevant to § 2254(d)(1) [and (2)] review," id. at 184. In other words, because the state court adjudicated Petitioner's SBI <u>Brady</u> claim on the merits, and Petitioner must satisfy the terms of § 2254(d), "good cause" does not exist for the discovery Petitioner seeks (at least prior to the analysis required under § 2254(d)), because this Court may look only to the state court record in applying § 2254(d).[12]

---

[11] "Section 2254(d) applies even where there has been a summary denial [of the claim in state court]." <u>Cullen</u>, 563 U.S. at 187.

[12] Even if this Court ultimately concluded that the state court's determination of Petitioner's SBI <u>Brady</u> claim fell short under § 2254(d), it could grant Petitioner relief only after applying the harmless error analysis set forth in <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993). <u>See</u> <u>Bauberger v. Haynes</u>, 632 F.3d 100, 103-05 (4th Cir. 2011) (citing, inter alia, <u>Fullwood v.</u>

A second reason supports a finding that Petitioner has not shown good cause for certain discovery related to the SBI <u>Brady</u> claim. Petitioner seeks to depose Isenhour. (<u>See</u> Docket Entry 11 at 6.) However, at the hearing on Petitioner's 2008 MAR, Petitioner specifically requested and received the permission of the state court to obtain a certificate to procure the attendance of Isenhour, who resided outside of North Carolina at that time. (<u>See</u> Docket Entry 7-24 at 5-11.) Moreover, the record reflects that the lead CPD officer involved in the investigation of the underlying crimes, Sergeant David Taylor, attended the hearing on the 2008 MAR. (<u>See</u> Docket Entry 7-25 at 15-21.) Thus, Petitioner had the opportunity to call Isenhour and/or Taylor as witnesses and question them about their compliance with <u>Brady</u> at the time of trial, their efforts to comply with the state court's 2005 order to locate and preserve evidence, and their knowledge of any files and

---

<u>Lee</u>, 290 F.3d 663, 678-83 (4th Cir. 2002)). Conceivably, after <u>Cullen</u>, the Court could look outside the state court record to perform that function, provided Petitioner satisfied the requirements of § 2254(e)(2). <u>See generally</u> <u>Hearn v.</u> <u>Ryan</u>, No. CV-08-448-PHX-MHM, 2011 WL 1526912 (D. Ariz. Apr. 21, 2011) (unpublished). Similarly, in appropriate circumstances, courts may consider matters outside of the state court record in connection with a gateway actual innocence claim. <u>See</u> <u>Cristin v. Brennan</u>, 281 F.3d 404, 417 n.14 (3d Cir. 2002) (holding that § 2254(e)(2) does not bar evidentiary hearings on whether a petitioner can establish cause and prejudice or actual innocence to excuse procedural default); <u>see also</u> <u>Smith v. Wasden</u>, No. CV 08-227-S-EJL, 2010 WL 672745, at *3-4 (D. Idaho Feb. 22, 2010) (unpublished) (declaring that "[t]he general rule prohibiting new factual development on substantive claims in 28 U.S.C. § 2254(e)(2) is not applicable to gateway procedural issues"). Given that the Court does not yet have before it a totally exhausted habeas petition, the Court cannot assess whether the interests of judicial economy favor proceeding directly to the § 2254(d) analysis (which would not depend upon additional discovery) or beginning with consideration of the gateway actual innocence question (which might involve additional discovery). Such considerations render any request for discovery in federal court on Petitioner's gateway actual innocence claim premature.

communications with other agencies regarding crime scene evidence submitted to the SBI that did not inculpate Petitioner.  However, Petitioner chose not to call those individuals as witnesses at the 2008 MAR hearing (see Docket Entries 7-24 to 7-30), a decision which forecloses a finding of good cause.  See Isaacs v. Head, 300 F.3d 1232, 1250 (11th Cir. 2002) (observing that the petitioner did "not explain why the discovery that he seeks now is any different from the discovery that was available to him in state courts" and that, under such circumstances, "the district court properly denied the petitioner's request to conduct additional discovery . . . because he [did not] show[] 'good cause' as required by Rule 6(a)").[13]

Moreover, Petitioner specifically seeks to depose Vaneekhoven; however, she did not participate in Petitioner's trial and thus does not have first-hand knowledge of compliance with Brady at that time.  (See Docket Entries 7-3 to 7-14.)  To the extent Petitioner now wishes to question Vaneekhoven regarding compliance with the state court's 2005 order to locate and preserve evidence, at least with regard to the evidence sent to the SBI, Petitioner's counsel could have identified Vaneekhoven as a material witness and moved to have her conflicted out of representing the state in advance of

---

[13] Given Petitioner's opportunity at the 2008 MAR hearing to call Isenhour and/or Taylor as witnesses, the record flatly contradicts Petitioner's statement in his memorandum in support of his motion for discovery that he "has not been permitted to question under oath any responsible official about why Brady material was first disclosed in 2005 . . . ."  (Docket Entry 11 at 3 (emphasis added).)

(and required to testify at) the 2008 MAR hearing.  Again, Petitioner's failure to pursue this avenue while in state court renders good cause for such discovery in federal court lacking. See Isaacs, 300 F.3d at 1250.[14]

2.   Discovery Related to the Fingerprint <u>Brady</u> Claim

Petitioner also seeks discovery on "(i) the late-disclosed crime scene fingerprints; (ii) potential alternative suspects identified in the files of the [NCIIC], CPD, and the [District Attorney's] [o]ffice; (iii) the completeness of the State's compliance with obligations under <u>Brady</u> following the untimely disclosure of suspect fingerprints . . .; and (iv) files and communications between agencies regarding alternate suspects . . . ." (Docket Entry 10 at 4.)  The Court will deny Petitioner's request for discovery on these topics.

On June 17, 2005, the state court granted Petitioner's counsel the right to examine the CPD's master case file (Docket Entry 7-20 at 20-22), which contained the two reports from Isenhour describing items of evidence he had delivered to the SBI (Docket Entry 1-5, ¶ 5; <u>see also</u> Docket Entry 7-37 at 3-8).  In the more detailed of

---

[14] Petitioner's failure to call Isenhour, Taylor, and/or Vaneekhoven as witnesses at the 2008 MAR hearing, at least in regards to his SBI <u>Brady</u> claim, also implicates the statutory bar against an evidentiary hearing on federal habeas review: "If the [petitioner] has failed to develop the factual basis of a claim in State court proceedings, the court <u>shall not</u> hold an evidentiary hearing on the claim unless the [petitioner] shows that the claim relies on a factual predicate that could not have been previously discovered through the exercise of due diligence; and the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the [petitioner] guilty of the underlying offense."  28 U.S.C. § 2254(e)(2) (emphasis added).

the two reports, Isenhour reported that "[a] total of <u>68 latent</u> <u>lifts were recovered from the crime scene</u> (interior and exterior)" and that "<u>[a]ll prints have been repeat[ed]ly checked against</u> <u>suspect(s)</u> and no identifications have been made from the latents." (Docket Entry 7-37 at 4 (emphasis added).)[15]  Thus, by mid-2005, Petitioner had notice that Isenhour obtained latent fingerprint lifts from the crime scene, as well as comparisons of those lifts to "suspect(s)." (<u>Id.</u>)  Again, at the 2008 MAR hearing, Petitioner chose not to call Isenhour and question him under oath about those fingerprints and/or any "suspect(s)."  Arguably, then, Petitioner lacks good cause for his requests for such information in this Court.  <u>See</u> <u>Isaacs</u>, 300 F.3d at 1250.

Setting that consideration aside, Petitioner still cannot demonstrate good cause for his fingerprint/alternate suspect-based discovery requests.  As discussed above, Petitioner's fingerprint-based <u>Brady</u> claim remains unexhausted, and persuasive authority supports the denial of discovery for unexhausted claims.  <u>See, e.g</u>, <u>Saucedo v. Brazelton</u>, No. 13-cv-01696-SI, 2015 WL 4481795, at *2 (N.D. Cal. July 22, 2015) (unpublished) (declaring that "[t]he right to federal discovery presupposes the presentation of an . . . exhausted federal claim" (internal quotation marks omitted)); <u>Brown</u> <u>v. Aud</u>, No. 2:09-CV-10735, 2015 WL 574875, at *2 (E.D. Mich. Feb.

---

[15] The other report reflects that "the crime scene was processed for latent prints of value, using conventional methods of dusting and lifting" and that "[n]umerous prints were lifted, with some being eliminated by [Isenhour] as those of the victim . . . ." (Docket Entry 7-37 at 7.)

11, 2015) (unpublished) (holding the petitioner not entitled to discovery because his <u>Brady</u> claim remained unexhausted); <u>Sherman v. McDaniel</u>, 333 F. Supp. 2d 960, 969 (D. Nev. 2004) (refusing to "grant the sort of wide-ranging discovery sought by [the] petitioner without a showing that he has exhausted in state court, and has not procedurally defaulted, the claims on which his proposed discovery is based" and observing that to grant the discovery "would tend to undermine the exhaustion requirement, and the doctrine of federal-state comity on which it rests"); <u>see also Keeney v. Tamayo-Reyes</u>, 504 U.S. 1, 9 (1992) ("The state court is the appropriate forum for resolution of factual issues in the first instance . . . ."), <u>superceded by statute on other grounds as stated in</u> <u>Williams v. Taylor</u>, 529 U.S. 420, 432-34 (2000); <u>Greene v. McDaniel</u>, No. 2:07CV304-RLH-GWF, 2009 WL 311168, at *5 (D. Nev. Feb. 6, 2009) (unpublished) ("State court] is the appropriate forum for [the] petitioner's discovery request, at least in the first instance." (citing <u>Keeney</u>)).

Accordingly, the Court will deny Petitioner's Motion for Leave to Conduct Discovery.

## V.   <u>Conclusion</u>

Petitioner has not exhausted his fingerprint-related <u>Brady</u> claim and has not shown good cause for discovery.

**IT IS THEREFORE ORDERED** that Petitioner's Motion for Leave to Conduct Discovery (Docket Entry 10) is **DENIED.**

**IT IS RECOMMENDED** that Respondent's Motion for Summary Judgment (Docket Entry 5) be granted in part and denied in part, in that Judgment be entered dismissing this action without prejudice pending Petitioner's exhaustion of his fingerprint-based <u>Brady</u> claim in the state courts, without issuance of a certificate of appealability.

/s/ L. Patrick Auld

**L. Patrick Auld**
**United States Magistrate Judge**

December 14, 2016