**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**


RONNIE WALLACE LONG,       )
                                     )
                Petitioner,   )
                                     )
                v.           )          1:16CV539
                                     )
FRANK LEE PERRY,          )
                                     )
                Respondent.   )


**MEMORANDUM OPINION, ORDER, AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Petitioner, a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Docket Entry 1.) Respondent has moved for summary judgment (Docket Entry 5) and Petitioner has requested leave to conduct discovery (Docket Entry 10). For the reasons that follow, the undersigned United States Magistrate Judge will deny Petitioner's discovery request, and will recommend that the Court deny his Petition.

## I. Procedural History

On October 1, 1976, in the Superior Court of Cabarrus County, a jury found Petitioner guilty of first-degree rape and first-degree burglary in cases 76 CRS 5708 and 76 CRS 5709, respectively. (See Docket Entry 1 at 6; see also Docket Entry 7-34 at 5-6.)[1] The trial court sentenced Petitioner to two concurrent life sentences. (Docket Entry 1 at 6.)

---

[1] Page citations refer to the page numbers that appear in the footer appended to documents upon their docketing in the CM/ECF system.

Petitioner appealed (see id.), alleging that the victim's pretrial identification qualified as impermissibly suggestive, see State v. Long, 293 N.C. 286, 289, 237 S.E.2d 728, 730 (1977), law enforcement officers unlawfully searched Petitioner's vehicle, see id. at 292, 237 S.E.2d at 731, and the trial court improperly admitted evidence of a latent shoeprint, see id. at 295, 237 S.E.2d at 733. On October 11, 1977, the North Carolina Supreme Court found no prejudicial error. See id. at 296, 237 S.E.2d at 734 ("Evidence of [Petitioner's] guilt was clear. His convictions result from a trial free from prejudicial error. The verdicts and judgments of the trial court must therefore be upheld. No error.").[2] Petitioner did not thereafter seek review by the United States Supreme Court. (See generally Docket Entry 1 at 6.)

On August 1, 1986, Petitioner submitted a pro se motion for appropriate relief ("1986 MAR") to the Cabarrus County Superior Court, alleging that (1) law enforcement officers illegally searched Petitioner's vehicle (see Docket Entry 7-15 at 4-8); (2) the state improperly selected the jury venire on the basis of race (see id. at 8-23); and (3) Petitioner received ineffective assistance of trial counsel in connection with the motions to quash

---

[2] Because a conviction for first-degree rape carried a mandatory death sentence at the time of Petitioner's indictment in May 1976, see N.C. Gen. Stat. §§ 14-21 (1966), Petitioner's appeal of right lay in the North Carolina Supreme Court. On July 2, 1976, the United States Supreme Court struck North Carolina's death penalty statute as unconstitutional, which converted the sentence for first-degree rape to life imprisonment. See Woodson v. North Carolina, 428 U.S. 280, 301 (1976).

the jury venire and to suppress evidence seized from Petitioner's vehicle, and Petitioner received ineffective assistance of appellate counsel generally (see id. at 23-28). Following appointment of counsel, Petitioner filed, through counsel, an amendment to his 1986 MAR, adding claims that (1) racial discrimination tainted the selection of the grand jury's foreperson; (2) trial counsel provided ineffective assistance by failing to move for a change of venue or special venire; and (3) appellate counsel acted ineffectively by not arguing the race discrimination in jury pool selection claim on appeal. (See Docket Entry 7-17 at 48-49.) After a hearing, the Honorable Russell G. Walker, Jr., denied the 1986 MAR on the merits. (See id. at 48-53.) The North Carolina Supreme Court subsequently denied certiorari review. State v. Long, No. 530P88, 377 S.E.2d 228 (Mem.), 1989 WL 14003 (N.C. Jan. 4, 1989).

On April 24, 1989, Petitioner filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court, alleging that (1) the trial court improperly admitted evidence seized during an illegal search of Petitioner's vehicle (Docket Entry 7-41 at 5); (2) the trial court improperly interfered with Petitioner's challenge to the jury pool selection process (id.); and (3) Petitioner received ineffective assistance of trial counsel generally and in regards to the challenge to the jury pool selection process (id. at 6). On May 3, 1990, United States

District Judge N. Carlton Tilley, Jr., adopted United States Magistrate Judge Russell A. Eliason's recommendation of dismissal of that petition on the merits, <u>Long v. Dixon</u>, Civ. No. C-89-278-S (M.D.N.C. May 3, 1990) (unpublished). (<u>See</u> Docket Entry 7-43.)[3]

Years later, after enlisting the assistance of the University of North Carolina Innocence Project (<u>see</u> Docket Entry 7-25 at 49-50; Docket Entry 7-26 at 1-2), Petitioner filed, through pro bono (and later appointed) counsel, a Motion for Location and Preservation of Evidence in the Cabarrus County Superior Court, specifically seeking any biological evidence taken from the victim and/or her home, the victim's clothing, hair samples taken from Petitioner, as well as the green toboggan law enforcement found in Petitioner's vehicle and any hair contained therein (Docket Entry 7-18). Petitioner also filed, through counsel, a Motion for DNA Testing, seeking to test any available biological evidence, including the hair in the green toboggan. (<u>See</u> Docket Entry 1-2 (hearing transcript on Motion for DNA Testing); <u>see also</u> Docket Entry 7-20 at 20-22 (state court's order denying Motion for DNA Testing).)[4] On May 23, 2005, the Honorable Erwin Spainhour granted Petitioner's Motion for Location and Preservation of Evidence, ordering the Cabarrus County District Attorney's office, the

---

[3] The Petition does not allege that Petitioner appealed that dismissal. (<u>See</u> Docket Entry 1 at 13.)

[4] The record does not contain a copy of the Motion for DNA Testing.

4

Concord Police Department ("CPD"), and the State Bureau of Investigation ("SBI") to locate and preserve all evidence. (Docket Entry 7-20 at 16-19.) In response, the SBI initially reported that it possessed no evidence related to Petitioner's case. (Docket Entry 7-21 at 23.)

At a subsequent hearing to determine whether new evidence existed, a sergeant with the CPD testified that he had located the master case file in Petitioner's case and a spiral evidence notebook. (See Docket Entry 1-2 at 5-13, 19-20.) On June 17, 2005, Judge Spainhour denied Petitioner's Motion for DNA Testing, but granted his counsel the right to examine the master case file and spiral notebook. (See Docket Entry 7-20 at 20-22.) The master case file contained two reports from an identification officer with the CPD, Detective Van Isenhour, detailing items of evidence he had delivered to the SBI. (Docket Entry 1-5, ¶ 5; see also Docket Entry 7-37 at 3-8.) One undated report listed only the latent shoeprint and inked impressions of the bottoms of Petitioner's shoes as items Detective Isenhour had delivered to the SBI for testing. (Docket Entry 7-37 at 7-8.) The other report, dated May 12, 1976, listed numerous additional items of evidence Detective Isenhour had delivered to the SBI for testing, including Petitioner's leather jacket, toboggan, and leather gloves, as well as paint samples, carpet fiber samples, a sample of the victim's head and pubic hair, a sample of Petitioner's head and pubic hair,

matchbooks from Petitioner's car, burned matches obtained from the scene, and the victim's clothing.  (See id. at 3-6.)[5]

On January 13, 2006, the SBI, with the assistance of the State Archives, located and provided Petitioner's post-conviction counsel with copies of three SBI test reports (and associated handwritten notes) corresponding to the items of evidence detailed in Detective Isenhour's May 12, 1976 report.  (See Docket Entry 7-44; see also Docket Entry 7-36 at 31-51.)  The newly disclosed SBI reports (and associated handwritten notes) revealed that SBI agents (1) compared the single hair found at the scene with Petitioner's head and public hair samples, and concluded that the hair from the scene did not match Petitioner's, and evaluated the victim's clothing and did not find any of Petitioner's hairs thereon ("SBI Hair Report") (see Docket Entry 7-36 at 43-51); (2) examined Petitioner's leather jacket, leather gloves, and toboggan, and did not find any trace of paint or carpet fibers from the victim's home ("SBI Paint/Fiber Report") (see id. at 31-40); (3) compared five matchbooks from Petitioner's car with the three burned matches from the scene, and found insufficient identifying characteristics to establish a linkage ("SBI Matches Report") (id.); and (4) compared the latent shoeprint with the inked impressions of Petitioner's shoe bottoms, and concluded that Petitioner's shoes could have made the

_____

[5] The May 12, 1976 report also referenced a hair "appearing to be human in origin" found at the base of the victim's stairs where the rape occurred (Docket Entry 7-37 at 3), but did not specifically list that hair as an item delivered by Detective Isenhour to the SBI for testing (see id. at 5).

shoeprint, but that insufficient identifying characteristics
existed to conclude that Petitioner's shoes did make the shoeprint
("SBI Shoeprint Report") (see id. at 41-42).

In response to another order from Judge Spainhour to locate
and preserve evidence (id. at 24-25), Northeast Medical Center
(formerly Cabarrus Memorial Hospital) produced 26 pages of the
victim's medical records from her hospitalization following the
rape (see id. at 28).  After in camera review, Judge Spainhour
authorized the release of 11 pages of those medical records to
Petitioner's post-conviction counsel.  (Id.; see also id. at 52-56;
Docket Entry 7-37 at 1-2.)  Those records made clear that examining
physician Dr. Lance Monroe prepared three slides of semen, took two
swabs of vaginal secretions and placed them in a test tube, and
took pubic combings from the victim.  (See Docket Entry 7-20 at 30;
Docket Entry 7-36 at 52-56; Docket Entry 7-37 at 1-2.)  Subsequent
orders from Judge Spainhour in 2007 to locate that biological
evidence produced no results.  (See Docket Entry 7-20 at 31-53.)

On August 29, 2008, Petitioner filed, through post-conviction
counsel, a second MAR ("2008 MAR") with the Cabarrus County
Superior Court (Docket Entries 7-19 to 7-23), claiming that (1) the
state failed to disclose exculpatory material to the defense in
violation of Petitioner's right to a fair trial under the Due
Process Clause of the United States Constitution, Article I,
Section 19 of the North Carolina Constitution, and Brady v.

<u>Maryland</u>, 373 U.S. 83 (1963); and (2) Petitioner discovered new evidence with a direct and material bearing on his guilt or innocence under N.C. Gen. Stat. § 15A-1415(c) (<u>see</u> Docket Entry 7-19 at 1).[6]  At the evidentiary hearing on Petitioner's 2008 MAR, Petitioner called (1) Richard Rosen, a professor at University of North Carolina Law School and founder of the school's innocence project (<u>see</u> Docket Entry 7-25 at 48-50; Docket Entry 7-26 at 1-12); (2) his trial counsel's investigator, Les Burns (<u>see</u> Docket Entry 7-26 at 12-73); (3) his trial counsel, Karl Adkins and James Fuller (<u>see</u> <u>id.</u> at 74-92; Docket Entry 7-27 at 1-30, 56-67; Docket Entry 7-28 at 1-35); (4) the assistant district attorney at Petitioner's trial, Ron Bowers (<u>see</u> Docket Entry 7-28 at 36-63); and (5) a rebuttal forensic evidence expert, Jeffrey Morris Hollifield (<u>see</u> Docket Entry 7-30 at 20-70).[7]

On February 25, 2009, the Honorable L. Donald Bridges denied Petitioner's claims under <u>Brady</u> and N.C. Gen. Stat. § 15A-1415(c), but granted sentencing relief on grounds not relevant to the instant Petition (which ultimately resolved in a manner unfavorable to Petitioner).  (Docket Entry 7-31.)  Petitioner, through new counsel, submitted a petition for writ of certiorari to the North

_____

[6] Petitioner also made two arguments relating to sentencing relief which do not bear on the instant Petition.  (<u>See</u> Docket Entry 7-19 at 2-3.)

[7] Despite obtaining the 2008 MAR court's permission to procure Detective Isenhour's attendance at the hearing (<u>see</u> Docket Entry 7-24 at 5-11), Petitioner did not call Detective Isenhour (or any other CPD officer involved in the case) as a witness at the hearing (<u>see</u> Docket Entries 7-24 to 7-30).

Carolina Supreme Court (Docket Entries 7-33 to 7-38), reasserting his Brady claim, and arguing that the state's failure to preserve the rape kit and the victim's clothing violated _Arizona v. Youngblood_, 488 U.S. 51 (1988), and _California v. Trombetta_, 467 U.S. 479 (1984) (see Docket Entry 7-33 at 3-5, 21-63). On February 4, 2011, the North Carolina Supreme Court issued a three-three per curiam decision, with one justice abstaining, resulting in affirmance of the trial court's denial of Petitioner's 2008 MAR. See _State v. Long_, 365 N.C. 5, 705 S.E.2d 735 (2011).

On February 3, 2012, Petitioner submitted, through North Carolina Prisoner Legal Services counsel, a second petition for a writ of habeas corpus under Section 2254 to this Court, alleging a Brady claim. _Long v. Lancaster_, No. 1:12CV119, Docket Entry 1 (M.D.N.C. Feb. 3, 2012). On August 2, 2012, the Honorable Catherine C. Eagles dismissed the action as successive, as Petitioner had not first applied to the United States Court of Appeals for the Fourth Circuit for permission to file a second or successive petition. _Long v. Lancaster_, No. 1:12CV119, 2012 WL 3151179 (M.D.N.C. Aug. 2, 2012) (unpublished). Petitioner did not appeal that dismissal. See Docket, _Long v. Lancaster_, No. 1:12CV119 (M.D.N.C.).

Thereafter, at Petitioner's counsel's request, the North Carolina Innocence Inquiry Commission ("NCIIC") agreed to review his case under the Postconviction DNA Testing Assistance Program.

(See Docket Entry 1-5, ¶ 7; see also Docket Entry 9-3.)[8] Upon inquiry by the NCIIC, the CPD located three envelopes containing 43 latent fingerprint lifts the CPD had taken from the scene. (See Docket Entry 9-3 at 2; see also Docket Entry 1-1.) An independent expert analyzed the prints, and excluded Petitioner and several alternate suspects as sources of the prints. (See Docket Entry 9-3 at 2.)[9] Additionally, the CPD ran the four latent fingerprint lifts of sufficient value to test through an Automated Fingerprint Identification System ("AFIS"), which returned "no possible contributors" for the lifts. (See Docket Entry 1-1.) The NCIIC provided Petitioner's new (and current) counsel from the Duke University Wrongful Convictions Clinic with a copy of the CPD's report reflecting the AFIS queries. (See Docket Entry 9-3 at 2.)

On July 30, 2015, the NCIIC decided not to pursue Petitioner's case, because of the lack of evidence appropriate for DNA testing. (Id.) Shortly thereafter, Petitioner requested a copy of the NCIIC's file in his case (which contained the Cabarrus County District Attorney's file and the CPD's file on Petitioner's case), but the District Attorney, Roxann Vaneekhoven, refused to consent to release of the District Attorney's file and the CPD's file.

---

[8] The North Carolina General Assembly established the eight-member NCIIC as a state agency in 2006 for the purpose of "investigat[ing] and evaluat[ing] post-conviction claims of factual innocence." www.innocencecommission-nc.gov (last visited May 14, 2018); see also N.C. Gen. Stat. § 15A-1460-75.

[9] According to Petitioner, CPD records previously provided to the defense included information about only one alternate suspect. (See Docket Entry 9 at 7.)

(See Docket Entry 9-2 at 2.)  The NCIIC also refused to consent to production of its file due to the "undu[e] burden[] for [the NCIIC] to separate out investigative materials and documents related to [the District Attorney's and CPD's] files from the [NCIIC's] files."  (Id.)

On April 4, 2016, Petitioner filed, through his current counsel, a motion under 28 U.S.C. § 2244 in the Fourth Circuit for an order authorizing this Court to consider a second or successive petition under Section 2254.  In re: Ronnie Wallace Long, No. 16-295, Docket Entry 2 (4th Cir. Apr. 4, 2016).  The Fourth Circuit granted that motion.  (Docket Entry 1-6.)  Thereafter, Petitioner, proceeding through counsel, filed the instant Petition in this Court.  (Docket Entry 1.)  Respondent moved for summary judgment both on the merits and on the procedural grounds of successiveness, non-exhaustion, and untimeliness (Docket Entries 6, 7), Petitioner responded (Docket Entry 9), and Respondent replied (Docket Entry 12).  Petitioner subsequently filed a Motion for Leave to Conduct Discovery (Docket Entry 10) (with a memorandum in support (Docket Entry 11)), which Respondent opposed (Docket Entry 13), whereupon Petitioner replied (Docket Entry 14).

The undersigned United States Magistrate Judge thereafter issued an Order denying Petitioner's Motion for Leave to Conduct Discovery (Docket Entry 10), and a Recommendation that the Court

grant in part and deny in part Respondent's Motion for Summary Judgment (Docket Entry 5), by entering a judgment dismissing the action without prejudice pending Petitioner's exhaustion of his fingerprint-based Brady claim in the state courts, without issuance of a certificate of appealability, Long v. Perry, No. 1:16CV539, 2016 WL 7235779 (M.D.N.C. Dec. 14, 2016) (unpublished) (Auld, M.J.). Petitioner objected to the Order and Recommendation primarily on the grounds that "the latent prints were new, undeveloped evidence to be considered in a holistic assessment of his actual innocence gateway claim, [and] not an independent claim under Brady." (Docket Entry 19 at 4.) The Court (per United States District Judge Catherine C. Eagles) entered an Order and a Judgment adopting the Recommendation in full and dismissing the matter without prejudice, without issuance of a certificate of appealability. Long v. Perry, No. 1:16CV539, slip op. (M.D.N.C. Feb. 1, 2017) (Eagles, J.).

Petitioner appealed that Judgment to the Fourth Circuit, and requested a certificate of appealability. (See Docket Entries 23 through 25.) The Fourth Circuit granted Petitioner a certificate of appealability, and vacated and remanded this Court's Judgment via an unpublished per curiam opinion on the grounds that Petitioner "unequivocally disclaimed, both before th[e Fourth Circuit] and the district court, any independent claim based upon newly discovered latent fingerprint evidence, [and] [t]hus, [that]

12

[Petitioner] did not present the district court with a mixed petition that required dismissal." <u>Long v. Perry</u>, 699 F. App'x 260, 261 (4th Cir. 2017).[10]

## II. **Petitioner's Claims**

The Petition identifies two grounds for relief: 1) Petitioner's "credible claim of actual innocence creates a 'gateway' to federal habeas relief" (Docket Entry 1 at 39 (bold font and capitalization omitted)); and 2) "the state violated Petitioner's constitutional rights under <u>Brady v. Maryland</u> by failing to disclose SBI reports and notes, the victim's medical records, and Detective Isenhour's Reports" (<u>id.</u> at 54 (bold font and capitalization omitted)).

## III. **Facts**

On direct appeal, the North Carolina Supreme Court described the trial evidence as follows:

> The State offered evidence tending to show that on the evening of 25 April 1976, [the victim], a fifty-four-year-old widow, was alone in her home [in] Concord. She walked into her den around 9:30 p.m. and was grabbed from behind by a black man wearing a black leather jacket, black gloves, and a green toboggan cap covering his ears but not his face. He threw her onto the floor, put a knife at her throat, and demanded money.

---

[10] The undersigned United States Magistrate Judge denied Petitioner's Motion for Leave to Conduct Discovery (Docket Entry 10) principally because, "given the recommendation of dismissal without prejudice pending exhaustion of the fingerprint-related <u>Brady</u> claim, discovery should not proceed in federal court unless and until Petitioner presents an entirely exhausted petition for review." <u>Long</u>, 2016 WL 7235779, at *10. However, the Fourth Circuit's vacation of the Court's Judgment due to its determination that Petitioner did not seek to bring a fingerprint-based <u>Brady</u> claim renders Petitioner's Motion for Leave to Conduct Discovery (Docket Entry 10) ripe for a new ruling.

He pushed her into her bedroom to her bed, where she rummaged through her pocketbook only to find that her money was gone.  He then shoved her into a lighted hall, threw her onto the floor, and raped her.  Other sordid details concerning [the assailant's] acts, not necessary to decision, are omitted.  The assault continued until the phone rang, at which time the assailant jumped up and left. [The victim] then ran unclothed out the back door to her neighbor's home, and was rushed by ambulance to the hospital.

A gynecologist found live active spermatozoa in her vagina, as well as numerous scratches and bruises on her face and body.

[Petitioner] offered evidence tending to show that on Sunday, 25 April 1976, [he] attended a class reunion planning meeting.  He made arrangements with friends to go to Charlotte later that night.  [Petitioner's] mother[] testified that her son was at home from around 8:30 p.m. until after 10:00 p.m. Mrs. Long, [Petitioner] and [Petitioner's girlfriend] participated in a phone conversation which lasted about forty-five minutes. [Petitioner's girlfriend] indicated that she called the Long residence at 9:00 p.m.  She said that she and her son talked with [Petitioner] and Mrs. Long until 9:45 p.m.  Shortly after 10:00 p.m., [Petitioner's] father returned home with the car and [Petitioner] left for a party in Charlotte.

. . . .

[O]n 5 May 1976 officers came to [the victim's] house and requested her to come and sit in district court to see if there might be a man she could recognize as her assailant.  The officers told her that they did not know who would be in court, and that she may have to come to court on two or more occasions before she could identify anyone.  [The victim] went to the courthouse on 10 May and talked with officers before entering the courtroom. Again, they made no suggestion to her that [Petitioner] or anyone else in particular would be in the courtroom. They simply told her to sit in the courtroom and look around and see if she could recognize the man who raped her.  [The victim] entered the courtroom with her friend . . . and sat apart from the officers.  There were as many as sixty people in the courtroom, and as many as a dozen black males.  [The victim] testified that when the

judge called the name Ronnie Wallace Long, a name she had
never heard before, a man she recognized as her assailant
walked down the aisle past her.  She testified that she
immediately recognized him, and that, without prompting,
she motioned to police that [Petitioner] was the
man. . . .

[A]fter the courtroom identification the police took [the
victim] to the station and showed her six or eight
photographs, and once again, without prompting, she
identified [Petitioner].  She also testified that
officers did not point out any particular picture to her,
and that she recognized [Petitioner] from seeing him at
the time of the assault. . . .

[Petitioner] agreed to [a] search [of his vehicle on 10
May 1976] . . . .  Upon search, [an officer] found a
green toboggan cap under the front seat, and a pair of
black leather gloves over the sun visor.  [Petitioner]
was wearing a black leather jacket.  [The victim]
described the jacket, the toboggan cap and the gloves as
similar or identical to those worn by [her assailant] at
the time of the assault. . . .

[According to] an expert on prints, . . . [a] shoe print
[lifted from the banister of the front porch of the
victim's home near a post leading to the roof which
provided access to an unlocked, second-story window above
the porch] . . . could have been made by shoes worn by
and taken from [Petitioner] at the time of his arrest.

Long, 293 N.C. at 288, 290, 292, 295, 237 S.E.2d at 729, 730-31,

732, 733-34.

## IV. <u>Discussion</u>

### A. Motion for Summary Judgment

Respondent moves for summary judgment on three grounds: (1)

the Court should dismiss the instant Petition as successive under

28 U.S.C. § 2244(b)(2) (<u>see</u> Docket Entry 7 at 15-22); (2) the one-

year statute of limitations set forth in the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA") bars the claims in

the Petition (see id. at 22-31); and (3) the Petition's claims lack merit under the deferential standard of review of 28 U.S.C. § 2254(d) and (e) (see id. at 31-48).

In response, Petitioner contends that "otherwise defaulted claims, including those filed outside of the one-year statute of limitations under AEDPA . . ., are excused when a petitioner satisfies the actual innocence gateway." (Docket Entry 9 at 8 (citing Schlup v. Delo, 513 U.S. 298, 319-22 (1995), and McQuiggin v. Perkins, 569 U.S. 383, 392-93 (2013)).) According to Petitioner, "the actual innocence gateway overcomes Respondents' affirmative defenses and entitles [Petitioner] to an evidentiary hearing." (Id. (capitalization omitted).) In connection with the actual innocence gateway issue, Petitioner points to Detective Isenhour's two summary reports, the SBI reports and associated notes, and the victim's medical records, turned over to Petitioner's counsel in 2005 and 2006, as well as the latent fingerprint lifts discovered by the NCIIC and compared against six alternate suspects and submitted to an AFIS in 2014 and 2015. (See Docket Entry 1 at 27, 34, 35; see also Docket Entry 9 at 8-12.) Petitioner argues that consideration of this new evidence, especially in light of the victim's "highly unreliable" identification of Petitioner (Docket Entry 1 at 39) and "the scant evidence presented against [Petitioner] at trial makes plain that

it is more likely than not that no reasonable juror would have convicted [him]" (id. at 47; see also Docket Entry 9 at 8-15).

The United States Supreme Court has recognized that a showing of actual innocence may (1) excuse a petitioner's non-compliance with AEDPA's one-year limitations period, see McQuiggin, 569 U.S. at 392-98; (2) permit a federal court to evaluate the merits of a constitutional claim even though a procedural default otherwise would preclude review, see Schlup, 513 U.S. at 315, 319-22; and (3) allow "a petitioner otherwise subject to defenses of abusive or successive use of the writ [to] have his federal constitutional claim considered on the merits," Herrera v. Collins, 506 U.S. 390, 404 (1993). However, the Supreme Court also ruled that showings of actual innocence "are rare," and that a petitioner must demonstrate that no reasonable juror could vote to find the petitioner guilty beyond a reasonable doubt. McQuiggin, 569 U.S. at 392; see also United States v. Jones, 758 F.3d 579, 583 (4th Cir. 2014) (noting that "substantial claim[s] of actual innocence are extremely rare" (quoting Schlup, 513 U.S. at 321)). Moreover, "'[a]ctual innocence' means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998). "To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not

17

presented at trial." <u>Schlup</u>, 513 U.S. at 324. The reviewing court must consider "all of the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under the rules of admissibility that would govern at trial." <u>House v. Bell</u>, 547 U.S. 518, 538 (2006) (internal quotation marks omitted).

Here, however, the Court need not undertake the analysis of whether new evidence sufficiently demonstrates Petitioner's actual innocence (or whether/what discovery should proceed on that issue), as required to overcome Respondent's affirmative defenses. Even assuming, <u>arguendo</u>, that no affirmative defense barred Petitioner's <u>Brady</u> claim, that claim fails on the merits. Specifically, for the reasons described below, the 2008 MAR court's denial of relief on the merits must stand.

This Court must apply a highly deferential standard of review in connection with any habeas claim "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). In particular, the Court may not grant relief on any such habeas claim unless the underlying state court decision on the merits "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." <u>Id.</u>; <u>see also</u> 28 U.S.C. § 2254(e)(1) (establishing, in federal

habeas proceedings, presumption of correctness as to state court factual findings, subject to rebuttal only by "clear and convincing evidence"). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part," Sharpe v. Bell, 593 F.3d 372, 378 (4th Cir. 2010), especially where the state court has "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)," id. at 379.

To qualify as "contrary to" United States Supreme Court precedent, a state court decision either must arrive at "a conclusion opposite to that reached by [the United States Supreme] Court on a question of law" or "confront[] facts that are materially indistinguishable from a relevant [United States] Supreme Court precedent and arrive[] at a result opposite" to the United States Supreme Court. Williams v. Taylor, 529 U.S. 362, 406 (2000). A state court decision "involves an unreasonable application" of United States Supreme Court case law "if the state court identifies the correct governing legal rule from [the United States Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407; see also id. at 409–11 (explaining that "unreasonable" does not mean merely "incorrect" or "erroneous"). In other words, "[a]s a condition for obtaining habeas corpus from a federal court, a state

prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011); see also Burt v. Titlow, 571 U.S. ___, ___, 134 S. Ct. 10, 16 (2013) ("Recognizing the duty and ability of our state-court colleagues to adjudicate claims of constitutional wrong, AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.").

Pursuant to Brady, "a State violates a defendant's due process rights when it fails to disclose to the defendant prior to trial 'evidence favorable to an accused where the evidence is material.'" Basden v. Lee, 290 F.3d 602, 608 (4th Cir. 2002) (quoting Brady, 373 U.S. at 87). "There are three fundamental components to a Brady claim: (1) 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching'; (2) the 'evidence must have been suppressed by the State'; and (3) the evidence must be material to the defense, that is, 'prejudice must ensue.'" Walker v. Kelly, 589 F.3d 127, 137 (4th Cir. 2009) (quoting Strickler v. Greene, 527 U.S. 263, 281–82 (1999)) (internal brackets and ellipses omitted) (emphasis added); see also Kyles v. Whitley, 514 U.S. 419, 434 (1995) ("[The] touchstone of materiality [in the Brady context] is a reasonable

probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." (internal quotation marks omitted)). "It is the petitioner's burden to establish the three elements of a <u>Brady</u> violation[.]" <u>Fullwood v. Lee</u>, 290 F.3d 663, 685 (4th Cir. 2003) (internal citation omitted).

The 2008 MAR court determined that Petitioner had not satisfied any of the three elements of his <u>Brady</u> claim, as follows:

> [Petitioner] has failed to prove by a preponderance of the evidence that his due process rights have been violated under <u>Brady</u>[], in that he has not shown by a preponderance of the evidence that the claimed evidence was withheld by the State, that it was exculpatory, or that the result likely would have been different with the claimed evidence. Decisions made by trial counsel for strategic purposes have been weighed as part of this determination.

(Docket Entry 7-31 at 13.) Petitioner contends that "the [2008] MAR [c]ourt's [o]rder was contrary to, or an unreasonable application of, the [United States] Supreme Court's clearly established <u>Brady</u> jurisprudence with respect to each of the three fundamental <u>Brady</u> components." (Docket Entry 1 at 57.) Those contentions ultimately fall short.

1.  <u>Favorability</u>

Petitioner challenges the 2008 MAR court's conclusion that Petitioner "ha[d] not shown by a preponderance of the evidence that the claimed evidence . . . was exculpatory" (Docket Entry 7-31 at 13) in three respects: the 2008 MAR court (1) failed to recognize that "[e]xculpatory evidence need not affirmatively exonerate Petitioner" (Docket Entry 1 at 57); (2) did not acknowledge that "[e]vidence that discredit[ed] the investigation is <u>Brady</u> material" (<u>id.</u> at 60; <u>see also</u> Docket Entry 9 at 21-22); and (3) "failed to recognize any impeachment value in the SBI reports and associated notes, and in Det[ective] Isenhour's report fully describing the items he collected and submitted to the SBI for analysis" (Docket Entry 1 at 62; <u>see also</u> Docket Entry 9 at 19-21).

Petitioner first contends that the 2008 MAR court unreasonably applied <u>Brady</u> and <u>Kyles</u> by failing to recognize that "[e]xculpatory evidence need not affirmatively exonerate Petitioner." (Docket Entry 1 at 57.) In that regard, Petitioner challenges the 2008 MAR court's finding of fact that "'both the expert for the State and the defense testified that the absence of evidence was not evidence of evidence [sic] and the lack of fibers or fragments <u>did not exonerate [Petitioner]</u>'" (<u>id.</u> (quoting Docket Entry 7-31 at 6) (emphasis added)),[11] and the 2008 MAR court's conclusion of law that

_____

[11] The 2008 MAR court likely meant to state that "the absence of evidence was not evidence of <u>absence</u>."

22

the SBI Paint/Fiber Report "'contained no meaningful analysis . . .
[and was] not _exculpatory_'" (_id._ at 58 (quoting Docket Entry 7-31
at 12) (emphasis added)). According to Petitioner, the 2008 MAR
court's "narrow view of favorable evidence is contrary to
well-established federal law [set forth] [i]n _Kyles_" (_id._), because
the "SBI reports and accompanying notes . . ., like the [withheld
evidence] in _Kyles_, contain no evidence connecting [Petitioner] to
the crime" and, thus, qualify as favorable (_id._ at 59).

The 2008 MAR court's conclusion that the SBI Paint/Fiber
Report and the SBI Hair Report did not qualify as exculpatory
(_see_ Docket Entry 7-31 at 12, 13) runs contrary to _Kyles_. In that
case, the United States Supreme Court rejected the state's argument
that a printout of the license plate numbers of cars parked at the
crime scene which lacked the number of the defendant's car failed
to qualify as "impeachment []or exculpatory evidence because [the
petitioner] could have moved his car before the list was created
and because the list does not purport to be a comprehensive listing
of all the cars [at the crime scene]." _Kyles_, 514 U.S. at 450-51.
In that regard, the Supreme Court further reasoned:

> Such argument . . . confuses the weight of the evidence
> with its favorable tendency, and even if accepted would
> work against the [s]tate, not for it. If the police had
> testified that the list was incomplete, they would simply
> have underscored the unreliability of the investigation
> . . . . But however the evidence would have been used,
> <u>it would have had some weight and its tendency would have
> been favorable to [the petitioner]</u>.

_Id._ at 451 (emphasis added).

Here, with regard to the conclusion in the SBI Paint/Fiber Report that "[e]xamination of [Petitioner's] clothing . . . failed to reveal the presence of any [carpet] fibers or paint similar to those [found at the crime scene]" (Docket Entry 7-36 at 31), and the conclusion in SBI Hair Report that "[m]icroscopic examination and comparison of the hair found at the [crime] scene showed it to be different from [Petitioner's head and public] hair" (id. at 43), "however [such] evidence would have been used, it would have had some weight and its tendency would have been favorable to [Petitioner]," Kyles, 514 U.S. at 451.[12]

The 2008 MAR court also contradicted Kyles by considering only whether the SBI Matches Report exculpated Petitioner (see Docket Entry 7-31 at 13), noting that the Report indicated that Special Agent Rick D. Cone "could not definitively say that the matches found at the crime scene did not match the matchbooks found in [Petitioner's] car" (id. at 12). In the Report, Special Agent Cone

---

[12] Notably, in Respondent's Brief in support of his Motion for Summary Judgment, he did not address arguments Petitioner raised in his Petition regarding the favorable nature of the SBI Paint/Fiber Report and the SBI Hair Report and instead argued that such evidence lacked materiality. (See Docket Entry 7 at 38 (reflecting Respondent's argument that "fair minded jurists could disagree, or for that matter agree with, [the 2008 MAR court's] result that [the] three SBI reports showing no connection between Petitioner and the crime scene were not material under Brady, because they did not create a reasonable probability of a different result" (internal quotation marks omitted); see also id. at 38-39 (observing that Petitioner's trial counsel "argued to the jury in closing argument that no evidence of any white paint chips, skin, hair, or anything else connected Petitioner to the crime" and, therefore, that "the SBI reports were consistent with the trial testimony or merely cumulative to undisputed facts").) Although Respondent did not expressly concede the favorability of the SBI Paint/Fiber Report and the SBI Hair Report, his failure to even address that issue lends further support to the conclusion that the 2008 MAR court contravened Kyles in finding that evidence lacked favorability.

concluded that "[e]xamination of the matches . . . failed to reveal sufficient identifying characteristics to allow the examiner to give an opinion with regard to their origin relative to the matchbooks." (Docket Entry 7-36 at 31.) However, in the accompanying notes, Special Agent Cone reported that "[a]ll but one of the match books [were] eliminated by color. Characteristics of the last were not sufficient for [identification] with matches . . . . They probably did not originate from this match book." (Id. at 40 (emphasis added).) Thus, Special Agent Cone eliminated four of the five matchbooks from Petitioner's car as sources of the matches found at the scene, and found that those matches probably did not originate from the fifth matchbook. Again, "however [such] evidence would have been used, it would have had some weight and its tendency would have been favorable to [Petitioner]." Kyles, 514 U.S. at 451.

Further, the 2008 MAR court unreasonably determined that the SBI Matches Report actually favored the state more than Petitioner, and that "the jury was misled to believe that the matches did not match which was to [Petitioner's] benefit." (Docket Entry 7-31 at 12 (emphasis added).) Detective Taylor testified that, to his knowledge, the matches from the scene did not match the matchbooks found in Petitioner's car outside the presence of the jury during a voir dire regarding Petitioner's consent to the search of his car. (See Docket Entry 7-9 at 37-38 (reflecting trial court's

request that jury exit courtroom after Petitioner's trial counsel requested voir dire); Docket Entry 7-10 at 12 (containing Detective Taylor's testimony regarding matches during voir dire); 38-39 (recording trial court's denial of motion to suppress by Petitioner's trial counsel and request to bailiff to bring jury back into courtroom).) Moreover, Special Agent Cone did not testify at Petitioner's trial (see Docket Entry 7-6 at 2-5), and neither of Petitioner's trial counsel argued in closing that the state failed to link the matches from the scene to the matchbooks found in Petitioner's car (see Docket Entry 7-13 at 15-51). Accordingly, the jury did not hear any evidence regarding the matches and matchbooks more favorable to Petitioner than the SBI Matches Report.

The Court should reach a different result, however, with regard to the SBI Shoeprint Report. At trial, Special Agent Dennis J. Mooney testified that, after his examination, he formed the opinion that the shoeprint lifted from the crime scene "could have been made by" Petitioner's shoe bottoms (Docket Entry 7-11 at 18-19), but could not conclude that Petitioner's shoes did make the shoeprint (id. at 19-20). That testimony does not qualify as favorable to Petitioner, as it inculpated him to some degree, by indicating that shoes of Petitioner's type made the shoeprint at the scene. The SBI Shoeprint Report mirrors Special Agent Mooney's testimony (compare id. at 14-20, with Docket Entry 7-36 at 41

(stating that the inked impressions of Petitioner's shoes "could have made" the shoeprint lifted from the scene, but that "[t]here were an insufficient number of distinct characteristics by which to effect an identification"), and Petitioner does not point to anything in the SBI Shoeprint Report that adds any degree of favorability to the shoeprint evidence at trial (see Docket Entries 1, 9).

Next, Petitioner maintains that the 2008 MAR court failed to acknowledge that his trial counsel could have relied on the victim's medical records to discredit the investigation and show that the state "fail[ed] to preserve critical biological evidence" by placing the vaginal swabs obtained from the victim in a glass test tube, which would have rendered such evidence "suspect" by the time Petitioner's trial counsel could have obtained the victim's medical records.  (Docket Entry 1 at 60.)  As an initial matter, the 2008 MAR court's conclusion that Petitioner "ha[d] not shown . . . that the claimed evidence was . . . exculpatory," rather than using the term "favorable" (Docket Entry 7-31 at 13 (emphasis added)), along with that court's failure to analyze the potentially impeaching nature of Petitioner's new evidence (see Docket Entry 7-31), suggests that the 2008 MAR court interpreted the concept of favorable evidence too narrowly.  See Walker, 589 F.3d at 137 ("'The evidence at issue must be favorable to the accused, either

because it is exculpatory, <u>or because it is impeaching</u>'" (quoting <u>Strickler</u>, 527 U.S. at 281–82) (emphasis added)).

However, even considering the 2008 MAR court's overly narrow view of favorable evidence under <u>Brady</u> and <u>Kyles</u>, the 2008 MAR court did not misapply such law with respect to the Petitioner's claim that the victim's medical records would demonstrate that the state failed to preserve critical biological evidence by placing the victim's vaginal swabs in a glass test tube. Those records make clear that Dr. Monroe (and/or his staff acting under his direction) examined the victim soon after the rape, obtained specimens from the victim according to Cabarrus Memorial Hospital's rape protocol, and placed two vaginal swabs from the victim in a stoppered glass test tube. (<u>See</u> Docket Entry 7-20 at 30; Docket Entry 7-36 at 52-56; Docket Entry 7-37 at 1-2.) Even assuming, <u>arguendo</u>, that such a practice amounted to a "failure to preserve critical biological evidence," the alleged actions and omissions of Dr. Monroe and/or staff working under his direction cannot be imputed to the state and thus such evidence does not impeach the quality of the <u>state's</u> investigation. <u>See Kyles</u>, 514 U.S. at 437 (holding that <u>Brady</u> places an affirmative duty on prosecutors "to learn of any favorable evidence known to others acting on the <u>government's</u> behalf in the case" (emphasis added)); <u>Bowie v. Polk</u>, No. 5:03-CV-137-MU, 2006 WL 2846980, at *30 (W.D.N.C. Sept. 29, 2006) (unpublished) (rejecting <u>Brady</u> claim where no evidence

existed that county or state department of social services or guardian ad litem assisted or acted as agents of prosecutor).

Petitioner additionally asserts that the 2008 MAR court unreasonably applied Brady by failing to recognize that his trial counsel could have used the medical records to argue that "[t]he [s]tate's subsequent loss of th[at] biological evidence . . . further discredit[ed] the investigation." (Docket Entry 1 at 60; see also Docket Entry 9 at 22 ("[I]n the end, law enforcement claims to have lost this biological evidence, which raises further questions about the competence of its investigation.").)

An authorization for release form reflects that Sargeant Marshall J. Lee with the CPD picked up the victim's biological specimens at the hospital at 12:35 a.m. on April 26, 1976. (Docket Entry 7-20 at 30.) Representatives of the CPD testified at the hearing on Petitioner's Motion for Location and Preservation of Evidence in 2005 that they did not know what happened to the biological evidence after that point. (See Docket Entry 1-2 at 6-13.) Additionally, one of the prosecutors from Petitioner's trial testified at the 2008 MAR hearing that no evidence existed that the SBI or any other entity tested the victim's biological evidence. (See Docket Entry 7-28 at 308-11.)

This evidence, which suggests that the CPD did not disclose the existence of the rape kit to the prosecution and did not maintain adequate safeguards for that evidence, does possess a

degree of favorability to Petitioner, in that it tends to impeach the quality of the state's investigation.[13]  Therefore, the 2008 MAR court ran afoul of and/or unreasonably applied <u>Kyles</u> by denying relief on the grounds that the victim's medical records did not qualify as exculpatory.

Petitioner additionally asserts that the 2008 MAR court unreasonably applied <u>Brady</u> by failing to recognize the impeaching

---

[13] Petitioner also maintains that, although the 2008 MAR court found that "the potential sources of the random hair [at the scene] were innumerable," including the victim's nephews whom she had entertained at her home previously that day, people with whom the victim had interacted earlier that day at the post office and at church, the three police officers who arrived at her home after the 911 call, and the tracking dogs led through her home (Docket Entry 7-31 at 5), the 2008 MAR court "ignored" the fact that his trial counsel could have relied on the SBI Hair Report to demonstrate "the [s]tate's failure to preserve the crime scene and conduct a reasonably diligent effort to identify the sources of the hair collected at the scene."  (Docket Entry 1 at 61.)  Petitioner did not explain how the existence of potential sources of hair who interacted with the victim <u>prior</u> to the rape could demonstrate the state's failure to preserve the crime scene.  Moreover, Petitioner failed to show how the appearance of police officers and tracking dogs at the scene in response to the victim's 911 call would amount to a failure to preserve the scene.  Petitioner also contends that his trial counsel could have utilized the SBI Hair Report to attack Special Agent Glen Glesne's failure to determine whether "the hairs he believed to be Caucasian found in the victim's underwear" actually belonged to the victim.  (<u>Id.</u>)  According to Petitioner, "since [the] victim described her attacker as a 'light-skinned' or 'yellow-looking' black man" (<u>id.</u> (quoting Docket Entry 7-8 at 36)), the state's "presum[ption] that the pubic hair of a person exhibiting both Caucasian and African features would not appear 'Caucasian' . . . may well have caused the police to neglect leads on other suspects who may have appeared less 'black' relative to [Petitioner], who is dark-skinned" (<u>id.</u>).  However, Petitioner put forth no support for his highly speculative assertion that a pubic hair that an expert hair analyst like Special Agent Glesne categorized as Caucasian could belong to a "'light-skinned' or 'yellow-looking' black man." (<u>Id.</u> (quoting Docket Entry 7-8 at 36, and citing Docket Entry 7-29 at 33).)  Such speculative use of the SBI Hair Report does not demonstrate its favorability to Petitioner.  <u>See</u> <u>Wood v. Bartholomew</u>, 516 U.S. 1, 6-7 (1995) (rejecting <u>Brady</u> claim because withheld evidence's influence on outcome of case too speculative); <u>Gloeckner v. Youngblood</u>, No. 1:12-CV-00935-BAM HC, 2012 WL 6719557, at *6 (E.D. Cal. Dec. 26, 2012) (unpublished) (holding that "mere speculation that there might have been something useful for impeachment purposes in those reports is not sufficient to demonstrate a <u>Brady</u> violation").  Thus, although, as discussed above, the 2008 MAR court contradicted <u>Kyles</u> by focusing on whether the SBI Hair Report qualified as exculpatory, the 2008 MAR court did not contravene <u>Kyles</u> by failing to recognize any tendency of that evidence to impeach the state's investigation.

character of the SBI reports and accompanying notes, as well as Detective Isenhour's summary reports. (Docket Entry 1 at 62; <u>see also</u> Docket Entry 9 at 19 ("The single most important error by the [2008] MAR court was that it completely ignored the favorable nature of the withheld evidence by considering whether it was affirmatively exculpatory, not its potential for impeachment.").) According to Petitioner, "[a] comparison of Det[ective] Isenhour's trial testimony to the withheld records shows that Det[ective] Isenhour was untruthful at trial" in two respects. (Docket Entry 1 at 63.) First, Detective Isenhour testified that he had never relinquished possession of the shoeprint-related evidence and Petitioner's clothing (<u>see</u> Docket Entry 7-11 at 6-10), but the SBI reports indicated that Detective Isenhour dropped off that evidence at the SBI on May 11, 1976, and returned to retrieve it five days later on May 16, 1976 (<u>see</u> Docket Entry 7-36 at 31-51). (Docket Entry 1 at 63-65.)

Second, Detective Isenhour testified as follows regarding the evidence he delivered to the SBI:

> Q. What did you then do for the remainder of the day of the 11th of May sir?
>
> A. I went to Raleigh, North Carolina, to the [SBI] Lab. I had previously contacted a Special Agent that I would be enroute (sic) there.
>
> Q. [Detective] Isenhour, did you take any items with you when you went?
>
> A. I did.

> Q. What did you take?
>
> A. I took the <u>pair of shoes</u> which I received from [Petitioner] in Kannapolis. I took <u>two inked impressions</u>, one of the left shoe and one of the right shoe which I had made on May the tenth, and I took the <u>latent lift</u>, which I had lifted from the top of the bannister column at [the victim's home].

(<u>Id.</u> at 64 (quoting Docket Entry 7-11 at 6 (emphasis added)).) Petitioner contends that "[t]he SBI reports directly contradict Det[ective] Isenhour's testimony" in that "they document that Det[ective] Isenhour took a total of fifteen items to the SBI." (<u>Id.</u> at 66.) Further, Petitioner maintains that the two differing versions of Detective Isenhour's summary reports again shows Detective Isenhour's "apparent decision to conceal . . . the additional thirteen items [he took] to the SBI." (<u>Id.</u>)

"'Favorable' evidence [under <u>Brady</u>] includes not only that evidence tending to exculpate the accused, but also any evidence adversely affecting the credibility of the government's witnesses." <u>United States v. Trevino</u>, 89 F.3d 187, 189 (4th Cir. 1996) (citing <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985), and <u>Giglio v. United States</u>, 405 U.S. 150, 154-55 (1972)). Significantly, although Respondent did not expressly concede the favorability (under <u>Brady</u>) of the impeachment evidence at issue, he addressed neither Petitioner's arguments regarding the conflict between Detective Isenhour's testimony that he delivered only the shoeprint evidence to the SBI, and the documentation that he submitted a total of fifteen items to the SBI, nor the impeachment value of the

two differing versions of Detective Isenhour's summary reports. (See Docket Entry 7 at 39-40.) With respect to the conflict between Detective Isenhour's testimony and the SBI Shoeprint Report regarding whether the shoeprint evidence ever left his possession, Respondent argues that "[t]he best that can be said about when the shoeprint evidence was returned, is that it is unclear from the evidence conclusively when or how it was returned," and that "[t]he impeachment value of this point is marginal and could easily have been explained away by [Detective] Isenhour as an honest mistake, misunderstanding, misstatement, memory lapse, or the report itself could somehow be mistaken." (Id.) Similarly, with regard to the conflict between Detective Isenhour's testimony and the SBI Paint/Fiber Report regarding whether Petitioner's clothing left Detective Isenhour's possession, Respondent argued that "there could have been an honest explanation such as mistake, misunderstanding, misstatement, memory lapse, or the report itself could somehow be mistaken." (Id. at 40.)

The 2008 MAR court unreasonably applied Brady and Kyles in failing to deem favorable the evidence of conflicts between Detective Isenhour's testimony and the SBI Reports, as well as the evidence of the two differing versions of Detective Isenhour's summary reports. In particular, the 2008 MAR court failed to account for the impeaching value of the two differing versions of the summary reports, i.e., one which harmonized with Detective

33

Isenhour's testimony that he delivered only the shoeprint evidence to the SBI, and one that listed the numerous additional items of evidence Detective Isenhour delivered to the SBI about which he did not testify. (See Docket Entry 7-31 at 7, 12.)

Furthermore, Respondent's argument that the conflicts between Detective Isenhour's testimony and the SBI reports regarding whether evidence remained in his possession could have an innocent explanation, at most, would minimize, not eliminate, its impeaching character. A jury ultimately decides what inferences to draw from conflicting evidence. The evidence in question would have enabled Petitioner's trial counsel to impeach Detective Isenhour's testimony in front of the jury and therefore qualified as favorable under Brady.

In sum, the 2008 MAR court did not contradict or unreasonably apply Brady and/or Kyles in addressing the SBI Shoeprint Report, but did contravene and/or unreasonably apply that United States Supreme Court authority by failing to recognize the favorability of the SBI Paint/Fiber Report, the SBI Hair Report, the SBI Matches Report, Detective Isenhour's summary reports, and the victim's medical records. However, that error entitles Petitioner to no relief, because, as explained in more detail below, the 2008 MAR court neither contradicted nor unreasonably applied United States Supreme Court authority in concluding that Petitioner fell short on Brady's materiality prong.

2. <u>Suppression</u>

Petitioner contends that the 2008 MAR court unreasonably applied <u>Brady</u> and its United States Supreme Court progeny in concluding that Petitioner "'failed to prove by a preponderance of the evidence that the [s]tate failed to disclose the [SBI reports], Detective Isenhour's Crime Scene Identification Report, and the victim's medical records.'" (Docket Entry 1 at 67 (quoting Docket Entry 7-31 at 10).) With regard to the victim's medical records, Petitioner alleges that the 2008 MAR court "erroneously suggested throughout the MAR Order that the [District Attorney] maintained an open file policy in name only, and that defense counsel were actually required to seek information about [Petitioner's] case directly from . . . the hospital." (<u>Id.</u> at 69 (citing Docket Entry 7-31 at 4, 7-8, 12).) That argument fails.

<u>Brady</u> "does not compel the disclosure of evidence available to the defendant from other sources, including diligent investigation by the defense." <u>Stockton v. Murray</u>, 41 F.3d 920, 927 (4th Cir. 1994) (citing <u>United States v. Wilson</u>, 901 F.2d 378, 380 (4th Cir. 1990)(in turn quoting <u>United States v. Davis</u>, 787 F.2d 1501, 1505 (11th Cir. 1986))); <u>accord</u> <u>Barnes v. Thompson</u>, 58 F.3d 971, 975 & n.4 (4th Cir. 1995). The 2008 MAR court correctly found that Petitioner's trial counsel knew the victim received treatment at the hospital after the rape and neither subpoenaed her medical records from the hospital before trial, nor requested a recess

after Dr. Monroe's trial testimony to obtain the medical records. (See Docket Entry 7-31 at 7-8, 12; see also Docket Entry 7-27 at 14-15.)[14]

Petitioner additionally maintains that the 2008 MAR court unreasonably applied Brady (as construed in Strickler and Kyles) by concluding that the state did not suppress the SBI Paint/Fiber Report, the SBI Hair Report, and the SBI Matches Report. (See Docket Entry 1 at 67-70; see also Docket Entry 7-31 at 10.) In reaching that conclusion, the 2008 MAR court found as a fact that (1) "the District Attorney at that time followed a policy of 'open file' discovery, making information available to defense counsel without the necessity of filing a motion for discovery," and that "Bowers testified that the District Attorney's office relied upon the police department to provide it with all of the evidence the police collected in a case" (Docket Entry 7-31 at 3 (emphasis added)); (2) "Bowers stated unequivocally under oath that he had no idea that physical evidence in this case was sent for testing to the SBI or that the SBI generated reports," and that "the first time he saw [Detective Isenhour's summary reports] and the SBI [r]eports was when he received them a few weeks before th[e 2008 MAR hearing]" (id.). Through these two findings of fact, the

_____

[14] The 2008 MAR court found that the state did not suppress the SBI Shoeprint Report, because one of Petitioner's trial counsel, Karl Adkins, testified that he had received it (see Docket Entry 7-31 at 4; see also Docket Entry 7-26 at 88; Docket Entry 7-27 at 1, 12), and Petitioner does not appear to contest that finding (see Docket Entry 1 at 67-70; see also Docket Entry 9 at 25-26). In any event, as discussed above, that evidence did not favor Petitioner.

2008 MAR court essentially found that Petitioner's trial counsel could not have obtained the SBI reports and Detective Isenhour's summary reports from the prosecution.

However, the 2008 MAR court then placed the burden on Petitioner's trial counsel to obtain that evidence directly from law enforcement. The 2008 MAR court found that Bowers "rel[ied] upon law enforcement officers to provide discovery to defense counsel," expected to hear from defense counsel if those officers refused to provide counsel with access to their evidence, and that Bowers did not hear from Petitioner's counsel in that regard. (Id. at 4.) Additionally, the 2008 MAR court believed that Petitioner's trial counsel made "strategic decisions" not to "request[] the specifics of medical or other forensic evidence that might point toward [Petitioner]" and "cho[se] to rely upon perceived gaps in the proof known to the prosecutors and available for use at trial," and that such decisions "should not be allowed to be used to [Petitioner's] benefit after a conviction has occurred." (Id. at 9.) The 2008 MAR court ultimately concluded:

> Defense counsel testified that the [d]istrict [a]ttorney exercised an open file policy and directed them to law enforcement to obtain what they needed. Pursuant to State v. Anderson, 303 N.C. 185 (1981), [Petitioner's counsel's] failure to request what they needed from law enforcement cannot be used against the [s]tate.

(Id. at 10-11 (emphasis added).)

Petitioner argues that the 2008 MAR court's decision to "excuse[] the [s]tate from its affirmative duty to disclose Brady

37

material because of an apparent strategic decision made by trial counsel not to seek additional police reports or the victim's medical records . . . is contrary to . . . Brady and unsupported by the record." (Docket Entry 9 at 25.) According to Petitioner, "[p]rosecutors have an affirmative duty to obtain information in the possession of other state agencies and disclose it if favorable to the defense, regardless of whether it is requested by the defendant." (Id. (citing Kyles, 514 U.S. at 432-33, and United States v Agurs, 427 U.S. 97, 107 (1976)).) Moreover, Petitioner contends that, "'if a prosecutor asserts that he complies with Brady through an open file policy, defense counsel may reasonably rely on that file to contain all materials the [s]tate is constitutionally obligated to disclose under Brady.'" (Id. (quoting Strickler, 527 U.S. at 283 n.23) (emphasis added).)

Petitioner further points out that his "trial counsel testified at the MAR hearing that they relied upon the prosecutor's open file policy for all discovery in this case." (Id. (citing Docket Entry 7-26 at 78-80 (containing testimony of Adkins), Docket Entry 7-27 at 61-66 (recording testimony of Fuller), and Docket Entry 7-28 at 40-42 (reflecting prosecutor Bowers' testimony regarding open file policy in his office).) Thus, Petitioner argues, "under the Supreme Court's clearly established Brady jurisprudence, any evidence that was not disclosed by the State – i.e., that was not part of the [s]tate's file open to the defense

– was 'suppressed' for the purposes of <u>Brady</u>," and his "trial counsel could not have waived [Petitioner's] right to otherwise favorable and material evidence even assuming, <u>arguendo</u>, that they made strategic decisions to avoid investigative avenues that had the potential to inculpate [Petitioner]." (<u>Id.</u> at 25-26.)

The 2008 MAR court contravened the United States Supreme Court's <u>Brady</u> jurisprudence by improperly placing the burden on Petitioner's trial counsel to seek out favorable <u>Brady</u> material from law enforcement. Indeed, the Supreme Court addressed that very issue in <u>Kyles</u> as follows:

> [T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, <u>including the police</u>. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.
>
> The [s]tate . . . would prefer an even more lenient rule. It pleads that some of the favorable evidence in issue here was not disclosed even to the prosecutor until after trial, and it suggested below that it should not be held accountable under <u>Bagley</u> and <u>Brady</u> for evidence known only to police investigators and not to the prosecutor. <u>To accommodate the [s]tate in this manner would, however, amount to a serious change of course from the</u> <u>Brady</u> <u>line</u> <u>of cases</u>. In the [s]tate's favor it may be said that no one doubts that police investigators sometimes fail to inform a prosecutor of all they know. But neither is there any serious doubt that "procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it." <u>Giglio</u>[, 405 U.S. at 154]. Since, then, the prosecutor has the means to discharge the government's <u>Brady</u> responsibility if he will, any argument for excusing a prosecutor from

> disclosing what he does not happen to know about boils
> down to a plea to substitute the police for the
> prosecutor, and even for the courts themselves, as the
> final arbiters of the government's obligation to ensure
> fair trials.

Kyles, 514 U.S. at 437-38 (emphasis added) (footnote and some internal citations omitted).

Petitioner also challenges the 2008 MAR court's conclusion that the state did not suppress Detective Isenhour's summary reports (see Docket Entry 7-31 at 10), which the 2008 MAR court based on a factual finding that Petitioner's trial counsel had learned of those reports during Detective Taylor's testimony at trial (see id. at 7). (See Docket Entry 1 at 70-72; see also Docket Entry 9 at 26.) According to Petitioner, "[that] finding is an especially egregious misstatement of MAR and trial testimony and is unreasonable in light of the evidence presented." (Docket Entry 1 at 71.) Petitioner points out that, at the 2008 MAR hearing, the state asked Adkins, one of Petitioner's trial counsel, if he should have realized that he did not possess Detective Isenhour's summary reports when Detective Taylor testified at Petitioner's trial regarding an "identification report," and that Petitioner's post-conviction counsel then objected, arguing that Detective Taylor's trial testimony referred to the victim's initial statement to CPD Sergeant Jack Parnell on the night of the crime, and not to the summary reports. (Id.; see also Docket Entry 7-27 at 15-23.) Petitioner maintains that the 2008 MAR court then sustained his

post-conviction counsel's objection, and could not "form any conclusions" that Detective Taylor's testimony referred to Detective Isenhour's summary reports. (Docket Entry 1 at 71-72; see also Docket Entry 7-27 at 23.)

The 2008 MAR court unreasonably applied Brady in concluding that Petitioner "ha[d] failed to prove by a preponderance of the evidence that the [s]tate failed to disclose . . . Detective Isenhour's Crime Scene Identification Report." (Docket Entry 7-31 at 10.) During the hearing, the 2008 MAR court ruled:

> I'm going to sustain the objection [of Petitioner's post-conviction counsel] at this point based upon my reading of the transcript. It appears to me that [Detective Taylor] was in fact being examined as to [the victim's statement to [Sergeant] Parnell on the night of the crime]. And then the question was asked as to whether or not he could use the police reports "contained in front of [him] to refresh [his] recollection."
>
> Now, my conclusion from that is that there were additional reports to which he was referring, but as soon as he began his description of the reports the judge sustained the objection to that line of questioning and then the questions returned to . . . [the victim's statement to [Sergeant] Parnell on the night of the crime].
>
> Now, it appears that those were some additional police reports apparently prepared by some officers other than [Detective] Taylor. But as to exactly what they were, and certainly as to forming any conclusions that they were[] the documents [] now identified as [Detective Isenhour's summary reports], [I] certainly don't think that can be established through the testimony of this witness at this point.
>
> Next question.

(See Docket Entry 7-27 at 22-23 (emphasis added).)

In contrast, in denying relief, the 2008 MAR court found as a fact that, "at the original trial, when Detective Taylor indicated that other reports such as an Identification Report existed, defense counsel did not appear surprised or request a recess to review those reports . . . [and] failed to ask Detective Taylor or Detective Isenhour any questions about the report at the trial." (Docket Entry 7-31 at 7.)  Although the 2008 MAR court correctly found that Petitioner's trial counsel did not request a recess or question Detective Taylor about the reports in front of him (see Docket Entry 7-10 at 44-52), because the 2008 MAR court had earlier ruled that it could not determine whether those reports included Detective Isenhour's summary reports (see Docket Entry 7-27 at 22-23), the 2008 MAR court should not have drawn any inference adverse to Petitioner regarding suppression of the summary reports.

In short, although the 2008 MAR court reasonably applied Brady in concluding that the state did not suppress the SBI Shoeprint Report and the victim's medical records, the 2008 MAR court's conclusion that the state did not suppress the SBI Paint/Fiber Report, the SBI Hair Report, the SBI Matches Report, and Detective Isenhour's summary reports unreasonably applied clearly established federal law as set forth in Brady.  Nonetheless, because, as explained in more detail below, the 2008 MAR court did not contradict or unreasonably apply Brady and/or its United States

Supreme Court progeny in concluding that the evidence lacked materiality, Petitioner cannot obtain relief in this Court.

3. <u>Materiality</u>

Petitioner maintains that the 2008 MAR court "applied the incorrect standard for evaluating <u>Brady</u> materiality, thereby reaching a decision contrary to clearly established federal law." (Docket Entry 1 at 72; <u>see also</u> Docket Entry 9 at 22-23.) More specifically, Petitioner faults the 2008 MAR court for its conclusion that Petitioner had "'not shown <u>by a preponderance of the evidence</u> that . . . the result likely would have been different with the claimed evidence.'" (Docket Entry 9 at 22 (quoting Docket Entry 7-31 at 13) (emphasis added).) Petitioner contends that <u>Kyles</u> "instructs courts that, in determining <u>Brady</u> materiality, '[t]he question is <u>not</u> whether the defendant would <u>more likely than not</u> have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" (Docket Entry 1 at 72-73 (quoting <u>Kyles</u>, 514 U.S. at 434) (emphasis supplied by Petitioner).)

Here, the 2008 MAR court's phrasing of Petitioner's burden to show "<u>by a preponderance of the evidence</u> that . . . the result likely would have been different with the claimed evidence" (Docket Entry 7-31 at 13 (emphasis added)) does not match the standard adopted in <u>Kyles</u>:

43

> [A] showing of materiality <u>does not require demonstration</u>
> <u>by a preponderance</u> that disclosure of the suppressed
> evidence would have resulted ultimately in the
> defendant's acquittal . . . . [The] touchstone of
> materiality is a "reasonable probability" of a different
> result, and the adjective is important. <u>The question is</u>
> <u>not whether the defendant would more likely than not have</u>
> <u>received a different verdict with the evidence</u>, but
> whether in its absence he received a fair trial,
> understood as a trial resulting in a verdict worthy of
> confidence. A "reasonable probability" of a different
> result is accordingly shown when the government's
> evidentiary suppression "undermines confidence in the
> outcome of the trial."

<u>Kyles</u>, 514 U.S. at 434 (quoting <u>Bagley</u>, 473 U.S. at 678) (internal

citations omitted) (emphasis added).

However, in another conclusion of law, the 2008 MAR court

indicated that the withheld evidence would have had <u>no</u> impact on

the outcome of the case:

> As to the cumulative [e]ffect of the items of evidence
> the defense alleges they did not receive, th[e] court
> finds, based on the findings of fact and conclusions of
> law stated herein, that the contents of several of the
> items the defense alleges they did not receive were fully
> addressed in front of the jury; that other materials
> contained in the reports were more favorable to the
> [s]tate's case than [Petitioner's]; and that any
> remaining matters that were not presented to the jury
> were of little or no value to the case as a whole; and
> that cumulative [e]ffect of any items with any value is
> so minimal that it would have had <u>no impact on the</u>
> <u>outcome of the trial</u>.

(Docket Entry 7-31 at 13 (emphasis added).) Because the 2008 MAR

court found that <u>no</u> chance of a different outcome existed, by

logical extension, the 2008 MAR court concluded that Petitioner had

not shown a "reasonable probability" of a different outcome.

In determining whether the withheld evidence raises "a reasonable probability that the result of the trial would have been different, a court must consider the aggregate effect that the withheld evidence would have had if it had been disclosed." Juniper v. Zook, 876 F.3d 551, 568 (4th Cir. 2017) (internal quotation marks and citations omitted). "In order to determine the aggregate effect of the withheld evidence, the court must both add to the weight of the evidence on the defense side all of the undisclosed exculpatory evidence and subtract from the weight of the evidence on the prosecution's side the force and effect of all the undisclosed impeachment evidence." Id. (internal quotation marks, brackets, and ellipses omitted).

Petitioner contends that the suppressed evidence qualifies as material, because his trial counsel could have used such evidence to "(1) more credibly attack the victim's identification of [Petitioner], (2) impeach Det[ective] Isenhour's testimony concerning which evidence he took to the SBI for analysis and whether it was always in his custody and control, and (3) more generally discredit the police investigation." (Docket Entry 1 at 73.) According to Petitioner, the withheld evidence rates as "material under Brady because its cumulative effect on the jury

would have been significant in a case that relied so heavily upon a questionable eyewitness identification."  (<u>Id.</u>)[15]

As an initial matter, Petitioner's attempt to discredit the strength of the victim's identification of Petitioner fails.  In connection with its discussion of the actual innocence issue, the Petition attacks the identification (see <u>id.</u> at 44-51), including by describing it as "highly unorthodox and suggestive" (<u>id.</u> at 46).  However, the Petition does not assert that the admission of the identification violated his federal constitutional rights, but instead raises only the <u>Brady</u> claim discussed herein.  (See <u>id.</u> at 54-77.)  Moreover, Petitioner challenged the identification as unconstitutionally suggestive on direct appeal, see <u>Long</u>, 293 N.C. at 289, 237 S.E.2d at 730, and the North Carolina Supreme Court expressly rejected that challenge on the merits, see <u>id.</u> at 290, 237 S.E.2d at 730 ("Having reviewed the totality of circumstances surrounding the pretrial courtroom identification, we conclude that there was no constitutional violation in the manner in which it was conducted."); <u>see also</u> <u>id.</u> at 290-91, 237 S.E.2d at 731 (finding "little likelihood of mistaken identification" where the victim "had ample opportunity to view the criminal at the time of the

---

[15] Although Petitioner maintains that "[t]he materiality determination is strengthened further by the additional consideration of the newly discovered latent fingerprint evidence discovered by the defense in 2015" (Docket Entry 1 at 73-74), the Court must restrict its analysis under Section 2254(d)(1) to the record before the 2008 MAR court, see <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011) ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."), which did not include the latent fingerprint evidence discovered in 2015.

crime, . . . recognized [Petitioner] as soon as he walked by her to approach the bench[,] . . . did not identify another person as her assailant[,] and . . . averred that she had no doubt in her mind whatsoever that [Petitioner] was the man who raped her"). Petitioner neither alleges that the United States Supreme Court reversed that ruling on certiorari review (see Docket Entry 1 at 12), nor challenged the victim's identification as impermissibly suggestive in his first Section 2254 petition in this Court (see Docket Entry 7-41 at 5-6; see also Docket Entry 7-43). Therefore, the North Carolina Supreme Court's holding on this point (not challenged in this Petition) binds this Court.

Further, as the 2008 MAR court reasonably found as fact, the victim (1) "recognized [Petitioner] by the way he walked, the way he talked, his voice, his face, his profile, the color of his skin and his mannerisms," and (2) informed law enforcement after identifying Petitioner at his court hearing and shortly thereafter in the second photo array that "there [wa]s no doubt in [her] mind that [Petitioner wa]s the man that raped [her]." (Docket Entry 7-31 at 9; see also Docket Entry 7-6 at 38, 45; Docket Entry 7-7 at 15-16, 37; Docket Entry 7-8 at 14-15.) Nor do the analyses and conclusions in the SBI Paint/Fiber Report, the SBI Hair Report, and the SBI Matches Report undermine the victim's identification in any material way. None of that evidence exculpates Petitioner, inculpates any alternative suspects, calls into question the

victim's ability to observe Petitioner's face during the attack, exposes any biases or motivations for the victim to falsely identify Petitioner, or diminishes the victim's credibility as a witness. (See Docket Entry 7-36 at 31-40, 43-51.) Given these considerations, this Court should reject Petitioner's characterization of the identification evidence as "questionable" (Docket Entry 1 at 73), and instead should adhere to the North Carolina Supreme Court's conclusion that the "[e]vidence of [Petitioner's] guilt was clear," Long, 293 N.C. at 296, 237 S.E.2d at 734.

As to the SBI Paint/Fiber Report, the 2008 MAR court found as follows:

> [Special] Agent Cone testified at the hearing that items do not adhere well to leather, especially after fifteen days. . . .
>
> At the trial, defense counsel argued to the jury that nothing was found on [Petitioner's] clothing. During closing arguments, defense counsel said "White house. White paint. White columns. White drain spout. White siding. White windows. White frame. White boards, and black jacket without one trace of white paint anywhere on it. And black leather gloves without one trace of white paint on them, and I say to you, ladies and gentlemen, that taking everything the [s]tate has said, that one cannot shimmy up a pole, or drain pipe at the place where they found the footprint – and a black leather jacket, and not have white paint on it."
>
> . . .
>
> At the [2008] MAR hearing, both the expert for the [s]tate and the defense testified that the absence of evidence was not evidence of [absence] and the lack of fibers or fragments did not exonerate [Petitioner].

(Docket Entry 7-31 at 6 (internal citation omitted).)  In addition, the 2008 MAR court noted that "the jury observed these items for themselves and the defense argued that nothing on these items contained materials from the victim's home."  (Id. at 12.)

The 2008 MAR court correctly applied Brady jurisprudence in concluding that the SBI Paint/Fiber Report lacked materiality as cumulative to trial evidence and the defense's argument to the jury.  See Richardson v. Branker, 668 F.3d 128, 146 (4th Cir. 2012) (noting that, "despite the fact that [the petitioner] did not have a sketch of item 41 at his disposal, his counsel was able to elicit testimony concerning the type of shoeprints on item 41 and the fact that those prints were inconsistent with [the petitioner's] shoeprint," and concluding that "the sketches of item 41 do not add any substance to [the SBI agent's] testimony and, therefore, do not constitute Brady material for this purpose"); McHone v. Polk, 392 F.3d 691, 701 (4th Cir. 2004) (holding that undisclosed evidence does not support relief under Brady if consistent with trial testimony or merely cumulative).

Regarding the SBI Matches Report, the 2008 MAR court found as follows:

> [Special] Agent Cone's report indicated, and he testified at this hearing, that he could not do a comparative analysis because the matches found at the crime scene had been burned down too low.  There was at least one matchbook that was found in [Petitioner's] car that could not be ruled out as the source of two matches found at the crime scene.  [Special] Agent Cone testified at th[e 2008 MAR] hearing that matches are consumable especially

> by a smoker which he believed [Petitioner] to be due to
> the marijuana he found in [Petitioner's] jacket and the
> rolling paper wrapper submitted with the jacket.

(Docket Entry 7-31 at 6-7.) The 2008 MAR court then concluded that

Petitioner failed to establish materiality, "because [Special]

Agent Cone could not definitively say that the matches found at the

crime scene did not match the matchbooks found in [Petitioner's]

car . . . ." (Id. at 12.)

Concerning the SBI Hair Report, the 2008 MAR court found as

follows:

> At the [2008] MAR hearing, both the [s]tate and
> [Petitioner] called expert witnesses qualified in the
> field of hair analysis. Both the [s]tate's expert and
> [Petitioner's] expert agreed that [Special] Agent Glesne
> could not determine if the random hair was human or
> derived from an animal. Several characteristics of the
> hair prevented definitive analysis. Those
> characteristics included the following: the heavy
> pigmentation of the hair prevented an observation of the
> interior structure of the hair; the scale structure was
> so worn down that [Special] Agent Glesne described it as
> "unidentifiable"; the medulla of the hair was at least
> 1/3 to 1/2 inches in diameter, which is wide for human
> hair; and the hair did not contain a root ball which is
> key in determining the origin of the hair.
>
> In addition, the potential sources of the hair were
> innumerable. On the day of the rape, the victim had
> entertained a nephew and others who walked through the
> hallway where the hair was found, the victim had attended
> church and had walked through the post office before
> returning home the day of the rape[.] Hours before the
> rape, the victim testified at trial that she had made
> preparations for a beach trip, pulling clothes, suitcases
> and other items out of closets and was "all over the
> house packing and cooking dinner." After the victim
> reported the rape, three law enforcement officers arrived
> at her home and searched the house, and tracking dogs
> were led throughout the home in order to obtain the
> rapist's scent.

[Special] Agent Remy testified at the hearing that all of
these individuals could have tracked in hair that was
found in the hallway via a primary or secondary transfer.
Furthermore, she testified that there was no way to know
how . . . long the hair had been there or how old it was
which means that it could have been transferred there
days, weeks, or months earlier.

[Special] Agent Glesne . . . also examined the victim's
clothing.   [Special] Agent Glesne found only brown
Caucasian hairs in the victim's underwear.  There is no
dispute that a black male committed the rape. [Special]
Agent Glesne did not compare those hairs to the
victim['] and did not exclude the victim as a source of
the hairs found in her underwear.  The victim testified
at trial that the rapist tore all of her clothes off
before the actual rape occurred.  In addition, the victim
never put on those clothes again. [Special] Agent Remy
testified that a transfer of hair occurs in less than 20%
of sexual encounters.

(Id. at 5 (internal citations omitted).)

The 2008 MAR court then concluded:

[B]ecause the original analyst could not determine
whether the hair was human, could not determine the race
of the person from whom the hair originated, and the
potential sources of the hair were too numerous,
[Petitioner] has failed to prove by a preponderance of
the evidence that the contents of th[e SBI Hair Report]
were material . . . .  The rapist had torn the clothing
off the victim and the victim never put the clothing on
again.  The only hair recovered was Caucasian, like the
victim's.  In fact, it was most likely the victim's own
hair.  The victim consistently testified that a black man
raped her, yet no negroid hair was found in her clothing.
Thus, the rapist did not transfer hair to the victim's
clothing, which is consistent with [Special] Agent Remy's
testimony that hair transfers do not occur in 80% of
sexual encounters.

(Id. at 11-12.)

Notably, Petitioner did not expressly attack any of the 2008

MAR court's above-quoted findings of fact as unreasonable in light

51

of the evidence presented at the hearing, or <u>specifically</u> challenge the 2008 MAR court's conclusions of law regarding the materiality of the SBI reports in question. (<u>See</u> Docket Entries 1, 9.) To the extent Petitioner argues that the impeaching nature of the withheld evidence could have weakened the strength of the victim's identification of Petitioner, that argument also fails. Detective Isenhour played <u>no</u> role in the victim's identification of Petitioner - he did not take the victim's statement immediately after the rape at her neighbor's house (<u>see</u> Docket Entry 7-9 at 2-3, 10-12 (testimony of Sergeant Parnell), he did not take the victim's statement at the hospital (<u>see</u> Docket Entry 7-8 at 50-51 (testimony of victim); <u>see also</u> Docket Entry 7-9 at 20-25 (testimony of Detective Taylor)), he did not show the victim the first photographic array at the hospital (<u>see</u> Docket Entry 7-9 at 25-26 (testimony of Detective Taylor)), he did not take the victim to court to identify a suspect in person (<u>see</u> Docket Entry 7-8 at 7-15 (testimony of victim); <u>see also</u> Docket Entry 7-9 at 26-34 (testimony of Detective Taylor)), and he did not show the victim the second photographic line-up at the police station (<u>see</u> Docket Entry 7-8 at 15-16 (testimony of victim)).

Petitioner asserts that his trial counsel could have used the withheld evidence to "impeach Det[ective] Isenhour's testimony concerning which evidence he took to the SBI for analysis and whether it was always in his custody and control." (Docket Entry

1 at 73.)  As discussed above, the two differing versions of Detective Isenhour's summary reports, as well as the SBI Paint/Fiber Report, SBI Matches Report, and SBI Hair Report, would have had some tendency to impeach Detective Isenhour as to his general credibility and the scope of the physical evidence collected and tested.  However, such impeachment would not change the substance of the reports at issue, which do not exculpate Petitioner, do not attack the state's theory of what happened, and do not affirmatively point to another perpetrator.  See Spicer v. Roxbury Corr. Inst., 194 F.3d 547, 561 (4th Cir. 1999) (noting importance of "the salience of the subject matter of the impeachment" and finding that "[i]mpeachment . . . relating to the central issue that the jury was required to decide is a far more serious blow to the prosecution's case" (emphasis added)); United States v. Avellino, 136 F.3d 249, 257 (2d Cir. 1998) ("In general, evidence whose function is impeachment may be considered to be material where the witness in question supplied the only evidence linking the defendant to the crime . . . [or] the only evidence of an essential element of the offense." (citations omitted) (emphasis added)); Gilday v. Callahan, 59 F.3d 257, 272 (1st Cir. 1995) ("[T]he evidence here taken cumulatively sheds no new light on the crime or [the] petitioner's involvement in it."); United States v. Willis, 43 F. Supp. 2d 873, 889 (N.D. Ill. 1999) ("[T]he [c]ourt does not accept, as [the petitioners] seem to suggest, that the

jury reasonably would have ignored the picture of factual guilt and acquitted [the petitioners] in reaction to the character of the [g]overnment's witnesses.").

Petitioner also contends that his trial counsel could have utilized the suppressed evidence to "more generally discredit the police investigation." (Docket Entry 1 at 73.) As discussed above, Petitioner's argument that the 2008 MAR court "ignored" the fact that his trial counsel could have relied on the SBI Hair Report to demonstrate "the [s]tate's failure to preserve the crime scene and conduct a reasonably diligent effort to identify the sources of the hair collected at the scene" (id. at 61) fails to demonstrate the SBI Hair Report's materiality, because Petitioner explained neither how the existence of potential sources of hair who interacted with the victim prior to the rape could demonstrate the state's failure to preserve the crime scene, nor how the appearance of police officers and tracking dogs at the scene in response to the victim's 911 call would amount to a failure to preserve the scene. As analyzed above, Petitioner's contention that his trial counsel could have utilized the SBI Hair Report to attack Special Agent Glesne's failure to determine whether "the hairs he believed to be Caucasian found in the victim's underwear" actually belonged to the victim (id.) also falls short, because Petitioner put forth no support for his highly speculative assertion that a pubic hair that an expert hair analyst like

Special Agent Glesne categorized as Caucasian could belong to a "'light-skinned' or 'yellow-looking' black man" (id. (quoting Docket Entry 7-8 at 36, and citing Docket Entry 7-29 at 33)). See Wood v. Bartholomew, 516 U.S. 1, 6–7 (1995) (rejecting Brady claim because withheld evidence's influence on outcome of case too speculative); Gloeckner v. Youngblood, No. 1:12-CV-00935-BAM HC, 2012 WL 6719557, at *6 (E.D. Cal. Dec. 26, 2012) (unpublished) (holding that "mere speculation that there might have been something useful for impeachment purposes in those reports is not sufficient to demonstrate a Brady violation").

The missing biological evidence would have had some tendency to discredit the caliber of the CPD's investigation, but two facts significantly lessen the potential impact of that evidentiary loss on the outcome of the trial. First, Dr. Monroe testified that he aspirated spermatozoa from the victim and examined it under a microscope, but he did not testify that he in any way linked that spermatozoa to Petitioner. (See Docket Entry 7-9 at 15-18.) Thus, even without the rape kit in evidence, Petitioner possessed the ability to argue that the state failed to make any meaningful use of the biological evidence, such as connecting it to Petitioner.[16] Indeed, Petitioner's trial counsel argued in closing to the jury: "No evidence that any skin, hair, or anything the [s]tate can

---

[16] Notably, Petitioner's trial counsel chose not to ask Dr. Monroe a single question on cross-examination, including whether or not he had performed any further testing on the spermatozoa or whether any other entity conducted such testing. (See Docket Entry 7-9 at 18.)

connect with [Petitioner][, n]one of that was brought here, and if
it exist[s], we don't know about it, and maybe it wouldn't fit this
man, if it exist[s]." (Docket Entry 7-13 at 45 (emphasis added).)
Arguing that the jury should discredit the state's investigation
because the state could not locate the biological evidence raises
a less compelling point than arguing, as Petitioner's trial counsel
did, that the state did not connect any such evidence to
Petitioner.

Second, Petitioner's argument improperly assesses the
materiality of the missing biological evidence from the vantage
point of the current day, rather than from the time of trial (i.e.,
1976). In 1976, DNA testing did not exist, and the only available
testing for semen merely could categorize the perpetrator as a
"secretor" (i.e., an individual who secretes his blood type in
bodily fluids, including semen - approximately 80% of the
population) or a "non-secretor" (approximately 20% of the
population). (Docket Entry 7-26 at 31, 68-70.) In contrast,
modern-day criminal juries, largely due to the multitude of
forensic crime shows on television, place much more weight on the
presence (or absence) of biological evidence (and especially DNA
evidence) that can identify perpetrators with precision. See,
e.g., United States v. Fields, 483 F.3d 313, 355 & n.39 (5th Cir.
2007) ("In this age of the supposed 'CSI effect,' explaining to the
jury why the [g]overnment had little in the way of physical or

scientific evidence was arguably critical to the [g]overnment's case."); Sweney v. Department of Corr. (Groveland Corr. Fac.), No. 09-CV-0119 VEB, 2011 WL 1376766, at *8 (W.D.N.Y. Apr. 11, 2011) (unpublished) ("Some researchers have recently noted that the plethora of television programs emphasizing forensic evidence such as CSI, NCIS, Law and Order, and Cold Case, have engendered an unrealistically high expectation by the public that forensic evidence is required for proof of guilt, thereby creating a heightened burden for the prosecution. *E.g.*, Michael Asimov, LAWYERS IN YOUR LIVING ROOM: LAW ON TELEVISION (ABA Publisher) (2009) (reporting results from a study involving the opinions of mock jurors in Los Angeles, California about the importance of DNA evidence; stating that 88 percent of the Los Angeles mock jurors surveyed thought that DNA evidence should be analyzed in all criminal cases and concluding that the 'high percentage of belief in DNA evidence correlates to the CSI effect').").

In sum, considering the evidence at issue in the aggregate, i.e., "add[ing] to the weight of the evidence on the defense side all of the undisclosed exculpatory evidence and subtract[ing] from the weight of the evidence on the prosecution's side the force and effect of all the undisclosed impeachment evidence," Juniper, 876 F.3d at 568 (internal quotation marks, brackets, and ellipses omitted), the 2008 MAR court reasonably applied the United States

Supreme Court's <u>Brady</u> jurisprudence in concluding that the evidence in question, considered cumulatively, did not qualify as material.

**B.  Motion for Leave to Conduct Discovery**

Petitioner has moved for discovery under Rule 6 of the Rules Governing Section 2254 Cases on the following topics:

> (i) the late disclosed crime scene fingerprints; (ii) potential alternative suspects identified in the files of the [NCIIC], CPD, and the [District Attorney's] [o]ffice; (iii) the completeness of the State's compliance with obligations under <u>Brady</u> following the untimely disclosure of suspect fingerprints and the 2005 production of favorable, exculpatory SBI lab reports; and (iv) files and communications between agencies regarding alternate suspects and crime scene evidence that provided no match to [Petitioner].

(Docket Entry 10 at 4.)

Petitioner seeks to pursue those topics by "obtain[ing] files from the [CPD], the [NCIIC], and the District Attorney's Office for Cabarrus County, and [by] tak[ing] the depositions of . . . former [CPD] detective Van Isenhour and District Attorney Roxanne [sic] Vaneekhoven[,] . . . the [CPD,] and the [NCIIC]." (<u>Id.</u> at 1; <u>see also</u> Docket Entry 11 at 6-7 ("[Petitioner] seeks production of the following documents: (1) [NCIIC] file for Petitioner's case; (2) Cabarrus County [District Attorney's] file for Petitioner's case; (3) [d]ocuments related to any fingerprint match search conducted in connection with the underlying criminal case and/or Petitioner's innocence claim; and (4) [a]ny files and communications between agencies regarding alternate suspects and crime scene evidence that provided no match to [Petitioner].").)  Respondent opposes

discovery, arguing that Petitioner has failed to demonstrate good cause for his requests. (See Docket Entry 13.)

"Unlike other civil litigants, a § 2254 habeas petitioner 'is not entitled to discovery as a matter of ordinary course.'" Stephens v. Branker, 570 F.3d 198, 213 (4th Cir. 2009) (quoting Bracy v. Gramley, 520 U.S. 899, 904 (1997)). Instead, to conduct discovery, a habeas petitioner "must provide reasons for the request," Rule 6(b), Rules Governing Sect. 2254 Proceedings, that establish "good cause," Rule 6(a), Rules Governing Sect. 2254 Proceedings. "A showing of good cause must include specific allegations suggesting that the petitioner will be able to demonstrate that he is entitled to habeas corpus relief." Stephens, 570 F.3d at 204. Moreover, "[a]n evidentiary hearing is not a fishing expedition for facts as yet unsuspected, but is instead an instrument to test the truth of facts already alleged in the habeas petition." Lenz v. Washington, 444 F.3d 295, 304 (4th Cir. 2006) (internal quotation marks and citation omitted).

1. Discovery Related to the SBI Evidence

Petitioner seeks discovery regarding "the completeness of the State's compliance with obligations under Brady following . . . the 2005 production of favorable, exculpatory SBI lab reports; and files and communications between agencies regarding . . . crime scene evidence that provided no match to [Petitioner]." (Docket

Entry 10 at 4 (internal parenthetical numbering omitted).)
Petitioner lacks good cause for such discovery.

The United States Supreme Court has made clear that,
"[a]lthough state prisoners may sometimes submit new evidence in
federal court, AEDPA's statutory scheme [as codified in § 2254] is
designed to strongly discourage them from doing so." Cullen v.
Pinholster, 563 U.S. 170, 186 (2011) (emphasis added). In this
regard, if a state prisoner's petition under § 2254:

> includes a claim that has been "adjudicated on the merits
> in State court proceedings" . . . that [petition] "shall
> not be granted with respect to such a claim unless the
> adjudication of the claim":
>
> > "(1) resulted in a decision that was contrary to,
> > or involved an unreasonable application of, clearly
> > established Federal law, as determined by the
> > Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an
> > unreasonable determination of the facts in light of
> > the evidence presented in the State court
> > proceeding."

Id. at 181 (quoting 28 U.S.C. § 2254(d)) (internal brackets and
ellipses omitted). "This is a difficult to meet and highly
deferential standard for evaluating state-court rulings, which
demands that state-court decisions be given the benefit of the
doubt." Id. (internal citations and quotation marks omitted).[17]

In light of that principle, the Cullen Court held that, "[i]f
a claim has been adjudicated on the merits by a state court, a

---

[17] "Section 2254(d) applies even where there has been a summary denial [of
the claim in state court]." Cullen, 563 U.S. at 187.

federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." Id. at 185 (emphasis added). Because "§ 2254(d)(2) includes the language 'in light of the evidence presented in the State court proceeding,'" the restriction of federal review under that provision to the state court record applies with "additional clarity." Id. at 185 n.7. Thus, any new evidence unearthed during discovery in federal court and "later introduced in federal court is irrelevant to § 2254(d)(1) [and (2)] review," id. at 184. In other words, because the state court adjudicated Petitioner's Brady claim on the merits, and Petitioner must satisfy the terms of § 2254(d), "good cause" does not exist for the discovery Petitioner seeks (at least prior to the analysis required under § 2254(d)), because this Court may look only to the state court record in applying § 2254(d).

A second reason supports a finding that Petitioner has not shown good cause for certain discovery related to the SBI evidence. Petitioner seeks to depose Detective Isenhour. (See Docket Entry 11 at 6.) At the 2008 MAR hearing, Petitioner specifically requested and received permission to procure the attendance of Detective Isenhour, who resided outside of North Carolina at that time. (See Docket Entry 7-24 at 5-11.) Moreover, the record reflects that the lead CPD officer involved in the investigation of

the underlying crimes, Detective Taylor, attended the 2008 MAR hearing. (See Docket Entry 7-25 at 15-21.)

Thus, Petitioner previously had the opportunity to call Detectives Isenhour and Taylor as witnesses and to question them about their compliance with Brady at the time of Petitioner's trial, their efforts to comply with the state court's 2005 order to locate and preserve evidence, and their knowledge of any files and communications with other agencies regarding crime scene evidence submitted to the SBI that did not inculpate Petitioner. However, Petitioner chose not to call Detective Isenhour or Detective Taylor as witnesses at the 2008 MAR hearing (see Docket Entries 7-24 to 7-30), a decision which forecloses a finding of good cause. See Isaacs v. Head, 300 F.3d 1232, 1250 (11th Cir. 2002) (observing that the petitioner did "not explain why the discovery that he seeks now is any different from the discovery that was available to him in state courts" and that, under such circumstances, "the district court properly denied the petitioner's request to conduct additional discovery . . . because he [did not] show[] 'good cause' as required by Rule 6(a)").[18]

Petitioner also seeks to depose Vaneekhoven; however, she did not participate in Petitioner's trial and thus does not have first-

---

[18] Given Petitioner's opportunity at the 2008 MAR hearing to call Detectives Isenhour and Taylor as witnesses, the record flatly contradicts Petitioner's statement in his memorandum in support of his motion for discovery that he "has not been permitted to question under oath any responsible official about why Brady material was first disclosed in 2005 . . . ." (Docket Entry 11 at 3 (emphasis added).)

hand knowledge of the state's compliance with <u>Brady</u> at that time. (<u>See</u> Docket Entries 7-3 to 7-14.)   To the extent Petitioner now wishes to question Vaneekhoven regarding compliance with the state court's 2005 order to locate and preserve evidence, at least with regard to the evidence sent to the SBI, Petitioner's counsel could have identified Vaneekhoven as a material witness and could have moved to have her appear at the 2008 MAR hearing as a witness rather than an advocate.   Again, Petitioner's failure to pursue this avenue while in state court renders good cause for such discovery in federal court lacking.  <u>See</u> <u>Isaacs</u>, 300 F.3d at 1250.[19]

## 2.   Discovery Related to the 2015 Fingerprint Evidence

Petitioner also seeks discovery on "(i) the late-disclosed crime scene fingerprints; (ii) potential alternative suspects identified in the files of the [NCIIC], CPD, and the [District Attorney's] [o]ffice; (iii) the completeness of the State's compliance with obligations under <u>Brady</u> following the untimely disclosure of suspect fingerprints . . .; and (iv) files and communications between agencies regarding alternate suspects

_____

[19] Petitioner's failure to call Detective Isenhour, Detective Taylor, and/or Vaneekhoven as witnesses at the 2008 MAR hearing, at least in regards to the SBI evidence, also implicates the statutory bar against an evidentiary hearing on federal habeas review: "If the [petitioner] has failed to develop the factual basis of a claim in State court proceedings, the court <u>shall not</u> hold an evidentiary hearing on the claim unless the [petitioner] shows that the claim relies on a factual predicate that could not have been previously discovered through the exercise of due diligence; and the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the [petitioner] guilty of the underlying offense."   28 U.S.C. § 2254(e)(2) (emphasis added).

63

. . . ." (Docket Entry 10 at 4.) The Court will deny Petitioner's request for discovery on these topics for three reasons.

First, because the state court adjudicated Petitioner's <u>Brady</u> claim on the merits, and Petitioner must satisfy the terms of § 2254(d), "good cause" does not exist for the discovery Petitioner seeks (at least prior to the analysis required under § 2254(d)), because this Court may look only to the state court record in applying § 2254(d).

Second, although in appropriate circumstances, courts may consider matters outside of the state court record in connection with a gateway actual innocence claim, <u>see</u> <u>Cristin v. Brennan</u>, 281 F.3d 404, 417 n.14 (3d Cir. 2002) (holding that § 2254(e)(2) does not bar evidentiary hearings on whether a petitioner can establish cause and prejudice or actual innocence to excuse procedural default), the Court has determined that the interests of judicial economy favor proceeding directly to an analysis of Petitioner's <u>Brady</u> claim under § 2254(d) (which does not depend upon additional discovery), rather than beginning with consideration of Petitioner's gateway actual innocence question (which might involve additional discovery).

Third, on June 17, 2005, the state court granted Petitioner's counsel the right to examine the CPD's master case file (Docket Entry 7-20 at 20-22), which contained Detective Isenhour's two summary reports (Docket Entry 1-5, ¶ 5; <u>see also</u> Docket Entry 7-37

at 3-8).  In the more detailed of the two reports, Detective Isenhour reported that "[a] total of <u>68 latent lifts were recovered from the crime scene</u> (interior and exterior)" and that "<u>[a]ll prints have been repeat[ed]ly checked against suspect(s)</u> and no identifications have been made from the latents." (Docket Entry 7-37 at 4 (emphasis added).)[20]  In other words, by mid-2005, Petitioner had notice that Detective Isenhour had obtained latent fingerprint lifts from the crime scene, as well as that he had made comparisons of those lifts to "suspect(s)." (<u>Id.</u>)  Again, at the 2008 MAR hearing, Petitioner chose not to call Detective Isenhour and to question him under oath about those fingerprints and/or any "suspect(s)." Petitioner thus lacks good cause for his requests for such information in this Court. See <u>Isaacs</u>, 300 F.3d at 1250.

Accordingly, the Court will deny Petitioner's Motion for Leave to Conduct Discovery.

## V.  **Conclusion**

Petitioner's <u>Brady</u> claim fails under Section 2254(d) and he has not shown good cause for discovery.

**IT IS THEREFORE ORDERED** that Petitioner's Motion for Leave to Conduct Discovery (Docket Entry 10) is **DENIED.**

---

[20] The other report reflects that "the crime scene was processed for latent prints of value, using conventional methods of dusting and lifting" and that "[n]umerous prints were lifted, with some being eliminated by [Detective Isenhour] as those of the victim . . . ." (Docket Entry 7-37 at 7.)

**IT IS RECOMMENDED** that Respondent's Motion for Summary Judgment (Docket Entry 5) be granted, and that Judgment be entered for Respondent, without issuance of a certificate of appealability.

   /s/ L. Patrick Auld   
**L. Patrick Auld**
**United States Magistrate Judge**

May 22, 2018